FILED
CLERK
3/16/2023 10:31 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EUGENE SCALIA, *Secretary of Labor, U.S. Department of Labor,* | * | Case No. 20-CV-03273(WFK) |
| Plaintiff, | * | Long Island Federal Courthouse<br>100 Federal Plaza<br>Central Islip, NY 11222 |
| v. | * | |
| SARENE SERVICES, et al., | * | January 10, 2023 |
| Defendants. | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: BARBARA CARINA DE LA PAZ, ESQ.
HOLLIS VIRGINIA PFITSCH, ESQ.
U.S. Department of Labor
Office of the Solicitor
201 Varick Street, Rm 983
New York, NY 10014

For the Defendants: SUSAN J. DEITH, ESQ.
Law Offices of Joseph F. Kilada
100 Quentin Roosevelt Blvd
Suite 208
Garden City, NY 11530

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, CT 06484 (203)929-9992

(Proceedings commenced)

THE COURT: Scalia v Sarene Services, Inc., et al. 20cv3273. Can I have counsel please state your appearances for the record.

MS. DEITH: Yes, Your Honor.

MS. DE LA PAZ: Yes, Your Honor. Oh --

MS. DEITH: This is Susan -- oh, I apologize. Apologize, Beth.

MS. DE LA PAZ: No, go ahead.

MS. DEITH: Susan Deith, for the plaintiffs, Sarene Nursing Agency and Irene Manolias.

MS. DE LA PAZ: Yes. This is Carina De La Paz for the plaintiff, Secretary of Labor.

MS. PFITSCH: And Hollis Pfitsch, also for the Secretary of Labor. Excuse me.

MS. DEITH: And, Your Honor --

THE COURT: All right.

MS. DEITH: -- my client Irene Magnolias is trying to log on. She just texted me she's having a problem. I just entered the password again. I'm hoping -- oh, that may be her.

MS. MANOLIAS: Hello. Can you hear me?

MS. DEITH: Irene -- yes, Irene. I was just telling them that you were having a problem getting on, but now that you're on --

MS. MANOLIAS: I'm sorry. Yeah. I --

MS. DEITH: -- we're all here.

MS. MANOLIAS: I apologize. I don't know if I interrupted anybody. I just couldn't hear anything and then all of a sudden I heard everything. Good afternoon, everybody.

THE COURT: Good afternoon. All right.

So I guess two parts to the request. The first -- looking for some additional -- I guess, what are you -- what are you missing from the training materials that you were looking for?

MS. DEITH: There are sections of the training materials that are redacted, so I don't know what I'm missing, because there are large redactions. Sometimes almost an entire page. So I -- Your Honor, I can't tell you what I'm missing.

THE COURT: And what -- from the secretary, what's -- what are the information that has been redacted? What does it pertain to?

MS. DE LA PAZ: Yes, Your Honor. So the request was for wage and hour timing materials that have to do with interviewing techniques and how investigators perform employee interviews.

So we provided two things, and these are not generally publically available. But we gave some materials

from the Wage and Hour Basic One Training that they do, which is a 14-page document, and then that had some partial redactions for investigative techniques where, you know, we and the Fair Labor Standard provisions in DC felt that the material in those sections was particularly, you know, either had to do with strategy or something foreseeing future investigations.

And then we also provided part of Chapter 52C of the field operation handbook, which deals with employee interviews. That was a three-page document. That one only had one very small redaction, again from investigative files and techniques.

And, yeah, that was essentially -- we only redacted for investigative techniques in that production.

THE COURT: So anything pertaining to like interviews, and stuff like that, is already contained in what you've provided to --

MS. DE LA PAZ: Yes. And much of it was not redacted. You know, there were some pages in the basic training materials, but -- for example, on selecting interviewing, we've redacted part of that section because we felt that that got into sort of more strategic --

THE COURT: Strategy.

MS. DE LA PAZ: -- that wage and hour looks at. Yeah.

THE COURT: Okay. So what -- what are you, I guess, looking for in terms of the training materials?

MS. DEITH: Well, Your Honor, we're calling into question the entire investigative process, based on what we heard at Ms. Stahl's depositions.

And so we want to understand, and we believe we have a right to understand, what is expected of these investigators. What techniques they're supposed to use and whether or not they used them, because we just don't feel that Ms. Stahl did a proper investigation and their entire case is based upon the investigation that Ms. Stahl did.

So we certainly feel we're entitled to find out whether or not she followed the protocol and how she came about asking these questions and getting these responses. And it's difficult to impossible for us to prepare our case if we don't know if she did her job or not.

So I don't understand -- if the Department of Labor is so secure that she did her job and followed what she was supposed to do, I don't understand why they would be so reluctant to hand over the materials.

MS. DE LA PAZ: Your Honor, would you like us to respond to that?

THE COURT: I mean, I guess my basic question is what does that have to do with anything? I mean, whether or not she did the investigation -- I mean, I guess maybe to her

credibility but, you know, either the plaintiff has developed sufficient evidence to support their case through the investigation or not. I'm not -- I'm not sure --

MS. DEITH: Well, Your Honor, we --

THE COURT: -- what is it about the -- what is it about the investigation that you're saying was improper or --

MS. DEITH: We don't believe --

THE COURT: -- was not a good investigation --

MS. DEITH: -- that all of --

THE COURT: -- or --

MS. DEITH: Yeah. We do not believe that all the proper questions were answered. There were areas that were not covered.

Again, we -- this goes along with wanting to have the additional time to depose Ms. Stahl. And even if Your Honor were not inclined to give us any additional training materials, that would include what's been redacted, we certainly believe that we're entitled to the extra time to question her on the training materials that have been provided thus far, and also to be able to understand why she contradicted herself so many times throughout the deposition to find out whether she took notes or didn't take notes, which were two very discreet examples that I included in my motion letter, because there were numerous others, but I didn't want to overwhelm the Court with that. I pulled out

the --

THE COURT: Yes.

MS. DEITH: -- two that were the most obvious. So we -- we really need time to redepose her.

We would like to have the additional information about the training materials, but even if we were not going to be awarded that by the Court, with the additional training materials we have been given so far and all of these contradictions she has, we would like to have the opportunity to ask her questions regarding this.

THE COURT: You didn't -- you didn't have these training materials when you deposed her last time?

MS. DEITH: No, we did -- no, we did not.

THE COURT: Okay. And based on what I've heard so far I don't think there's a need to produce further training material information. I haven't heard --

MS. DE LA PAZ: Your Honor, can I respond to the -- to the point about the deposition?

THE COURT: Sure.

MS. DE LA PAZ: So at the -- so Investigator Stahl was deposed over two days, and it was, you know, several months apart, and on the second day, the topics of the questioning were really geared around the wage/hour methodology and how we (indiscernible) did this investigation and how the, you know, memorialized employee statements. So

we feel that the defendants have already had plenty of time to question Ms. Stahl about her methods.

And then after that deposition was over, we received the request for -- originally it was wage/hour methodology related to calculating computations and we provided some information about that.

And then we received another request for once counsel changed -- because there was a change in counsel, for materials related to interviewing. So we didn't get these requests until after the deposition was over and defendants did have, you know, plenty of time to already question her about wage hour methods and we don't believe that.

You know, maybe they didn't like some of the answers they got, but they certainly had time to ask questions, and if there was anything that they perceived as a contradiction between day one and day two, they had plenty of time to like point that out and follow up on it. So we don't think a second deposition is called for.

We would be open to answering some interrogatories on these topics, but we think that a deposition is kind of not proportional because, again, the investigation is not with (indiscernible) and that's not what our case is going to depend on at trial.

MS. MANOLIAS: Your Honor, am I allowed to say something?

THE COURT: I really think --

MS. MANOLIAS: (Indiscernible.)

THE COURT: -- you should -- you should talk through your attorney, but --

MS. DEITH: Yeah. Irene, I'll let you know when I --

MS. MANOLIAS: Oh, I'm sorry. I didn't -- I didn't understand if I was allowed to. I'm sorry.

MS. DEITH: Apologies, Your Honor.

THE COURT: That's okay.

MS. DEITH: Your Honor, our -- our client has been so forthright in providing ESI even when we didn't think it was necessary. My client has spent hundreds of thousands of dollars in defense of this. We've provided everything the Department of Labor has -- the Department of Labor has asked us for.

We believe that we are completely entitled to addition -- additional deposition time. We did not have this information as to what the questions were to be asked. What the investigative process was.

You can see that the deponent contradicted herself repeatedly and this warrant -- her credibility is called into question. The entire case is based on her investigation and her findings. And we certainly think that we're entitled to ask for additional questions based upon what we now know.

And I think it --

THE COURT: Well, let me --

MS. DEITH: I'm sorry, Your Honor.

THE COURT: Let me ask one question. There does seem to be a discrepancy, or at least a question about whether she had notes or not.

Did you ever ascertain what, if any, notes there were and produce them?

MS. DEITH: I did ask the Department of Labor and they gave us a response that really made no sense whatsoever. Let me just see if I can pull that up. I know I did print that out.

When we asked them if there were notes or not notes, they basically told us they provided everything they have and did not even answer the question. Let me see. I can -- I can get that right here.

THE COURT: Have they produced any notes to you?

MS. DEITH: No, they have not. No.

THE COURT: Are there -- are there any notes that the invest -- I can't imagine that the investigator took no notes during the entire investigation. That doesn't seem plausible.

MS. DE LA PAZ: So, Your Honor --

MS. DEITH: Right -- right -- I beg your pardon. Just a moment. Your Honor, I have here where I said evidence

of any notes or communications involving the Nicole Stahl relating to the methodology she used to determine the damages owed in this case.

Nicole testified that she could not recall whether she took any notes. Then she thought she did take notes. Please confirm whether notes were taken. And the response that I received was all documents responsive to this request were previously produced. There are no additional responsive documents.

Basically not answering the question as to whether or not there are any notes. And that's from an email from Carina and Hollis on March 24th of 2022.

MS. DE LA PAZ: Your Honor, can I -- can I respond to that?

THE COURT: Yes. Why don't you clarify that.

MS. DE LA PAZ: So, yeah. So during the deposition first of all, and this is part of why the transcript portions are a bit hard to glean is that, you know, Investigator Stahl was asked about different types of notes.

So we received a request in October for, you know, notes related to employee interviews and our response to that was -- and this is, you know, Ms. Stahl testified to -- is that during the investigation, she took contemporaneous notes during interviews. So she essentially would open a Word document. She would call the employee, and then as she was

doing interview, she would edit that Word document in real time and then she would review it with them, finalize it, and that is what became the employee's statement, and that statement didn't go through multiple revisions afterwards.

And this is something that Nicole talked about in her deposition that we also talked about off the record, because we felt that the questioning wasn't really getting into the -- what the real process is.

And then when they asked questions about -- then there was another part of the deposition where they were asking about whether Nicole took notes of the specific questions. Essentially, whether she had a list of questions that she was asking the employees and whether she took notes about the questions she was going to ask.

THE COURT: That's the --

MS. DE LA PAZ: And that is where she said no, like I ask, you know, pretty similar questions in every investigation. That's in my head. Don't really have notes of that.

Either way, we would say that a specific list of questions would be privileged for -- in various ways, but that's what where we think the contradiction is coming from.

And in our response in October, on October 28th, we sort of explained that this is what our position is on the notes. We did also produce -- in the case file there is, you

know, the case diary. There are various types of notes in the file itself that we produced during phase one.

So we're not really sure what else -- it seems like defendants are asking about, you know, things that -- like multiple drafts of employee statements, which just don't exist, and we've told them that.

THE COURT: I see. So the -- she basically took her notes directly into what became the statement?

MS. DE LA PAZ: Right. As she was talking to them --

THE COURT: So she like handwrote notes --

MS. DE LA PAZ: -- she edited the --

THE COURT: -- and then like edited and then created a statement after the fact.

MS. DE LA PAZ: Right. She was type -- she was like doing it all in real time and typing it up.

MS. DEITH: But, Your Honor, she clearly says I don't take any -- I didn't write anything down. It's -- no, it's probably in my head. And quite frankly, with all due respect, we're entitled to ask these questions of the investigator, not to be getting secondhand answers from one of her attorneys.

I mean, there are clear contradictions throughout the deposition and we have preening materials now that we should be entitled to ask her questions on.

Again, Your Honor, we have been so forthcoming with all the discovery on our end and we're not asking them for very much at all.

THE COURT: All right. Well, look, I -- at the very least, I think you're entitled to ask her about the training materials. So I'll give you a limited extension to the deposition to ask her about any of the new materials that you've received since the deposition.

If you want to clarify directly with the witness, as you probably should, exactly what the note situation is, I mean, it's probably a good idea.

MS. DEITH: Yes. That would be very --

THE COURT: If there -- if there are other notes that haven't been produced, they probably should be unless they're privileged in some manner.

If there are no other notes and you want to get that clarification, that's -- I think that's probably a good idea to clarify that, what -- what has been, you know -- if there are no other notes, then that's fine. You know, but I can understand the need to get some clarity on that issue. So feel free to ask --

MS. DEITH: Okay.

THE COURT: -- about the -- that and, you know, question her about the training materials.

At this point, at least, I don't see any basis for

additional training materials beyond what you have, and I definitely don't see any need to do forensic analysis of her computer without more.

You know, there's some vague references to, you know, not trusting the investigation, but you're going to need a lot more than that. Some kind of specific allegation of tampering or something that would make any of that like even remotely relevant.

MS. DEITH: Okay. So then, Your Honor, would we have a leave then to renew that motion after the deposition if something comes up?

THE COURT: Yes. If you have some specific reason why you would need it. But like the vague kind of allegations you have in this motion are nowhere near what you would need to get that kind of stuff. It's way out of proportion to the needs of the case.

MS. DEITH: All right. Well, Your Honor, to be clear, it was really just to verify when the notes were taken and that no changes were made as the case progressed. It wasn't to find anything substantive in the notes.

It was really just that we were concerned because of our testimony being so contradictory, we had concerns that she might have gone back and changed some of the notes that she took and the metadata from the forensic examination of the computer would give that information.

Again, it's nothing substantive. It's really just verifying the --

THE COURT: You can ask for -- you can ask for metadata in the discovery request. And then --

MS. DEITH: Okay.

THE COURT: -- most of the time, that's fine. But asking for a forensic analysis of her computer is way beyond that.

MS. DEITH: Oh, then that's my misunderstanding, Your Honor. I thought that was necessary in order for us to get the metadata.

THE COURT: No --

MS. DEITH: So we can ask --

THE COURT: -- you can --

MS. DEITH: -- okay. So we can ask for the metadata on each of the reports. When they were created. When they were finalized, and so on. That's what you would ordinarily get if you were to right click and get properties on a file.

THE COURT: You know, it depends on what -- like, I'm not a computer whiz, but I know that depending on how the files are saved and what program they used and what database, if any, they're in, the metadata is potentially different.

So I don't know exactly what information you would get from it. You would have to ask for it and see.

MS. DEITH: Okay. No problem. I can check with Avalon that is our ESI company and I'm sure we can come up with the proper questions to ask. I appreciate that.

MS. PFITSCH: Your Honor, if I may --

MS. DE LA PAZ: I mean, you're -- yes. I'm sorry.

MS. DEITH: Go ahead.

MS. DE LA PAZ: No, no, no, no. Go for it.

MS. PFITSCH: The discovery request -- new discovery request would have needed to be served, and this is an issue defendants have been -- has been on their radar for a long time.

And I think that obviously if -- if like you're saying the basis for additional discovery came up at the deposition that you're allowing, then I could see renewed request.

But at this point, I think it's too late for defendants to ask for the metadata, given the timing that this has been an open issue for a long time. We're now at the close of discovery and it -- we should be limited to the issues that have already emerged.

And as you're saying, there's no basis -- the defendants have not shown a proper basis to get a forensic exam. And you've given them an opportunity to explore this. It's an additional issue. That seems sufficient and should be limited to that at this point.

MS. DEITH: But your -- Your Honor basically said that we don't need the entire forensic examination. That we can obtain the information we're looking for by asking for the metadata, and I did ask for that information prior to the close of discovery. It was part of this motion.

So I don't see how you can argue that this is outside of something I've already asked for when I'm just willing to take a more narrow version as a result of something I've already requested. This isn't new.

MS. DE LA PAZ: Well, and we have outlined -- Your Honor, we've outlined in our letter a number of ways in which the kinds of information defendants seek is available short of -- it -- it's not -- you don't need metadata in order to get it and some of the information they've had in the case file.

I just wanted to say that I don't -- I think that it's -- the time to issue new requests are -- and even new format is metadata could be -- I'm not sure how we would get it and the burden that it would require or if it even exists.

But there -- as we've outlined in our letter, there are some ways in which defendants can -- have had some of the data about the dates of interviewing and in -- from the case file and obviously now they could in the deposition that you're ordering pursue this same request that way.

MS. DEITH: No. We're just -- we just want to get

the metadata. That's what I was interested in and it is my error that I thought it took a more involved examination of the computer, which would entail doing a forensic exam, but as Your Honor pointed out, the metadata is easily accessed -- well, not -- not through having to do a whole forensic exam.

So this is something we've been asking for. We've been seeing all along that we're concerned about the veracity of Ms. Stahl's statements. About when she may have gone back and made changes, so I don't -- you know, we've given you so much ESI here.

I don't understand what the problem is if there's nothing to hide here and if the documents were done at a particular time and finalized at a particular time, I don't understand why you would have any problem with our having the Metadata and I think we're entitled to it.

THE COURT: I don't think -- I don't think producing Metadata for a few reports is a particularly onerous burden, unless you come back and tell me that there's some reason why you can't access it. It should be relatively easy to do.

MS. DE LA PAZ: Well, Your Honor --

THE COURT: These are (indiscernible) reports and you can have a limited continuation of the deposition with respect to the new materials.

MS. DEITH: Okay.

THE COURT: But no forensic analysis and I don't see any need to turn over any additional training materials at this time.

MS. DE LA PAZ: Your Honor, we would ask that the additional deposition time be limited to, like, two hours at the most.

MS. DEITH: I think that's an awfully short period of time, especially if the depositions are now done, you know by video, and it always takes extra time in doing that, getting it set up, and also sometimes there's a little bit of trouble with communication. People understanding questions.

We would have no problems if you wanted to limit the deposition to five hours.

MS. DE LA PAZ: Your Honor, there's like 14 pages of training materials that they have to ask Ms. Stahl about as well as a handful of questions about and --

THE COURT: I think four hours should --

MS. DE LA PAZ: -- they're taking we don't --

THE COURT: I think four hours is more than sufficient to ask --

MS. DEITH: Four hours.

THE COURT: -- the questions you need to ask. It probably shouldn't take that long, but --

MS. DEITH: Thank you, Your Honor.

THE COURT: -- all right.

MS. DEITH: And, Your Honor, I do -- I do believe, if you don't mind, I think my client wanted to say something. Irene, did you have anything to add or have we covered whatever you had wanted to say?

MS. MANOLIAS: Are you talking to me, Susan? I didn't hear you direct --

MS. DEITH: I'm sorry. Irene, I didn't know if you wanted --

MS. MANOLIAS: Okay. I'm sorry.

MS. DEITH: -- to say anything.

MS. MANOLIAS: I -- I actually do. And thank you, Your Honor, for letting me speak for a moment.

Another reason that ties into this and why we'd like to redepose Ms. Stahl is she was asked the question seven times, a clear crisp question, of what she meant by settlement purposes. And she didn't answer the question. It's her freeze and yet she says she -- that she literally says she came up with a calculation for settlement purposes.

Yet doesn't answer after seven times of wasted time of deposition, and then finally answers by saying she doesn't understand. She doesn't understand why.

Then she boasts about the five other home care agencies in which she received a settlement amount from a settlement amount that she came up with from them, and boasted about it, which is concerning to me.

The other reason is in the motion exam -- that the motion that the Department of Labor gave you, the reasons that they say they -- that the lawsuit is based on is not true, the letter to you. They say it's based on proper records for the aides and time sheets.

Ms. Stahl's deposition is the exact opposite reason of that and that may be what they believe they found. But she says clearly she based this lawsuit on three hours of time that she came up with a conservative average or assumed from this data that everyone is owed. And what's very frustrating to me is that the Department of Labor cannot not see the error they made.

You take 24 hours. You minus eight hours of sleep. You're left with 16. Where's our three hours of credit for breakfast, lunch and dinner? It's a mistake they made.

And then they go into this whole thing about record keeping and challenging the notes that Department of Labor makes, and when we go to ask Ms. Stahl specific questions on where she came up with this ideology that Sarene should go against the laws of FLSA and pay everyone for breakfast, lunch, and dinner. At the start of this lawsuit she has seven different categories of inconsistencies. She asked this question. Didn't ask this question.

She even goes as far as saying, as Susan said, that she didn't take a note. She pointed to her head and said

it's all in my head. A lead investigator testified she didn't take a note.

She did take a note. Didn't take a note. Did ask this question. Didn't ask this question. And she concludes that from her knowledge, she knows more than the New York State Department of Case Management System. That she concluded those three hours, because she, quote, unquote, knows what it's like to take care of a human being. Everybody fails all these patients. Sarene should pay for three hours for breakfast, lunch, and dinner. And when we go to ask specific questions, she doesn't answer this.

What the attorney said that she opened up a Word document file? She never said that in her testimony. I read her testimonies over and over and over. She clearly says she doesn't know what she asked. It was a long time ago. I can't remember. And then she says some unarticulated gibberish that we can't even understand what she's saying that wasted so much time in her deposition.

So on top of getting some understanding of where exactly in the training materials does it say, for instance, that you could start a lawsuit for settlement purposes or other things that she doesn't have to take a note and can put it all in her head, we didn't have time to ask her those things.

But I want to also have time for her to explain

what she meant by starting a lawsuit for settlement purposes, because that means to me, at the very least, that's unethical and this reasoning, if she doesn't have notes, to justify why she should go against the New York Department of Health practices and her own FLSA of having us pay for breakfast, lunch, and dinner. I think she should answer that.

And if she had an issue with that, why come to Sarene with that. Why not go to the Secretary of Labor and say I think all live-ins should be paid for breakfast, lunch, and dinner, instead of trying to have us do it with an $11 million lawsuit to pay everyone for these hours?

Or better yet, if they made a mistake, why didn't they come to you and say, you know what? We forgot to minus breakfast, lunch, and dinner. Be an easy math calculation. Twenty-four minus eight for sleep, minus three, brings you right down to 13.

And I believe we should have to ask her what she based her feelings on to come up with this calculation, because to me, you take the breakfast, lunch, and dinner out, times it by 358 aides, and you come up with a calculation of damages of zero.

Yet four years later, they go on a fishing expedition of trying to challenge notes that are approved by the Department of Health, and nowhere in the New York State Court of Appeals does it say notes have to be done a certain

way and it's done intentionally, which will be explained in our summary judgment, if it comes to that.

But I would like to also ask her what she meant by that and have her answer with something better than I don't understand.

Thank you for listening to that, but I'm sorry for taking so long.

MS. DE LA PAZ: Your Honor, I think -- just to respond to that very quickly.

We're getting really beyond the scope of what the request in the motion was about and, you know, the way that we interpret your ruling is that you're allowing additional deposition time to ask about these training materials, because these training materials, you know, defendants did not have them at the time that the previously deposed Ms. Stahl.

And, you know, allowing some questioning about the sort of notes that were taken, but a lot of these other topics that Ms. Manolias is discussing, you know, as she mentioned, sometimes Ms. Stahl was asked the same question seven times.

And if the answer was she didn't know or if the answer was something that defendants didn't like, they're welcome to cross her on that. They're welcome to try to use that to impeach her. But these topics have already been

covered. They asked her about computations extensively in her deposition and we see no basis for, you know, reopening that entire -- that set of topics, you know. Every deposition has some amount of inconsistency. We would argue so did Ms. Manolias's deposition. So did all of the depositions.

But this -- we would like to keep this limited narrowly to sort of the same materials that were produced after deposition.

MS. DEITH: But certainly should any of those questions follow suit after having asked questions about the notes or getting clarification on the training materials, I do understand what you're saying that that is not the primary line of questioning, but, of course, if it comes as a normal question that would follow a question about the notes or about the training materials, we certainly should be entitled to ask the questions.

But no, that's not going to be the basic line of questioning. I understand what you're saying.

THE COURT: Yes. I'm not going to pre-screen what questions you can ask and not ask. I've given you the general parameters and I'll leave it up to the parties to deal with it. If something comes up during the deposition and you can't resolve it on your own, feel free to give me a call in chambers and I'll deal with it.

MS. DEITH: Great. Great.

MS. DE LA PAZ: Okay.

THE COURT: All right.

MS. DEITH: Thank you very much, Your Honor. And thank you for allowing my client a --

THE COURT: No problem.

MS. DEITH: -- opportunity to --

MS. MANOLIAS: Thank you so much. I appreciate it. Thank you.

THE COURT: Have a good day, everyone.

MS. DEITH: Thank you.

MS. DE LA PAZ: Thank you --

MS. PFITSCH: Thank you, Judge.

MS. DE LA PAZ: -- Your Honor.

(Proceedings concluded.)

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Christine Fiore

______________________________ February 20, 2023

Christine Fiore, CERT