FILED
CLERK
8:34 am, Jan 16, 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X
                              :
EUGENE SCALIA,                :
                              :    20-CV-3273 (NJC)(ST)
                Plaintiff,    :
                              :    January 10, 2024
                              :
           V.                 :    Central Islip, NY
                              :
SARENE SERVICES, INC.,        :
et al.,                       :
                Defendant.    :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
BEFORE THE HONORABLE NUSRAT J. CHOUDHURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: HOLLIS PFITSCH, ESQ.
BARBARA DE LA PAZ, ESQ.
U.S. Department of Labor
Office of the Solicitor
201 Varick Street, Room 983
New York, NY 10014

For the Defendant: SUSAN DEITH, ESQ.
Law Offices of
Joseph F. Kilada, P.C.
100 Quentin Roosevelt Blvd, #208
Garden City, NY 11530

Court Transcriber: ARIA SERVICES, INC.
c/o Elizabeth Barron
274 Hovey Road
Milo, ME 04463
Aria@leinen.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service

THE CLERK: This is 20-CV-3273, Scalia v. Sarene Services, Incorporated, et al.

Counsel, please state your appearances for the record.

MS. PFITSCH: Thank you, your Honor. Hollis Pfitsch for the Secretary of Labor, the Acting Secretary of Labor.

MS. DE LA PAZ: Barbara De La Paz, also for the Acting Secretary of Labor.

THE COURT: Good morning.

MS. DEITH: Susan Deith with the Law Offices of Joseph F. Kilada, P.C. for defendants.

THE COURT: Okay, thank you. Good morning.

I did see that Ms. Rudich is still recovering from a foot injury. I understand that she was in court for the appearance before Judge Tiscione earlier this week.

MS. DEITH: And I believe that's what put her over the top because she's had several surgeries throughout the year and it's been very tough on her, and she can barely get out of bed now.

THE COURT: Understood. Well, thank you for being here on behalf of defendants and let her know that I wish her a speedy recovery.

MS. DEITH: Thank you, your Honor.

THE COURT: Okay, great.

So we're here on the pre-motion conference letters concerning the Acting Secretary's motion to amend the complaint. I've reviewed the correspondence of both parties. I also went back and sort of refreshed my recollection with the TRO motion and the papers that both parties had submitted with respect to that. I wanted to hear more and I think I'll just let both parties know what some of my concerns are.

One concern is that the case has been in discovery for a very long time. I understand discovery closed on December 4th. And the claim of retaliation that the Acting Secretary has brought is obviously tied to the underlying allegations of unpaid overtime. I understand that the allegations are that the uninterrupted sleep breaks were not in fact uninterrupted and that meal breaks were not in fact uninterrupted as well, so that any exemptions that the defendant may claim from adhering to the FLSA standards under those grounds according to the Acting Secretary are without merit. That's the contention.

I don't know what actually happened but those are facts, right, and those facts need to be resolved by a fact finder. But I understand that the retaliation claim is tied up with those underlying

merits arguments. So the question before me is whether to permit an admittedly untimely amendment because the schedule permitting amendment of the complaint, that time frame has passed. So what I'm looking at is whether the standards under Rule 16(b) apply.

I'm considering whether allowing amendment to then open up discovery again once discovery has closed is going to cause undue prejudice, and I'm thinking through whether it makes sense for the retaliation claims to be brought in a separate suit with the fact finder on a preliminary injunction motion or, you know, at trial really, considering any arguments about the declarations and the weight or lack of weight to be given thereof to really be a question going to what facts are properly in the record.

So I'm thinking through those issues and that's why I felt it was important to have the parties in court today so I could hear arguments clearly. I know sometimes it's hard on Zoom for counsel not to interrupt each other, which was a challenge at the last Zoom conference we had, so I wanted to just really hear clearly from each side what their position is on each of those issues.

I did read many of the cases that were cited in the TRO motion as well as in the motion to amend, in

particular the three central cases that the plaintiff is relying on, on its theory of retaliation. This is Acosta v. Southwest Fuel from the Central District of California, I believe. There's another Acosta case v. I believe Allstate Electric. I may have gotten the name wrong, from the District of Arizona. And there's another case out of a district court in Florida as well. So there are these three cases that are the principal ones that I saw relied upon in the TRO motion for the retaliation theory.

And I would like both parties to address that case as well because my question is whether the Second Circuit or cases -- courts within the Second Circuit have recognized an adverse employment action in the form of alleged coercion in interviewing former employees, in an effort to put together declarations in support of litigation. I see those three cases and I'm interested -- I believe it's important to know what the Second Circuit authority is on those issues.

So I've laid out the questions and things that I'm thinking about. I'd like to give each side time to make their full argument. You will get the time you need because I really want to hear what you have to say. I'll start first with plaintiffs.

MS. PFITSCH: Thank you, your Honor.

THE COURT: You can sit down, whatever you're more comfortable with.

MS. PFITSCH: Up to you.

THE COURT: Up to you.

MS. PFITSCH: As you noted, discovery is closed. However, the case law under the Rule 16 good-cause standard routinely finds that delay due to additional discovery is not undue prejudice. The courts look more to whether a dispositive motion deadline has been set, whether a trial date has been set. That said, we also do not anticipate significant discovery if any in this case for either side.

THE COURT: Can I interrupt you please?

MS. PFITSCH: Yes.

THE COURT: On the dispositive motion practice, when is the deadline for summary judgment motions?

MS. PFITSCH: We don't have one right now because of the settlement conference and then this dispute around the statements and the preliminary injunction hearing. Judge Tiscione is waiting for the parties I believe to propose a schedule after these issues are resolved.

THE COURT: Understood, thank you.

MS. PFITSCH: So as I was saying, we don't

anticipate significant discovery if any given that the parties will have an opportunity at the preliminary injunction hearing to exchange documents, see each other's exhibits, even cross-examine witnesses. Our proposal would be to, after the preliminary injunction hearing, confer briefly with defendants, perhaps come to an agreement on whether any discovery is necessary, how quickly it could be resolved, propose a very short time line if any to Judge Tiscione for additional discovery. Tiscione, I'm sorry, I keep mispronouncing his name and we just saw him on Monday.

Our goal in amending the complaint is simply to make certain that we can get a permanent relief. We do not want to delay the case. We want this case to move quickly to dispositive motion practice after the preliminary injunction hearing. We need the preliminary relief. The goal with adding the retaliation claim is simply to also get a permanent relief primarily of a permanent injunction against retaliation. We have included a claim for punitive damages but that does not require a significant amount of additional discovery either as the analysis for punitive damages looks at the same actions under consideration for the claim itself, the defendants' actions as opposed to --

THE COURT: Let me interrupt you again.

MS. PFITSCH: Yes.

THE COURT: This is all very helpful and I just want to make sure I'm asking the questions as you go because I think that will be helpful for me. Why would the Secretary need a permanent injunction at the conclusion of the case? And the reason I ask is because I understand the theory of the preliminary injunction request, which is that if the Court were to find that there was an attempt to coercibly, under circumstances giving rise to coercion, ask former employees who are potential witnesses to sign declarations against their interest -- if that were to be true and found after a hearing, the purpose of the preliminary injunction would be to insure that the Acting Secretary is able to get the evidence needed to prove the claims on the merits, right? But at the conclusion of the suit, once the claims have been proven or not -- proven, why would there need to be a permanent injunction?

MS. PFITSCH: In all of our actions, your Honor, we seek a permanent injunction against further violations of the Fair Labor Standards Act. It is possible -- we actually discussed this the other day -- that that injunction with our existing -- our existing

request for relief could incorporate the prohibition on retaliation within that injunction if we were to succeed at trial and obtain that permanent injunction.

THE COURT: Could you say that again?

MS. PFITSCH: So in our current complaint, we do have a request for a permanent injunction. Usually, that is focused on the withholding of unpaid wages, requiring defendants to comply with the Fair Labor Standards Act in the future. That's particularly important for the Secretary's enforcement, both to obtain redress for the past violations but to insure that defendants are complying going forward. So the purpose of adding the retaliation claim would be to make certain that we can have a permanent injunction requiring them to comply with the retaliation prohibition going forward, as well as the overtime requirements and the other provisions of the Fair Labor Standards Act currently outlined in the original complaint.

THE COURT: So the theory is that the Secretary wants to request a permanent injunction essentially requiring the defendant, if they prevail at trial, to not do this again, meaning coerce statements, et cetera.

MS. PFITSCH: Or retaliate --

THE COURT: And, again, I'm not finding facts. Yeah.

MS. PFITSCH: Or retaliate in other ways.

THE COURT: Okay, good. Okay, I understand. And then you said for punitive damages, there's no additional discovery. What is the theory behind seeking to amend to add that claim or that form of relief?

MS. PFITSCH: That form of relief. Traditionally, retaliation claims are redressed with compensatory damages to the individuals. Here, we have an entire group that's been affected and we don't necessarily want to stop the current case to have entire discovery on individuals' impact and potential compensatory damages to those individuals. Instead, we are seeking punitive damages to essentially punish the defendants for their violation of the retaliation prohibition. The focus of the punitive damages is deterrence, so it takes -- the analysis takes a look at the defendants -- the egregiousness of the defendants' actions and the jury is asked to quantify so that there's not -- the additional claim is fairly limited additional relief that we would be seeking on a permanent basis.

THE COURT: So you're basically seeking --

you would be seeking additional relief but on the same facts essentially.

MS. PFITSCH: Yes.

THE COURT: Okay, understood, thank you.

MS. PFITSCH: To your point about instating this claim in a separate suit, we think judicial efficiency dictates bringing it in this suit given that the relief requested and the facts and circumstances are so closely tied to the existing litigation. Having a -- if we file a related case and a new complaint, we think it would likely have the same impact if even more on slowing down the original case because it could be that the Court -- of course, this would be likely up to you, your Honor -- may need to slow it down for that case to catch up in order to efficiently resolve both cases since all parties and the claims are related. So we do think it is most efficient to allow the claim to be added in this case and then hopefully quickly have -- quickly have the claim added, very short discovery if any, and move on to dispositive motions.

THE COURT: And if I were to not allow discovery, what impact or what would the Acting Secretary's position be, because I am concerned that the case has been ongoing for many years at this point and really, the claims need to move forward

expeditiously.

MS. PFITSCH: Yes. I think we would be fine with that, your Honor.

THE COURT: Understood.

MS. PFITSCH: We believe that the parties -- both parties will get sufficient discovery in preliminary -- in the context of the preliminary injunction hearing. Defendants in their letter referenced extensive discovery but did not detail that in any way. Again, we contend that sufficient discovery will actually take place at the preliminary injunction hearing.

THE COURT: Okay.

MS. PFITSCH: Do you want us to go on to the retaliation theory?

THE COURT: Yes, please.

MS. PFITSCH: Okay. We do think, to the question of good cause, your Honor, and -- we do feel that we do have good cause to amend at this time. Good cause looks at diligence, which the defendants have not taken issue with, prejudice, which we've just discussed in terms of the discovery schedule, and then the final consideration being whether the claim is futile. So I'll talk about the retaliation theory under the standard currently that applies under the motion to

amend if that makes sense.

THE COURT: Yes, please. That does make sense.

MS. PFITSCH: All right.

THE COURT: I'm not asking for a preview of the PI arguments.

MS. PFITSCH: Right.

THE COURT: I'm really focused on the motion to amend standards.

MS. PFITSCH: Right.

THE COURT: And this is why discovery was front of mind as I looked at the docket and the history of the case.

MS. PFITSCH: And that makes a lot of sense. We have -- I believe -- so the proposed amended complaint -- you're familiar with the facts but they're summarized in the proposed amended complaint. The specific factual allegations there far surpass the facial plausibility standard that applies at this time. Under Rule 16's good-cause standard, we look at the motion-to-dismiss standard effectively.

The facts outline the three requirements of the prima facie case of retaliation. You're specifically focusing I believe on the adverse-action prong.

THE COURT: Exactly, the second prong.

MS. PFITSCH: And as you can see in --

THE COURT: But feel free to go all three.

MS. PFITSCH: Okay, I can. I'm happy to do that. So as you are aware, defendants' former employees participated in this litigation from the investigation phase by providing information to the Department, and more recently working with the Department to begin to prepare to testify. That is protected activity under the Fair Labor Standards Act. It's well-established that a worker need not actually be testifying in order to benefit from the protection from retaliation but can be about to testify, and many decisions -- there are many decisions finding that providing information, cooperating with the Department in its investigation and enforcement is protected activity.

Defendants then took an adverse action, as the complaint outlines, against the employees as a whole and individual employees who were affected, by soliciting false statements of unrepresented employees against their interests under misleading and coercive circumstances.

THE COURT: I'm going to interrupt you briefly.

MS. PFITSCH: Yes.

THE COURT: Because I did notice something in your papers, in the correspondence. To me, it's important that the employees you're referring to are former employees, right? I saw and I heard at our last proceeding that the defendant indicates that they're no longer employing any of the potential witnesses at issue. There was some discussion amongst the parties as to whether the defendant would potentially re-employ some of them in some different capacity. Obviously, I haven't heard any evidence on that issue but I just wanted to see your response to that distinction because are we really only talking about former employees or are we also talking about current employees?

MS. PFITSCH: The employees I think are better characterized as workers who no longer currently work for Sarene. They are not former in the sense that in the same way in which other industries have former employees, employees who have been terminated or employees who have been fired, the way that this industry works is that home health aids are often working for multiple agencies at different times, looking for additional or different work.

So the workers definitely expressed to us that they continued to hope for work from Sarene, and

defendants we think capitalized on that kind of posture with the employment -- with the employees as to the employer by holding out the possibility of reopening their live-in-aid practice by even offering a position to one employee and also involved -- appealed to their interests or need potential in getting a job referral by, as we have heard from at least one worker, making the signing of a statement contingent on getting a job reference. So the fact that they are no longer currently working for Sarene both doesn't matter in this particular context and in addition, under the Fair Labor Standards Act, former employees are just as protected as current employees by the retaliation prohibition.

THE COURT: So just going for a moment on the theory of using the lay language that these are former employees -- and I understand the distinctions that you're making about this particular industry. But if none of the witnesses are currently employed by Sarene, currently getting a paycheck from Sarene, the Acting Secretary's investigation and litigation, if successful, would still result in compensation for them, is that correct?

MS. PFITSCH: That's right, yes.

THE COURT: Okay. So the critical thing is,

it seems, under the retaliation theory that the plaintiff is putting forward, is that the people whom the defendant is speaking with worked for the defendant at some point and, if the Secretary wins, would get some money. That's the issue.

MS. PFITSCH: Right.

THE COURT: Okay.

MS. PFITSCH: And for this particular kind of adverse employment action, soliciting statements that waive the workers' rights in this action, whether they're current or former, doesn't matter at all.

THE COURT: And on that point, I know we talked about this a little bit at the last hearing, I am thinking about this in terms of the amendment standard, not the PI standard. But I just want to make sure that I'm looking at the correct statement in the declaration. Let me see if I have it before me. I may not have it before me. Can you just tell me exactly what that purported waiver statement is that's in the declaration?

MS. PFITSCH: Yes. Let's make sure that we have (ui).

MS. DE LA PAZ: Yes. Your Honor, I am looking at I believe it's Exhibit 1 of the first declaration of Nikita (ph) Smith. And in paragraph 5,

the last sentence is, "There was no time in which I was not paid overtime to which I was entitled." And paragraph 95 of the proposed amended complaint contains that as well.

THE COURT: Thank you for pointing that out. I do have that.

MS. DEITH: I'm sorry, can you repeat what document you're looking at?

MS. PFITSCH: So it's quoted in paragraph 95 of the proposed amended complaint.

THE COURT: Thank you, that's helpful.

MS. PFITSCH: For the purposes of this motion, that's probably the --

MS. DEITH: Okay.

MS. PFITSCH: -- easiest place to look.

THE COURT: Okay. So it's the Acting Secretary's position that there was -- the statement by a declarant who's a potential witness for the plaintiff, the statement that, "There was no time in which I was not paid overtime to which I was entitled," if accepted by the Court in a declaration by that witness could make that person then vulnerable to impeachment if they were to sign a statement that said, I actually didn't get uninterrupted meal breaks, I didn't get uninterrupted sleep breaks. Is that

correct? Am I understanding this properly?

MS. PFITSCH: Yes, that's right, your Honor.

THE COURT: Okay. So that's the problematic statement.

MS. PFITSCH: Yes.

THE COURT: And the concern is that -- and this goes to the allegations of the complaint. I'm looking at like a 12(b)(6) standard.

MS. PFITSCH: Yes.

THE COURT: Which I believe is what I need to do on a motion to amend, like have you plausibly stated a claim that the defendant engaged in an effort to secure declarations from potential witnesses for the plaintiff that include statements that could make them vulnerable to impeachment if those declarations were accepted as part of the factual record --

MS. PFITSCH: That's right.

THE COURT: -- or somehow otherwise compromised their ability to secure unpaid overtime if the plaintiff were to prevail, is that correct?

MS. PFITSCH: That's right.

THE COURT: Okay, thank you. This is helpful for me to understand the theory. So I was thinking about this adverse action issue in that I wasn't seeing as much case law on former employees, but

what you're explaining to me is that the former or current employee issue under the law is not the dispositive distinction because former or current employees would get compensation if the plaintiff were to prevail at trial.

MS. PFITSCH: Right, and could be then dissuaded from participating in the lawsuit, which is the Supreme Court standard, if a reasonable employee would be dissuaded from protected activity. The protected activity here is participating in the lawsuit. So whether they're currently working or formerly working is -- has no impact on whether the action is adverse.

THE COURT: And that's the Burlington Northern standard --

MS. PFITSCH: Yes.

THE COURT: -- that the United -- the Supreme Court set forth, right? So I am bound to apply that Supreme Court precedent.

MS. PFITSCH: Yes.

THE COURT: Okay, I understand. And then the third element is causation. Walk me through your causation argument.

MS. PFITSCH: Yes. To some degree, the causal connection is self-evident to quote Judge

Schindlin (ph) in the Mullens (ph) case, which had a somewhat similar situation where police officers were being questioned about their testimony in a Fair Labor Standards Act action. So here, defendants' statements, as we've just went over the language -- the statements refer directly to this lawsuit, request authority to use the statements in the lawsuit, are seeking to affect the workers' rights to participate in the lawsuit, which is the protected activity in this case. So the causal connection is admitted on the face of the statements, essentially.

THE COURT: So going back to the former-employee distinction, I want to -- I am wrestling with this. So another distinction I saw in some of the cases -- and you pointed to Mullens. This is what made me reflect on this. In the Southwest Fuel case as well as Mullens, there were these additional circumstances in which the problematic declarations were being sought from current employees during working hours on the work site. There were a lot of facts around that. Is the context here distinguishable? If so, why? If not, why not?

MS. PFITSCH: I don't think so, your Honor. I think this is why it's important to look specifically at this industry and the fact that the workers in this

particular situation are still interested in seeking continued employment from Sarene and, in general, the way that the home-health-aid industry works and then specifically these workers. The way that the defendants in this case were able to find a similar amount of leverage that they would have had if these people were continuing to be -- were currently employed was to offer job-related incentives in connection with signing the statements, even offered jobs conditioned -- good job referrals on signing the statements, and asked the employees whether they were interested in coming back, so holding out the possibility of current employment in the context of asking them to -- for information and then signing a statement. So the defendants, even though they couldn't bring them into a room as current employees as took place in some of the other cases that we're citing, created a similar coercive environment.

THE COURT: Okay, thank you for that.

MS. DE LA PAZ: Can I also add just briefly that in those cases, the courts were similarly concerned about the misleading context and sort of whether employees were informed of the existence of the lawsuit, informed of their interest in the lawsuit before giving those statements, and those facts are

certainly present here as well.

THE COURT: Yeah, and I think in the context argument, I see in the arguments that the plaintiff is making here and the context arguments made in those cases. I'm thinking more about the punitive action component, so this is why I've been asking about, what is the harm? Because I see in the defendants' papers that their argument is, there's no adverse action. And I will hear from the defendants so I want to kind of hear their full argument there. It seems to me that this is like the critical issue here, both on the 12(b)(6) and, frankly, on the preliminary injunction standard. So I'm thinking through those issues, so I appreciate your response and I will hear from the defendant on that as well.

MS. PFITSCH: On the question of the standard, your Honor, I would just simply point out that reasonable inferences are in the plaintiff's favor at this stage, and we have -- and it's included in the amended complaint, alleged -- more than alleged but we will provide statements to the -- we'll provide statements and then declarations and have testimony in the PI hearing that workers have already been deterred, so that we can already see the punitive -- the impact -- even the impact of the defendants' actions on the

protected activity of the workers.

THE COURT: Thank you for --

MS. PFITSCH: And I think that's the --

THE COURT: Thank you for raising that. I did have a question about that. Is the evidence of deterrence that you have at this point that I'm looking at for the 12(b)(6) standard, which I understand is a much more lenient standard than the preliminary injunction standard or the TRO standard --

MS. PFITSCH: Yeah.

THE COURT: They're very different. But is the -- I see the allegation of deterrence in the complaint. And are the facts that you're giving or the factual allegations you're giving to support that broader claim in the daily declaration, the declaration of the investigator who reports -- can you walk me through that?

MS. PFITSCH: Yes, your Honor. For the purposes of the -- in the materials that we submitted for the application for the TRO, it is the daily declaration that sets out the experiences of the Department, hearing from workers who had obtained a call from Sarene in this statement-gathering campaign and now no longer wish to speak with us.

THE COURT: How many people?

MS. PFITSCH: At this point, I believe it's two.

MS. DE LA PAZ: At least two.

MS. PFITSCH: At least two that we've spoken with currently.

THE COURT: Okay, so the daily -- and I will consult the daily declaration but you're summarizing that the daily declaration attests that the Department heard from two people who no longer want to speak to investigators because they were contacted by the defendants for these conversations about potential declarations.

MS. PFITSCH: And those are the two employees who we were able to speak with about the fact that they no longer wish to speak with us and got that far in the conversation. Mr. Daley (ph) will also testify generally about calls made and lack of return calls or that kind of additional evidence, but we have spoken with two about the fact that they no longer wish to speak with us.

THE COURT: And those two are not the individuals who submitted other declarations that support the TRO motion like Ms. Smith or I believe --

MS. PFITSCH: No, they're separate people.

THE COURT: They're separate people.

MS. PFITSCH: Yes.

THE COURT: And -- okay. I mean, there is a hearsay question there that I'll just flag.

MS. PFITSCH: Right.

THE COURT: Which is not an issue at a 12(b)(6) but --

MS. PFITSCH: Right.

THE COURT: -- raises questions.

MS. PFITSCH: I think actually, the Mullens case in the Second Circuit did find -- it was a sort of similar situation. I think it was a police investigator who testified about the experiences of other police officers, the effect -- and the Second Circuit said that it was permissible to allow hearsay on the PI -- at the PI stage.

THE COURT: I understand that it's permissible. I understand that sometimes courts don't acknowledge hearsay at the PI stage when the hearsay goes to the ultimate question. And here, when there's a claim for retaliation that would then lead to potentially relief in the form of a permanent injunction, I wonder whether this circumstance raises that concern. I don't know the answer to that question. For 12(b)(6) purposes, it does not seem to be an issue.

MS. PFITSCH: I agree.

THE COURT: It seems that there would be sufficient factual allegations making the claim plausible. That's the analysis that the Court needs to look at at this stage, correct?

MS. PFITSCH: Yes.

THE COURT: Okay. Okay. I also asked a couple of questions about some of those other cases. Is there anything you want to share about this case in relation to the two Acosta decisions and the case from Florida? And I think my ultimate question was, what authority is there in the Second Circuit other than Mullens?

MS. PFITSCH: Can I confer with my colleague briefly?

MS. DE LA PAZ: Yeah, your Honor. So as you pointed out, we believe that Mullens is apposite in this situation. We would also direct you to Hahn v. Sheng Noodle House, Inc. (ph). The West Law cite on that is 2022 W.L. 4134223. That's from the Eastern District and it's a decision from 2022.

There, it was slightly different facts but the Court did note that blacklisting and retaliation against former employees, including refusing to write recommendations for prospective employers and other

forms of, you know, hindering those former employees' prospects was retaliation. And we believe that that's analogous because, as we've alleged here, employees were told that there would be, you know, consequences to not signing one of these statements and, you know, signing the statements was pegged to receiving certificates of good performance and things like that.

THE COURT: Thanks for raising this because I have questions about this part of the plaintiff's theory. It seems to me to be the weakest part of the theory. I didn't see specific factual allegations in the complaint that make this part of the theory plausible, so tell me where I should look. I'm looking at page 14 of the proposed amended complaint. This is paragraphs 96, 97. "In their calls to former aids to solicit declarations, defendants' representatives also inquired whether former aids were interested in receiving a certificate of good performance or a good job reference."

That seems different to me than blacklisting. I will look at the Hahn case but it seemed that based on my review of the allegations, that there weren't sufficient facts making a plausible claim that the defendant is retaliating by blacklisting individuals. I didn't see facts on blacklisting.

MS. PFITSCH: The workers have -- the workers who have expressed that they're not able to be identified expressed concerns about blacklisting. With all reasonable inferences in the plaintiff's favor, I would submit that 96 and 97 are sufficient in that what defendants successfully -- defendants' offers of future work and a certificate of good performance and job references -- we go on to 98 -- led employees to believe that they needed to sign the declaration in order to get future work or a good job reference and that if they didn't, they would not get any future work or a good job reference.

THE COURT: But the defendant didn't say that.

MS. PFITSCH: The defendant did not say that.

THE COURT: Right.

MS. PFITSCH: That is right.

THE COURT: So there's like an extra step.

MS. PFITSCH: That we know of, in the calls that we -- that we are aware of, that's right.

THE COURT: And no one has called the Department to say, I was blacklisted by Sarene. Sarene told this other person or entity I wanted to work for that they shouldn't hire me.

MS. PFITSCH: We don't evidence of blacklisting, we have fear of blacklisting. That is correct.

MS. DE LA PAZ: I would direct the Court to the second declaration of Nikita Smith, specifically paragraphs 2 through 5, which I believe other declarations we've provided deal with the situation most specifically.

THE COURT: That was paragraphs 2 through 5?

MS. DE LA PAZ: Yes.

THE COURT: Okay, thank you very much. Anything further that the plaintiff would like to add at this point?

MS. PFITSCH: I think that's it, your Honor.

THE COURT: Okay, thank you so much.

MS. PFITSCH: Thank you.

MS. DEITH: Thank you, your Honor. I think perhaps the best way to start off, if you don't mind, is to continue the discussion of the cases that were cited by plaintiff because I feel that we can distinguish them and that the cases they're relying on do not include in them the examples that they have given in terms of our type of alleged retaliation.

In the Walsh case, there was a threat by the Martins to continue to interfere with the litigation

process with threats of retaliation, which included blacklisting and calls to law enforcement as a consequence for cooperation with the Department. That was Walsh. It's an Eastern District case from May, 2023, Walsh v. Versa Construction Company (ph).

Further, in the Rodriguez v. National Golf Links of America -- that's another Eastern District case cited by them. It's from June 8th of 2020. It says based upon the standard in this Circuit, it's clear that there has to be something that rises to the level in order to constitute actionable retaliation. In that particular case and in another case, Porter v. Moore from the Eastern District of New York in January, 2020, defendant employees using fake IRS agents to approach their litigation adversaries at their home was sufficient to state an FLSA retaliation.

Another case, Lu v. Elegance Restaurant (ph), that is Eastern District from September of 2017, finding that defendant's post-employees' test messages threatening to disclose to authorities plaintiffs' immigration status was an adverse employment action for the purposes of FLSA retaliation. Bad faith or groundless counterclaims and other legal proceedings against statutory rights are actionable retaliation. None of that is in here. The defendants have not

engaged in any of the conduct referenced by those courts.

And then going back to Mullens, which plaintiffs' counsel referred to, that was a very different situation there. There was evidence that the NYPD had directed its Internal Affairs Bureau, the Department's disciplinary arm, to investigate a number of the plaintiffs who had given testimony and to require those plaintiffs to do an unusual procedure to turn over documents and information, again a very serious form of retaliation that did not go on here.

There's no comparable evidence of any actual, immanent -- or evidence of any specific threat to the defendants (sic). My clients called people who they did not even know were necessarily witnesses for the plaintiff because the plaintiff did not supply us with the list. We've been fighting for this for four years and they keep saying that it's government-informing privilege and they can't give the information to us.

The client, since they couldn't see the statements, they conducted their own investigation with the former employees. There were absolutely no threats made. The representations in the proposed amended complaint are inaccurate and false. Plaintiffs have --

defendants have the right to defend themselves in court, and if they were getting no information and they felt that they would be able to by doing these interviews, which were non-threatening in any way -- in fact, even if people asked for a letter of recommendation, Sarene was happy to send it. They were trying to get the information because we're getting nothing here from the other side.

THE COURT: Can I ask a question about the cases that I questioned your adversaries about? This is the Acosta v. Southwest Fuel case, Acosta v. -- I forget the other party's name, potentially Allstate something from Arizona, and then the Florida case, each of which concern the challenged adverse employment action of the defendant engaging in conversations with people who could get compensation if the Acting Secretary or the Secretary of Labor succeeded in an FLSA case, and then were asked to sign declarations, including statements not very different than the one that's in paragraph 95 of the proposed amended complaint that if they were actually submitted in evidence could make those individual declarants subject to potential penalties of perjury were they to then sign different statements in support of the FLSA claims at issue. How do you distinguish those cases from the

retaliation theory that's brought here?

MS. DEITH: First of all, your Honor, it is our position that these statements that allegedly are had by the plaintiff don't say what they believe them to say.

THE COURT: So that's a fact question, right? That's a question I need to resolve at a fact stage and we're here now at a Rule 16(b) amendment stage, which requires me to look at the complaint from the perspective of Rule 12(b)(6), which is, has the plaintiff proposed a claim that is implausible? Why is it -- they may not win, right, because you're saying that the context isn't what the Acting Secretary is arguing that it is. You're telling me, Court, the context isn't as bad as what they're saying, but that's a fact question. Here, I'm asking the question of whether the claims are plausible because that's the legal question I'm required to resolve when determining whether your adversary gets the chance to amend their complaint after the date for amendment has passed.

MS. DEITH: Right, and I appreciate your position, your Honor, but it is our position that it would be futile because there's not case law to apply in this instance which would show this type of behavior to rise to the level of retaliation. First of all,

Sarene --

THE COURT: Excuse me, counsel. You didn't answer my question --

MS. DEITH: Sorry,

THE COURT: -- about those three cases because I am wrestling with those cases. So how do you distinguish Acosta v. Southwest Fuel?

MS. DEITH: Because these statements were asked to be given voluntarily. There was no coercion involved. There was no offer of getting a job back. Sarene no longer hires home-live-in aids.

THE COURT: But I have the Daley declaration in the record, which provides different facts, and then there are the other two declarations as well, right? The Smith declaration is one of them and there's another declaration as well. And at this point, I don't have facts in the record that dispute the allegations concerning the context or the statements of the declaration. Like one of the proposed declarations is in the record, right? So on the record that I have before me, I don't see that I can find that the claim is futile.

MS. DEITH: I have -- excuse me one moment, your Honor. Your Honor, we have 115 declarations that if the Court would like to look at in camera to see

that there's been no coercion here and these people signed them of their own free will. I mean, if you're going to accept the declaration of their investigator, we believe we should have an opportunity for you to see what these letters say.

THE COURT: I do want to see those declarations on the PI hearing, right? That's the purpose of the PI hearing is to determine what the facts were. And frankly, more than declarations, I want to hear from witnesses. I want to hear from people because as I mentioned in the last hearing, there are real credibility issues here on all sides. I mean, I don't know, if a declaration that's put forward by the Acting Secretary says something different than a declaration put forward by Sarene, who's telling the truth, right?

MS. DEITH: Right.

THE COURT: Those are credibility determinations.

MS. DEITH: Well, your Honor, if I may then, perhaps it would be more in the interests of judicial economy for us to proceed with the injunction hearing. You'd have an opportunity to see the declarations. You'd have an ability to see who you believe is telling the truth and who may not be. I think it's perhaps

early now to make the determination if you're saying that you do want to see facts. I have facts I can show you but --

THE COURT: But you need to argue to me based on the Rule 16(b) factors why there is undue delay, prejudice, or futility, right? So your argument that your facts may contravene their facts, that may win on a PI motion, but I'm determining right now whether to permit amendment. Does that make sense?

MS. DEITH: Yes, your Honor, absolutely, and that's why I'm saying that the cases that they found don't rise to the level of any kind of alleged behavior on the part of our defendants. Nothing that they did anywhere near the egregious acts taken in these other cases.

THE COURT: I did question the plaintiff about some of the factual differences. I do think that some of the cases that they cite, the two Acosta decisions and the Florida decision, contain some factual allegations that may be more coercive than what they're alleging is coercive here. But is there a case that you can point me to that says that some coercion is okay and that it's only when there's more coercion, that that gives rise to a retaliation claim?

MS. DEITH: Too many papers on the desk,

right? Here we go, okay. Yeah, basically, when you look at the Lee -- wait one second. This is the Lee case, which is Lee v. Oliver King Enterprises. It's a Southern District case from 2015 that denied plaintiff leave to amend the complaint, holding that plaintiff has adequately alleged that he engaged in protected activity and that his protected activity is what he's complaining about. But the second factor is problematic, saying, considering all the facts in the complaint rise to the level of an employment action disadvantaging the plaintiff.

It says that the scope of post-employment conduct does not have a direct connection to the former employee's prospects and has only been limited in a very narrow way in the Second Circuit. In that case, the plaintiff did not cite a single post-employment retaliation case from this Circuit or elsewhere that did not involve either employment-related harm or threaten a legal claim against the plaintiff and the court has found none. Plaintiff's allegations therefore do not fall into a category of retaliation that has heretofore been recognized in this Circuit. So I do not believe that anything that my clients have done rises to the level of any other cases in this Circuit. It's a very narrow limitation here and all we

were doing was seeking information because the government refused to give it to us.

THE COURT: And do you dispute the representation that the calls were initiated with statements purporting to frame the reason of the call as a quality-control check?

MS. DEITH: I've spoken with my clients and they have not indicated to me that anything that they said in the call was anything more than finding out about their experiences at Sarene. I have some of my clients here if you want me to quickly double-check with them but that was my understanding.

THE COURT: So you are telling me that the declarations that you have in that stack there were conversations with individuals who formerly worked at your client and that none of them were, when interviewed, told that the purpose of the interview was a "quality control check," which I think is part of the central theory of the plaintiff's retaliation claim.

MS. DEITH: Excuse me, your Honor.

THE COURT: Take your time.

MS. DEITH: No, your Honor, no quality control check.

THE COURT: Okay.

MS. DEITH: It was just, as I said, to

interview them, to get information we were not allowed to receive from the plaintiffs. We've done nothing wrong. There's no retaliation here. My client doesn't even hire live-in, home-health aids anymore. And anyone who asked for a recommendation just because they happen to have been on the phone, my client sent them a recommendation letter.

THE COURT: And is there also a dispute that the conversations your client had with these individuals offered potentially certificates of good performance and other incentives of that kind?

MS. DEITH: There were no -- there were no incentives. They just wanted to get the facts. And, again, if the witness, if the potential witness brought up -- asking, can I have a recommendation just in the course of conversation, my client was happy to send out recommendations.

THE COURT: And these are declarations that you put together or your client put together in support of your anticipated summary judgment motion, is that right?

MS. DEITH: Correct, your Honor, yes.

THE COURT: Okay. Anything further that you want to argue?

MS. DEITH: Just basically that yes, this is

-- our main argument is, this will be totally futile. There is no retaliation. It won't be helpful to judicial economy by adding in this retaliation claim now. We want to get to close discovery, start dispositive motion practice, get this injunction hearing out of the way. This case is now in its fifth year. My clients spent over half a million dollars on this case.

So we really do not believe that there is any basis upon which to allow the plaintiffs to amend their complaint, but I do ask your Honor, if you are entertaining that at all, that we be given a full brief to submit in our defense and also, that discovery absolutely must be opened, especially in light of this declaration from James Daley. So, again --

THE COURT: What is your response to the plaintiff's argument that the witnesses who would testify at the preliminary injunction hearing, any documents, exhibits exchange in furtherance of that hearing would indeed constitute any discovery necessary to get to the bottom of the retaliation claim, since that is the issue that the preliminary injunction hearing is meant to resolve?

MS. DEITH: I understand but I don't know what they're planning to send us and we may have things

we want that they don't want to send us, and then we have to go through motions to compel and whatnot. As I said, this is going on -- this is a case from 2020. Plaintiffs have asked for an inordinate number of documents. I mean, we really --

THE COURT: I don't want re-litigate discovery.

MS. DEITH: Right.

THE COURT: I'm not Judge Tiscione and he's managed the discovery process. I was reassigned to this case like less than two months ago. So I hear your frustration but it's just not the issue that's before me.

MS. DEITH: I understand, your Honor.

THE COURT: And as I mentioned at the beginning, I am very committed to expeditiously moving forward all of the cases on my docket. And as you may have heard, I don't move trial dates. I set very firm trial dates and I expect parties to adhere to them. So I'm very interested in seeing a resolution of this case.

I think my question was much more narrow, which was, I issued an order requiring the parties to serve on each other witness lists and exhibits that they plan to use at the preliminary injunction hearing

and then to brief to me any motions in limine concerning the request to strike or object to the inclusion of any of that evidence.

MS. DEITH: Yes.

THE COURT: So given that I've laid out that process, why would discovery need to be reopened on this issue?

MS. DEITH: Because it may not be everything that's covered here. There may be additional things that we will need, and I think it's unreasonable --

THE COURT: But I don't have -- you need to make a more specific argument there. That's a very vague argument. If the plaintiff is trying to get a preliminary injunction, which is extraordinary relief, a very high burden that they have to meet to show that they get that, right, and they're going to put forward lists of witnesses who are required to testify before me on these issues, and I would anticipate that that would include individuals like Mr. Daley, who you could depose, why would you need discovery -- sorry, not depose, you could cross-examine. Why would you need discovery on that?

MS. DEITH: Would it be possible to get a deposition of James Daley?

THE COURT: No. I'm asking why it's not

sufficient for you to be able to cross-examine a witness on the stand in order to ask your questions. I just don't understand why discovery needs to be reopened here.

MS. DEITH: Because I think at a minimum, we need to get our seven-hour deposition of him. He seems to be a very large part of this retaliation claim and he hasn't even been deposed at all. So at the very least, your Honor, I'm asking that we get to depose James Daley. If you believe the other items for discovery would be covered by what's due for the injunction hearing, I would have no problem with that if we could add in a caveat, your Honor, respectfully, that if there is more discovery needed after this, that we could make an application to the Court. I'm sure it would be limited but at the very least, we do want to be able to -- if you're going to allow this amended complaint or take more time in considering whether you're going to grant it or not, we want the opportunity to speak -- to have a deposition of James Daley.

THE COURT: So I'm not inclined to extend discovery in this case because as you mentioned, discovery has taken place over a long time. But I am interested in determining whether retaliation occurred,

and I've asked the plaintiffs whether they would or whether it would rather bring a separate action concerning that issue because I don't want an amendment of the complaint to be used as an opportunity to unnecessarily open discovery, because this case needs to move forward. So you're stating that you believe the deposition of James Daley is critical and necessary to resolving a preliminary injunction on retaliation, or are you saying that it's necessary to resolve the ultimate claim of retaliation?

MS. DEITH: It's necessary for the claim of retaliation.

THE COURT: Okay.

MS. DEITH: Because his statement is basically hearsay, and there may be some relevance for the TRO -- for the injunction hearing. But in any event, with all these statements he's made that are so opposite to what we've heard from the former employees we reached out to, at a minimum, we believe we should be able to depose him, and we could do that before the hearing that's coming up for the injunction.

THE COURT: Anything further you'd like to argue?

MS. DEITH: No, just basically, your Honor, our main point here is that it really would be futile.

There is no retaliation. There are no cases in the Second Circuit that cite any sort of behaviors on the part of the defendant that would rise to the level of retaliation. So we would plan to make a 12(b)(6) motion to dismiss on it. It would take up even more of the Court's time because we don't feel that they should make this motion because it would be totally futile.

THE COURT: Well, I don't give advisory opinions but what I would say is that I would be doing a 12(b)(6) analysis if I were to grant leave to amend, so your 12(b)(6) motion would be futile because I would have already reached that analysis.

MS. DEITH: Oh, before you decide whether or not to grant the leave to amend?

THE COURT: Yeah. I mean, that's the analysis that -- that's what I've been saying through the course of our time together here, that the analysis I need to engage in is a 12(b)(6) analysis. So whether that analysis is on the record of a proceeding like this or that analysis is in writing, that's the analysis I would do prior to permitting an amendment. So if I were to engage in that analysis and find that amendment is -- meets the good-cause standard of Rule 16(b), a 12(b)(6) motion would be foreclosed because I would have already done that analysis.

MS. DEITH: So then would we --

THE COURT: And I guess this goes back to my question to you, and I asked it before and I don't believe you responded. What Second Circuit case tells me that I can find a proposed amendment futile absent declarations in the record contesting evidence that's already in the record? In other words, your argument is you need to have the declarations in the record for me to find that the proposed amendment is futile. If I were to find the proposed amendment futile today and those declarations aren't in the record, what Second Circuit decision tells me I can do that based on what you're arguing in court?

MS. DEITH: No. Everything that I have found in this Circuit has basically listed what would be considered a retaliatory action, which were much more egregious behavior than making telephone calls to just find out what happened and having the former employees sign these.

THE COURT: So I need to -- I really ask that you stick with me on the facts that are in the record because I have these statements in the declaration that is set forth in paragraph 95 of the proposed amended complaint. "There was no time in which I was not paid overtime to which I was entitled."

Do you contest that those statements are in the declarations that you have on your desk?

MS. DEITH: I'm sorry, your Honor, just what page?

THE COURT: Sure. This is page 14 of the proposed amended complaint. It's paragraph 95.

MS. DEITH: Okay. Can you repeat the question?

THE COURT: Are you saying that the declarations on your desk don't include this statement?

MS. DEITH: Excuse me.

(Pause in proceedings.)

MS. DEITH: Sorry, your Honor, yes, the statements do contain the verbiage there was no time in which I was not paid overtime to which I was entitled.

THE COURT: Okay, so the sentences are there. The issue is -- your argument is, the context is different than what the plaintiff is arguing.

MS. DEITH: Absolutely, your Honor. Again, and I don't want to revisit the whole case with you, but through all of these years of discovery, plaintiffs have yet to give us one single example of someone being up at night and not being paid in four years.

THE COURT: I'm not getting to that yet, right? Those are the ultimate merits of the case and

my brain is just not there yet. I'm still focused on the amendment, this proposed retaliation claim, the preliminary injunction hearing that's in the next couple of weeks. That's the land that I'm in.

MS. DEITH: Got it.

THE COURT: What I'm hearing is that the context -- the argument of futility centers on the context of the calls, and the plaintiff has put forth facts in support of the TRO motion that present a certain view of the context. The defendant argues that their view of the context is in declarations that have yet to be submitted in the record.

MS. DEITH: Yes, your Honor.

THE COURT: And the defendant is also saying that they would like discovery to be reopened to depose Mr. Daley --

MS. DEITH: Yes.

THE COURT: -- in the event that I permit amendment of the complaint because that deposition would be critical not just to the PI hearing but also to the ultimate merits of the retaliation claim.

MS. DEITH: Yes.

THE COURT: That would go towards the requested permanent injunction that the plaintiff outlined.

MS. DEITH: Exactly, your Honor.

THE COURT: Okay. So in light of this, I would like to hear from both parties. I'm not inclined to reopen discovery. I just think it hurts this case from getting to the just and efficient resolution that it needs to have. I'm going to ask plaintiff whether you want to make any arguments about whether amendment is truly necessary.

As I mentioned at the beginning of today's proceedings, I asked -- I noted that one of the things I'm thinking through is whether these arguments about the declarations really go to the merits of the proposed declarations rather than to a retaliation theory and that if retaliation is something the Acting Secretary feels strongly about in terms of getting this permanent injunction as relief separate and apart from the relief already pled in this complaint, should that be brought as a separate action? So I'm going to turn it back to the plaintiff for their position here.

MS. PFITSCH: Your Honor, we do believe that the Court can hear the retaliation claim at the preliminary injunction hearing and provide the preliminary relief even if no amendment is made.

THE COURT: I'm sorry, say that again please.

MS. PFITSCH: That the Court can grant the preliminary relief that we have requested for a retaliation claim that isn't yet in the complaint given the fact that the relief requested is closely tied to and affects the permanent relief we've asked for in the complaint.

THE COURT: Okay, let me look at the complaint and just see where we land. So if I go to --

MS. PFITSCH: Just to clarify, I'm speaking to the question of whether the amendment is necessary at all.

THE COURT: Exactly. So plaintiff's position is amendment is not necessary to get relief in the form of a TRO or preliminary injunction.

MS. PFITSCH: Right.

THE COURT: And that in essence, what you would be giving up is the request for relief in the form of a permanent injunction.

MS. PFITSCH: Right. And we would need authority -- we would need to go back to our office in order to answer your question of as a practical matter, whether the Acting Secretary is willing to let go of the possible amendment. We think it's legally possible to get, like I'm saying, the preliminary relief we would need. An amendment isn't necessary for that

purpose. However -- then there's the sort of practical question of whether the amendment is necessary in the long run, which we would need authority to answer, but we could go back and raise that question with our office.

THE COURT: Anything further that you'd like to argue?

MS. DE LA PAZ: Yeah, just to -- I guess we don't fully understand why reopening discovery to depose James Daley would be necessary given that, you know, as defendants point out, he has some hearsay testimony that we believe the Rules of Evidence allow to be presented at the PI hearing but at trial, he would obviously not be presenting hearsay testimony. It would be different witnesses speaking to those issues in the context of the permanent relief sought for retaliation. And also, they've had years to depose James Daley. We gave his name in our amended initial disclosures back in 2021 as someone who was involved in the investigation.

THE COURT: Interesting.

Ms. Deith, what's your response to that point that the defendant had time and notice that Mr. Daley was someone with relevant information to plaintiff's claims and could have been deposed years

before?

MS. DEITH: We were not -- we were not aware of the amount of involvement that Mr. Daley had in this case, and it's only been in recent months, due I guess to the depositions of other parties and through these papers, that we see what a large role he's playing. And based upon that and these hearsay statements he has in his declaration, even if your Honor does not want to reopen discovery, we would respectfully request that we at least get to depose James Daley because he does seem to be very involved in the case at this point.

THE COURT: Well, he's involved in the retaliation claim. I think that you're right on that point since his declaration is what was put forward by the Acting Secretary to put facts in the record concerning potential chilling effect or deterrence of other individuals from coming forward, which is one of the harms alleged from the retaliation claim. So he does appear to be central to that theory. It's not clear to me -- I don't know based on the record that I have that he's central to other aspects of the case. I haven't looked at it, as you know. I really don't want to reopen discovery. I just think it will engage in extraordinary delay. The discovery has gone on for a very long time and I think that the claims just need to

be resolved. The parties are very far apart from what I'm hearing here in terms of their understanding of the facts surrounding the retaliation theory.

I'm not inclined to permit amendment with an oral ruling today. I'm inclined to either have the parties brief the issue along with the preliminary injunction arguments. I would permit additional briefing if that's the route that we go. Alternatively, if the Acting Secretary is going to withdraw the request to amend and proceed based on the current complaint, that would then not be necessary. So I think I'm waiting -- I'm going to wait for a response from the plaintiff as to how they want to proceed.

Any questions about that? I'm looking first to plaintiff's counsel.

MS. PFITSCH: No questions about that, your Honor.

THE COURT: Okay, thank you.

MS. PFITSCH: I did want -- I'm sorry.

MS. DEITH: No, go ahead.

MS. PFITSCH: Going back to some of defendants' original arguments -- I'm sorry to go back and let me know if you don't want to hear anymore, but just one small response to defendants' explanations for

their conduct. We recently received a favorable decision on a similar issue in the Northern District. At the motion to dismiss stage, as you're focused on, the legitimate -- the defendants' contentions that their conduct was legitimate and non-discriminatory, non-retaliatory, that comes at the latter part of the McDonnell Douglas standard for the determination of a retaliation case.

So for the purposes of the motion to dismiss standard, which is what applies here for the motion to amend, defendants' explanation may well have -- as you pointed out, may well have explanations of their conduct, but those aren't to be considered in the motion to amend stage. And we had a decision, Walsh v. Ip (ph), 2023 W.L. 3377629, where Judge D'Agostino --

THE COURT: Could you say that again? Thank you so much. I'm taking it down.

MS. PFITSCH: 2023 W.L. 3377629 at *4. Judge D'Agostino outlined that defendants had excuses for -- in that case, the defendants had procured a worker's arrest by ICE in retaliation for his protected activity. Defendants have explanations for their conduct which Judge D'Agostino said at the motion -- at the motion to dismiss stage that we're not required to prove the full case at the motion to amend stage and

those explanations are for a later -- a later time.

THE COURT: And I agree with -- I mean, that is the standard.

MS. PFITSCH: Right.

THE COURT: I think what I'm struggling with is the futility argument. What facts do I look at when assessing the futility argument? Am I looking just at the complaint, the allegations of the proposed amended complaint, or am I looking at those allegations in light of other evidence in the record. So I don't know, and I don't believe the parties have yet told me or given me a case that addresses that question.

Do you see my point? When assessing the futility argument, which is the argument that defendants are raising in response to the motion under Rule 16(b) to amend the complaint for good cause, do I look just at the allegations and the plausibility of the allegations or am I also looking at other facts in the record such as the Daley declaration, the Smith first and second declarations, et cetera?

MS. PFITSCH: At the futility -- at the motion to amend stage, you're just looking at the allegations and the complaint, and we submit that the allegations outlined here are sufficient to overcome -- to show that the case is not -- that the claim is not

futile. We can show a facial plausibility for the prima facie case of retaliation. In fact, we don't need to show the full prima facie case. It's the reasonable inference of liability standard. It's even lower than the prima facie case.

That said, there are as a practical matter examples of situations were courts have done similar to what it sounds like you may be contemplating, to hear the fuller evidence at the -- this is not unusual for there to be mid-litigation a preliminary injunction or TRO against retaliation close to the end of the case. And in the Austin case in particular, the court heard the preliminary injunction, granted a limited -- had the preliminary injunction hearing, granted the limited injunction, the relief that the Secretary was requesting in that case, and at that point then also entertained the motion to amend. I don't think the decision was made at the same point. It may have been made subsequently. There's not a published decision on the amendment.

THE COURT: So the amendment actually may have happened after.

MS. PFITSCH: Yes, it did happen after.

THE COURT: That's very interesting.

MS. PFITSCH: In Southwest Fuel, in

contrast, it doesn't appear from the docket that an amendment was ever made so that the court -- that case was very close to trial. You can tell from the decision that the court also did not want to extend the case for discovery and instead created a case management plan to move the case to trial, but the case settled before -- I believe it settled before trial so there was no retaliation claim amended before any further adjudication. It may have been amended -- the complaint -- sometimes when there's a consent judgment, there's also an amended complaint to support the consent judgment when there's a settlement, so it may be in the final amended complaint that resolved the case along with the consent judgment.

THE COURT: I mean, I think the question of like what is the record I'm looking at to resolve this 16(b) question is an important one and --

MS. PFITSCH: I --

THE COURT: Go ahead.

MS. PFITSCH: I will say, your Honor, that you -- in the motion to dismiss context, the Court can refer to extrinsic evidence when a complaint relies on it. So we cite to the declaration, so that there are motion to dismiss cases where the parties then provide the documents that a complaint explicitly refers to.

THE COURT: Are the declarations explicitly referred to in the proposed amended complaint?

MS. PFITSCH: In paragraphs 94 and 95.

THE COURT: Okay. Let me just take a look. Hold on one second.

MS. PFITSCH: Usually, it's in the sort of opposite context where a complaint refers to a document in part, as we have here, and then in submitting a motion to dismiss, the defendant attaches the full -- says, well, court, if you look at the full document, you have a different inference. So the courts say yes, you can look at that extrinsic evidence if it is referred to in the documents. I think we would contend that it's not necessary but that there's no problem in referring to the declaration. We don't think it changes the inferences that would be brought that --

THE COURT: And these references here in 94 and 95 to defendants' declarations, does that refer to the specific declarations that the plaintiff has identified or the big stack that the defendants have identified?

MS. PFITSCH: We have not seen the big stack. It's only the ones that we appended to -- the declarations that we submitted for the application for the TRO.

THE COURT: For the TRO. Okay.

Any further arguments that you would like to make?

MS. DEITH: Thank you, your Honor. My clients have just brought to my attention that another reason why we feel we should be allowed to take deposition of James Daley is because many of the interviews that he conducted were done after discovery was closed, so these things weren't even discoverable prior to the close of discovery and any questions we could ask him about it did not arise until the close of discovery. So if they're still doing post-discovery-close investigations by James Daley, respectfully, I believe we should be able to depose James Daley. If you don't want to open discovery up for other items at this point, I understand, but we really do implore the Court to allow us to depose Mr. Daley.

THE COURT: If I grant amendment.

MS. DEITH: Yes, if you grant the amendment.

THE COURT: Understood.

MS. DEITH: Also, should you be inclined to grant the amendment, we would like the opportunity to fully brief this and have it be a brief separate for the one for the injunction. We don't want to confuse the issues here so that if you decide no, they can't

amend, great, thank you. But if you decide you want further briefing on this, we would like the opportunity to do a separate brief from the brief that's already been submitted by plaintiff and that we are ready to send in our opposition to. I believe it's due tomorrow. So it would seem a waste of time to then try and coordinate the two together. If you're inclined to want to consider this further, we would do a separate brief on this.

THE COURT: Okay, so thanks for reminding me of the schedule. If I remember correctly, plaintiff has already served their brief in support of the motion for preliminary injunction on the defendant.

MS. DEITH: Yes.

THE COURT: That did not address this amendment question.

MS. DEITH: Right.

THE COURT: Understood. I think it's probably cleaner to keep the briefing separate. I understand that there are some -- there is some duplication and inefficiency in that approach. But given that the plaintiff has already served the brief, I don't think it makes sense to combine briefing, so thank you for raising that issue.

Any concerns about that?

MS. PFITSCH: No, and I think we would be happy to do it on a relatively quick basis so that all of those briefs would be submitted at the time of the PI hearing and you would have both issues before you.

THE COURT: Okay. I think it would be helpful to me if the parties would -- I guess there are two questions. One is whether the Acting Secretary wants to reconsider the request to amend. You may want some time to think about that and confer with colleagues and others. The second is whether the parties wants to propose a briefing schedule. If the Acting Secretary wants to continue with amendment, then to confer on a briefing schedule that is fairly expeditious but complete and thorough and addresses the questions that I've raised.

I've raised a couple of questions about Second Circuit precedent that I'm interested in, particularly with respect to what record I look at when assessing an argument concerning futility. Another that has come up is, if the complaint is not amended, whether the complaint as currently pled would still permit me to entertain the preliminary injunction motion on the retaliation theory. The second is any Second Circuit precedent, courts within the Second Circuit as well, concerning allegedly coercive

interviews with the goal of obtaining declarations as being recognized as an adverse employment action for purposes of an FLSA retaliation theory.

Those are some of the things that I've mentioned and this proceeding has been recorded on FTR so the parties can request a transcript from the court reporter and that could be provided expeditiously as well. I think that is the way I'd like to proceed. If the Acting Secretary wants to take some time, like a day maybe to think about the approach that you want to take and then if you do want to go forward with the amendment, to meet and confer. I think the parties well understand my concerns about opening up discovery and the delays that that can lead to.

I'm happy to see where you land after the plaintiffs go back and think about their position and if they want to proceed, meet and confer with the defendant on an expeditious time line. If we need to put the preliminary injunction hearing back by a week in order to permit adequate briefing on this issue, I'm open to doing that. I do want to make sure that we're expeditiously moving forward.

MS. DEITH: And, your Honor, should you be inclined to allow them to amend the complaint, would we -- would you consider the deposition of James Daley as

the limited additional discovery?

THE COURT: That's an argument you could make in your brief if you want to lay out the authority, the reasons why that's so critical. You heard them say here today that they don't believe it's necessary. If they don't amend the complaint, I don't believe that that request would stand, but that would make sense for you to address I think in your opposition brief.

MS. DEITH: Thank you, thank you.

THE COURT: Yeah.

MS. PFITSCH: Your Honor, do you mind repeating the second -- you laid out three points. One about the record and what you can rely on, on a motion to amend. Do you mind repeating the second point?

THE COURT: You know, I don't remember what I said.

MS. PFITSCH: Okay, we'll get the transcript.

THE COURT: I know the third was about Second Circuit case law concerning adverse actions.

MS. PFITSCH: Right.

THE COURT: And maybe my law clerk knows what I said.

MS. DE LA PAZ: I believe it was whether

amendment is needed to rule on the PI.

THE COURT: Exactly, thank you. If the Acting Secretary does not wish to proceed with the request to amend the complaint and the complaint is as it is, can I move forward with the PI hearing and making findings concerning a preliminary injunction on a retaliation theory?

MS. PFITSCH: All right, thank you.

THE COURT: So does our order of operations make sense? We'll wait to hear from the plaintiff as to their position, if you could file a letter with me just letting me know whether you wish to proceed.

MS. PFITSCH: I think it's much more likely that we're going to proceed with the amendment, so we'll start conferring --

THE COURT: Okay.

MS. PFITSCH: -- with defendants about the briefing schedule. But then also, we will take the question back to the office just to raise it one last time, but we'll confer with defendants about the proposed briefing schedule and get a letter in.

THE COURT: Okay. As I'm indicating to both sides, I would like to keep the PI hearing schedule where it is. If in your meeting and conferring, both sides agree that a limited extension would be helpful,

I'm open to a limited, like one-week extension of time for the exchange of exhibits and witness lists and for the hearing itself. So you can discuss that amongst yourselves as well.

MS. PFITSCH: I'm a bit concerned about our witness availability having been --

THE COURT: Understood.

MS. PFITSCH: -- people focused on the date.

THE COURT: Understood, and I would be as well.

MS. PFITSCH: But we'll discuss that with the defendants.

THE COURT: Yeah. Anything further?

MS. DEITH: No, your Honor, thank you very much. So at this point, I'll be waiting to hear from Ms. Pfitsch regarding whether the Secretary is --

MS. PFITSCH: We're going to discuss a proposed briefing schedule.

MS. DEITH: Oh, I thought before that, you were going to check to see if he was going to withdraw the --

MS. PFITSCH: I think that's unlikely so we'll start conferring you about a briefing schedule.

MS. DEITH: Okay.

THE COURT: Okay. Thank you very much for

your time and your argument. I appreciate it very much.

MS. DEITH: Thank you, your Honor.

MS. PFITSCH: Thank you, your Honor.

* * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON January 13, 2024