UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JULIE A. SU, Acting Secretary of Labor, United States Department of Labor,

Plaintiff,

-against-

SARENE SERVICES, INC. d/b/a SERENE HOME NURSING AGENCY and IRENE MANOLIAS, Individually,

Defendants.

Civil Action No.: 2:20-cv-03273 (WFK/ST)

---

March 29, 2024
5:06 p.m.

DEPOSITION of NEKIETA SMITH, taken by Defendants, pursuant to Notice, held at the offices of SERENE HOME NURSING AGENCY, 42 Academy Street, Patchogue, New York before Wayne Hock, a Notary Public of the State of New York.

A P P E A R A N C E S:

UNITED STATES DEPARTMENT OF LABOR
Attorney for Plaintiff
201 Varick Street
New York, New York 10014
BY: CARINA DE LA PAZ, ESQ.
delapaz.barbara.c@dol.gov

LAW OFFICES OF JOSEPH KALIDA
Attorneys for Defendants
100 Quentin Roosevelt Boulevard
Garden City, New York 11530

BY: FRAN RUDICH, ESQ.
Fran.Rudich@Laborlawfirm.org

ALSO PRESENT

IRENE MANOLIAS
TYLER STAUBER

* * *

N E K I E T A S M I T H, having
been first duly sworn by a
Notary Public of the State of
New York, upon being examined,
testified as follows:

EXAMINATION BY
MS. RUDICH:

Q. Good afternoon, Ms. Smith. My name is Fran Rudich. I represent Serene Nursing Agency in a case pending in the Eastern District of New York.

I'm going to be asking you some questions tonight in connection with that case.

If you don't understand a question, please let me know and I'll rephrase it.

If you don't hear a question, let me know and I'll have the court reporter, who's sitting to your left, read it back.

A. Okay.

Q. If you answer a question, I'm going to assume you heard it and

N. Smith

understood it; okay?

A. Okay.

Q. We understand those are the rules?

A. Yes.

Q. And the other rule is make sure -- let me finish my questions even though you're probably anticipating what they are, because we can't -- because the court reporter takes down everything that's said in the room. So if we're talking over each other, he can't get an accurate record, and I'm sure you would want an accurate record as much as we do. Try not interrupt and I'll do the same, I'll try not to interrupt you as well.

Do you understand you have a right to have an attorney here today?

A. Yes.

Q. But you've chosen not to have an attorney here today?

A. Yes.

Q. So Ms. De La Paz, who's sitting to your right, is not representing you

N. Smith

today?

A. No.

Q. How long have you been a home health aide?

A. Since 2013, so it's a while.

Q. And when were you employed by Serene?

A. I don't remember the exact year and date, but I think it's in two thousand -- I believe 2017/'18, somewhere around that time.

Q. Are you currently employed by Serene?

A. No.

Q. And so when did you stop being employed by Serene?

A. I think 2020 or 2021. Between 2020 and 2021.

Q. And while you were employed by Serene, did you work both as an hourly aide and a live-in aide?

A. Live-in.

Q. So you did not work as an hourly aide?

N. Smith

A. I don't remember working hourly. I don't remember that.

Q. You might have but you don't remember?

A. I don't recall working hourly.

MS. RUDICH: I'm going to ask that this be marked as Nekieta Smith Exhibit 1. It's a one-page document that is a pay stub to Nekieta Natalee Hurd Smith from Serene Services, Inc.

(Whereupon, a document entitled Earnings Statement was marked Defendant's Exhibit 1 for identification.)

Q. Is this an example of an paycheck stub while you were employed at Serene?

A. I never received a pay stub. I usually used ADP, so I never got a copy of my pay stub. It was through ADP.

Q. Direct deposit?

A. Yes.

Q. So while you were employed as a full-time live-in aide, how much did you

N. Smith

earn per week?

A. I don't remember.

Q. If you look at Exhibit 1, that might refresh your memory.

A. How much I earned per hour?

Q. Per week. Per two weeks. This is every two weeks. Oh, this is one week.

A. It says here $2,015.02.

Q. Two thousand one hundred --

A. No, $2,015.02.

Q. Thank you.

Did you consider that salary a good salary?

A. That salary includes overtime.

Q. That's right.

A. Yes.

Q. It does include overtime?

A. Yes.

Q. So you considered that a good salary?

A. It was an okay salary at the time.

Q. Are you employed now?

A. Yes, I am.

N. Smith

Q. And who are you employed by?

A. Is that important?

Q. Yes.

A. I do not wish to say.

MS. RUDICH: Carina?

Q. You have to answer.

THE WITNESS: Do I have to answer?

MS. DE LA PAZ: Yes, you do.

THE WITNESS: Northwell Health.

Q. And what is your position at Northwell Health?

A. Physical therapy aide.

Q. And do you live in someone's house or do you go to different people's houses every day?

A. I do not understand that question.

For my job?

Q. Yes, for your job as a physical therapist aide.

A. No, I work in a facility.

Q. And what are your hours that you work in the facility?

N. Smith

A. I'm 10:00 a.m. to 6:00 p.m. Monday through Thursdays. Friday 8:00 to 4:00 p.m.

Q. So you would have been available to take this deposition after 6:00 during the week?

A. After 6:00 p.m. Monday through Thursday, yes.

Q. Did you work as an hourly aide for Serene or for this -- did you work as an hourly aide for Sisters of St. Joseph for Serene?

A. Sisters of St. Joseph?

Q. Does that name ring a bell with you?

A. It was a night shift, an overnight shift? I'm not -- I'm not sure. I'm not sure.

MS. RUDICH: I'm going to ask that this be marked as Nekieta Smith Exhibit 2. It's a one-page document entitled Serene Home Nursing Agency Aide Activity Sheet.

(Whereupon, a document entitled

N. Smith

Serene Home Nursing Agency Aide Activity Sheet was marked Defendant's Exhibit 2 for identification.)

Q. Ms. Smith, have you ever seen this before?

A. Yes.

Q. What is it?

A. It's an hourly shift.

Q. So does this refresh your memory as to whether or not you worked as an hourly aide while you were employed by Serene?

A. On some cases, yes.

Q. And do you see the -- so the patient name says St. Joseph's Sisters.

A. That's the name of the facility that the patient was in.

Q. Thank you.

A. You're welcome.

Q. Did you contribute to your 401(k) plan that Serene offered you?

A. I don't think so. I don't remember if I was offered a 401(k).

MS. RUDICH: The court reporter,

N. Smith

who's sitting to your left, can't take down shakes of the head or nods or shrugs of the shoulder, so everything has to be verbal.

I'm going to ask that this next document be marked as Nekieta Smith Exhibit 3. It's a multipage document, one, two, three-page document that's titled Home Instead Professional Reference Request.

(Whereupon, a document entitled Home Instead Professional Reference Request was marked Defendant's Exhibit 3 for identification.)

MS. RUDICH: For the record, the second page is titled CastleBranch Employment Verification, and the third page of Exhibit 3 is entitled Preferred Home Care of New York Request For Records.

THE WITNESS: What is CastleBranch?

Q. I will tell you what these are, and that might help you. These are

N. Smith

reference requests that Serene received from jobs that you applied to. So CastleBranch must be the name of a company you applied to.

A. I never heard of CastleBranch. Never.

Q. It might be a corporation.

A. I do not know what corporation that is.

Q. Do you recognize the Home Instead?

A. I do recognize Home Instead, and I did a live-in job with Home Instead.

Q. Did you do those before or after you were employed by Serene?

A. I don't remember if it was before.

Q. Would it refresh your memory if I told you that Home Instead asked Serene for a professional reference? Would that indicate that you applied for a job with them after you were employed by Serene?

A. They asked for -- Serene for a reference?

N. Smith

Q. Yes.

A. So that would be after, yes.

Preferred Home Care, I think I only did in-service with them. I did not work with them directly. I only went to in-service with them. I never had a patient with them. I only did in-service with them and that was it with Preferred.

Q. What do you mean when you say "in-service"?

A. I went for in-service where I would do the paperwork. Orientation. But I never got a case with them. I never did a job with them. I never took a patient with them.

Q. Now, do you see -- can you identify anything negative that Serene wrote on any of these reference requests about your work performance?

A. There's nothing negative on any of them, no.

Q. Did anyone at Serene ever do anything to prevent you from getting your most recent job?

N. Smith

MS. DE LA PAZ: Objection to form.

You can answer.

THE WITNESS: I'm sorry?

Q. Let me go back.

How long have you been working in your current job?

A. I recently started February 5.

Q. And were you unemployed before that?

A. No, I worked at Stony Brook as a nurse assistant.

Q. So did anybody at Serene do anything to prevent you from getting your most recent job?

MS. DE LA PAZ: Objection to form.

You can answer.

THE WITNESS: Prevent me from getting?

Q. Did they do anything to stop you from getting your most recent job?

A. No, because I never needed any information from Serene to get the

N. Smith

position that I'm in right now, so no.

Q. Did they give you a bad reference for your position you have now?

MS. DE LA PAZ: Objection to form.

You can answer.

THE WITNESS: What's the question?

Q. Did Serene give you a bad reference?

MS. RUDICH: Withdrawn.

Can you read back my last question, please.

Q. Did Serene give you a bad reference for your most recent job?

MS. DE LA PAZ: Objection to form.

You can answer.

THE WITNESS: I didn't need a reference from Serene for my present job.

Q. Did you ask for a reference from Serene for your present job?

A. No, I did not.

N. Smith

Q. So Serene did not do anything to prevent you from getting your most recent job?

A. No, they did not.

Q. What was your employer immediately before your current position?

A. Stony Brook.

Q. And what was your position there?

A. Nurse assistant.

Q. At the hospital?

A. Yes.

Q. And did Serene do anything to prevent you from getting that job?

MS. DE LA PAZ: Objection to form.

THE WITNESS: No.

Q. How long did you work at Stony Brook? From when to when?

A. November, 2019 until I resigned November -- I resigned January -- I don't remember exact, but I did two years at Stony Brook.

Q. Starting which year?

N. Smith

A. 2019 November.
Q. So November, 2019 until 2021?
A. I'm not a hundred percent sure on the year, but I believe so.
Q. So you worked at Stony Brook when you were also working at Serene?
A. Yes.
Q. What month in 2021 did you stop working for Stony Brook Hospital?
A. I don't remember.
MS. RUDICH: I'm going to ask that this document be marked as Nekieta Smith Exhibit 4. It's a two-page e-mail dated October 20, 2020.
(Whereupon, an e-mail dated October 20, 2020 was marked Defendant's Exhibit 4 for identification.)
MS. DE LA PAZ: Objection.
What is this -- how is this within the scope of this deposition?
MS. RUDICH: Because she put in her declaration that she enjoyed

N. Smith

working for Serene and Serene was a good place to work and this is an example of why it's a good place to work.

MS. DE LA PAZ: When did she put that in her declaration? What declaration are you talking about?

MS. RUDICH: Well, this does --

Q. Did you --

MS. DE LA PAZ: Fran, I'm going to object and ask the witness -- and request that the witness not answer.

MS. RUDICH: You can't do that.

MS. DE LA PAZ: I can request that she not answer. She doesn't have to take my advice.

MS. RUDICH: No, you can't.

MS. DE LA PAZ: I can't instruct her not to answer but I can request that she not answer.

MS. RUDICH: This is ridiculous.

MS. DE LA PAZ: Fran, we can go off the record and you can explain to me how this is within the scope of the

N. Smith

deposition and I will happily let you ask the question.

MS. RUDICH: Let's go off the record.

(Discussion held off the record)

Q. Did you ever see these texts before today?

A. What texts? The e-mails?

Q. I'm sorry, the e-mail. You're right.

MS. DE LA PAZ: I'm going to put a standing objection on the record to this entire line of questioning, but I'll allow the witness to answer.

Q. Did you ever see this e-mail before?

A. I can't recall, but --

Q. Is that your e-mail?

A. Yes.

Q. That's your correct e-mail?

A. Yes.

Q. Now, did you ask Serene to help you get a mortgage when you bought your place?

N. Smith

A. No.

Q. Then what is this e-mail about?

A. Okay.

This e-mail is -- I wasn't working with Serene when I started my house buying process and I started -- I was at Stony Brook. The loan mortgagor said I'm new working at Stony Brook, so my previous job before I started working at Stony Brook, I would need a letter from my previous job. So I reached out to them because they were the one I was working with before I started working at Stony Brook asking them for an employment letter, proof of employment letter.

Q. And did Serene give you that proof of employment?

A. I don't know if it was sent over. I'm not sure.

Q. Did you get a mortgage?

A. I did my mortgage, yes.

Q. And when you asked for this employment letter, were you an employee of Serene?

N. Smith

A. No, I was not.

Q. Do you think that this is something that Serene had to do for a former employee such as yourself or was it a nice thing to do?

MS. DE LA PAZ: Objection to form.

THE WITNESS: What's the question? Sorry.

MS. RUDICH: Can you read back the question, please.

(Whereupon the requested portion was read back by the reporter)

THE WITNESS: They didn't -- they didn't do anything, no. Nothing was sent over.

Q. How do you know that?

A. It stated right here on the back letter. It said, "hi, Kathy, I spoke with Lupe from the mortgage company. She said nothing is needed at this time", so nothing was sent over from Serene to my mortgage company.

Q. Well, because you had already --

N. Smith

they had already sent the -- did you call Serene to ask them to write -- was the HR department helpful and efficient when you worked at Serene to address any issues that you had brought up to them?

A. I never had any issue.

Q. So you never had an issue when you were employed with Serene that needed to be addressed by the HR?

A. No.

Q. So congratulations on your new job.

A. Thank you.

Q. Did you leave Serene on good terms in 2021?

A. Yes.

Q. Did you get along with everyone at Serene?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I never had an issue with anyone at Serene.

Q. Did you ever communicate in any way any type of issue or concern either

N. Smith

personnel or patient-related with anyone at Serene which you felt went unaddressed?

A. I think once.

Q. And what was that?

A. It was -- I don't remember who the patient is, who the patient was, but it was like one time I called. I think the patient wasn't sleeping and I called to say that the patient wasn't sleeping and I did not really get a good response.

Q. And what was the patient's name?

A. I don't remember the patient. But I -- I don't remember. I don't remember the patient's name.

Q. How many patients did you work with when you were employed by Serene?

A. I don't remember.

Q. More than five?

A. No.

Q. More than three?

A. I think it's around maybe two to three.

Q. Who did you call when your patient wasn't sleeping?

N. Smith

A. Who did I call?

Q. You said you called Serene, so I'm wondering who did you call?

A. I don't remember who I spoke with. There was a couple of them in the office.

Q. So you only called one time about this particular patient?

A. No, it's a couple of times.

Q. And what did you want Serene to do?

A. It's not what I want them to do. I was just trying to let them know that the patient wasn't sleeping and I wasn't getting sleep.

Q. Did you write that on any of your timesheets?

A. No. There's nowhere on the timesheet for me to put that in.

MS. RUDICH: I'm going to ask that this next document be marked as Nekieta Smith Exhibit 5. It's a one-page document entitled Live-in Personal Care Aide Policy Addendum,

N. Smith

Noncompliance Reporting For Mandatory Rest and Breaks.

(Whereupon, a document entitled Live-in Personal Care Aide Policy Addendum, Noncompliance Reporting For Mandatory Rest and Breaks was marked Defendant's Exhibit 5 for identification.)

THE WITNESS: Who was my supervisor? Because I don't know who my supervisor is.

Q. I can't answer your questions, but I understand what you're asking.

A. No, I'm just curious.

Q. Did you have a nursing supervisor that --

A. No, not that I know of.

Q. So when you were a home healthcare aide, you didn't have a nursing supervisor that you reported to if you had any problems with your patient?

A. No. I normally would -- it would normally be I would talk to -- like I said, I called a couple of times and I

N. Smith

don't remember who I spoke with, and it was like I got something like if the patient is a problem, we can put someone else in the spot.

Q. Now, when you worked for Serene, did you, in fact, have a respite aide when you weren't getting sleep during the night?

MS. DE LA PAZ: Objection to form.

THE WITNESS: No. I can't remember that.

Q. You didn't have a respite aide?

A. I don't remember that.

Q. Was your patient -- did you have a patient with the initials AG?

A. AG?

Q. I could say it off the record but I can't put it on the record, if you would like me to tell you off the record. But I can't put it on the record because it's a HIPAA violation.

MS. DE LA PAZ: Do you want to go off the record so she can say the full

N. Smith

name of the patient?

THE WITNESS: Yes, please.

MS. RUDICH: Off the record.

(Discussion held off the record)

MS. RUDICH: Off the record, we told Ms. Smith the name of one of her patients.

Q. Does that refresh your memory whether or not AG was your patient?

A. Yes.

Q. Did AG wear diapers?

A. Yes. She's bedbound.

Q. What is a respite aide?

A. Someone that will cover for you to get rest.

Q. Who is -- did you ever hear of an individual named Ingrid Leon?

A. Ingrid? I don't remember that name.

Q. Was Ingrid Leon a respite aide that was assigned to your patient while you were also assigned to the patient?

A. I don't remember the person's name.

N. Smith

Q. Did you have a respite aide while you were assigned to AG?

A. Not all the time. I don't remember the person's name.

Q. Would you say AG was your patient about ninety percent of the time that you worked at Serene?

A. Ninety percent? I'm not -- I don't think she's ninety percent of the time, no.

Q. Was Ingrid completely responsible for your patient from 11:00 p.m. until 7:00 a.m. every night so that you could sleep eight hours uninterrupted?

MS. DE LA PAZ: Objection to form; foundation.

THE WITNESS: There was no sleep at all. I was in the hall. The patient was right there. I was on the couch and the patient was right in front of me, so there was no sleep at all.

Q. Did you tell Serene that there was no sleep at all?

N. Smith

A. They were aware of it, yes.

Q. How were they aware of it?

A. The family told them the area that the patient is living in, the daughter. We was in a living room and the patient was in a hospital bed. There was a couch that we slept on and the patient was in the middle of the couch, in the middle of where the couch is.

Q. Was it a sleeper couch?

A. No.

Q. So you slept with the patient on a couch?

A. The patient was in a bed and it was a couch. Ingrid would be on one side of the couch and I would be on one side for the time that I remember. So we would be sitting up there.

MS. RUDICH: Let's take a break, please.

(Whereupon a break was taken)

Q. So if Ingrid said you were sleeping every night she was in the house with you, would she be lying?

N. Smith

MS. DE LA PAZ: Objection to form; foundation.

THE WITNESS: She cannot say that I'm sleeping because we're in the same area. Even if she has to change a patient, there's no sleep for me. We stay in the same little hallway. There's a couch on the side and the mother's bed is in the middle. She sleeps on one side of the couch and I'm on the other side. So anything she's doing with the AG, I'm right there.

Q. So you do know who Ingrid is?

A. I don't remember her name, but I know some nights a lady come. I don't know her name. I don't remember the person's name.

Q. Were you attending to the patient from 11:00 p.m. to 7:00 a.m. when the other aide was present?

A. Yes, I do. Yes.

Q. What were you doing when you were up during the night when the aide was

N. Smith

there, the other aide?

A. What do you mean what I was doing?

Q. Well, did you have responsibility for the patient when the respite aide was there?

A. Yes, we still have to turn the patient every three hours.

Q. Did you turn them or did the respite aide turn them?

A. Assist. I can't turn her on her own.

Q. Could the respite aide turn her on their own?

A. Not all the time. I don't remember -- I don't remember the person's name that was there not all the time, there was not someone there every night.

Q. Did you have an order to turn the patient?

MS. DE LA PAZ: Objection to form.

Q. Every two hours.

A. Not every two hours, no. Three

N. Smith

hours.

Q. You had an order from the doctor to turn the patient --

A. Not the doctor.

Q. From whom did you --

A. The daughter.

Q. So the daughter told you to turn the patient every three hours?

A. Yes.

Q. Were you allowed to touch the patient as a home healthcare aide?

MS. DE LA PAZ: Objection to form.

THE WITNESS: What do you mean "touch the patient"?

Q. Were you allowed to put your hands on patients as a home healthcare aide?

A. Yes.

Q. When you were up during the night for patient AG, did you put that on your timesheets?

A. There was just -- I don't understand the question.

N. Smith

If I put it on my timesheet?

Q. Did you indicate on any of your activity sheets that you were up during the night with patient AG?

A. No, I never did.

Q. Why not?

A. I have no reason and no idea.

Q. If Ingrid said in a declaration that you never did anything from 11:00 p.m. to 7:00 a.m. while she was there, would she be lying?

MS. DE LA PAZ: Objection to form.

I'm going to request that you don't answer that.

Fran, is there any foundation --

MS. RUDICH: You can't request --

MS. DE LA PAZ: I can request.

MS. RUDICH: We're not doing this.

MS. DE LA PAZ: Fran, do you have any foundation to make a representation? Ingrid has not provided a declaration in this case

yet as far as I'm aware, so what is your foundation for representing to the witness what Ingrid said?

MS. RUDICH: We spoke to her.

Q. So if Ingrid told me --

MS. DE LA PAZ: So you're making a representation right now on the record that you spoke to Ingrid already?

MS. RUDICH: Not me but my client.

MS. MANOLIAS: We asked.

You want to look her up? Are you going to get her to lie, too, like you get everybody else to lie? This is ridiculous.

MS. DE LA PAZ: Fran, please refrain from accusing -- Fran, this is getting extremely unprofessional.

MS. RUDICH: No, you are being extremely unprofessional.

MS. DE LA PAZ: I don't understand how, but --

MS. RUDICH: Well, I don't

N. Smith

understand how I am, too. I'm upset that your witnesses keep lying. We have proof that they're lying and they keep lying.

So let's introduce --

MS. DE LA PAZ: If you can represent that you've already spoken to Ingrid, then go ahead and ask the question.

Q. We did speak to Ingrid and she told us that you were snoring on the couch during the night.

A. Me?

Q. Yes.

A. I'm not aware of that.

MS. MANOLIAS: Ask her what a respite aide does.

Q. What does a respite aide do?

A. I answered that already.

Q. Please answer the question.

A. They assist.

Q. They assist during the night or all the time?

A. All the time.

N. Smith

MS. RUDICH: Off the record.

(Whereupon a break was taken)

Q. I'm going to ask you some questions about Exhibit 5.

Did you ever see this document before today?

A. I don't remember seeing it.

Q. Is that your signature?

A. That's my initial, not my signature.

Q. Are those your initials?

A. Yes.

Q. And did you sign this that you understood you had -- that for patient -- I'm going to refer you to the third paragraph down. "For patient safety and to preserve the rights of the personal care aide, the personal care aide must report to the nursing supervisor within twelve hours the noncompliance events the following information".

What did you understand that to mean?

A. That I should call the

N. Smith

supervisor.

Q. And who was your supervisor?

A. I do not know.

Q. During COVID, did a nurse call you every day?

A. No.

Q. A nurse -- did a nurse ever call you during COVID?

A. I can't remember, no. I can't remember if someone called me.

Q. Did Tyler ever call you during COVID?

A. No.

Q. Tyler is the gentleman sitting to my --

A. I know his name, not his face. It's the first time meeting him, seeing him.

Q. Did Tyler call you during COVID?

A. I think Tyler call me this year.

Q. This year?

A. This year, last year. Between last year to this year. But it's not during COVID.

N. Smith

Q. Did you understand that you had to report all incidents of overtime within twelve hours?

A. I know it should be reported, but I don't know -- I know it should be reported, but they told us to report it before the pay period.

Q. So it's your testimony today that you did not have any calls from a nurse during COVID?

A. Yes.

Q. And you do understand you're under oath and it's the penalties of perjury?

A. I know.

I do not getting a call from any nurse.

Q. And you're under oath, and your testimony today -- I just want to be clear -- is that you did not have a nursing supervisor?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I did not say I

N. Smith

did not have. I said I do not know who my nursing supervisor is.

Q. Did the nursing supervisor ever call you while you were employed by Serene?

A. No. The only person I can remember calling me is Tyler.

Q. Did you do anything to prepare for your deposition today?

A. No.

Q. Did you speak to Carina De La Paz?

A. Yes.

Q. What did you say to her?

A. What do you mean?

Q. How many times did you speak to Carina about this deposition?

A. A couple of times.

Q. When was the first time?

A. I don't remember exactly when.

Q. Within the past month?

A. The first time, sometime last year.

Q. And what did she say to you and

N. Smith

you say to her during your first conversation with her about this deposition?

A. She called, she introduced herself, she told me there was a lawsuit going on between Serene and the company that she work for, and I was like oh, that's kind of surprising. I'm wondering why someone from Serene called me to offer me a job. Yes.

So it was after that, I knew that there was a lawsuit going on.

Q. Did Ms. De La Paz tell you what type of questions were going to be asked here today?

A. No.

Q. Did she tell you how you should answer the questions?

A. No. She said to answer truthfully.

Q. That's all she said about the questions?

A. Yes.

Q. What else did she say -- during

N. Smith

the two or three conversations you had with Ms. De La Paz about this deposition, what else did she tell you?

A. She was just asking me if I have any paperwork to submit.

Q. And what kind of paperwork was she asking you about?

A. Like work, like the timesheets and stuff like that.

Q. Why are you here today?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't understand that question.

Q. Did Ms. De La Paz explain to you why you had to appear here today?

A. Not really, no.

Q. What do you understand is the reason why you're here today?

A. That we weren't paid for a certain amount of hours and they're trying to get Serene to pay us for the hours we worked.

Q. And what hours weren't you paid

N. Smith

for?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Unpaid break time, because sometimes we don't get break times.

Q. And did Ms. De La Paz tell you that this case was about unpaid break times?

A. No.

Q. How do you know that this case is about unpaid break time?

A. It's the way she explained it, but she didn't directly said unpaid break time.

Q. What did she say?

A. It was just a lawsuit going on about unpaid -- about unpaid time that we worked, whether we get time to sleep or not.

Q. How would Serene know that you were not sleeping for having your breaks if you didn't tell them?

MS. DE LA PAZ: Objection to

N. Smith

form.

THE WITNESS: So before Carina called, I did get a call from someone that they were representing Serene, and that person called to ask me if, during the time that I was working at Serene, they called to ask me if I was getting paid for break or my sleep time. So I did have a call from someone that was asking me those questions.

Q. Did Carina ask you about where you slept at your patients' homes?

A. No.

Q. Did you tell her where you slept?

A. Yes.

Q. And what did she say to you after you told her that?

A. I don't remember what she said. I don't remember.

Q. Did she say that that would be part of your claim in this lawsuit?

A. No. She never stated what would

be my claim or anything, no.

Q. Do you know what your claim is in this lawsuit?

A. Not fully.

Q. So what do you know your claim to be?

A. That I will be paid for no lunch break that I wasn't taking, that I wasn't able to take, and sleep time that I wasn't getting.

Q. And it's your testimony today that you did not tell Serene that you weren't getting breaks or sleep time?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Like I said, a couple of times I called in and I was told, if you cannot do the job, we'll find someone to replace you.

Q. And who did you speak with?

A. I don't remember exactly.

Q. Was it Tyler?

A. No.

Q. Was it Valerie from human

N. Smith

resources?

A. I don't remember the person's name.

Q. So this unidentifiable person told you that you could not work if you can't handle the job?

A. Yes.

Q. Look at your pay stub, Exhibit 1 I think it was.

Do you see on it that there's a line on it -- do you the column that's entitled Earnings? The first -- on the left-hand side, it says earnings.

A. Yes.

Q. And the second line down says overtime?

A. Yes.

Q. Does that indicate that you got overtime?

A. Yes.

Q. So you did get paid overtime?

A. Yes.

Q. So what are you -- what do you believe you're still owed them?

N. Smith

MS. DE LA PAZ: Objection to form.

You can answer.

THE WITNESS: Overtime is referred to as more hours -- it's more than forty hours, so it's considered overtime. So I do more than the hours I was scheduled for, so it was more than forty hours.

Q. And you got paid for those hours; correct?

A. Yes.

Q. Does Serene owe you any money sitting here today?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I do not wish to answer that question.

Q. You have to answer it.

A. Yes.

Q. And what do they owe you for?

A. Sleep time and break time.

Q. Did Ingrid do her job well?

MS. DE LA PAZ: Objection to

N. Smith

form.

THE WITNESS: I do not know who Ingrid is.

Q. The respite aide that you worked with.

Did she do her job well?

A. I assist her.

Q. That's not what I asked. I asked if she did her job well.

A. I assist her.

Q. What does that mean?

A. I was helping her.

Q. So did she do her job well?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I was helping her. I don't know if you would consider that she's doing a good job if I have to assist her.

Q. Have you ever testified at deposition before?

A. Never.

Q. Do you know who Nicole Stahl is?

A. No.

N. Smith

Q. Did you ever speak to anybody with the name of Nicole from the Department of Labor?

A. Nicole? No.

Q. Did you ever speak to anyone from the Department of Labor named James Daly or Jim Daly?

A. I can't remember, no.

Q. How many people from the Department of Labor have you spoken with?

A. Two.

Q. And who are they?

A. Her (indicating).

Q. Carina?

A. Carina.

I don't remember the other lady's name.

Q. Was it Hollis?

A. Yes.

Q. And what did Hollis say to you about the case?

A. I don't remember what she said to me.

Q. Did Hollis talk to you about

this deposition?

A. Most -- I think I spoke to her once or twice. But for most time, I spoke -- the other times I spoke with Carina.

Q. So when you spoke to Hollis about this deposition, what did she say to you?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't remember exactly what she said, but she was the first one I spoke to before I got to Carina.

Q. How about generally what did she say to you?

A. From I can remember, she was the one who told me the beginning that there was a case going on.

Q. And what were you assisting the respite aide with while she was working with you?

A. Positioning, turning the patient, stuff like that.

Q. Is that it? Anything else?

N. Smith

A. That's basically it with her with AG.

Q. Did you have a respite aide for any other patients while you were employed by Serene?

A. No. I can't remember.

Q. Why did Ingrid need your help in positioning the patient?

A. The patient is paraplegic, so even me, I need help turning the position of the patient.

Q. So who helped you during the day when the respite aide wasn't there?

A. The daughter.

Q. The daughter lived at the house?

A. Yes, with her husband. Both the husband and daughter lived in the house.

Q. So she always needed two people to help position the patient?

A. No, not all the time. I mean, yes, but if there's no one there, we'll figure it out.

Q. Is it your testimony today that you never slept a full night while you

N. Smith

were taking care of AG?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Not every night.

Q. Every night you did not sleep a full night?

A. Right, correct.

Q. And how long were you working with AG?

A. I do not remember the period how long I was working with her for.

Q. Was it more than six months?

A. I don't remember the exact time.

Q. Well, I'm asking -- was it more than three months?

A. I do not remember the exact time.

Q. So if I tell you that you worked for AG from August, 2020 through January, 2021, would that refresh your memory?

A. I don't remember the exact time.

Q. I'm not asking you the exact time. I'm just asking --

A. Round and about?

N. Smith

Q. Yes, roundabout.

A. Possibly.

Q. So you possibly worked for AG for five months?

A. I'm not sure.

Q. And so is it your testimony that for the entire time that you worked for AG, you never got more than -- you never got five hours of uninterrupted sleep?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Not every night.

Q. So some nights you did?

A. Some nights I did, yes.

Q. So when you testified that you never got a full night's sleep -- and we can go back to the testimony -- were you mistaken?

MS. DE LA PAZ: Objection to form. Mischaracterizes prior testimony.

MS. RUDICH: Let's go back. We'll just search for when she said she never slept for a night.

N. Smith

THE WITNESS: Okay.

Q. So the only communicated with Serene once time that you had a concern about your patient; correct?

A. I never said once. I said a couple of times.

Q. I'll read you the question and the answer.

"Did you ever communicate in any way any type of issue or concern, either personal or patient-related, with anyone at Serene that which you felt went unaddressed".

"I think once".

That's your testimony today.

MS. DE LA PAZ: Objection.

Fran, she also later testified that she called a couple of times.

Q. Well, then which testimony is correct then, either the couple of times or the once?

A. A couple of times.

Q. So when you testified under oath that you only called once, that was not

N. Smith

true?

MS. DE LA PAZ: Objection to form.

THE WITNESS: What was the question?

Q. "Did you ever communicate in any way any type of issue or concern, either personal or patient-related, with anyone at Serene which went unaddressed".

And then you said: "I think once".

A. I think.

Q. So do you think once or a few times?

A. A couple of times.

Q. So the once here was not true?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I think I said.

Q. Right, you think once, and I'm saying was that true if you said a couple of times?

A. It was a couple of times.

Q. So that wasn't true when you

N. Smith

said --

MS. DE LA PAZ: Objection to form.

MS. RUDICH: What's the objection, Carina?

MS. DE LA PAZ: You're mischaracterizing her testimony.

MS. RUDICH: I'm reading it right from the transcript.

MS. DE LA PAZ: And you're saying that she was lying when she --

MS. RUDICH: I'm saying you can't --

MS. DE LA PAZ: You just said that wasn't true and I'm objecting because that's mischaracterizing the fact. She said she thought once and then she said it was a couple of times. I don't see how that's a lie, I don't see how that's even a contradiction, and we're still on the record. This is all the same deposition.

Q. So it's your testimony today

N. Smith

that you were not sleeping regularly for five hours uninterrupted while you worked for AG; correct?

A. Yes.

Q. And you never told -- did you ever tell Serene that?

A. No.

Q. How would Serene know that you weren't sleeping?

MS. DE LA PAZ: Objection to form.

Q. If you didn't tell them.

A. Like I said before that I reported a couple of times and I was told that if I can't do the job, they can find someone else who can.

Q. And you don't know the name of the person who said that to you?

A. No.

Q. Did you take notes during these conversations?

A. No, I did not.

Q. But even though the person told you if you couldn't do the job, you should

N. Smith

-- you could get a new job, you still have to report overtime to your employer; correct?

A. I should have, yes.

Q. And you didn't?

A. No.

Q. And so today, almost three years after you were employed by Serene, you remembered that you didn't sleep or eat but you didn't tell them at the same time that you weren't eating or sleeping; correct?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Yes.

Q. And did you decide to say that after you spoke to the Department of Labor about this lawsuit?

A. No. I just did not report it because I was in a situation and I needed the job, so I didn't report it, because I was told that they could give somebody else my job if I can't do it, so I just did not report it because I didn't want to

lose my job.

Q. But your pay stub indicates that you did get overtime.

MS. DE LA PAZ: Objection to form.

Q. So is it your testimony today that Serene didn't want to pay you the money they owed you if they already paid you overtime?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't understand your question.

Q. Why wouldn't Serene want to opinion why didn't you report any respite -- why didn't you report your respite aide for not doing a good job so that you could sleep?

MS. DE LA PAZ: Objection to form.

THE WITNESS: There's no -- I couldn't report her because, like I said, the patient was in the living room and there was a couch right in

front. So when she's there and I'm there, there's nowhere I could go to get sleep because she's right there with the patient. We was right on the couch.

Q. Did you tell Serene that you had to stay with the respite aide during the night?

A. No.

Q. Do you think that would be something that Serene would want to know so that you could get sleep?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Like I said, I called in a few times and I was told, if I can't do the job, they could replace me, and I did not want to lose my job, so I didn't call it in.

Q. What number did you call?

A. I don't remember.

Q. Do you have it on your phone?

A. I don't think it right now.

Q. Do you have the same phone today

that you had when you reported that you weren't sleeping?

A. No.

Q. You have a different phone?

A. Yes.

Q. What is your telephone number?

A. PII - phone number .

Q. And who is your provider?

A. T-Mobile.

Q. And you called from that number to report that you weren't sleeping?

A. I don't think I have this number at that time. I don't remember.

Q. What number did you have prior to PII - phone number , what number did you have before that number?

A. It was (908), that's all I remember, it's a (908) number.

Q. So when we subpoena T-Mobile for this number, it will have all the calls you made while you had PII - phone number ?

A. Yes.

Q. And how long have you had the number PII - phone number ?

N. Smith

A. I believe 2020 or 2021.

Q. And so you had this number during some of the time you were employed by Serene?

A. I believe so.

Q. And have you used your cell phone to call Serene about not sleeping during the night?

A. I did not report that I wasn't sleeping.

Q. What did you report then?

A. I told you, I called a couple of times and did say that the lady wasn't sleeping and I was told that if I cannot do the job, they can find someone else to replace me.

Q. When you called, did you tell them that you weren't sleeping?

A. Yes.

Q. So you did tell Serene you weren't sleeping?

A. It was a case where -- yes, yes.

Q. And if you had this number, it would have been from your cell phone you

N. Smith

would have called them?

A. Yes, I would have a cell phone.

MS. DE LA PAZ: Fran, this is getting very outside of the scope of the retaliation.

MS. RUDICH: It's okay.

Let's take a break.

(Whereupon a break was taken)

Q. I'm referring you to Exhibit Number 5, please.

Do you have it in front of you?

A. Yes.

Q. Did you understand -- when you read this, did you understand it?

A. I honestly did not read this. It was sent in a PDF. I just signed. I honestly did not read it.

Q. Well, I'm going to refer you to the last paragraph where it says, "please acknowledge by signing and dating this form that you have read and understood live-in personal care aide policy addendum".

Do you see that?

N. Smith

A. Yes.

Q. So were you telling -- was that truthful when you signed this?

A. I did not read it.

Q. So it was not truthful?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I did not read it. I just signed it because it was sent in a PDF.

Q. Was this policy explained to you on the phone?

A. No, no.

Q. How many times have you spoken to Tyler Stauber on the phone before November of 2023?

A. Before November? I don't know the timing, but I don't know if I spoke to him before November. I don't know.

Q. Did Tyler Stauber call you to ask you about overtime occurrences while working at Serene and ask you to sign the declarations?

A. Yes.

N. Smith

Q. How many times did you speak to Tyler in November of 2023?

A. It was a couple of times. I don't know exactly the amount of times, but it was a couple of times he called.

Q. And during any of those times, did you tell Tyler that you were unemployed?

A. No.

Q. You never told Tyler you were unemployed?

A. No, because I was never unemployed. No.

Q. Did you ever tell Tyler you were looking for a job?

A. No, no.

Q. Were you looking for a job?

A. No. No, I wasn't.

Q. So when -- now, in your declaration, you stated that Tyler told you to call somebody to get a job for Serene; correct?

A. He told me to call somebody? No.

N. Smith

Q. Where were you working in December of 2023?

A. Northwell, South Shore Hospital.

Q. Is it your testimony today that there was no place for you to write that you worked overtime during the night?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't understand that question.

Q. Why didn't you ever write on your activity sheet that you were up during the night?

A. Because I called in a couple of times and I were told if I cannot do the job. I'm literally being told stop complaining or we'll find somebody else to replace you.

Q. Did anybody tell you that that was said to other people that were employed by Serene?

A. No.

Q. Did Carina tell you that somebody testified at a deposition in this

N. Smith

case that they were told the same thing?

A. No.

Q. Did Hollis tell you?

A. No.

Q. What did Hollis tell you your deposition was going to be about?

A. Hollis, I never spoke to Hollis about this deposition.

Q. What did you speak to Hollis about then?

A. Like I said, she told me there was a lawsuit going on. Like I said, I spoke to her maybe like once or twice, and then I started speaking to her (indicating). So I haven't spoke to Hollis in a while.

Q. Did you first learn that this lawsuit was about missing meal breaks and not sleeping when you -- did you first learn about it when you spoke to Carina?

A. No.

Q. When did you learn about it?

A. When someone from Serene called me and started asking me if I was getting

N. Smith

my lunch break and sleep time, and I was telling them that some days I do get and sometimes I don't. What I have to do to get my lunch break is whenever the patient is having her break, I would take my break time with that patient. So I had a person call me from Serene informing me that oh, we're just checking in to see how was your work at Serene and they want to offer me a job but they want to know what it was like my experience working with Serene and if I was getting my lunch break or whatever. And it was after that then I heard from Carina and what's her name.

Q. So what did you do after you received this call from -- did you call the Department of Labor right after you received this call from Tyler?

A. I never called the Department of Labor.

Q. So how did they know that you received a call from Tyler?

A. They called me. I got a call from what's her name. Not her

N. Smith

(indicating).

Q. Hollis?

A. Hollis.

Q. And what did Hollis say to you during this call?

A. It was just saying that there was a lawsuit going on between Serene and workers.

Q. So you never told Hollis or Carina that you received a call from Serene asking about your time working there?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Yes, I did. It was then that I said to Hollis like oh, so that's the reason why someone from Serene called me and was asking me about lunch break. And after that, I started getting a lot of calls from Serene, from Tyler.

Q. How many --

A. A couple of times he called me about doing a declaration.

N. Smith

Q. Did you ever sign a declaration?

A. No.

Q. Did you feel harassed about the declaration?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Yes.

Q. Did you tell Hollis that you worked with a respite aide?

A. No.

Q. Did you tell Hollis that, when the respite aide was there, you were off duty?

A. No.

Q. Did you ever tell Carina that you had a respite aide?

A. No.

Q. Did you ever tell Carina that, when the respite aide was there, you were off duty?

A. No.

Q. Did you think that would be important to tell them?

A. Yes.

N. Smith

Q. But you didn't tell them?

A. Because I didn't remember of having a respite aide.

Q. But now you do remember?

A. You said someone was there. Like I said, I do not remember the person's name, but I know some nights there was a lady.

Q. And the nights that the lady was there, is it your testimony that you had to sleep with her on the couch?

A. Yes.

Q. Did she sleep, too? You're under oath.

A. I don't wish to answer that question.

Q. You have to.

A. I wouldn't say she sleeps, I wouldn't say she sleeps.

Q. So you were both up never night during the night --

MS. DE LA PAZ: Objection to form.

Q. -- while you worked for AG?

N. Smith

A. Most of the night, yes.

Q. And so for the entire time you worked for AG, is it your testimony that for the majority of nights that you were there, you did not get five hours of uninterrupted sleep?

A. I never said majority, I said some nights.

Q. So was it more than half the time?

A. The nights that she was there --

MS. DE LA PAZ: Fran, I've let this go for a long time, but this has nothing to do with the retaliation.

MS. RUDICH: It does.

MS. DE LA PAZ: No, it doesn't.

Q. How were you retaliated against, Ms. Smith?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't understand that question.

Q. Were you retaliated against by Serene in any way at any time?

MS. DE LA PAZ: Objection to form.

Q. You could answer.

A. I think I was when I called and I asked about -- when I was explaining and I was told, if I can't do the job, they'll find someone to replace me.

Q. Was that the only retaliation you experienced from Serene?

A. And lately, when the other guy called me --

Q. Retaliation is defined as an action taken against an employee to punish that employee for complaining about labor law violations and providing information to the Department of Labor or participating in any proceedings at the Department of Labor.

MS. DE LA PAZ: Objection --

Finish your question.

Q. Did you experience that when you were employed by Serene?

MS. DE LA PAZ: Objection to form.

N. Smith

THE WITNESS: Yes.

Q. How?

A. I was -- when I called and I complained about the patient, I were told, if I cannot do the job, they'll find someone to replace me.

Q. And that was the only time you felt you were retaliated against by Serene?

A. During when I'm working. But the other day when I got a call from someone from Serene that told me that, if I do not sign the deposition [sic] and I needed a reference, Serene would not give me a reference if I do not sign the declaration that was sent to me.

Q. And you spoke to Tyler about the declaration?

A. I did.

Q. So Tyler was the one who told you that?

MS. DE LA PAZ: Objection to form.

THE WITNESS: No, it was someone

N. Smith

else.

Q. So you spoke to somebody else at Serene about your declaration?

A. It wasn't about the declaration.

Q. Did you speak to -- did you submit a declaration in connection with this case?

A. What is a declaration?

Q. A signed statement under oath.

MS. DE LA PAZ: Objection.

THE WITNESS: From who?

Q. From you.

A. If I made a declaration to who?

Q. For this case.

A. I don't know. I was sent a couple from Tyler, but I never signed anything.

MS. DE LA PAZ: Fran, we can go off the record and take a break for you to look for the declarations.

(Whereupon a break was taken)

MS. RUDICH: I'm going to ask that this document be marked as Exhibit 6. It's a multipage

N. Smith

declaration of Nekieta Smith dated December 5, 2023.

(Whereupon, a document entitled Declaration of Nekieta Smith was marked Defendant's Exhibit 6 for identification.)

Q. Is it your testimony today that AG was a paraplegic?
A. Yes, she is.
Q. She is a paraplegic?
A. She was. She passed away.
Q. So she couldn't walk or move her arms?
A. She could walk -- no, she couldn't walk. She used a wheelchair. She have a wheelchair.
Q. What is your understanding of what a paraplegic is?
A. A person who cannot move.
Q. So it's your testimony today that AG couldn't move?
A. Her legs, she couldn't move. She could move her hands, but her legs, we have to put her in a wheelchair.

N. Smith

Q. So if we have documents that show she wasn't a paraplegic, would those documents be inaccurate?

MS. DE LA PAZ: Objection to form.

MS. RUDICH: Don't worry, I'm getting them.

THE WITNESS: No, but she wasn't able to walk. She used a wheelchair. She is not able to move on her own, no.

Q. So when she was in bed, she couldn't roll over or switch positions?

A. No.

MS. RUDICH: Off the record.

(Whereupon a break was taken)

Q. How many declarations did Tyler send you?

A. I think three or four.

Q. Were they the same declarations or were they different?

A. They were different.

Q. So he sent you three or four different declarations?

N. Smith

MS. DE LA PAZ: Objection to form.

THE WITNESS: Yes.

Q. So Tyler sent you two or three different declarations.

Did you sign any of them?

A. No.

Q. Why not?

A. Because of what I was told. If I didn't sign them and I needed a reference, I wouldn't get it.

Q. But you didn't sign them?

A. No. I felt like I was being bullied to sign them.

MS. RUDICH: I'm going to ask that this be marked as Nekieta Smith Exhibit 7.

(Whereupon, a document entitled Personal Care was marked Defendant's Exhibit 7 for identification.)

Q. You testified that you didn't sign the declarations Tyler sent you; correct?

A. Yes.

N. Smith

Q. Were you retaliated in any way for not signing them?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I was told if I didn't sign them and I needed a reference, Serene wouldn't offer me one.

Q. But did Serene give you references?

A. I'm not aware of it.

Q. I'm going to show you what's been marked as Exhibit 3. They are the references that we spoke about earlier from Serene.

You just testified that you are not aware of any references given by Serene, yet I marked that as an exhibit in this deposition.

MS. DE LA PAZ: Objection to form. Mischaracterizes.

Q. Did you testify just now that you are not aware of any references that Serene gave you?

N. Smith

A. I did.

Q. What are those that are contained in Exhibit 3?

A. You guys gave me three pieces of paper. I'm not aware of one.

Q. Are they references?

A. I suppose so.

Q. What are they entitled?

A. It has my name. It says professional references request.

Q. Does that change your testimony about whether Serene ever gave references for you?

MS. DE LA PAZ: Objection to form. Mischaracterizes.

THE WITNESS: I said I'm not aware. In other words, I didn't remember.

Q. I understand you don't remember.

Does that refresh your memory?

A. Yes.

Q. Did Serene ever give you references?

A. Yes.

N. Smith

Q. Have you ever seen Exhibit 7 before, Ms. Smith?

A. No.

Q. This is a personal care plan for your patient AG.

Do you see where it says, "daily activities"?

MS. DE LA PAZ: Objection.

Fran, I'm going to object.

Can you lay some foundation that this plan of care actually applied during the time period that Ms. Smith was caring for this patient? This document is dated November, 2019.

THE WITNESS: And she never got showered. She never took a shower.

Q. But she could?

A. No.

MS. DE LA PAZ: Wait, don't volunteer.

MS. RUDICH: You're not -- you don't represent her, so please don't give her instructions.

MS. DE LA PAZ: I'm not giving

N. Smith

her instructions.

MS. RUDICH: You just said it, don't volunteer.

MS. DE LA PAZ: I'm giving her advice.

MS. RUDICH: You can't give her advice.

MS. DE LA PAZ: Yes, I can.

Q. During our break, did you speak to Carina about this deposition?

A. No.

Q. Have you spoken to Carina about this deposition since it started?

A. You mean today?

Q. Yes.

A. No.

Q. Does this indicate that Ms. AG was a paraplegic?

MS. DE LA PAZ: Objection.

Again, Fran, can we please lay some foundation --

MS. RUDICH: I'm asking her about that document right in front of her.

MS. DE LA PAZ: That she's never

N. Smith

seen before.

MS. RUDICH: But she can read.

THE WITNESS: I used the wrong word, paraplegic, but she's not able to move on her own. She uses a wheelchair.

Q. Do you know what "ambulation" means?

A. No.

Q. Did Ms. AG use a walker?

A. No.

Q. Did Ms. AG use a wheelchair?

A. Yes.

MS. RUDICH: I'm going to ask that this be marked as Nekieta Smith Exhibit 8. It's a multipage document entitled Declaration of Nekieta Smith, and it is four pages, and it is dated November 16 -- sorry, November 5, 2023.

(Whereupon, a document entitled Declaration of Nekieta Smith was marked Defendant's Exhibit 8 for identification.)

N. Smith

MS. DE LA PAZ: Sorry, Fran, I'm seeing a declaration that's dated December 5, 2023. You just said November 5.

MS. RUDICH: I misspoke, I misspoke, December 5.

Q. Have you ever seen this document before today?

A. Yes.

Q. What is it?

A. A statement that I gave.

Q. Is it a declaration under oath?

A. Yes.

MS. DE LA PAZ: Objection to form.

MS. RUDICH: What's the objection?

MS. DE LA PAZ: "Under oath" is vague and confusing here.

Q. Do you see on the first line, "I, Nekieta Smith, declare under penalty of perjury as prescribed by 28 U.S. Section 1756 [sic] that the following is true and correct"?

N. Smith

So everything in this declaration you're swearing is true and correct.

A. Yes.

Q. Did you write this declaration?

A. I didn't write it. It was -- I spoke it. It was a statement.

Q. So who typed it up?

A. No idea.

Q. Did you sign this?

A. I did.

Q. Is that your signature on the third page?

A. Yes.

Q. And how did you first obtain possession of this to sign it?

A. It was an e-mail that was sent to me.

Q. By who?

A. I don't remember who sent it to me. I think it's either Carina or --

Q. Hollis?

A. Hollis, yes. I don't remember which of them.

Q. And they e-mailed it to you?
A. It was -- yes. It was a conversation over the phone and I told them what happened.
Q. Are these your words or are these the words that Ms. Hollis or Carina typed up from what you told them?
A. No, these are my words.
Q. All these are your words?
A. Yes.
Q. Let's go through it.
I'm referring you to paragraph two.
A. Okay.
Q. You say, "I gave some information about my work hours and mentioned specific patients".
What information did you give to the person from Serene who called you about your work hours and your specific patients?
A. So when the guy called me and was asking me about my lunch break and my sleep time, that person I gave those

information to.

Q. But you don't know who that person was?

A. No. He did told me his time, but like I said, I wasn't expecting anything, like I didn't know anything lawsuit was going on or anything. It was after I spoke to the guy, then I heard from Hollis.

Q. So Hollis called you. You didn't call Hollis after you spoke with the person at Serene?

A. No. I got a call.

Q. You didn't call the Department of Labor?

A. No.

Q. They called you?

A. Yes.

Q. And what did they say when they called you?

A. They told me there was a lawsuit going on with Serene.

Q. Did you ask them what the lawsuit was about?

N. Smith

A. No, I said oh, that's the reason why someone from Serene called me and was asking me about my lunch break and my sleep time.

Q. Did the person from Serene tell you about the lawsuit?

A. No.

Q. Let's go back to your testimony.

You said you learned about the lawsuit when somebody from Serene called you and asked you about your lunch breaks and sleep time?

A. No, I said after the person called me, it was then that I learned about the lawsuit.

Q. So how did you first learn about the lawsuit?

A. After the person called me, then I heard from -- I keep forgetting her name.

MS. DE LA PAZ: Hollis.

THE WITNESS: Hollis.

Q. So you learned about the lawsuit.

N. Smith

Who told you about the lawsuit first?

A. Hollis.

Q. When she called you?

A. Yes.

Q. And what did she tell you that the lawsuit was about?

MS. DE LA PAZ: Objection to form.

THE WITNESS: She told me that there was a lawsuit going on with Serene for unpaid time and lunch with the employees.

Q. Was that the first time you thought you could be owed money by Serene for your unpaid lunch breaks and sleep time?

A. No.

Q. Did you decide that this lawsuit applied to you because you weren't paid for your sleep time and meal breaks?

A. Yes.

Q. Do you expect to receive money in this lawsuit?

N. Smith

A. Yes.

Q. Are you testifying today so you could receive that money?

MS. DE LA PAZ: Objection to form.

THE WITNESS: No.

Q. Why are you testifying today?

A. Because I know that I worked and I worked the hours that I wasn't paid for.

Q. Did Serene retaliate against you in any way after you refused to sign the declaration they sent you?

A. Yes.

Q. How?

A. I was told that if I do not sign the declaration and I need a reference from Serene, they won't give it to me.

Q. But they gave you the references.

MS. DE LA PAZ: Objection to form.

THE WITNESS: This is after everything went on.

Q. Did Tyler tell you that they

wouldn't give you a reference?

A. I don't know if it was Tyler or the other guy.

Q. If I make a representation on the record under oath that only Tyler called you, would that refresh your memory as to who called you?

MS. DE LA PAZ: Objection to form; foundation.

THE WITNESS: It can, but it wasn't only Tyler that called me. I have the person's number.

Q. Do you have it with you? Please say it on the record.

A. I do not have it with me.

Q. Do you have your phone with you?

A. I do have my phone with me.

Q. Did they call you on your cell phone?

A. Yes, but that's from last year. I do not have the record on my phone.

Q. Can you check, please?

A. I do not have to check because I know I do not have the record on my --

N. Smith

Q. How do you know you don't have the record?

A. It only keeps the call log for a certain period of time.

Q. So did Tyler send you a declaration to sign?

A. He sent me a couple of them.

Q. And they were all different?

A. Yes.

MS. DE LA PAZ: Objection to form.

Q. So the one that was attached to your declaration that you submitted was one of them, so you have other ones in your possession?

A. Say that again?

Q. Do you have all the declarations that were sent to you in your possession?

A. No, I do not.

Q. What happened to them?

A. After a while, the file expires. You cannot open the file. After a while, the file expires.

Q. So how do you know that they

N. Smith

were all different?

A. Because the dates on the top, they were all different employment dates. They all have different employment dates.

Q. Why did you wait to announce being owed overtime until Hollis called you?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Because I moved on. I honestly never remembered anything about it.

Q. So sitting here today, you don't remember any details about it?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Not that I don't remember any details about it because I'm giving you the details that I know of. I said I just moved on.

Q. So if we get a declaration from Ingrid, your respite aide, that you did sleep and you were off duty, would she be lying?

N. Smith

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't know.

Q. You don't know if she'd be lying?

A. No.

Q. So did you sleep?

A. Not all the time, no.

MS. DE LA PAZ: Objection to form. Asked and answered quite a few times.

MS. RUDICH: I'm going to ask that this be marked Nekieta Smith Exhibit 9. It's a two-page document entitled Declaration of Nekieta Smith.

(Whereupon, a document entitled Declaration of Nekieta Smith was marked Defendant's Exhibit 9 for identification.)

Q. How many declarations do you remember signing for the Department of Labor?

A. I think three or four.

Q. So let's go to the one in front

N. Smith

of you that's marked as Exhibit 9.

Do you know how DocuSign works?

A. Yes.

Q. Do you know if DocuSign will send you the same document automatically if you don't sign it?

A. You're asking if I know?

Q. Yes.

A. No, I'm not aware of that.

Q. Do you have the text -- paragraph one, "since Serene called me to ask me to sign a statement, Serene representatives have repeatedly sent me copies of the statement and repeatedly sent me text messages asking me to sign it".

Do you have those text messages?

A. I believe I do. I do have messages in my phone.

Q. You have text messages from Serene?

A. Yes.

MS. RUDICH: Did you produce them, Carina?

N. Smith

MS. DE LA PAZ: I want to say they're attached as some of the exhibits to her third declaration.

MS. RUDICH: I'm asking about the second declaration.

MS. DE LA PAZ: That's part of why the third declaration exists, so we could produce and attach those texts.

MS. RUDICH: Did you produce the entire text message?

MS. DE LA PAZ: I believe so.

Q. So I'm going to refer you to the second paragraph of Exhibit 9. "On December 6, a man called me named Jim or Jimmy".

Does that refresh your memory as to the name of the person who called?

A. I believe so.

Q. And when you worked for Serene, did you know anybody named Jim or Jimmy that worked there?

A. No.

Q. If I tell you today that there's

N. Smith

nobody named Jim or Jimmy that works for Serene, would that change your testimony today?

A. No.

Q. Could Jim or Jimmy have been from the Department of Labor?

A. No.

Q. James Daly?

A. No.

Q. So do you see the third paragraph? Did Jim tell you that you did not need the certificate? What certificate are you referring to?

A. No. He told me that if I sign the DocuSign that was sent to me, they would offer me a certificate from Serene, and I told him I do not need a certificate.

Q. What type of certificate did he offer you?

A. I think it's some honor certificate or something like that.

Q. Did you ever get that while you were employed by Serene?

N. Smith

A. No.

Q. So it was an honor certificate?

A. He said it was a certificate like something like honor certificate or something like that. I don't remember exactly. But he offered like, if I don't sign it, I wouldn't get a certificate and I told him I don't need a certificate.

Q. Did he explain to you what the certificate was?

A. No.

Q. Did you ask him what the certificate was?

A. No, because I was not interested in getting the certificate, so I did not ask him what the certificate was for.

Q. What happened when you didn't sign the declaration? What did Serene do to you when you did not sign the declaration?

MS. DE LA PAZ: Objection to form.

THE WITNESS: What they did to me?

N. Smith

Q. Did they retaliate against you for not signing the declaration?

A. Like I told you, I was told if I do not sign it and I need a reference, I will not get a reference.

Q. Did Serene offer you a job?

A. Yes.

Q. Did you consider that to be retaliation?

MS. DE LA PAZ: Objection to form.

THE WITNESS: No, I think that would be them trying to get me to sign the paper so they're offering me a job, so they decided to offer me a job.

Q. Did you ask Serene for a job?

A. No, I did not. No, I did not ask for a job.

Q. Did Serene tell you to speak to somebody in HR about a job?

A. No, no, no.

Q. So is it your testimony today that Serene just offered you a job out of

N. Smith

the blue?

A. Yes, yes.

Q. Did anybody at the Department of Labor tell you that them offering you the certificate was retaliatory?

A. No.

Q. Did anybody at the Department of Labor ever tell you what retaliation meant?

A. No.

Q. But you did look for another job a month after the declaration was sent to you; correct?

MS. DE LA PAZ: Objection to form.

THE WITNESS: Say that again?

Q. You did get a new job a month after the declaration was sent to you?

A. I transferred. I still work for Northwell. I just transferred departments because of the schedule.

Q. So you did get a new position after?

A. Yes.

N. Smith

Q. And were you unhappy with your position prior to the one that you currently have?

A. It was the schedule. I wasn't okay with the schedule.

Q. You were unhappy with the schedule?

MS. DE LA PAZ: Objection.

THE WITNESS: Yes.

Q. Were you looking for a new job because you were unhappy with the schedule?

A. I wasn't looking for a new job because I wasn't going to leave Northwell, I wasn't going to leave the hospital, I wasn't going to leave because of the union, I just wanted a different schedule.

MS. RUDICH: I'm going to ask that this be marked as ten. It's a six-page document entitled Declaration of Nekieta Smith, and it's dated December 27.

(Whereupon, a document entitled Declaration of Nekieta Smith

N. Smith

was marked Defendant's Exhibit 10
for identification.)

Q. Have you ever seen this document before, Ms. Smith?

A. Yes.

Q. What is it?

A. It's a declaration.

Q. Is it your third declaration that you signed in connection with this case?

A. Yes.

Q. Now, is Exhibit D -- Exhibit B --

MS. DE LA PAZ: Just to be clear, we're talking about exhibits that are attached to this declaration?

MS. RUDICH: That's right.

Q. Exhibit B, Exhibit D, were those the entire text messages that you received from Serene after they sent you the declaration?

A. Yes.

Q. Do you consider these text messages to be harassment?

N. Smith

MS. DE LA PAZ: Objection to form.

THE WITNESS: Yes.

Q. Why?

A. I think I was forced to do the DocuSign.

Q. But you didn't do the DocuSign.

A. No, I did not, but I keep getting these messages to remind me to do it.

Q. And that's your -- that's what you consider to be harassing?

A. I never normally get messages from Serene. The only time I get messages from them is them asking me to DocuSign.

Q. I'm asking you, did you consider the fact that they asked you to sign a declaration to be harassment?

A. To the amount of time it was sent to me and I was being called, yes.

MS. RUDICH: Off the record.

(Whereupon a break was taken)

Q. So I'll read you the definition of harassment that's from the

N. Smith

Merriam-Webster dictionary.

"Harassment: Aggressive pressure or intimidation".

Do you believe that you receiving the declarations was aggressive pressure?

A. I believe the phone call that I got that told me that, if I don't sign it, they won't give me a reference is of such.

Q. And what was -- the date of your declaration is December 27, 2023.

Do you see that? Let's look at the dates of the references.

MS. DE LA PAZ: These are the references in Exhibit 3?

MS. RUDICH: Yes.

MS. DE LA PAZ: So Fran, we're asking about Exhibit 3?

MS. RUDICH: Yes.

MS. DE LA PAZ: I'm making sure because she doesn't have it in front of her.

(Discussion held off the record)

MS. RUDICH: I'm going to ask

N. Smith

that this be marked Exhibit 11. It's a one-page document entitled Serene Home Nursing Agency Home Health Certification and Plan of Care. It's dated March 1, 2021.

(Whereupon, a document entitled Serene Home Nursing Agency Home Health Certification and Plan of Care was marked Defendant's Exhibit 11 for identification.)

Q. Were you working for patient AG on March 1, 2021?

A. 2021? I don't remember the dates I was working with her.

Q. Do you see where it says, "safety measures"? It's the box underneath -- do you see where it says, "paralysis"?

A. Yes.

Q. Is that checked off?

A. No.

Q. So does that mean that the patient wasn't paralyzed?

A. Yes.

N. Smith

Q. Is it illegal to turn and position a patient without direction from a doctor?

MS. DE LA PAZ: Objection to form.

THE WITNESS: What's the question?

Q. Is it illegal to turn and position a patient without direction from a doctor or a medical professional?

MS. DE LA PAZ: Objection to form.

THE WITNESS: I don't know.

Q. I'm going to ask you, do you see on the bottom it says nurse's signature, Ashley Evans?

A. Okay.

Q. Does that refresh your memo of who your nursing supervisor was?

A. No.

Q. Did a nursing supervisor ever come to visit you when you worked for AG?

A. I can't remember. No. Never. I don't remember anyone coming there.

N. Smith

Q. When you were employed by Serene, did a nursing supervisor ever visit you at any of your patients' house?

A. No, none that I remember. No.

Q. Were you turning and positioning your patient that wasn't paralyzed?

MS. DE LA PAZ: Objection to form.

THE WITNESS: She was immobile. We have to turn her. We was taught here at Serene orientation that each patient that is bedbound should be turned every three hours. I have copies of in-service that was sent to me from Serene with all those information on it. I do not have them with me.

MS. RUDICH: I ask that they be produced, Carina.

MS. DE LA PAZ: We'll take it under advisement.

Q. Well, why were you to position and turn them in she could move on her own?

N. Smith

A. She wasn't able to move on her own. She was not able to move on her own. All this that say all this, she was not able to move on her own.

Q. So she wasn't paralyzed but she wasn't able to move on her own; is that your testimony today?

A. Yes.

Q. Did anybody at the Department of Labor tell you that Serene was found guilty of not paying overtime?

A. No. No.

Q. Did anybody at the Department of Labor tell you that a lot of home healthcare aides from Serene were saying that they were up all night?

A. No. I heard nothing about no other aide with Serene or whatever.

Q. I just want to make sure I understand.

So you were up many nights when you worked for patient AG; correct?

A. Yes.

Q. And you never once told Serene

N. Smith

you were up during the night?

MS. DE LA PAZ: Objection to form.

Q. Is that true?

A. Like I said before, I did a couple of times and I were told, if I cannot do my job, they will replace me.

Q. And what did you understand them to mean that you couldn't do the job?

A. If I keep complaining, they'll get replacement, they'll find somebody else to give the job to.

Q. What were you complaining about?

A. That I wasn't sleeping and I wasn't getting breaks. It's just like you either shut up or we give somebody else your job.

Q. Who told you that?

MS. DE LA PAZ: Objection to form.

THE WITNESS: When I called the office. I don't know.

Q. Did you work while the respite aide was at Ms. AG's house?

N. Smith

A. If I work?

Q. Yes, while you were working.

A. We work together.

Q. Did Ingrid hear you make any of these calls to Serene?

A. Who is Ingrid?

Q. Did the respite aide --

A. I don't remember the person's name. I know there was a lady there and I did say I don't remember the person's name. I do not remember the person's name.

Q. But you slept with her every night?

MS. DE LA PAZ: Objection to form.

THE WITNESS: We didn't sleep together. We were sitting on the couch.

Q. I meant you were sitting on the couch with her every night but you don't remember her name.

A. I don't remember the person's name, yes.

N. Smith

Q. Do you remember that you had a respite aide?

A. Yes. Some nights, not all the nights.

Q. So did the respite aide hear you call Serene to tell them that you were up during the night?

A. I never called in the night times. I never called at night. I never called them at night.

(Whereupon a break was taken)

MS. RUDICH: I think we're finished for today. I'm not closing the deposition. I might have to recall Ms. Smith.

MS. DE LA PAZ: Is there any reason you can't continue now?

MS. RUDICH: Yes.

MS. DE LA PAZ: Why?

MS. RUDICH: Because all the while she said I need proof to show that she's lying.

MS. DE LA PAZ: So you're saying that your stated reason for being

N. Smith

unable to complete this deposition that Ms. Smith is present for and willing to continue, there is no logistical reason we cannot continue the deposition today?

MS. RUDICH: We get seven hours and I'm done for today. That's it.

MS. DE LA PAZ: Fran, you get seven hours but don't get to divide it up however you -- over the course of several days without a reason.

MS. RUDICH: I'll put this on the record. There are things -- there are things that we learned today that Ms. Smith testified to that we'd like to explore with proof, with evidence, with documents. And we just learned about them today. I'm not ending the deposition. I'm going to call her back because of what she testified to today and what she stated today and we have proof that -- we have proof to contradict that.

MS. DE LA PAZ: Would you like to

N. Smith

introduce that proof now and ask her about it now?

MS. RUDICH: No, we can't right now because we've got to get the transcript. She denies saying things and then I go back and I read them and I want to read the deposition. If I asked her if she stated, she'll just --

MS. DE LA PAZ: So we're adjourning for today. On the record, we're not -- at this time, we are not consenting to bringing Ms. Smith back for a second day, so we can continue to confer about that.

MS. RUDICH: We will. I'll explain to you judge and I'll put all this on the record and I would tell the judge why we need more time.

(CONTINUED ON NEXT PAGE)

N. Smith

MS. DE LA PAZ: You're welcome to do that.

I have no questions.

While we're still on the record, I would like to request a free read and sign copy of the transcript under Federal Rule 30(E). And we can follow that up with you.

(TIME NOTED: 7:44 p.m.)

________________________ (Signature of witness)

Subscribed and sworn to

before me this_________

day of________________,

2024.

_______________________

Notary Public

* * *

# I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| N. Smith | Ms. Rudich | 3 |

# E X H I B I T S

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled Earnings Statement | 6 |
| Exhibit 2 | Document entitled Serene Home Nursing Agency Aide Activity Sheet | 9 |
| Exhibit 3 | Document entitled Home Instead Professional Reference Request | 11 |
| Exhibit 4 | E-mail dated October 20, 2020 | 17 |

I N D E X (continued)

E X H I B I T S (continued)


| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Document entitled Live-in Personal Care Aide Policy Addendum, Noncompliance Reporting For Mandatory Rest and Breaks | 25 |
| Exhibit 6 | Document entitled Declaration of Nekieta Smith | 75 |
| Exhibit 7 | Document entitled Personal Care | 77 |
| Exhibit 8 | Document entitled Declaration of Nekieta Smith | 82 |
| Exhibit 9 | Document entitled Declaration of Nekieta Smith | 93 |
| Exhibit 10 | Document entitled Declaration of Nekieta Smith | 100 |

I N D E X (continued)

E X H I B I T S (continued)

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Document entitled Serene Home Nursing Agency Home Health Certification and Plan of Care | 104 |

ATTORNEY RUDICH FROM LAW OFFICES OF JOSEPH KALIDA HAS RETAINED ALL EXHIBITS

REQUESTS

| Page | Line |
|---|---|
| 106 | 20 |

* * *

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of April, 2024.

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: US DOL V. SERENE
DATE OF DEPOSITION: March 29, 2024
WITNESS' NAME: NEKIETA SMITH

PAGE/LINE(S)/ CHANGE REASON

____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________
____/________/____________________/____________

____________________________
NEKIETA SMITH

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_______DAY
OF_________________,2024.

___________________________
NOTARY PUBLIC

MY COMMISSION EXPIRES_____________________

* * *

**0**
**03273** 1:10
**1**
**1** 6:9,14 7:4 45:9 104:6,13 114:10
**10** 101:2 115:22
**100** 2:9 115:24
**10014** 2:5
**104** 116:9
**106** 116:15
**10:00** 9:2
**11** 104:2,10 114:18 116:5
**11530** 2:9
**16** 82:20
**17** 114:20
**1756** 83:24
**18** 5:11
**1st** 117:23
**2**
**2** 9:22 10:4 114:12
**2,015.02.** 7:9,11
**20** 17:15,18 114:20 116:15
**201** 2:4
**2013** 5:6
**2017** 5:11
**2019** 16:21 17:2,3 80:15
**2020** 5:18,19 17:16,18 51:20 61:2 114:20
**2021** 5:18,19 17:3,9 22:16 51:21 61:2 104:6,13,14
**2023** 63:17 64:3 65:3 75:3 82:21 83:4 103:12
**2024** 1:12 113:15 117:23 118:4,22
**25** 115:10
**27** 100:23 103:12
**28** 83:23
**29** 1:12 118:4
**2:20** 1:10
**3**
**3** 11:8,15,19 78:14 79:4 103:16,19 114:6,16
**30** 113:8
**3922** 117:25
**4**
**4** 17:14,19 114:19
**401** 10:22,24
**42** 1:20
**4:00** 9:4
**5**
**5** 14:9 24:23 25:8 36:5 62:11 75:3 82:20 83:4,5,7 115:5
**516** 60:8,16,22 60:25
**530-5522** 60:8 60:16,22,25
**5:06** 1:13
**6**
**6** 74:25 75:6 95:16 114:11 115:11
**6:00** 9:2,6,8
**7**
**7** 77:18,21 80:2 115:14
**75** 115:13
**77** 115:15
**7:00** 28:14 30:21 33:11
**7:44** 113:10
**8**
**8** 82:17,24 115:16
**82** 115:18
**8:00** 9:3
**9**
**9** 93:15,19 94:2 95:15 114:15 115:19
**908** 60:18,19
**93** 115:21
**a**
**a.m.** 9:2 28:14 30:21 33:11
**able** 44:10 76:10,11 82:5 107:2,3,5,7
**academy** 1:20
**accurate** 4:13 4:15
**accusing** 34:19
**acknowledge** 62:21
**acting** 1:4
**action** 1:10 72:14 117:18
**activities** 80:8
**activity** 9:24 10:3 33:4 65:13 114:14
**actually** 80:12
**addendum** 24:25 25:6 62:24 115:7
**address** 22:5
**addressed** 22:10
**adjourning** 112:12
**adp** 6:20,21
**advice** 18:17 81:6,8
**advisement** 106:22

**aforesaid** 117:8
**afternoon** 3:9
**ag** 26:17,18 27:10,12 28:3 28:6 30:13 32:22 33:5 50:3 51:2,10 51:20 52:4,9 56:4 70:25 71:4 75:9,22 80:6 81:18 82:11,13 104:12 105:23 107:23
**ag's** 108:25
**agency** 1:8,20 3:11 9:23 10:2 104:4,8 114:14 116:7
**aggressive** 103:3,6
**ahead** 35:9
**aide** 5:5,22,22 5:25 6:25 8:14 8:22 9:10,12 9:24 10:2,12 24:25 25:5,20 26:7,14 27:14 27:21 28:2 30:22,25 31:2 31:7,11,14 32:12,19 35:18 35:19 36:19,19 47:5 49:21 50:4,14 58:17 59:8 62:23 69:10,13,17,20 70:4 92:23 107:19 108:25 109:8 110:3,6 114:14 115:7
**aides** 107:16
**allow** 19:15
**allowed** 32:11 32:17
**ambulation** 82:8
**amount** 41:22 64:5 102:20
**announce** 92:6
**answer** 3:24 8:7,9 14:4,19 15:7,19 18:13 18:16,20,21 19:15 25:13 33:16 35:21 40:19,20 46:4 46:19,20 53:9 70:16 72:4
**answered** 35:20 93:11
**anticipating** 4:9
**anybody** 14:14 48:2 65:20 95:22 99:4,8 107:10,14
**appear** 41:17
**applied** 12:3,5 12:22 80:12 88:21
**april** 117:23
**area** 29:4 30:6
**arms** 75:14
**ashley** 105:17
**asked** 12:20,24 20:23 34:13 40:15 47:9,10 72:6 87:12 93:11 102:18 112:9
**asking** 3:13 20:15 25:14 41:5,8 43:11 51:15,23,24 66:25 68:12,19 81:23 85:24 87:4 94:8,16 95:5 102:16,17 103:19
**assigned** 27:22 27:23 28:3
**assist** 31:12 35:22,23 47:8 47:11,20
**assistant** 14:13 16:11
**assisting** 49:20
**assume** 3:25
**attach** 95:9
**attached** 91:13 95:3 101:17
**attending** 30:20
**attorney** 2:4 4:19,22 116:11
**attorneys** 2:8
**august** 51:20
**automatically** 94:6
**available** 9:5
**aware** 29:2,3 34:2 35:16 78:12,18,24 79:6,18 94:10

**b**

**b** 1:7 101:14,19 114:8 115:3 116:3
**back** 3:22 14:6 15:13 21:11,14 21:19 52:18,23 87:9 111:21 112:7,14
**bad** 15:3,10,15
**basically** 50:2
**bed** 29:7,15 30:10 76:13
**bedbound** 27:13 106:13
**beginning** 49:18
**believe** 5:11 17:5 45:25 61:2,6 94:19 95:13,20 103:5 103:8
**bell** 9:15

**blood** 117:18
**blue** 99:2
**bottom** 105:16
**bought** 19:24
**boulevard** 2:9
**box** 104:17
**break** 29:20,22 36:3 42:5,6,9 42:13,15 43:9 44:9 46:23 62:8,9 67:2,5,6 67:6,13 68:20 74:20,22 76:17 81:10 85:24 87:4 102:23 110:12
**breaks** 25:3,7 42:23 44:14 66:19 87:12 88:17,22 108:16 115:10
**bringing** 112:14
**brook** 14:12 16:8,20,24 17:6,10 20:8,9 20:11,15
**brought** 22:6
**bullied** 77:15
**buying** 20:7

**c**

**c** 2:2
**call** 22:2 23:24 24:2,4 36:25 37:5,8,12,20,21 38:17 39:5 43:4,10 59:20 59:21 61:8 63:21 64:22,24 67:8,17,17,19 67:23,24 68:6 68:11 73:12 86:12,14,15 90:19 91:4 103:8 110:7 111:20
**called** 23:8,9 24:3,8 25:25 37:11 40:5,10 43:4,6,8 44:18 53:19,25 59:17 60:11 61:13,18 62:2 64:6 65:15 66:24 67:20,24 68:19 68:24 72:5,12 73:4 85:20,23 86:11,18,21 87:3,11,15,19 88:5 90:7,8,12 92:7 94:12 95:16,19 102:21 108:22 110:9,10,11
**calling** 39:8
**calls** 38:10 60:21 68:21 109:6
**care** 11:20 13:4 24:25 25:5 36:19,19 51:2 62:23 77:20 80:5,12 104:5 104:9 115:6,15 116:9
**carina** 2:6 8:6 39:12,18 43:3 43:13 48:15,16 49:5,14 55:6 65:24 66:21 67:15 68:11 69:16,19 81:11 81:13 84:22 85:7 94:25 106:20
**caring** 80:14
**case** 3:11,15 13:14 33:25 42:9,12 48:22 49:19 61:23 66:2 74:8,15 101:11 118:3
**cases** 10:14
**castlebranch** 11:17,23 12:4 12:6
**cell** 61:7,25 62:3 90:19
**certain** 41:22 91:5
**certificate** 96:13,14,17,19 96:20,23 97:3 97:4,5,8,9,11 97:14,16,17 99:6
**certification** 104:5,9 116:8 117:2
**certify** 117:5,16
**change** 30:6 79:12 96:3 118:5
**check** 90:23,24
**checked** 104:21
**checking** 67:9
**chosen** 4:21
**city** 2:9
**civil** 1:10
**claim** 43:24 44:2,3,6
**clear** 38:20 101:15
**client** 34:12
**closing** 110:14
**column** 45:12
**come** 30:17 105:23
**coming** 105:25
**commencem...** 117:10
**commission** 118:24
**communicate** 22:24 53:10 54:7
**communicated** 53:3
**company** 12:4 21:21,24 40:7

**complained** 73:5
**complaining** 65:18 72:15 108:11,14
**complete** 111:2
**completely** 28:12
**concern** 22:25 53:4,11 54:8
**confer** 112:16
**confusing** 83:20
**congratulations** 22:12
**connection** 3:14 74:7 101:10
**consenting** 112:14
**consider** 7:13 47:18 98:9 101:24 102:13 102:17
**considered** 7:20 46:7
**contained** 79:4
**continue** 110:18 111:4,5 112:15
**continued** 112:21 115:2,3 116:2,3
**contradict** 111:24
**contradiction** 55:22
**contribute** 10:21
**controversy** 117:20
**conversation** 40:3 85:4
**conversations** 41:2 56:22
**copies** 94:15 106:15
**copy** 6:20 113:7
**corporation** 12:8,9
**correct** 19:21 46:12 51:8 53:5,21 56:4 57:4,13 64:23 77:24 83:25 84:4 99:14 107:23
**couch** 28:21 29:8,9,10,11,14 29:16,17 30:9 30:11 35:12 58:25 59:6 70:12 109:20 109:22
**counsel** 117:21
**couple** 24:6,10 25:25 39:19 44:18 53:7,19 53:21,23 54:16 54:22,24 55:19 56:15 61:13 64:4,6 65:15 68:24 74:17 91:8 108:7
**course** 111:11
**court** 1:2 3:20 4:10 10:25
**cover** 27:15
**covid** 37:5,9,13 37:20,25 38:11
**curious** 25:15
**current** 14:8 16:7
**currently** 5:13 100:4
**cv** 1:10

**d**

**d** 1:7 101:13,19 114:4 115:2 116:2
**daily** 80:7
**daly** 48:8,8 96:9
**date** 5:10 103:11 118:4
**dated** 17:15,17 75:2 80:15 82:19 83:3 100:22 104:6 114:19
**dates** 92:3,4,5 103:14 104:15
**dating** 62:21
**daughter** 29:6 32:7,8 50:15 50:16,18
**day** 8:17 37:6 50:13 73:12 112:15 113:14 117:23 118:21
**days** 67:3 111:12
**de** 2:6 4:24 8:10 14:2,17 15:5,17 16:16 17:21 18:6,11 18:15,19,23 19:12 21:7 22:20 26:10,24 28:16 30:2 31:22 32:13 33:13,19,22 34:7,18,23 35:7 38:23 39:12 40:14 41:3,12,16 42:3,8,25 44:15 46:2,16 46:25 47:15 49:9 51:3 52:11,20 53:17 54:3,18 55:3,7 55:11,15 56:11 57:14 58:5,11 58:20 59:14 62:4 63:7 65:8 68:14 69:6 70:23 71:13,17

71:20 72:2,20 72:24 73:23 74:11,19 76:5 77:2 78:4,21 79:15 80:9,20 80:25 81:5,9 81:20,25 83:2 83:15,19 87:22 88:9 89:5,21 90:9 91:11 92:9,16 93:2 93:10 95:2,7 95:13 97:22 98:11 99:15 100:9 101:15 102:2 103:15 103:18,21 105:5,12 106:8 106:21 108:3 108:20 109:16 110:17,20,24 111:9,25 112:11 113:2
**december** 65:3 75:3 83:4,7 95:16 100:23 103:12
**decide** 57:17 88:20
**decided** 98:16
**declaration** 17:25 18:7,8 33:9,25 64:21 68:25 69:2,5 73:17,19 74:4 74:5,7,9,14 75:2,5 82:18 82:23 83:3,13 84:3,6 89:13 89:17 91:7,14 92:22 93:16,18 95:4,6,8 97:19 97:21 98:3 99:13,19 100:21,25 101:8,9,17,22 102:19 103:12 115:12,17,20 115:23
**declarations** 63:24 74:21 76:18,21,25 77:6,23 91:18 93:21 103:6
**declare** 83:22
**defendant's** 6:14 10:3 11:14 17:19 25:8 75:6 77:20 82:24 93:19 101:2 104:10 114:9 115:4 116:4
**defendants** 1:9 1:18 2:8
**defined** 72:13
**definition** 102:24
**delapaz.barb...** 2:6
**denies** 112:6
**department** 1:4 2:3 22:4 48:4,7 48:11 57:18 67:18,20 72:17 72:19 86:15 93:22 96:7 99:4,8 107:10 107:14
**departments** 99:21
**deposit** 6:22
**deposition** 1:17 9:6 17:23 19:2 39:10,18 40:4 41:3 47:22 49:2,7 55:24 65:25 66:7,9 73:14 78:20 81:11,14 110:15 111:2,6 111:20 112:8 118:4
**description** 114:9 115:4 116:4
**details** 92:15 92:19,20
**diapers** 27:12
**dictionary** 103:2
**different** 8:16 60:5 76:22,23 76:25 77:6 91:9 92:2,4,5 100:18
**direct** 6:22
**direction** 105:3 105:10
**directly** 13:6 42:15 117:19
**discussion** 19:6 27:5 103:24
**district** 1:2,2 3:12
**divide** 111:10
**doctor** 32:3,5 105:4,11
**document** 6:9 6:12 9:22,25 11:7,8,9,12 17:13 24:22,24 25:4 36:6 74:24 75:4 77:19 80:15 81:24 82:17,22 83:8 93:15,17 94:6 100:21,24 101:4 104:3,7 114:10,12,16 115:5,11,14,16 115:19,22 116:5
**documents** 76:2,4 111:18
**docusign** 94:3 94:5 96:16 102:7,8,16
**doing** 30:13,24 31:4 33:20

47:19 58:18 68:25
**dol** 118:3
**dol.gov** 2:6
**duly** 3:3 117:9
**duty** 69:14,21 92:24

**e**

**e** 2:2,2 3:2,2 17:15,17 19:9 19:10,16,19,21 20:3,5 84:18 85:2 113:8 114:4,8,19 115:2,3 116:2 116:3
**earlier** 78:15
**earn** 7:2
**earned** 7:6
**earnings** 6:13 45:13,14 114:11
**eastern** 1:2 3:12
**eat** 57:10
**eating** 57:12
**efficient** 22:4
**eight** 28:15
**either** 22:25 53:11,21 54:8 84:22 108:17
**employ** 117:21
**employed** 5:7 5:13,17,20 6:17,24 7:24 8:2 10:12 12:16,23 22:9 23:17 39:5 50:5 57:9 61:4 65:22 72:23 96:25 106:2
**employee** 20:24 21:5 72:14,15
**employees** 88:14
**employer** 16:6 57:3
**employment** 11:18 20:15,16 20:18,24 92:4 92:5
**enjoyed** 17:25
**entire** 19:14 52:8 71:3 95:12 101:20
**entitled** 6:12 9:23,25 11:12 11:19 24:24 25:4 45:13 75:4 77:19 79:9 82:18,22 93:16,17 100:21,24 104:3,7 114:10 114:12,16 115:5,11,14,16 115:19,22 116:5
**errata** 118:2
**esq** 2:6,10
**evans** 105:17
**events** 36:21
**everybody** 34:16
**evidence** 111:17
**exact** 5:9 16:23 51:14,17,22,23
**exactly** 39:21 44:22 49:12 64:5 97:7
**examination** 3:7
**examined** 3:5 114:5
**example** 6:16 18:4
**exhibit** 6:9,14 7:4 9:22 10:4 11:8,15,19 17:14,19 24:23 25:8 36:5 45:9 62:10 74:25 75:6 77:18,21 78:14,19 79:4 80:2 82:17,24 93:15,19 94:2 95:15 101:2,13 101:14,19,19 103:16,19 104:2,10 114:10,12,16 114:19 115:5 115:11,14,16 115:19,22 116:5
**exhibits** 95:4 101:16 116:12
**exists** 95:8
**expect** 88:24
**expecting** 86:6
**experience** 67:12 72:22
**experienced** 72:10
**expires** 91:22 91:24 118:24
**explain** 18:24 41:16 97:10 112:18
**explained** 42:14 63:12
**explaining** 72:6
**explore** 111:17
**extremely** 34:20,22

**f**

**face** 37:17
**facility** 8:23,25 10:17
**fact** 26:7 55:18 102:18
**family** 29:4
**far** 34:2
**february** 14:9
**federal** 113:8
**feel** 69:4
**felt** 23:3 53:13 73:9 77:14

**figure** 50:23
**file** 91:22,23,24
**find** 44:20 56:16 61:16 65:18 72:8 73:6 108:12
**finish** 4:8 72:21
**finished** 110:14
**first** 3:3 37:18 39:20,23 40:2 45:13 49:13 66:18,20 83:21 84:16 87:17 88:3,15
**five** 23:19 52:5 52:10 56:3 71:6
**follow** 113:8
**following** 36:22 83:24
**follows** 3:6
**forced** 102:6
**forgetting** 87:20
**form** 14:3,18 15:6,18 16:17 21:8 22:21 26:11 28:17 30:3 31:23 32:14 33:14 38:24 41:13 42:4 43:2 44:16 46:3,17 47:2,16 49:10 51:4 52:12,21 54:4,19 55:4 56:12 57:15 58:6,12,21 59:15 62:22 63:8 65:9 68:15 69:7 70:24 71:21 72:3,25 73:24 76:6 77:3 78:5 78:22 79:16 83:16 88:10 89:6,22 90:10 91:12 92:10,17 93:3,11 97:23 98:12 99:16 102:3 105:6,13 106:9 108:4,21 109:17
**former** 21:5
**forty** 46:7,10
**found** 107:11
**foundation** 28:17 30:3 33:17,23 34:3 80:11 81:22 90:10
**four** 76:20,24 82:19 93:24
**fran** 2:10 3:10 18:11,23 33:17 33:22 34:18,19 53:18 62:4 71:13 74:19 80:10 81:21 83:2 103:18 111:9
**fran.rudich** 2:11
**free** 113:6
**friday** 9:3
**front** 28:22 59:2 62:12 81:24 93:25 103:22
**full** 6:25 26:25 50:25 51:7 52:17
**fully** 44:5
**further** 117:16

**g**

**garden** 2:9
**generally** 49:15
**gentleman** 37:15
**getting** 13:24 14:15,21,23 16:3,15 24:16 26:8 34:20 38:17 43:9 44:11,14 62:5 66:25 67:13 68:21 76:8 97:16 102:10 108:16
**give** 15:3,10,15 20:17 57:23 73:15 78:10 79:23 80:24 81:7 85:19 89:18 90:2 103:10 108:13 108:17
**given** 78:18
**giving** 80:25 81:5 92:20
**go** 8:16 14:6 18:23 19:4 26:24 35:9 52:18,23 59:3 71:14 74:19 85:12 87:9 93:25 112:7
**going** 3:13,25 6:7 9:20 11:6 17:12 18:11 19:12 24:21 33:15 34:15 36:4,16 40:7 40:13,15 42:18 49:19 62:19 66:7,13 68:8 74:23 77:16 78:13 80:10 82:15 86:8,23 88:12 93:13 95:14 100:15 100:16,17,19 103:25 105:15 111:20
**good** 3:9 7:14 7:20 18:3,4 22:15 23:11 47:19 58:18
**guilty** 107:12

**guy** 72:11 85:23 86:9 90:4
**guys** 79:5

**h**

**h** 3:2 114:8 115:3 116:3
**half** 71:10
**hall** 28:19
**hallway** 30:8
**hand** 45:14 117:23
**handle** 45:7
**hands** 32:18 75:24
**happened** 85:5 91:21 97:18
**happily** 19:2
**harassed** 69:4
**harassing** 102:13
**harassment** 101:25 102:19 102:25 103:3
**head** 11:3
**health** 5:5 8:11 8:13 104:4,8 116:7
**healthcare** 25:20 32:12,18 107:16
**hear** 3:19 27:17 109:5 110:6
**heard** 3:25 12:6 67:14 86:9 87:20 107:18
**held** 1:19 19:6 27:5 103:24 117:7
**help** 11:25 19:23 50:8,11 50:20
**helped** 50:13
**helpful** 22:4
**helping** 47:13 47:17
**hereunto** 117:22
**hi** 21:20
**hipaa** 26:23
**hock** 1:21 117:4
**hollis** 48:19,21 48:25 49:6 66:4,6,8,8,10 66:17 68:3,4,5 68:10,17 69:9 69:12 84:23,24 85:7 86:10,11 86:12 87:22,23 88:4 92:7
**home** 1:7,19 5:4 9:23 10:2 11:10,13,20 12:11,13,14,20 13:4 25:19 32:12,18 104:4 104:4,8,8 107:15 114:13 114:17 116:6,7
**homes** 43:14
**honestly** 62:16 62:18 92:12
**honor** 96:22 97:3,5
**hospital** 16:12 17:10 29:7 65:4 100:16
**hour** 7:6
**hourly** 5:21,24 6:2,6 9:10,12 10:9,12
**hours** 8:24 28:15 31:9,24 31:25 32:2,9 36:21 38:4 41:22,23,25 46:6,7,8,10,12 52:10 56:3 71:6 85:17,21 89:10 106:14 111:7,10
**house** 8:16 20:7 29:24 50:16,18 106:4 108:25
**houses** 8:17
**hr** 22:3,10 98:22
**human** 44:25
**hundred** 7:10 17:4
**hurd** 6:11
**husband** 50:17 50:18

**i**

**idea** 33:8 84:10
**identification** 6:15 10:4 11:15 17:20 25:9 75:7 77:21 82:25 93:20 101:3 104:11
**identify** 13:18
**illegal** 105:2,9
**immediately** 16:7
**immobile** 106:10
**important** 8:3 69:24
**inaccurate** 76:4
**incidents** 38:3
**include** 7:18
**includes** 7:15
**indicate** 12:22 33:3 45:19 81:18
**indicates** 58:3
**indicating** 48:14 66:16 68:2
**indirectly** 117:19
**individual** 27:18
**individually** 1:8

**information** 14:25 36:22 72:16 85:17,19 86:2 106:17
**informing** 67:8
**ingrid** 27:18,19 27:21 28:12 29:16,23 30:15 33:9,24 34:4,6 34:9 35:9,11 46:24 47:4 50:8 92:23 109:5,7
**initial** 36:10
**initials** 26:17 36:12
**instruct** 18:19
**instructions** 80:24 81:2
**interested** 97:15 117:19
**interrupt** 4:16 4:17
**intimidation** 103:4
**introduce** 35:6 112:2
**introduced** 40:5
**irene** 1:8 2:14
**issue** 22:7,8,23 22:25 53:11 54:8
**issues** 22:5

**j**

**james** 48:7 96:9
**january** 16:22 51:20
**jim** 48:8 95:16 95:22 96:2,6 96:12
**jimmy** 95:17,22 96:2,6
**job** 8:20,21 12:14,22 13:15 13:25 14:8,16 14:23 15:16,22 15:24 16:4,15 20:10,12 22:13 40:11 44:19 45:7 46:24 47:7,10,14,19 56:16,25 57:2 57:22,24 58:2 58:18 59:18,20 61:16 64:16,18 64:22 65:17 67:11 72:7 73:6 98:7,16 98:17,18,20,22 98:25 99:12,18 100:11,14 108:8,10,13,18
**jobs** 12:3
**joseph** 2:8 9:12 9:14 116:11
**joseph's** 10:16
**judge** 112:18 112:20
**julie** 1:4

**k**

**k** 3:2 10:22,24
**kalida** 2:8 116:12
**kathy** 21:20
**keep** 35:3,5 87:20 102:9 108:11
**keeps** 91:4
**kind** 40:9 41:7
**knew** 40:12
**know** 3:17,20 12:9 20:19 21:18 24:14 25:11,18 30:15 30:17,18 37:4 37:17 38:5,6,6 38:16 39:2 42:12,22 44:3 44:6 47:3,18 47:24 56:9,18 59:12 63:18,19 63:20 64:5 67:11,22 70:8 74:16 82:8 86:3,7 89:9 90:3,25 91:2 91:25 92:20 93:4,5 94:3,5,8 95:22 105:14 108:23 109:10

**l**

**la** 2:6 4:24 8:10 14:2,17 15:5 15:17 16:16 17:21 18:6,11 18:15,19,23 19:12 21:7 22:20 26:10,24 28:16 30:2 31:22 32:13 33:13,19,22 34:7,18,23 35:7 38:23 39:12 40:14 41:3,12,16 42:3,8,25 44:15 46:2,16 46:25 47:15 49:9 51:3 52:11,20 53:17 54:3,18 55:3,7 55:11,15 56:11 57:14 58:5,11 58:20 59:14 62:4 63:7 65:8 68:14 69:6 70:23 71:13,17 71:20 72:2,20 72:24 73:23 74:11,19 76:5 77:2 78:4,21 79:15 80:9,20 80:25 81:5,9 81:20,25 83:2 83:15,19 87:22

88:9 89:5,21 90:9 91:11 92:9,16 93:2 93:10 95:2,7 95:13 97:22 98:11 99:15 100:9 101:15 102:2 103:15 103:18,21 105:5,12 106:8 106:21 108:3 108:20 109:16 110:17,20,24 111:9,25 112:11 113:2
**labor** 1:4,4 2:3 48:4,7,11 57:18 67:18,21 72:15,17,19 86:16 93:23 96:7 99:5,9 107:11,15
**laborlawfirm....** 2:11
**lady** 30:17 61:14 70:9,10 109:10
**lady's** 48:18
**lately** 72:11
**law** 2:8 72:16 116:11
**lawsuit** 40:6,13 42:18 43:24 44:4 57:19 66:13,19 68:8 86:8,22,25 87:7,11,16,18 87:25 88:2,8 88:12,20,25
**lay** 80:11 81:21
**learn** 66:18,21 66:23 87:17
**learned** 87:10 87:15,24 111:15,18
**leave** 22:15 100:15,16,17
**left** 3:21 11:2 45:14
**legs** 75:23,24
**leon** 27:18,21
**letter** 20:11,16 20:16,24 21:20
**lie** 34:15,16 55:20
**line** 19:14 45:12,16 83:21 116:14 118:5
**literally** 65:17
**little** 30:8
**live** 5:22,23 6:25 8:15 12:14 24:24 25:5 62:23 115:6
**lived** 50:16,18
**living** 29:5,6 58:24
**llc** 118:2
**loan** 20:8
**log** 91:4
**logistical** 111:5
**long** 5:4 14:7 16:19 51:9,12 60:24 71:14
**look** 7:4 34:14 45:9 74:21 99:12 103:13
**looking** 64:16 64:18 100:11 100:14
**lose** 58:2 59:19
**lot** 68:21 107:15
**lunch** 44:8 67:2 67:5,13 68:20 85:24 87:4,12 88:13,17
**lupe** 21:21
**lying** 29:25 33:12 35:3,4,5 55:12 92:25 93:6 110:23

**m**

**m** 3:2
**made** 60:22 74:14
**mail** 17:15,17 19:10,16,19,21 20:3,5 84:18 114:19
**mailed** 85:2
**mails** 19:9
**majority** 71:5,8
**make** 4:7 33:23 90:5 107:20 109:5
**making** 34:7 103:21
**man** 95:16
**mandatory** 25:2,7 115:9
**manolias** 1:8 2:14 34:13 35:17
**march** 1:12 104:6,13 118:4
**marked** 6:8,13 9:21 10:3 11:7 11:14 17:13,18 24:22 25:7 74:24 75:6 77:17,20 78:14 78:19 82:16,24 93:14,19 94:2 100:20 101:2 104:2,10
**marriage** 117:18
**matter** 117:20
**meal** 66:19 88:22
**mean** 13:10 31:3 32:15 36:24 39:16 47:12 50:21 81:15 104:23 108:10

**means** 82:9
**meant** 99:10 109:21
**measures** 104:17
**medical** 105:11
**meeting** 37:18
**memo** 105:19
**memory** 7:5 10:10 12:19 27:9 51:21 79:21 90:7 95:18
**mentioned** 85:18
**merriam** 103:2
**message** 95:12
**messages** 94:16 94:18,20,21 101:20,25 102:10,14,15
**middle** 29:9,10 30:10
**mischaracteri...** 52:21 78:22 79:16
**mischaracteri...** 55:8,17
**missing** 66:19
**misspoke** 83:6 83:7
**mistaken** 52:19
**mobile** 60:10 60:20
**monday** 9:3,8
**money** 46:14 58:9 88:16,24 89:4
**month** 17:9 39:22 99:13,18
**months** 51:13 51:16 52:5
**mortgage** 19:24 20:21,22 21:21,24
**mortgagor** 20:8
**mother's** 30:10
**move** 75:13,20 75:22,23,24 76:11 82:6 106:24 107:2,3 107:5,7
**moved** 92:11 92:21
**multipage** 11:8 74:25 82:17

**n**

**n** 2:2 3:2 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:4,6 115:2 116:2
**name** 3:10 9:15 10:16,17 12:4 23:12,15 27:2 27:7,20,25 28:5 30:16,18 30:19 31:18 37:17 45:4 48:3,18 56:18 67:15,25 70:8 79:10 87:21 95:19 109:10 109:12,13,23 109:25 118:3,4
**named** 27:18 48:7 95:16,22 96:2
**natalee** 6:10
**need** 15:20 20:11 50:8,11 89:17 96:13,18 97:9 98:5 110:22 112:20
**needed** 14:24 21:22 22:9 50:19 57:21 73:15 77:11 78:7
**negative** 13:18 13:21
**nekieta** 1:17 6:8,10 9:21 11:7 17:14 24:23 75:2,5 77:17 82:16,18 82:23 83:22 93:14,16,18 100:22,25 115:12,17,20 115:23 118:4 118:20

**never** 6:19,20 12:6,7 13:7,14 13:14,15 14:24 22:7,8,22 33:6 33:10 43:25 47:23 50:25 52:9,9,17,25 53:6 56:6 64:11,13 66:8 67:20 68:10 70:21 71:8 74:17 80:16,17 81:25 92:12 102:14 105:24 107:25 110:9 110:10,10
**new** 1:2,20,22 2:5,5,9 3:5,12 11:20 20:9 22:12 57:2 99:18,23 100:11,14 117:5 118:2
**nice** 21:6
**nicole** 47:24 48:3,5
**night** 9:17 26:9 28:14 29:24 30:25 31:19 32:22 33:5 35:13,23 50:25 51:5,6,7 52:13 52:25 59:9 61:9 65:7,14 70:21,22 71:2 107:17 108:2 109:15,22 110:8,9,10,11
**night's** 52:17
**nights** 30:17 52:14,15 70:8 70:10 71:5,9 71:12 107:22 110:4,5
**ninety** 28:7,9 28:10
**nods** 11:3
**noncompliance** 25:2,6 36:21 115:8
**normally** 25:23 25:24 102:14
**northwell** 8:11 8:13 65:4 99:21 100:15
**notary** 1:21 3:4 113:16 117:4 118:23
**noted** 113:10
**notes** 56:21
**notice** 1:18
**november** 16:21,22 17:2 17:3 63:17,18 63:20 64:3 80:15 82:20,20 83:5
**number** 59:21 60:7,11,13,15 60:16,17,19,21 60:25 61:3,24 62:11 90:13
**nurse** 14:13 16:11 37:5,8,8 38:11,18
**nurse's** 105:16
**nursing** 1:8,19 3:11 9:23 10:2 25:16,20 36:20 38:21 39:3,4 104:4,8 105:20 105:22 106:3 114:13 116:6

**o**

**oath** 38:14,19 53:24 70:15 74:10 83:13,19 90:6
**object** 18:12 80:10
**objecting** 55:16
**objection** 14:2 14:17 15:5,17 16:16 17:21 19:13 21:7 22:20 26:10 28:16 30:2 31:22 32:13 33:13 38:23 41:12 42:3,25 44:15 46:2,16 46:25 47:15 49:9 51:3 52:11,20 53:17 54:3,18 55:3,6 56:11 57:14 58:5,11,20 59:14 63:7 65:8 68:14 69:6 70:23 71:20 72:2,20 72:24 73:23 74:11 76:5 77:2 78:4,21 79:15 80:9 81:20 83:15,18 88:9 89:5,21 90:9 91:11 92:9,16 93:2 93:10 97:22 98:11 99:15 100:9 102:2 105:5,12 106:8 108:3,20 109:16
**obtain** 84:16
**occurrences** 63:22
**october** 17:15 17:18 114:20
**offer** 40:10 67:10 78:8 96:17,21 98:7 98:16
**offered** 10:22 10:24 97:7 98:25
**offering** 98:15 99:5

**office** 24:7 108:23
**offices** 1:19 2:8 116:11
**oh** 7:8 40:8 67:8 68:18 87:2
**okay** 3:23 4:2,3 7:22 20:4 53:2 62:7 85:15 100:6 105:18
**once** 23:4 49:4 53:4,6,15,22,25 54:12,14,17,21 55:18 66:14 107:25
**ones** 91:15
**open** 91:23
**opinion** 58:16
**order** 31:20 32:3
**orientation** 13:13 106:12
**outside** 62:5
**overnight** 9:18
**overtime** 7:15 7:18 38:3 45:17,20,22 46:5,8 57:3 58:4,10 63:22 65:7 92:7 107:12
**owe** 46:14,22
**owed** 45:25 58:9 88:16
92:7
**own** 31:13,15 76:11 82:6 106:25 107:3,3 107:5,7

**p**

**p** 2:2,2
**p.m.** 1:13 9:2,4 9:8 28:14 30:21 33:11 113:10
**page** 6:9 9:22 11:9,17,19 17:15 24:24 84:14 93:15 100:21 104:3 112:21 114:5,9 115:4 116:4,14 118:5
**pages** 82:19
**paid** 41:21,25 43:9 44:8 45:22 46:11 58:9 88:21 89:10
**paper** 79:6 98:15
**paperwork** 13:13 41:6,7
**paragraph** 36:17 62:20 85:13 94:12 95:15 96:12
**paralysis** 104:19
**paralyzed** 104:24 106:7 107:6
**paraplegic** 50:10 75:9,11 75:19 76:3 81:19 82:5
**part** 43:24 95:7
**participating** 72:18
**particular** 24:9
**parties** 117:17
**passed** 75:12
**past** 39:22
**patchogue** 1:20
**patient** 10:16 10:18 13:8,15 23:2,7,7,9,10 23:13,25 24:9 24:15 25:22 26:4,16,17 27:2,10,22,23 28:7,13,20,21 29:5,7,8,13,15 30:7,21 31:6,9 31:21 32:4,9 32:12,16,22 33:5 36:15,17 49:24 50:9,10 50:12,20 53:5 53:12 54:9 58:24 59:5 67:5,7 73:5 80:6,14 104:12 104:24 105:3 105:10 106:7 106:13 107:23
**patient's** 23:12 23:15
**patients** 23:16 27:8 32:18 43:14 50:5 85:18,22 106:4
**pay** 6:10,19,21 38:8 41:23 45:9 58:3,8
**paycheck** 6:17
**paying** 107:12
**paz** 2:6 4:24 8:10 14:2,17 15:5,17 16:16 17:21 18:6,11 18:15,19,23 19:12 21:7 22:20 26:10,24 28:16 30:2 31:22 32:13 33:13,19,22 34:7,18,23 35:7 38:23 39:13 40:14 41:3,12,16 42:3,8,25 44:15 46:2,16 46:25 47:15 49:9 51:3 52:11,20 53:17 54:3,18 55:3,7 55:11,15 56:11 57:14 58:5,11

58:20 59:14 62:4 63:7 65:8 68:14 69:6 70:23 71:13,17 71:20 72:2,20 72:24 73:23 74:11,19 76:5 77:2 78:4,21 79:15 80:9,20 80:25 81:5,9 81:20,25 83:2 83:15,19 87:22 88:9 89:5,21 90:9 91:11 92:9,16 93:2 93:10 95:2,7 95:13 97:22 98:11 99:15 100:9 101:15 102:2 103:15 103:18,21 105:5,12 106:8 106:21 108:3 108:20 109:16 110:17,20,24 111:9,25 112:11 113:2
**pdf** 62:17 63:11
**penalties** 38:14
**penalty** 83:22
**pending** 3:11
**people** 48:10 50:19 65:21
**people's** 8:16
**percent** 17:4 28:7,9,10
**performance** 13:20
**period** 38:8 51:11 80:13 91:5
**perjury** 38:15 83:23
**person** 39:7 43:6 45:5 56:19,24 67:7 75:20 85:20,25 86:4,13 87:6 87:14,19 95:19
**person's** 27:24 28:5 30:19 31:17 45:3 70:8 90:13 109:9,11,12,24
**personal** 24:25 25:5 36:18,19 53:12 54:9 62:23 77:20 80:5 115:6,15
**personnel** 23:2
**phone** 59:23,25 60:5 61:8,25 62:3 63:13,16 85:4 90:17,18 90:20,22 94:20 103:8
**physical** 8:14 8:21
**pieces** 79:5
**place** 18:3,4 19:25 65:6 117:8
**plaintiff** 1:5 2:4
**plan** 10:22 80:5 80:12 104:5,9 116:8
**please** 3:17 15:14 21:12 27:3 29:21 34:18 35:21 62:11,20 80:23 81:21 90:14,23
**policy** 24:25 25:5 62:23 63:12 115:7
**portion** 21:13
**position** 8:12 15:2,4 16:7,9 50:11,20 99:23 100:3 105:3,10 106:23
**positioning** 49:23 50:9 106:6
**positions** 76:14
**possession** 84:17 91:16,19
**possibly** 52:3,4
**preferred** 11:20 13:4,9
**prepare** 39:9
**prescribed** 83:23
**present** 2:12 15:21,24 30:22 111:3
**preserve** 36:18
**pressure** 103:3 103:7
**prevent** 13:24 14:15,20 16:3 16:15
**previous** 20:10 20:12
**prior** 52:21 60:15 100:3
**probably** 4:9
**problem** 26:4
**problems** 25:22
**proceeding** 117:7
**proceedings** 72:18
**process** 20:7
**produce** 94:24 95:9,11
**produced** 106:20
**professional** 11:10,13 12:21 79:11 105:11 114:17
**proof** 20:16,18 35:4 110:22 111:17,23,23 112:2
**provided** 33:25

**provider** 60:9
**providing** 72:16
**public** 1:21 3:4 113:16 117:4 118:23
**punish** 72:14
**pursuant** 1:18
**put** 17:24 18:6 19:12 24:20 26:4,20,22 32:17,22 33:2 75:25 111:13 112:18

**q**

**quentin** 2:9
**question** 3:17 3:19,24 8:19 15:9,14 19:3 21:10,12 32:25 35:10,21 41:15 46:19 53:8 54:6 58:14 65:11 70:17 71:23 72:21 105:8
**questioning** 19:14
**questions** 3:14 4:8 25:13 36:5 40:15,19,23 43:12 113:4
**quite** 93:11

**r**

**r** 2:2
**reached** 20:12
**read** 3:21 15:13 21:11,14 53:8 62:15,16,18,22 63:5,9 82:3 102:24 112:7,8 113:6
**reading** 55:9
**really** 23:11 41:18
**reason** 33:8 41:20 68:18 87:2 110:18,25 111:5,12 118:5
**recall** 6:6 19:18 110:16
**receive** 88:24 89:4
**received** 6:19 12:2 67:17,19 67:23 68:11 101:20
**receiving** 103:6
**recent** 13:25 14:16,23 15:16 16:3
**recently** 14:9
**recognize** 12:11,13
**record** 4:14,15 11:16 18:24 19:5,6,13 26:19,20,21,22 26:25 27:4,5,6 34:9 36:2 55:23 74:20 76:16 90:6,15 90:22,25 91:3 102:22 103:24 111:14 112:12 112:19 113:5 117:14
**records** 11:21
**refer** 36:16 62:19 95:14
**reference** 11:11 11:13 12:2,21 12:25 13:19 15:4,11,16,21 15:23 73:15,16 77:12 78:8 89:17 90:2 98:5,6 103:10 114:18
**references** 78:11,15,18,24 79:7,11,13,24 89:20 103:14 103:16
**referred** 46:6
**referring** 62:10 85:13 96:14
**refrain** 34:19
**refresh** 7:5 10:10 12:19 27:9 51:21 79:21 90:7 95:18 105:19
**refused** 89:12
**regularly** 56:2
**related** 23:2 53:12 54:9 117:17
**remember** 5:9 6:2,3,5 7:3 10:24 12:17 16:23 17:11 23:6,13,14,15 23:18 24:5 26:2,13,15 27:19,24 28:5 29:18 30:16,18 31:17,17 36:8 37:10,11 39:8 39:21 43:21,22 44:22 45:3 48:9,17,23 49:11,17 50:7 51:11,14,17,22 59:22 60:14,19 70:3,5,7 79:19 79:20 84:21,24 92:15,19 93:22 97:6 104:14 105:24,25 106:5 109:9,11 109:12,23,24 110:2
**remembered** 57:10 92:12
**remind** 102:10
**repeatedly** 94:14,15

**rephrase** 3:18
**replace** 44:20 59:19 61:17 65:19 72:8 73:7 108:8
**replacement** 108:12
**report** 36:20 38:3,7 57:3,20 57:22,25 58:16 58:17,23 60:12 61:10,12
**reported** 25:21 38:5,7 56:15 60:2
**reporter** 3:21 4:11 10:25 21:14 117:2
**reporting** 25:2 25:6 115:8 118:2
**represent** 3:10 35:8 80:23
**representation** 33:24 34:8 90:5
**representatives** 94:14
**representing** 4:25 34:3 43:5
**request** 11:11 11:14,21 18:13 18:15,20 33:15 33:18,19 79:11 113:6 114:18
**requested** 21:13
**requests** 12:2 13:19 116:13
**resigned** 16:21 16:22
**resources** 45:2
**respite** 26:7,14 27:14,21 28:2 31:7,11,14 35:18,19 47:5 49:21 50:4,14 58:16,17 59:8 69:10,13,17,20 70:4 92:23 108:24 109:8 110:3,6
**response** 23:11
**responsibility** 31:6
**responsible** 28:13
**rest** 25:3,7 27:16 115:9
**retained** 116:12
**retaliate** 89:11 98:2
**retaliated** 71:18,24 73:9 78:2
**retaliation** 62:6 71:15 72:9,13 98:10 99:9
**retaliatory** 99:6
**ridiculous** 18:22 34:17
**right** 4:19,25 7:16 15:2 19:11 21:19 28:20,21 30:13 34:8 51:8 54:21 55:9 58:25 59:4,5 59:24 67:18 81:24 101:18 112:4
**rights** 36:18
**ring** 9:15
**roll** 76:14
**room** 4:12 29:6 58:25
**roosevelt** 2:9
**round** 51:25
**roundabout** 52:2
**rudich** 2:10 3:8 3:10 6:7 8:6 9:20 10:25 11:16 15:12 17:12,24 18:9 18:14,18,22 19:4 21:11 24:21 27:4,6 29:20 33:18,20 34:5,11,21,25 36:2 52:23 55:5,9,13 62:7 71:16 74:23 76:7,16 77:16 80:22 81:3,7 81:23 82:3,15 83:6,17 93:13 94:24 95:5,11 100:19 101:18 102:22 103:17 103:20,25 106:19 110:13 110:19,21 111:7,13 112:4 112:17 114:6 116:11
**rule** 4:7 113:8
**rules** 4:5

**s**

**s** 2:2 3:2 114:8 115:3 116:3 118:5
**safety** 36:17 104:17
**salary** 7:13,14 7:15,21,22
**sarene** 1:7
**saying** 54:22 55:11,13 68:7 107:16 110:24 112:6
**says** 7:9 10:16 45:14,16 62:20 79:10 80:7 104:16,18 105:16

**schedule** 99:22 100:5,6,8,13,18
**scheduled** 46:9
**scope** 17:23 18:25 62:5
**search** 52:24
**second** 11:17 45:16 95:6,15 112:15
**secretary** 1:4
**section** 83:24
**see** 10:15 13:17 19:7,16 36:6 45:11 55:20,21 62:25 67:9 80:7 83:21 96:11 103:13 104:16,18 105:15
**seeing** 36:8 37:18 83:3
**seen** 10:5 80:2 82:2 83:8 101:4
**send** 76:19 91:6 94:6
**sent** 20:19 21:17,23 22:2 62:17 63:10 73:17 74:16 76:24 77:5,23 84:18,21 89:13 91:8,19 94:14 94:16 96:16 99:13,19 101:21 102:21 106:15
**serene** 1:7,19 3:10 5:8,14,17 5:21 6:11,18 9:11,13,23 10:2,13,22 12:2,16,20,23 12:24 13:18,23 14:14,25 15:10 15:15,21,24 16:2,14 17:7 18:2,2 19:23 20:6,17,25 21:4,23 22:3,5 22:9,15,19,23 23:3,17 24:3 24:11 26:6 28:8,24 39:6 40:7,10 41:23 42:22 43:5,8 44:13 46:14 50:6 53:4,13 54:10 56:7,9 57:9 58:8,15 59:7,12 61:5,8 61:21 63:23 64:23 65:22 66:24 67:8,10 67:12 68:8,12 68:19,22 71:25 72:10,23 73:10 73:13,15 74:4 78:8,10,16,19 78:25 79:13,23 85:20 86:13,23 87:3,6,11 88:13,16 89:11 89:18 94:12,13 94:22 95:21 96:3,17,25 97:19 98:7,18 98:21,25 101:21 102:15 104:3,8 106:3 106:12,16 107:11,16,19 107:25 109:6 110:7 114:13 116:6 118:3
**service** 13:5,7,8 13:11,12 106:15
**services** 1:7 6:11
**set** 117:23
**seven** 111:7,10
**several** 111:12
**shakes** 11:3
**she'd** 93:5
**she'll** 112:9
**sheet** 9:24 10:3 65:13 114:15 118:2
**sheets** 33:4
**shift** 9:17,18 10:9
**shore** 65:4
**shoulder** 11:4
**show** 76:3 78:13 110:22
**shower** 80:17
**showered** 80:17
**shrugs** 11:4
**shut** 108:17
**sic** 73:14 83:24
**side** 29:16,17 30:9,11,12 45:14
**sign** 36:14 63:23 69:2 73:14,16 77:7 77:11,13,15,23 78:7 84:11,17 89:12,16 91:7 94:7,13,16 96:15 97:8,19 97:20 98:5,14 102:18 103:9 113:7
**signature** 36:9 36:11 84:13 105:16 113:11 117:25
**signed** 62:17 63:4,10 74:10 74:17 101:10
**signing** 62:21 78:3 93:22 98:3
**sisters** 9:12,14 10:16

**sitting** 3:21 4:24 11:2 29:19 37:15 46:15 92:14 109:19,21
**situation** 57:21
**six** 51:13 100:21
**sleep** 24:16 26:8 28:15,18 28:22,25 30:7 42:20 43:9 44:10,14 46:23 51:6 52:10,17 57:10 58:19 59:4,13 67:2 70:12,14 71:7 85:25 87:5,13 88:17,22 92:24 93:8 109:18
**sleeper** 29:11
**sleeping** 23:9 23:10,25 24:15 29:24 30:5 42:23 56:2,10 57:12 60:3,12 61:8,11,15,19 61:22 66:20 108:15
**sleeps** 30:11 70:19,20
**slept** 29:8,13 43:14,17 50:25 52:25 109:14
**smith** 1:17 3:9 4:1 5:1 6:1,8 6:11 7:1 8:1 9:1,21 10:1,5 11:1,7 12:1 13:1 14:1 15:1 16:1 17:1,14 18:1 19:1 20:1 21:1 22:1 23:1 24:1,23 25:1 26:1 27:1,7 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1,19 72:1 73:1 74:1 75:1,2,5 76:1 77:1,17 78:1 79:1 80:1,3,13 81:1 82:1,16 82:18,23 83:1 83:22 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 93:14,16,18 94:1 95:1 96:1 97:1 98:1 99:1 100:1,22,25 101:1,5 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,16 111:1,3,16 112:1,14 113:1 114:6 115:13 115:18,21,24 118:4,20
**snoring** 35:12
**somebody** 57:23 64:22,24 65:18,25 74:3 87:11 98:22 108:12,17
**someone's** 8:15
**sorry** 14:5 19:10 21:10 82:20 83:2
**south** 65:4
**speak** 35:11 39:12,17 44:21 48:2,6 64:2 66:10 74:6 81:10 98:21
**speaking** 66:15
**specific** 85:18 85:21
**spoke** 21:20 24:5 26:2 34:5 34:9 49:3,4,5,6 49:13 57:18 63:19 66:8,14 66:16,21 73:18 74:3 78:15 84:8 86:9,12
**spoken** 35:8 48:11 63:15 81:13
**spot** 26:5
**st** 1:10 9:12,14 10:16
**stahl** 47:24
**standing** 19:13
**started** 14:9 20:6,7,10,14 66:15,25 68:21 81:14
**starting** 16:25
**state** 1:22 3:4 117:5
**stated** 21:19 43:25 64:21 110:25 111:22 112:9
**statement** 6:13 74:10 83:12 84:8 94:13,15 114:11
**states** 1:2,4 2:3
**stauber** 2:14 63:16,21

**stay** 30:8 59:8
**stenographic...** 117:12
**stony** 14:12 16:8,19,24 17:6,10 20:8,9 20:11,14
**stop** 5:16 14:22 17:9 65:17
**street** 1:20 2:4
**stub** 6:10,17,19 6:21 45:9 58:3
**stuff** 41:10 49:24
**su** 1:4
**submit** 41:6 74:7
**submitted** 91:14
**subpoena** 60:20
**subscribed** 113:12 118:21
**supervision** 117:13
**supervisor** 25:11,12,17,21 36:20 37:2,3 38:22 39:3,4 105:20,22 106:3
**suppose** 79:8
**sure** 4:7,14 9:18,19 17:4 20:20 52:6 103:21 107:20
**surprising** 40:9
**swearing** 84:3
**switch** 76:14
**sworn** 3:3 113:12 117:9 118:21

**t**

**t** 3:2,2 60:10,20 114:8 115:3 116:3
**take** 9:6 11:2 18:17 29:20 44:10 56:21 62:8 67:6 74:20 106:21
**taken** 1:18 29:22 36:3 62:9 72:14 74:22 76:17 102:23 110:12 117:11
**takes** 4:11
**talk** 25:24 48:25
**talking** 4:12 18:8 101:16
**taught** 106:11
**telephone** 60:7
**tell** 11:24 26:21 28:24 40:14,18 41:4 42:8,24 43:16 44:13 51:19 56:7,13 57:11 59:7 61:18,21 64:8 64:15 65:20,24 66:4,6 69:9,12 69:16,19,24 70:2 87:6 88:7 89:25 95:25 96:12 98:21 99:5,9 107:11 107:15 110:7 112:19
**telling** 63:3 67:3
**ten** 100:20
**terms** 22:16
**testified** 3:6 47:21 52:16 53:18,24 65:25 77:22 78:17 111:16,21
**testify** 78:23
**testifying** 89:3 89:8
**testimony** 38:9 38:20 44:12 50:24 52:7,18 52:22 53:16,20 55:8,25 58:7 65:5 70:11 71:4 75:8,21 79:12 87:9 96:3 98:24 107:8 117:6,10 117:11,15
**text** 94:11,16 94:18,21 95:12 101:20,24
**texts** 19:7,9 95:10
**thank** 7:12 10:19 22:14
**therapist** 8:22
**therapy** 8:14
**thing** 21:6 66:2
**things** 111:14 111:15 112:6
**think** 5:10,18 10:23 13:4 21:3 23:4,8,22 28:10 37:21 45:10 49:3 53:15 54:11,13 54:14,20,21 59:11,24 60:13 69:23 72:5 76:20 84:22 93:24 96:22 98:13 102:6 110:13
**third** 11:18 36:16 84:14 95:4,8 96:11 101:9
**thought** 55:18 88:16
**thousand** 5:10 7:10
**three** 11:9 23:21,23 31:9 31:25 32:9 41:2 51:16

57:8 76:20,24 77:5 79:5 93:24 106:14
**thursday** 9:9
**thursdays** 9:3
**time** 5:12 6:25 7:23 21:22 23:8 24:8 28:4 28:7,11 29:18 31:16,18 35:24 35:25 37:18 39:20,23 42:5 42:13,16,19,20 43:7,10 44:10 44:14 46:23,23 49:4 50:21 51:14,18,22,24 52:8 53:4 57:11 60:14 61:4 67:2,7 68:12 71:3,11 71:14,25 73:8 80:13 85:25 86:5 87:5,13 88:13,15,18,22 91:5 93:9 102:15,20 112:13,20 113:10 117:8
**times** 24:10 25:25 39:17,19 42:7,10 44:18 49:5 53:7,19 53:21,23 54:15 54:16,23,24 55:20 56:15 59:17 61:14 63:15 64:2,4,5 64:6,7 65:16 68:24 93:12 108:7 110:10
**timesheet** 24:20 33:2
**timesheets** 24:18 32:23 41:9
**timing** 63:19
**titled** 11:10,17
**today** 4:19,22 5:2 19:8 36:7 38:9,20 39:10 40:16 41:11,17 41:20 44:12 46:15 50:24 53:16 55:25 57:8 58:7 59:25 65:5 75:8,21 81:15 83:9 89:3,8 92:14 95:25 96:4 98:24 107:8 110:14 111:6,8,15,19 111:22,22 112:12
**together** 109:4 109:19
**told** 12:20 27:7 29:4 32:8 34:6 35:12 38:7 40:6 43:20 44:19 45:6 49:18 56:6,15 56:24 57:23 59:17 61:13,15 64:11,21,24 65:16,17 66:2 66:12 68:10 72:7 73:5,13 73:21 77:10 78:6 85:4,8 86:5,22 88:2 88:11 89:16 96:15,18 97:9 98:4,4 103:9 107:25 108:7 108:19
**tonight** 3:14
**took** 13:15 80:17
**top** 92:3
**touch** 32:11,16
**transcribed** 117:12
**transcript** 55:10 112:6 113:7 117:14
**transferred** 99:20,21
**true** 54:2,17,22 54:25 55:16 83:25 84:3 108:5 117:14
**truthful** 63:4,6
**truthfully** 40:21
**try** 4:15,16
**trying** 24:14 41:22 98:14
**turn** 31:8,10,11 31:12,14,20 32:4,8 105:2,9 106:11,24
**turned** 106:14
**turning** 49:23 50:11 106:6
**twelve** 36:21 38:4
**twice** 49:4 66:14
**two** 5:10 7:7,8 7:10 11:9 16:23 17:15 23:22 31:24,25 41:2 48:12 50:19 77:5 85:14 93:15
**tyler** 2:14 37:12 37:15,20,21 39:8 44:23 63:16,21 64:3 64:8,11,15,21 67:19,23 68:22 73:18,21 74:17 76:18 77:5,23 89:25 90:3,6 90:12 91:6
**type** 22:25 40:15 53:11

54:8 96:20
**typed** 84:9 85:8

**u**

**u.s.** 83:23
**unable** 111:2
**unaddressed** 23:3 53:14 54:10
**under** 38:14,19 53:24 70:15 74:10 83:13,19 83:22 90:6 106:22 113:7 117:13
**underneath** 104:18
**understand** 3:16 4:4,18 8:18 25:14 32:25 34:24 35:2 36:23 38:2,13 41:14 41:19 58:13 62:14,15 65:10 71:22 79:20 107:21 108:9
**understanding** 75:18
**understood** 4:2 36:15 62:22
**unemployed** 14:10 64:9,12 64:14
**unhappy** 100:2 100:7,12
**unidentifiable** 45:5
**uninterrupted** 28:15 52:10 56:3 71:7
**union** 100:18
**united** 1:2,4 2:3
**unpaid** 42:5,9 42:13,15,19,19 88:13,17
**unprofessional** 34:20,22
**upset** 35:2
**use** 82:11,13
**used** 6:20 61:7 75:16 76:10 82:4
**uses** 82:6
**usually** 6:20

**v**

**v** 118:3
**vague** 83:20
**valerie** 44:25
**varick** 2:4
**verbal** 11:5
**verification** 11:18
**veritext** 118:2
**violation** 26:23
**violations** 72:16
**visit** 105:23 106:4
**volunteer** 80:21 81:4

**w**

**wait** 80:20 92:6
**walk** 75:13,15 75:16 76:10
**walker** 82:11
**want** 4:14 24:11,13 26:24 34:14 38:20 57:25 58:8,15 59:12,19 67:10 67:11 95:2 107:20 112:8
**wanted** 100:18
**way** 22:25 42:14 53:11 54:8 71:25 78:2 89:12
**wayne** 1:21 117:4
**we've** 112:5
**wear** 27:12
**webster** 103:2
**week** 7:2,7,8 9:7
**weeks** 7:7,8
**welcome** 10:20 113:2
**went** 13:6,12 23:3 53:13 54:10 89:24
**wfk** 1:10
**wheelchair** 75:16,17,25 76:10 82:7,13
**whereof** 117:22
**willing** 111:4
**wish** 8:5 46:18 70:16
**withdrawn** 15:12
**witness** 8:8,11 11:22 14:5,20 15:8,20 16:18 18:12,13 19:15 21:9,15 22:22 25:10 26:12 27:3 28:18 30:4 32:15 34:4 38:25 41:14 42:5 43:3 44:17 46:5,18 47:3 47:17 49:11 51:5 52:13 53:2 54:5,20 57:16 58:13,22 59:16 63:9 65:10 68:16 69:8 71:22 73:2,25 74:12 76:9 77:4 78:6 79:17 80:16 82:4 87:23 88:11 89:7,23 90:11 92:11,18 93:4 97:24 98:13 99:17 100:10 102:4 105:7,14

106:10 108:22 109:18 113:11 114:5 117:9,15 117:22 118:4
**witnesses** 35:3
**wondering** 24:4 40:9
**word** 82:5
**words** 79:18 85:6,7,9,10
**work** 5:21,24 8:23,25 9:10 9:11 13:6,20 16:19 18:3,5 23:16 40:8 41:9 45:6 67:10 85:17,21 99:20 108:24 109:2,4
**worked** 10:11 14:12 17:6 22:5 26:6 28:8 41:24 42:20 47:5 51:19 52:4,8 56:3 65:7 69:10 70:25 71:4 89:9,10 95:21 95:23 105:23 107:23
**workers** 68:9
**working** 6:2,6 14:7 17:7,10 18:2 20:6,9,10 20:13,14 43:7 49:21 51:9,12 63:23 65:2 67:12 68:12 73:11 104:12 104:15 109:3
**works** 94:3 96:2
**worry** 76:7
**write** 22:3 24:17 65:6,12 84:6,7
**wrong** 82:4
**wrote** 13:19

**x**

**x** 114:4,8 115:2 115:3 116:2,3

**y**

**year** 5:9 16:25 17:5 37:21,22 37:23,23,24,24 39:24 90:21
**years** 16:23 57:8
**york** 1:2,21,22 2:5,5,9 3:5,12 11:20 117:5 118:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.