**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Eugene Scalia, Secretary of Labor, United States Department of Labor, <br><br>                                 Plaintiff, <br><br>               -v- <br><br> Sarene Services, Inc. d/b/a Serene Home Nursing Agency; Irene Manolias, Individually, <br><br>                           Defendants. | 2:20-cv-03273 (NJC) (ST) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, District Judge:

This case concerns claims brought by the then-Secretary of Labor, Eugene Scalia ("Secretary"), on behalf of the U.S. Department of Labor (the "Department") against Sarene Services Inc., d/b/a Serene Home Nursing Agency ("Serene"), and Irene Manolias ("Manolias" and collectively, "Defendants") under provisions of the Fair Labor Standards Act of 1938 (the "FLSA"). (Compl., ECF No. 1) The FLSA permits the Secretary to enforce the statute's minimum wage and overtime provisions, 29 U.S.C. § 216(c) ("Section 16(c)"), and to seek injunctive relief for violations of such provisions, *id*. § 217 ("Section 17"). The Complaint alleges that Defendants failed to keep accurate time records and to pay certain former employees—home health aides who provide services to people requiring home care twenty-four hours a day and seven days a week ("live-in aides")—minimum and overtime wages in violation of various FLSA provisions, *id*. §§ 206, 207, 211(c), 215(a)(2), and 215(a)(5) ("Sections 6, 7, 11(c), 15(a)(2) and 15(a)(5)"). (Compl.) In 2023, Julie A. Su ("Acting Secretary" or "Plaintiff")

was substituted for Eugene Scalia in this action when Su became Acting Secretary of Labor for the Department in March 2023. (Am. Compl. at 29, ECF No. 132-16.)

Before the Court is Plaintiff's Motion to Amend the Complaint ("Motion to Amend") (ECF Nos. 106, 132), which seeks to add an FLSA retaliation claim under 29 U.S.C. § 215(a)(3) ("Section 15(a)(3)") as described in a proposed Amended Complaint (Am. Compl.). The proposed Amended Complaint alleges that Defendants engaged in three forms of retaliation: first, during the fall of 2023, Defendants solicited sworn declarations containing false statements from former live-in aides against their interests under misleading and coercive circumstances; second, Defendants attempted to interfere with this litigation by discouraging employees from speaking with the Department; and third, since the filing of this litigation in 2020, Defendants have taken punitive measures against live-in aides who sought to report unpaid hours to the company, including comments discouraging such reports, disciplinary verbal warnings, and termination. (*See id*. ¶¶ 80–101, 114–16.) For the reasons set forth below, the Court grants the Motion to Amend and accepts the proposed Amended Complaint as the operative pleading.

## JURISDICTION

The Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because all claims are brought under the FLSA, 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), and 215(a)(5). (*See* Compl. ¶¶ 83–90.) The Court also has jurisdiction under 28 U.S.C. § 1345 because this action is brought by the Acting Secretary on behalf of the Department, which is an agency of the United States that exercises express statutory authorization to bring suit under the FLSA, 29 U.S.C. § 216(c). (Compl. at 1 and ¶ 1.)

The Court has personal jurisdiction over Defendants because they are New York residents. The Complaint alleges that Serene's principal place of business is located in

Patchogue, New York. (Compl. ¶ 4; *see also* Stauber Dep. at 3:10–13, ECF No. 134-2.) The

Complaint also alleges that Manolias is a New York resident (Compl. ¶ 25), and the record

shows that she is the company's owner and chief executive officer (Manolias Dep. at 34:6,

173:25, 180:2–5, 221:6, 221:25, ECF No. 134-1). This Court has personal jurisdiction over New

York residents. *See* 10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and

Procedure* § 1064 (4th ed. 2020) (describing the defendant's residence in the forum state as one

of the oldest bases of personal jurisdiction). Additionally, Defendants waived service pursuant to

Rule 4(h) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). (*See* ECF Nos. 5, 6.)

Venue is proper under 28 U.S.C. § 1391(b)(2) because, as described below, a substantial

part of the events or omissions giving rise to this action occurred in this judicial district—

namely, former employees' work for Serene as live-in aides and the company's alleged failure to

adhere to the FLSA's minimum wage, overtime, and recordkeeping requirements. (Compl. ¶ 2,

¶¶ 39–79.)

## PROCEDURAL HISTORY

The Secretary initiated this action on July 21, 2020, by filing the Complaint. (Compl.)

The Complaint alleges, among other things, that former Serene live-in aides "are owed millions

of dollars in unpaid back wages and liquated damages" due to Defendants' alleged FLSA

violations between 2017 and 2019. (Compl. at 2.) Exhibit A to the Complaint provides the names

of 337 different people who are alleged to have worked for Serene as live-in aides. (Compl. Ex.

A, ECF No. 1-1.) The Complaint alleges that each of these workers will receive back wages if

the Acting Secretary prevails in this action. (*Id*.; Compl. at 2.)

Defendants answered the Complaint. (ECF Nos. 10, 13.) From November 2020 through

December 2023, the parties conducted discovery in a contentious process that produced

numerous disputes requiring the intervention of Magistrate Judge Steven Tiscione and requests

for extensions of time to complete discovery.[1] Judge Tiscione ordered a February 28, 2022

deadline for amendments to the Complaint. (Elec. Order, Dec. 23, 2021.)

On October 11, 2023, this case was reassigned to my docket. On December 4, 2023,

Judge Tiscione noted that discovery was complete. (Min. Entry, Dec. 4, 2023.)

On December 8, 2023, days after the close of discovery, the Acting Secretary filed a

motion for a temporary restraining order and preliminary injunction ("TRO and PI Motion").

(ECF No. 102.) The Acting Secretary asserted that, in November 2023, the Department began

receiving calls from people reporting that Defendants were holding telephone conversations with

former live-in aides and pressuring them to sign sworn declarations containing statements

disclaiming entitlement to unpaid wages. (*See* Mem. of Law ISO TRO and PI Mot. at 3–4, ECF

No. 102-2.) The Acting Secretary asserted that Defendants promised the former live-in aides

work and implied that not signing declarations would get them into trouble with Serene and the

New York State Department of Health ("DOH"). (*Id.*) According to the Acting Secretary,

Defendants conducted these calls under false pretenses and failed to notify the live-in aides

---

[1] *See, e.g.*, ECF Nos. 29 (granting in part Plaintiff's motion to compel discovery production), 35 (same), 47 (requiring parties to review documents to facilitate settlement discussions), 50 (managing document production review and ordering a status report following review), 57 (denying Defendants' motion to stay), 63 (granting in part and denying in part Defendants' motion to compel meta-data and additional deposition), 69 (granting Defendants' motion for extension of time to complete discovery), 75 (granting Defendants' motion to continue ordering Defendants to produce additional documents and extending discovery deadlines), 86 (denying Defendants' motion to compel); Elec. Order, Apr. 30, 2021 (granting parties' joint motion for extension of time); Elec. Order, Aug. 4, 2021 (same); Elec. Order, Oct. 1, 2021 (same); Elec. Order, Dec. 23, 2021 (same); Elec. Order, Mar. 1, 2022 (granting Defendants' motion for an extension of time); Elec. Order, Dec. 5, 2022 (granting parties' extended discovery schedule); Elec. Order, Mar. 13, 2023 (granting Defendants' motion for extension of time); Elec. Order, July 13, 2023 (same); Elec. Order, Sept. 1, 2023 (granting Defendants' motion to continue); Elec. Order, Oct. 19, 2023 (granting Defendants' motion for extension of time); Elec. Order, Oct. 31, 2023 (granting Defendants' motion for an extension of time to file motion to compel).

(whether verbally or in writing) of this litigation, their rights under the FLSA, or their right to refuse to participate in the calls. (*Id.*) In support of the TRO and PI Motion, the Acting Secretary provided declarations from James Daly ("Daly"), an investigator with the Department's Wage and Hour Division ("Wage and Hour"), and former Serene live-in aides, Jennifer Grant ("Grant"), Valery Peterkin ("Peterkin"), and Nekeita Smith ("Smith"). (ECF Nos. 102-3–7.)

On December 9, 2023, the Court ordered Defendants to respond to the TRO and PI Motion by December 14, 2023, and scheduled an in-person TRO hearing for December 19, 2023. (Elec. Order, Dec. 9, 2023.) On December 11, 2023, Defendants moved to extend the response deadline until December 28, 2023, and to adjourn the hearing, which the Acting Secretary opposed. (ECF Nos. 103, 104.) The Court held a held oral argument via Zoom on the TRO portion of the TRO and PI Motion on December 12, 2023, rather than requiring Defendants to provide a written submission. (Elec. Order, Dec. 12, 2023; Min. Entry, Dec. 12, 2023.)

At the hearing, the Court dismissed the TRO and PI Motion as moot because the parties' reached the following agreement:

> The parties agreed that Defendants would henceforth refrain from contacting any of Defendants' former home health care live-in aide employees, engaging in conversations with any of these former employees regarding topics at issue in the litigation, or soliciting or obtaining any statements from these employees until the Court's resolution of Plaintiff's anticipated renewed Preliminary Injunction Motion. This includes Defendants' agreement to refrain from speaking with former home health care live-in aide employees currently working for the Defendants in a different capacity, and to refrain from answering calls or engaging in conversations initiated by former home health care live-in aide employees.

(Min. Entry, Dec. 12, 2023.) The Court required the parties to submit a jointly proposed briefing schedule and hearing date on the Acting Secretary's anticipated renewed PI Motion. (*Id.*) The Court ordered a briefing schedule reflecting the parties' proposed dates and scheduled a hearing on the anticipated renewed PI Motion for February 1, 2024. (*Id.*; Elec. Order, Dec. 14, 2024.)

On December 20, 2024, the Acting Secretary filed a letter requesting a pre-motion conference on an anticipated Motion to Amend the Complaint pursuant to Rules 15(a)(2) and 16(b), Fed. R. Civ. P. (ECF No. 106.) The Acting Secretary sought to add an FLSA retaliation claim under Section 15(a)(3) based on the same facts alleged in support of the original TRO and PI Motion. (ECF No. 106 at 1.) Defendants responded to the letter on December 29, 2023. (ECF No. 108.)

On January 10, 2024 and January 12, 2024, the Court held pre-motion conferences with the parties concerning the anticipated renewed PI Motion and the parties' correspondence concerning the Acting Secretary's anticipated Motion to Amend. (Min. Entry, Jan. 12, 2024.) The Court construed the Acting Secretary's pre-motion conference letter (ECF No. 106) as the Motion to Amend and noted that the parties' correspondence raised issues "material to resolution of the Preliminary Injunction Motion," including "the parties' central dispute over the factual context surrounding calls from Defendants' representatives to former live-in health aides preceding requests that they sign declarations to be used by Defendants in this case." (*Id.*) The Court required the parties to meet and confer on a proposal for limited, expedited discovery on the material facts related to both motions. (*Id.*)

The Court granted the parties' joint discovery proposal and ordered the retaliation discovery to be completed by February 29, 2024. (Min. Entry, Jan. 12, 2024; Min. Entry, Jan. 19, 2024.) Due to this grant of discovery, the Court adjourned the February 1, 2024 hearing on the anticipated renewed PI Motion. (Min. Entry, Jan. 12, 2024.) The discovery period was extended from February 29, 2024 to May 3, 2024, due to the parties' numerous requests for additional time and various disputes. (*See* ECF Nos. 120, 123–24; Elec. Order, Feb. 13, 2024; Elec. Order, Mar. 13, 2024; Elec. Order, Apr. 8, 2024; Min. Entry, May 2, 2024; ECF No. 128.) The parties

stipulated to the scope of the retaliation discovery, including document production and depositions of witnesses. (ECF No. 113.) As stipulated by the parties, the retaliation discovery involved the depositions of Wage and Hour Investigator Daly; four former Serene live-in aides: Grant, Smith, Peterkin, and Patrick Atta ("Atta"); Manolias; and three Serene staff members: Tyler Stauber ("Stauber"), Brittany Condon ("Condon"), and Valerie Sirio ("Sirio"). The parties also stipulated to certain facts in January 2024 and to additional facts in April 2024. (Jan. 17, 2024 Stipulation ("Jan. 2024 Stip."), ECF No. 132-8; Apr. 17, 2024 Stipulation ("Apr. 2024 Stip."), ECF No. 132-9.)

The parties sought the Court's intervention with respect to two limited retaliation discovery disputes. One dispute involved the Acting Secretary's motion to compel the production of declarations signed by former Serene live-in aides following calls by Serene staff during the fall of 2023. (*See* ECF No. 125.) Defendants asserted work product privilege over the declarations, but conceded that the declarants are all former employees who have not been employed by Defendants in any capacity for several years and that the declarants may benefit financially if the Acting Secretary prevails in this action. (*See* Min. Entry, May 2, 2024.) The Court rejected Defendants' assertion of work product privilege over the declarations, finding that even if defense counsel had been involved in preparing the declarations, Defendants had waived any work product privilege by disclosing them to the non-party former employees, who reviewed and signed them. (Min. Entry, May 2, 2024.)[2]

---

[2] The Court noted that Defendants had not shown that these former employees are parties to this litigation, are allied in interest with the Defendants, and have litigation objectives in common with the Defendants. (*See* Min. Entry, May 2, 2024 (citing *Giuffre v. Dershowitz*, No. 19 CIV 3377 (LAP), 2022 WL 1471032, at *4 (S.D.N.Y. May 10, 2022); *Sec. & Exch. Comm'n v. Xia*, No. 21CV5350PKCCLP, 2022 WL 377961, at *2 (E.D.N.Y. Feb. 8, 2022); *Sec. & Exch. Comm'n v. Gupta*, 281 F.R.D. 169, 171 (S.D.N.Y. 2012) (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 191 (2d Cir. 2000)).)

On January 26, 2024, the Acting Secretary filed the renewed PI Motion, along with a supporting brief and factual exhibits, Defendants' opposition brief, the Acting Secretary's reply, and Defendants' sur-reply. (ECF Nos. 114–117.) Following the close of discovery on the retaliation issues, on June 11, 2024, the parties filed supplemental briefs and supporting factual submissions addressing their post-discovery positions on the Motion to Amend and the PI Motion along with additional supporting factual submissions. (*See* ECF Nos. 132, 133.)

On June 18, 2024, the Court held a status conference and asked whether either party sought an evidentiary hearing on the PI Motion. (*See* Min. Entry, June 19, 2024.) The parties reported that the witnesses who were deposed during the period of retaliation discovery had testified for time periods ranging from two to seven hours. (*Id.*) Defendants argued that Atta, Smith, Grant, and Peterkin—the worker witnesses on whose testimony the Acting Secretary relies in support of the Motion to Amend and PI Motion—are not credible witnesses. (Stat. Conf., June 18, 2024.) The Acting Secretary noted that several worker witnesses would not be available for an evidentiary hearing for most of July and August 2024. (Min. Entry, June 19, 2024.) The parties waived their right to an evidentiary hearing on the PI Motion and asked the Court to rule on both motions based on the written record, including the complete deposition transcripts for each witness deposed during the retaliation discovery period. (*Id.*) Defendants confirmed their position that the Court could assess witness credibility based on the written record. (Stat. Conf., June 18, 2024.)

Following receipt and review of the deposition transcripts, the Court ordered Defendants to identify the specific portions of worker witness deposition testimony that Defendants believe call into question those witnesses' credibility and for the Acting Secretary to respond to Defendants' submission. (Min. Entry, June 20, 2024.) Defendants asked for an extension of time,

which the Court granted. (ECF No. 135; Elec. Order, June 21, 2024.) Defendants filed a letter

purporting to identify "non-credible testimony" by Smith, Grant, Peterkin, and Atta. (ECF No.

136.) In support, Defendants rely on two declarations presented to this Court for the first time:

one from Ingrid Leon ("Leon"), a former Serene employee who worked from 2018 to 2021 as an

hourly "respite" aide the same patient who Smith served as a live-in aide; and one from Susan

Edwards ("Edwards"), a Serene patient who received care from Grant when she worked as a

Serene live-in aide. (ECF Nos. 136, 136-1, 136-2.) The Department provided a response. (ECF

No. 137.)

## FACTUAL BACKGROUND

Serene is a licensed home health care agency that provides home health aides to patients

requiring assistance with activities of daily living. (*See* Compl. ¶¶ 5–6.) Manolias is the owner

and chief executive officer of Serene. (Manolias Dep. at 34:6, 173:25, 180:2–5, 221:6, 221:25.)

In 2019, Wage and Hour began investigating Serene for FLSA violations. (*See* Daly Decl. ¶ 3,

ECF No. 102-3.)

In July 2020, the Secretary filed this action, alleging that Defendants violated the FLSA's

minimum wage and overtime requirements by improperly deducting hours from live-in aides'

compensated time for uninterrupted sleep and meal breaks they did not actually receive. (Compl.

at 2.) The Complaint alleges that Defendants paid live-in aides for only a set number of hours—

12.5 hours per day from March 15, 2017 through mid-2019, and 13 hours per day from mid-2019

to the present—even though these employees worked much longer hours. (*Id*.) The Complaint

also alleges that Defendants failed to maintain accurate time records for live-in aides from at

least March 2017 through the present, in violation of the FLSA's recordkeeping requirements.

(*Id*.) The Complaint also alleges that former Serene live-in aides "are owed millions of dollars in

unpaid back wages and liquated damages" resulting from Defendants' alleged FLSA violations between 2017 and 2019. (Compl. at 2.) Exhibit A to the Complaint provides the names of 337 different people alleged to be former Serene live-in aides who may receive back wages if the Acting Secretary prevails in this action. (Compl. Ex. A.)

In 2021, Serene stopped employing live-in aides to provide twenty-four-hour, live-in care for patients. (Manolias Dep. at 160:22–161:4.) The company continues, however, to employ home health aides who work on an hourly basis. (Manolias Dep. at 164:8–12.)

## I.     The Acting Secretary's Investigation During the Course of this Litigation

Wage and Hour Investigator Daly attests that in mid- to late-2021, a number of Serene's former live-in aide employees told the Department that, while working for Serene, they were afraid of getting in trouble for reporting to company staff that their sleep and meal breaks were in fact interrupted. (Daly Decl. ¶ 5; Daly Dep. at 22:6–23:3, 29:21–24, ECF No. 134-9.) Daly attests that at least one former live-in aide who attempted to report unpaid hours to Serene told the Department that Serene representatives discouraged them from complaining about not getting uninterrupted sleep and meal breaks and told them to work elsewhere if they were unhappy. (Daly Decl. ¶ 5; Daly Dep. at 20:17–21:4, 29:12–24, 201:19–202:2.) Daly also testified that former live-in aides who reported these experiences to the Department requested that the Department keep their names confidential out of fear that Serene would subject them to adverse employment consequences, such as getting fired or verbal reprimands. (Daly Decl. ¶ 6; Daly Dep. at 28:20–25, 35:8–14, 52:17–22, 99:18–20, 114:23–115:8, 122:25–124:16, 132:16–133:3.)

## II.    Defendants' Outreach to Former Live-in Aides for Declarations Disclaiming Entitlement to Unpaid Wages

In early October 2023, shortly before the close of discovery in this action, Manolias directed Serene employees Stauber and Condon to call the company's former live-in aides.

(Manolias Dep. at 40:6–15; Stauber Dep. at 22:7–17.) Manolias sought to collect information from former live-in aides about their experiences working for Serene, including whether they were given uninterrupted sleep and meal breaks. (*See* Manolias Dep. at 9:18–23, 40:6–15, 46:17–24; Stauber Dep. at 22:7–17, 25:24–26:5; Condon Dep. at 57:13–15, ECF No. 134-3.) Manolias also directed Stauber and Condon to ask former live-in aides whether they would sign sworn declarations in support of Defendants' anticipated motion for summary judgment on the Acting Secretary's claims for violation of the FLSA's minimum and overtime wage requirements. (Manolias Dep. at 41:22–43:10.)

From October 1, 2023 through December 12, 2023, three Serene representatives— Manolias, Stauber, and Condon—called former Serene live-in aides, obtaining somewhere between 100 and 120 signed declarations. (Jan. 2024 Stip. ¶ 2; Apr. 2024 Stip. ¶ 1; Stauber Dep. at 84:24–85:12.) Defendants maintain that only Manolias, Stauber, and Condon made the calls. (Jan. 2024 Stip. ¶ 2.) Stauber made the vast majority of calls to former live-in aides. (Stauber Dep. at 86:20–87:18.) Manolias called around five former live-in aides and Condon called two. (Manolias Dep. at 47:8–12; Condon Dep. at 69:4–5.)

Former live-in aide Grant testified that she received a call from a person named Al Jenkins ("Jenkins"), who said that he was calling on behalf of Serene. (Grant Decl. ¶ 2, ECF No. 102-4; Grant Dep. at 14:16–20, ECF No. 134-5.) Grant started recording the call after Jenkins introduced himself. (Grant Decl. ¶ 3; Grant Dep. at 15:23–16:2.) The record includes a transcript of the call. (Grant Decl. at 3–6.) Manolias testified, however, that no one named Al Jenkins works for Serene or called former Serene live-in aides between October and December 2023. (Manolias Dep. at 170:21–171:16.)

11

### III.     Former Live-in Aides' Declarations Disclaiming Entitlement to Unpaid Wages

The record contains 115 declarations signed by former Serene live-in aides as a result of Serene representatives' fall 2023 outreach. (*See generally* ECF No. 132-12.) There are 108 different declarants; several declarants signed multiple declarations containing minor differences, such as altered dates of employment with Serene. [3] All 115 declarations contain the following statement disclaiming that Defendants had ever failed to pay them for their work: "There was no time in which I was not paid overtime to which I was entitled." (*See* ECF No. 132-12 at 2–116.) The declarations are all dated between November 7, 2023 and December 11, 2023, and each is signed by the declarant under penalty of perjury. (*See id.*) All 115 declarations include the following language or a slight variation thereof:

- "I enjoyed working at Serene" or "I enjoyed working at Serene and had a positive experience while working there."

- "As a live-in, I worked 13 hours in a 24-hour workday entirely in the home of patients approved by the New York case management system. I clocked in at the start of the workday and clocked out at the end. During my 24-hour workday, I knew I would receive three 1-hour uninterrupted breaks for breakfast, lunch, and dinner. I also knew that I would receive 8 hours of sleep, of which 5 hours were to be uninterrupted for calls to duty for patient-related care issues. Throughout the time I was at Serene, I knew I would be entitled to overtime pay if I did not receive three one-hour uninterrupted meal breaks or eight hours of sleep, with five of those hours being uninterrupted sleep time. I knew how to report these occurrences to the agency and that it was my responsibility to report these situations to Serene to receive overtime pay."

---

[3] Six of the 108 declarants signed more than one declaration. *See* ECF No. 132-12 at 37 (Adjei-Sechere 11/7/2023 Decl.), 64 (Adjei-Sechere 12/4/2023 Decl.), 91 (Animah 11/17/2023 Decl.), 92 (Animah 11/20/2023 Decl.), 105 (Audate 11/13/2023 Decl.), 108 (Audate 11/11/2023 Decl.), 66 (Danquah 11/15/2023 Decl.), 67 (Danquah 11/17/2023 Decl.), 54 (White 11/16/2023 Decl. No. 1), 58 (White 11/16/2023 Decl. No. 2), 49 (Quansah 11/19/2023 Decl.), 70 (Quansah 11/17/2023 Decl.), 71 (Quansah 11/16/2023 Decl.).) There are only minor differences between the versions signed by these declarants, such as alterations in the declarant's stated dates of employment with Serene. (*Compare id.* at 105 (stating that Audate worked for Serene from April 2014 to May 2020) *with id.* at 108 (stating that Audate worked for Serene from May 20, 2020 to April 23, 2014).

- "When I started at Serene, I received an orientation on how to make the agency aware of shifts when it was not possible for me to receive either my three-hour uninterrupted breaks for meals or eight hours of sleep, of which five were uninterrupted. I was trained that the patient's medical or safety issues and care needs came first before my uninterrupted meal and sleep time. I was also told if such circumstances occurred, I should call my nursing supervisor while they were occurring. If the agency office was closed, I was to call the on-call coordinator and report these incidents to them immediately and then document these occurrences to ensure I received overtime pay."

- "I can say with confidence that my experience with Serene Home Nursing Agency was always a positive one where I enjoyed earning a very good salary with benefits and was always treated with respect and dignity. The agency allowed me to work overtime each week, in which my weekly paycheck was accurately paid to me on a weekly basis. ***There was no time in which I was not paid overtime to which I was entitled.***"

(*See, e.g.*, *id.* at 4–5 (emphasis supplied).) Each of these paragraphs appears in the same sequence in each declaration. (*See generally* ECF No. 132-12.) All but two declarations also include the statement: "I understand that this Declaration may be used in connection with litigation with the Department of Labor." (*See id.*) The only two declarations that do not include this disclaimer are dated November 7, 2023—the earliest date of any declaration—and are signed by Grace Johnson and Josephine Adjei-Sechere ("Johnson" and "Adjei-Sechere"). (*See id*. at 36–37.)

The 115 declarations are nearly identical, containing the stock language noted above. Only five of them include a handful of additional sentences. Two of these five declarations include a paragraph in which the declarants describe being questioned by a Department investigator about whether they experienced interrupted meal breaks or sleep time while working as a Serene live-in aide. (*See id.* at 4 ¶ 5 (Inez Deen Decl.), 16 ¶ 6 (Anang Adjorkor Decl.).) The other three declarations include a paragraph in which the declarants identify the number of times they experienced interrupted meal breaks and/or sleep time while working for Serene. (*See id*. at 8 ¶ 5 (Mona Laryea-Walker Decl.), 98 ¶ 5 (Roberta Williams Decl.), 116 ¶ 5 (Kate Reinhold

Decl.).) All 115 declarations are identical aside from the differences described here and some

minor formatting or wording differences. (*See generally* ECF No. 132-12.)

According to Daly, former Serene live-in aides who spoke to the Department reported

that the template declaration they were asked to sign contained untruthful information. (Daly

Dep. at 126:16–25.) Manolias and Stauber testified that the declarations were "tailored" to the

experience of each former live-in aide. (Manolias Dep. at 59:14–60:22; Stauber Dep. 108:16–23,

224:25–225:7.) Careful review of the declarations shows, however, that 108 of the 115

declarations are nearly identical, if not identical, aside from the date, name, and the signature of

the declarant, presenting the identical or nearly identical stock language in the exact sequence

shown above. (*See* ECF No. 132-12 at 2–3, 5–7, 9–15, 17–35, 38–97, 99–115.) The same stock

paragraphs are presented in the same sequence even in the five declarations that have a handful

of additional sentences and the two declarations without the disclaimer noting the declarant's

understanding that the document may be used in this litigation. (*See* ECF No. 132-12 at 4, 8, 16,

36–37, 98, 116.)

Stauber testified that the declarations sent to former live-in aides were drafted with the

assistance of counsel. (Stauber Dep. at 10:3–6.) After calling the former employees, Serene

representatives sent them the declarations via DocuSign and asked them to sign. (*Id.* at 111:4–8.)

Stauber testified that he believes he spoke on the phone with every former live-in aide who

ultimately signed a declaration and that he did so before he transmitted a proposed declaration

for the live-in aide to sign. (*See id.* at 85:19–21 (testifying that he "believe[s]" he spoke with

each of the aides who signed a declaration), 115:22–116:8 (testifying that he called aides who

spoke to Manolias and agreed to sign a declaration), 95:16–98:22 (testifying that his process was

to call an aide and, when an aide did not answer, to leave a voicemail and/or send a follow-up

text so that he could set up a time to speak by phone), 46:8–47:6 (testifying that he would send the declaration after the phone call).)

## IV.    Reports to the Department About Defendants' Declaration Gathering Efforts

In November 2023, Wage and Hour received reports that Serene representatives had been calling former live-in aides and requesting that they sign template statements under misleading and coercive circumstances. (*See* Daly Decl. ¶¶ 7–11; Daly Dep. at 7:16–9:18.) Daly attested that following these calls, two former employees reported to the Department that they no longer wished to share information with the Department. (Daly Decl. ¶ 10.)

On November 9, 2023—two days after Johnson and Adjei-Sechere signed declarations lacking the disclaimer that the declarations could be used "in litigation with the Department of Labor"—the Acting Secretary sent Defendants a letter expressing concern about retaliation and noting the Department's receipt of reports from former Serene live-in aides that Serene representatives were questioning them "without mentioning the pending lawsuit or otherwise informing employees of the purposes for which Serene may use employees' answers." (Sec'y's Letter dated Nov. 9, 2023 at 4, ECF No. 132-14.)

## V.    The Purpose and Nature of Calls from Serene Representatives Soliciting Former Live-In Aides to Sign Declarations

Witnesses for the Acting Secretary and Defendants present conflicting testimony about precisely what Serene representatives said to former live-in aides about the nature and purpose of the fall 2023 calls soliciting declarations. Manolias and Stauber testified that Serene staff questioned former live-in aides in connection with DOH requirements and an unidentified New York State grant during the same time period when Serene staff were gathering declarations for use in this FLSA litigation. (Manolias Dep. at 104:16–105:3, 114:14–19, 115:6–13; Stauber Dep. at 180:10–19.) Manolias and Stauber also testified that their references to DOH requirements

15

during the fall 2023 calls were accurate. (*See* Manolias Dep. at 102:23–105:3, 123:13–124:5; Stauber Dep. at 145:8–147:14.) Atta and Peterkin testified, however, that references to DOH left them confused about the nature and purpose of the calls. (*See* Atta Dep. at 45:10–19, ECF No. 132-2; Peterkin Dep. at 77:13–24, ECF No. 134-8.)

Atta testified that he received several calls from Serene representatives about signing a declaration, including a call from a female representative and a follow-up call from Stauber. (Atta Dep. at 27:3–17, 45:6–47:22, 87:6–17.) According to Atta, the female Serene representative said he needed to sign a declaration so that she could close out his former patient's file with DOH. (*Id.* at 15:2–25, 27:3–17.) Atta testified that this confused him because his patient had died three years before the call. (*Id.* at 15:2–25.) Atta also testified that Stauber called him and then followed up with an email telling him that he needed to sign a document—the template declaration. (*Id.* at 45:6–47:22, 87:6–17.) Atta expressed confusion about this as well. (*Id.* at 45:12–19.) Atta testified that when he received the follow-up call and text messages, he felt harassed and believed that he had to sign the declaration or otherwise would get in "trouble" with Serene or DOH. (*Id.* at 43:16–44:20, 48:21–49:24, 62:8–19, 69:8–70:13, 80:8–23.)

Smith testified that she received multiple calls from Serene representatives asking her about her meal and sleep breaks, and that she did not learn the calls were connected to this litigation until the Department called her at a later date. (Smith Dep. at 87:2–88:6, ECF No. 134-7.) Smith testified that she was told during one of the calls that if she did not sign the declaration and needed "a reference from Serene, they w[ouldn't] give it to" her. (*Id.* at 89:16–18.) Smith testified that Stauber called her and then Serene representatives followed up with multiple text messages asking her to sign different declarations. (*Id.* at 87:2–88:6, 91:6–10; 94:11–23.) Smith

16

further testified that she felt harassed when Serene sent her follow-up text messages asking her to sign the declaration. (*Id.* at 101:19–102:4.)

Condon and Stauber both testified that Condon called former live-in aide Peterkin to solicit a signed declaration for use in this litigation. (Stauber Dep. at 181:21–25; Condon Dep. at 71:19–25.) Condon testified that she introduced herself as an "*employee advocate* calling to ask you questions about your experience working as a live-in aide with Serene." (Condon Dep. at 71:19–25 (emphasis supplied).) Even after Peterkin stated that she thought "she was owed money" by Serene, Condon told Peterkin that she was "not on anyone's side." (*Id.* at 84:24–85:21.) Stauber then called Peterkin back under the auspices of "investigat[ing]" her care of a specific patient pursuant to DOH requirements and questioned Peterkin about whether she experienced interrupted sleep time and meal breaks when working for Serene. (Stauber Dep. 183:22–184:14, 190:2–25.) Peterkin testified that Stauber said that he was "calling on behalf of the health department." (Peterkin Dep. at 77:14–15.) According to Peterkin, "[Stauber] didn't say it was a lawsuit with Sarene and . . . the labor department," but mentioned "the health department. . . ." (Peterkin Dep. at 77:22–78:1.) According to the Acting Secretary, Stauber's questioning of Peterkin is memorialized in a one-page "Internal Investigation Report," which states that the investigation was "unfounded" but was never provided to DOH. (Pl.'s Supp. Br. ISO Mot. to Amend and Mot. for PI ("Pl.'s Supp. Brief") at 4 n.3 (citing SERENE500000) , ECF No. 132.)[4] Stauber and Manolias testified that the Peterkin investigation results were not reported to DOH. (Manolias Dep. at 111:18–112:19; *see also* Stauber Dep. at 186:6–187:17.)

---

[4] The Court has not seen this Internal Investigation Report because neither party submitted it into the record.

Grant testified that she received three calls from a Serene representative. (Grant Dep. at 12:19–25, 14:2–20, 17:4–25; Grant Decl. ¶ 2 (citing Phone Recording Transcript ("Phone Transcript") at 3:7–9).) As noted above, Grant testified that she recorded one of the calls, which was from a Serene representative who introduced himself as Al Jenkins and said that the call was connected to a DOH quality control check with past aides. (Grant Dep. at 12:19–23, 14:2–20, 17:4–25; Grant Decl. ¶ 2 (citing Phone Transcript at 3:7–9).) Manolias, however, testified that she does not know Al Jenkins, that Serene did not ask anyone to call Grant, and that only Manolias, Stauber, and Condon called former live-in aides to solicit declarations. (Manolias Dep. at 40:6–15, 47:8–10, 170:25–171:6.) The record thus gives rise to a question of fact as to whether Jenkins called Grant on behalf of Serene and thus, whether the statements made during that call are attributable to Serene. (*Compare* Grant Dep. at 14:2–20; Grant Decl. ¶ 2 (citing Phone Transcript at 3:7–9) *with* Manolias Dep. at 40:6–15, 47:8–10, 170:25–171:6.)

## VI.   Lack of Written Notice to Former Live-In Aides of Their Rights, this FLSA Action and the Implications of Signing the Declarations

Stauber testified that he asked former Serene live-in aides about their conversations with the Department during calls to solicit them to sign declarations. (Stauber Dep. at 222:11–225:7.) Nevertheless, no Serene representative provided written notice of this litigation or rights under the FLSA to any of the former live-in aides solicited to sign declarations in the fall of 2023. (*See* Stauber Dep. at 110:111; Condo Dep. at 46:22-24; *see also* Jan. 2024 Stip.) None of the 108 declarants received any written notice describing this litigation or their rights, including their rights under the FLSA to unpaid overtime and minimum wages and to protection from retaliation, before signing a declaration. (*See* Jan. 2024 Stip. ¶ 1.)

Moreover, the declarations themselves contain no information about the Acting Secretary's FLSA litigation against Serene, former live-in aides' rights under the FLSA to

overtime and minimum wages and to protection from retaliation, or the implications of signing

the declaration on these former employees' ability to recover unpaid wages should the Acting

Secretary prevail in this action. (*See* ECF No. 132-12 at 2–116.) Nor do the declarations state

that the declarants understood that they were not required to speak to Serene representatives

about whether they received uninterrupted meal breaks or sleep time when working for Serene or

that they were not required to sign the declaration. (*See id*.)

## VII.   Whether Serene Representatives Provided Verbal Notice to Former Live-In Aides of Their Rights, this FLSA Action and the Implications of Signing the Declarations

Former live-in aides testified that the Serene representatives who called them did not tell

them about the Acting Secretary's FLSA litigation against Serene before questioning them about

the very issues at the heart of this litigation—meal breaks, sleep time, and procedures for

reporting overtime when working for the company—or when asking them to sign declarations

disclaiming that Serene owed them unpaid wages.

Smith testified that someone from Serene, whose name she could not recall, called to ask

about her experience working for the company and specifically about whether she had received

uninterrupted sleep time and meal breaks, but did not tell Smith about this litigation. (Smith Dep.

at 87:2–5.) Rather, Smith testified that she first learned about the Acting Secretary's FLSA

litigation against Serene during a call she received from the Department *after* the Serene

representative had asked her to sign a declaration disclaiming entitlement to unpaid wages from

Serene. (Smith Dep. at 39:25–40:13, 87:6–88:6.)

Grant testified that she received three calls from a Serene representative who stated that

the call was connected to a DOH quality control check with past aides. (Grant Dep. at 12:19–23,

14:2–20, 17:4–25; Grant Decl. ¶ 2 (citing Phone Transcript at 3:7-9).) During at least one of the

calls, the Serene representative asked Grant to sign a declaration. (Grant Dep. at 12:7–18.) Grant

attested that the "Serene representative did not refer to the U.S. Department of Labor or mention the . . . lawsuit against Serene." (Grant Decl. ¶ 4.)

Atta testified that Stauber called and questioned him about whether he had received uninterrupted sleep time when working for Serene, but did not explain that the call was connected to this action. (Atta Dep. at 43:16 – 44:20; 83:14–19.) Atta also testified that he signed not one, but two declarations. (*Id.* at 56:21–23.) Atta's second declaration, dated November 14, 2023, includes the disclaimer concerning the potential use of the declaration in connection with this litigation. (ECF No. 132-12 at 10.) Stauber testified that he sent Atta a second declaration in order to correct the inadvertent exclusion of the sentence referencing this litigation from the first declaration. (Stauber Dep. at 236:8–11.)[5] Atta testified, however, that Stauber said he had to sign because the time was almost up. (Atta Dep. at 83:4–85:17.)

By contrast, Manolias testified that she instructed Stauber and Condon to:

> assure . . . that the aides understood, that they were under no obligation and no pressure to sign the declarations . . . that they understood that we were in litigation with the Department of Labor, wage and hour division, and that by them signing the declarations, that they would be not able to be a part of Department of Labor's lawsuit against Serene . . . .

(Manolias Dep. at 42:4–18; *see also id*. at 45:9–24.) Stauber testified that he informed former live-in aides that he was calling in connection with this litigation and that signing the declaration would mean they could not "participate" in the litigation. (Stauber Dep. at 127:10–130:2, 232:8–13, 237:25–238:6.) Stauber also testified that he told the former employees that signing the declaration was voluntary. (*Id.* at 175:8–9, 237:6–9.) Condon similarly testified that Manolias directed her to inform former aides that signing the declaration was voluntary and that aides who signed could not "participate" in this litigation. (Condon Dep. at 58:2–16.)

---

[5] The parties have not submitted Atta's first declaration into the record.

Defendants confirm that there are no documents reflecting guidance provided to Serene representatives who called former live-in aides to solicit declarations, such as scripts, talking points or notes that describe this litigation, former live-in aides' rights, and the implications for declarants of signing declarations containing the stock language described above. (Jan. 2024 Stip. ¶ 1.) Defendants also admit that there are no notes taken by Serene representatives in the course of making these calls. (*See* Jan. Stip. ¶ 1; Apr. 2024 Stip. ¶¶ 3–6.) Stauber testified that he shredded his call notes and that no one at Serene told him to preserve documents related to this litigation. (Stauber Dep. at 12:19–14:5, 99:3–11, 126:11–16.) Condon testified that she provided her call notes to Defendants' counsel who quoted them in Condon's declaration supporting Defendants' opposition to the original PI Motion. (Condon Dep. at 82:21–83:25, 89:2–90:25; *see* Condon Decl., ECF No. 115-5.) The record thus lacks any written documentation to corroborate Manolias, Stauber, and Condon's testimony that they informed former live-in aides about their rights, this FLSA action, and the implications of signing the declarations on their ability to recover unpaid wages should the Acting Secretary prevail in this action.

Viewing the record as a whole, there are material questions of fact as to whether Serene representatives informed Smith and Atta about this litigation, their rights, and the implications of signing a declaration disclaiming entitlement to unpaid wages and addressing working conditions at Serene. The record also raises questions of fact as to whether Atta signed a declaration out of fear that he might get in "trouble" with DOH if he did not do so. The record thus gives rise to material questions of fact as to whether Serene representatives properly informed *any* of the former live-in aides who they asked to sign declarations about this litigation, their rights, and the implications for them of signing declarations addressing issues central to the claims in this action.

21

**VIII.    Whether Serene Representatives Created the Impression that Live-In Aides Who Did Not Sign Declarations May Lose Future Work or Experience Other Negative Repercussions**

Daly testified that around six former live-in aides reported to the Department that, during calls in which they were asked to sign declarations, Serene representatives stated that the company may resume hiring live-in aides or asked them if they wanted their jobs back. (*See* Daly Dep. at 51:5–12, 52:11–14; *see also* Daly Decl. ¶ 11.) In October 2023—while Serene representatives were soliciting former live-in aides to sign declarations disclaiming entitlement to unpaid wages from the company—Smith, a former live-in aide who also worked for Serene on an hourly basis, received an October 24, 2023 letter from the company asking her to "update their employee file, with anticipation for some potential work." (Smith Third Decl. at 1, 3, ECF No. 114-7.) The letter stated that Serene was "expecting a large abundance of work" and sought to "offer work opportunities to [these aides] once again." (*Id.* at 3.)

Serene employee Valerie Sirio attests in her January 5, 2024 declaration that Serene sent the October 24, 2023 letter to hundreds of aides "as a marketing strategy." (Sirio Decl. ¶ 8, ECF No. 115-4.) By contrast, during in her March 15, 2024 deposition, Sirio testified that she did not know anything about the letter or Serene's efforts to recruit aides. (Sirio Dep. at 31:5–13, 33:1– 34:3, 82:17–85:22, ECF No. 134-4.) Manolias testified that Smith did receive the October 24, 2023 letter. (*See* Manolias Dep. at 184:6–21.) According to Manolias, the purpose of the October 24, 2023 letter was to update the contact information for home health aides who worked on an *hourly* basis—not former live-in aides. (*Id.* at 184:6–185:16, 188:12–19.) Manolias also testified that Serene regularly sends letters of this kind asking aides to update their contact information in anticipation of potential future work. (*Id.* at 188:8–19.) Nevertheless, Defendants stipulate that "Serene has no documents related to" the October 24, 2023 letter asking former live-in and/or

hourly aides to update their employee files and advertising a "large abundance of work." (Apr. 2024 Stip. ¶ 3.)

Smith testified that Serene held out the possibility of future work and offered her a certificate of good performance in exchange for a signed declaration. (Smith Dep. at 40:9–11, 73:8–74:18, 78:6–9, 96:15–19.) According to Smith, a Serene representative first called to ask whether she would be interested in working for Serene again and then followed up with an email requesting that she sign an inaccurate template declaration. (First Smith Decl. ¶¶ 2–4, ECF No. 114-5.) Smith also attests that a Serene representative called to ask her to sign a statement within an hour of the call and said that she could receive a certification of good performance. (Second Smith Decl. ¶¶ 2–5, ECF No. 114-6.) Smith testified in deposition that one of the Serene representatives who called her stated that the company would not give her a job reference in the future unless she signed the declaration, and that this made her feel pressured to sign. (Smith Dep. at 96:11–99:20, 103:3–10). Smith testified that the follow-up calls and text messages she received from Serene asking her to sign the declaration made her feel harassed, bullied, and like she was being forced to sign. (Smith Dep. at 69:4–69:8, 77:13–15, 101:24–102:21.) Smith did not sign a declaration. (*See* ECF No. 132-12.) By contrast, Stauber testified that, during his call with Smith, he did not hold out the possibility of future work with Serene when asking her to sign a declaration. (Stauber Dep. at 233:16–23.) According to Stauber, Smith affirmatively asked him for the opportunity to work for Serene. (*Id*.)

Atta testified that he felt pressured to sign the declaration because he believed Serene would not rehire him if he refused. (Atta Dep. at 69:4–70:13, 80:8–81:9.) Stauber testified that Atta was "happy to hear from [him]," that they "spoke very friendly to each other," and after speaking, Atta was "more than happy to sign the declaration." (*Id*. at 174:19–175:10.)

23

The record thus gives rise to material questions of fact as to whether Defendants created the impression that former live-in aides, including Smith and Atta, may lose future opportunities to work with Serene or experience other negative repercussions if they did not sign declarations addressing issues central to the FLSA claims in this action, namely lack of entitlement to unpaid wages from Serene and practices relating to sleep and meal breaks and overtime reporting at the company.

## DISCUSSION

### I.   Motion to Amend the Complaint

#### A.  Legal Standard

Rules 15 and 16 of the Federal Rules of Civil Procedure govern a plaintiff's ability to amend the complaint, and "when read together, set forth three standards for amending pleadings that depend on when the amendment is sought." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).

First, Rule 15(a)(1) permits "a plaintiff [to] freely amend her pleadings . . . as of right without court permission" twenty-one days after a complaint is served or twenty-one days after service of a responsive pleading or motion under Rule 12(b), (e), or (f), Fed. R. Civ. P. *Sacerdote*, 9 F.4th at 115.

Second, after the time to amend as of right has passed—"either upon expiration of a specified period of time in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)"—a plaintiff seeking to amend a complaint must either request leave from the court or obtain the opposing party's written consent. *Sacerdote*, 9 F.4th at 115; Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) sets forth a lenient standard under which "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Unless there is a showing

24

of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court

should grant leave to amend." *Adlife Mktg. & Commc'ns Co. v. Best Yet Mkt., Inc.*, No. 17-CV-

02987 (ADS) (ARL), 2018 WL 4568801, at *1 (E.D.N.Y. Sept. 24, 2018) (citing *Forman v.

Davis*, 371 U.S. 178, 182 (1962)).

Third, Rule 15(a)(2)'s period of "liberal" amendment ends upon expiration of the date set

by the court as the deadline after which no amendment will be permitted. *Sacerdote*, 9 F.4th at

115. At that point, Rule 16 also applies, and a court must balance the "liberal" amendment

standard of Rule 15 with Rule 16(b)(4)'s requirement that the plaintiff show "good cause" for an

extension of the deadline to amend. Fed. R. Civ. P. 16(b)(4); *Holmes v. Grubman*, 568 F.3d 329,

334–35 (2d Cir. 2009); *see also Pasternack v. Shrader*, 863 F.3d 162, 174 n.10 (2d Cir. 2017)

(plaintiff must satisfy both Rules 15 and 16 to be permitted to amend after the deadline in the

scheduling order has passed). The purpose of Rule 16(b)(4) is to "offer a measure of certainty in

pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed."

*Parker v. Columbia Pictures, Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (quotation marks

omitted). The good cause standard permits the trial court to exercise "discretion to ensure that

limits on time to amend pleadings do not result in prejudice or hardship to either side." *Kassner

v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243–44 (2d Cir. 2007). The "primary consideration"

when determining good cause is "whether the moving party can demonstrate diligence" in

seeking leave to amend. *Id.* at 244; *Parker*, 204 F.3d at 340.

Rule 16(b)(4)'s good cause requirement is met when a "party [shows] that, despite its

having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol

Holdings, Inc. v. BMD Munai, Inc.*, No. 05–CV–3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug.

14, 2009). Diligence is shown when "the basis for the claim arose several months before the

party requested the amendment." *Lema v. Fitizcon Construction/Ren Corp.*, No. 20-CV-2311 (MKB), 2022 WL 1321596, at *4 (E.D.N.Y. May 3, 2022); *see also Bryan v. Commack Union Free Sch. Dist.*, No. 18-CV-7249 (RRM) (PK), 2021 WL 633751, at *4 (E.D.N.Y. Feb. 18, 2021) (finding good cause to allow amendment of a complaint to add retaliation claims six months after the amendment deadline because plaintiff learned the relevant facts after the deadline). By contrast, "[a] party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Luck v. McMahon*, No. 3:20-CV-00516 (VAB), 2021 WL 4248887, at *36 (D. Conn. Sept. 17, 2021) (citation omitted); *Feuer v. Cornerstone Hotels Corp.*, No. 14-CV-5388 (JFB) (SIL), 2017 WL 3841841, at *4 (E.D.N.Y. Aug. 4, 2017), *R. & R. adopted*, No. 14-CV-5388 (JFB) (SIL), 2017 WL 3842350 (E.D.N.Y. Aug. 31, 2017).

In determining whether a plaintiff has met Rule 16's good cause requirement, a court may also consider other relevant factors, including whether allowing amendment at that particular stage of the litigation would prejudice a defendant. *Kassner*, 496 F.3d at 244. An assessment of prejudice includes consideration of "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). "[D]elay (and its necessary consequence, litigation expense) does not, without more, constitute undue prejudice." *Pasternack*, 863 F.3d at 174.

Once a court has determined that the party seeking leave to amend the complaint after the deadline has passed has shown good cause, it must then ensure that the party has also met the requirements of Rule 15(a)(2) and show that there is no bad faith, undue delay, futility, or undue

prejudice to the non-moving parties. *See Huber v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 09348(ALC)(DF), 2012 WL 6082385, at *3–8 (S.D.N.Y. Dec. 4, 2012).

### B.  Rule 16 Analysis

Rule 16 applies to the Acting Secretary's Motion to Amend because the time to amend the Complaint as of right under Rule 15(a)(1) passed in December 2020, twenty-one days after the filing of the Amended Answer (ECF No. 13), and the deadline to amend set forth in Judge Tiscione's scheduling order passed on February 28, 2022. *See* Elec. Order, Dec. 23, 2021; *Sacerdote*, 9 F.4th at 115.

The Court assesses the proposed amendments to the Complaint to determine whether the new allegations meet Rule 16(b)(4)'s good cause standard. The proposed amendments seek only to substitute Acting Secretary Su for former Secretary Scalia—an amendment uncontested by Defendants—and to add an FLSA retaliation claim. (*See* Rev. Redline Am. Compl. at 1–3, 12–20, ECF No. 132-15 (identifying proposed amendments to the Complaint in redline).)

The proposed FLSA retaliation claim advances three retaliation theories: first, that during fall 2023, Defendants allegedly solicited sworn declarations containing false statements from former live-in aides against their interests under misleading and coercive circumstances (*see id*. ¶¶ 87–100, 116); second, that Defendants have attempted to interfere with this litigation by discouraging employees from speaking with the Department (*see id*. ¶¶ 86, 116); and third, that since the filing of this litigation in 2020, Defendants have taken punitive measures against live-in aides who sought to report unpaid hours to the company, including comments discouraging such reports, disciplinary verbal warnings, and termination (*see id*. ¶¶ 85, 116). The vast majority of the proposed amendments concern the first and second retaliation theories. They center on allegations that Serene representatives called former live-in aides under false pretenses to

27

question them about facts central to this litigation and to solicit declarations disclaiming entitlement to unpaid overtime from the company without mentioning this litigation or their rights or informing them how the declarations could affect their interests in this litigation. (*See id.* ¶¶ 80–101, 114–16.)

The Acting Secretary has demonstrated diligence in seeking leave to amend within less than two months of learning the facts relevant to its first and second FLSA retaliation theories. In November 2023, Wage and Hour began hearing from former live-in aides that Serene representatives had recently called to ask them to sign statements disclaiming that Serene owed them unpaid wages stemming from interruptions to their sleep time and meal breaks. (Daly Decl. ¶¶ 7–11; Daly Dep. at 7:16–9:18.) By December 1, 2023, Grant told the Department that a Serene representative had called her on November 16, 2023 and questioned her about whether she had experienced uninterrupted sleep time and meal breaks when working for the company. (*See* Grant Decl. ¶ 2.) By December 4, 2023, Peterkin told the Department that Stauber had called her on November 4, 2023, asked her about her sleep time and meal breaks when working for Serene, and asked her to sign a statement. (*See* Peterkin Decl. ¶¶ 2, 4, ECF No. 102-5.) By December 5, 2023, Smith told the Department that a Serene representative had called her in mid-November 2023, asked whether she received uninterrupted sleep time and meal breaks when working for Serene, and asked her to sign a declaration containing untruthful statements. (*See* First Smith Decl. ¶ 2.) On December 8, 2023, the Acting Secretary filed the first TRO and PI Motion, arguing that Serene representatives were engaging in conduct that would dissuade former live-in aides from speaking to the Department and testifying in this matter and providing declarations from Daly, Grant, Smith, and Peterkin. (ECF Nos. 102, 102-3–102-7.) On December 20, 2023, the Acting Secretary filed a letter requesting leave to amend the Complaint

to add an FLSA retaliation claim pursuant Section 15(a)(3) and included a proposed amended complaint. (*See* ECF Nos. 106, 106-1.)

Additionally, in the course of retaliation discovery, Stauber, Manolias, and Condon testified that they informed former live-in aides that signing the declarations would mean they could not "participate" in the the Acting Secretary's litigation. (Stauber Dep. at 23:3–24:8, 127:10–130:2, 232:8–13, 237:25–238:6, 242:18–24; Manolias Dep. at 55:2–10; Condon Dep. at 58:2–16.) Although these specific facts emerged after the Acting Secretary initially sought leave to amend in December 2023, they bolster the demonstration of good cause to permit amendment.

The Acting Secretary thus sought leave to amend the Complaint within less than two months of learning about conduct that forms the crux of the proposed FLSA retaliation claim— namely, the fall 2023 outreach by Serene representatives to solicit former live-in aides to sign declarations disclaiming entitlement to unpaid wages from Serene for use in this litigation. Courts have granted leave to amend under Rule 16 in circumstances where plaintiffs had access to facts relevant to the proposed amendments for much longer periods of time than the two-month time frame at issue here. *See, e.g.*, *Margel v. E.G.L. Gem Lab Ltd.*, No. 04-CV-1514 (PAC) (HBP), 2010 WL 445192, at *10 (S.D.N.Y. Feb. 8, 2010) (granting motion to amend despite delay of at least six months and noting that "courts frequently grant leave to amend after much longer periods of delay"); *Zomba Recording Corp. v. MP3.com, Inc.*, No. 00-CV-6831 (JSR), 2001 WL 770926, at *1 (S.D.N.Y. July 10, 2001) (granting leave to amend despite seven-month delay by plaintiffs given the absence of any material prejudice).[6]

---

[6] Although the court's decision in *Zomba* did not explicitly identify the length of time between when the moving party learned relevant facts and when it sought leave to amend, a review of the district court docket shows that the delay was approximately seven months. *See Zomba Recording Corp. v. MP3.com, Inc.*, No. 00-CV-6831 (JSR) (S.D.N.Y.), Elec. Order, Nov. 14,

Finally, the record also shows that the Acting Secretary was sufficiently diligent in seeking leave to amend within several years of learning facts relevant to its third FLSA retaliation theory—the theory that Defendants have taken punitive measures against live-in aides who sought to report to Serene that they were not paid for all of the hours they worked, including through comments discouraging such reports, disciplinary verbal warnings, and termination. (Rev. Redline Am. Compl. ¶ 85.) The Department first learned of facts relevant to this retaliation theory "[s]tarting in mid-2021," when several Serene employees reported that, after they complained to the company "about not getting sleep or working during breaks," they "were told to quit if they were unhappy." (Daly Decl. ¶ 5.) Thus, around two and a half years passed between when the Secretary first learned of at least some facts relevant to this FLSA retaliation theory and when the Acting Secretary sought leave to amend in December 2023. Courts have found good cause for amendment even in circumstances involving far longer delay. For example, in *Rachman Bag Co. v. Liberty Mutual Insurance Co.*, the Second Circuit affirmed the district court's grant of leave to amend the defendant's answer to include a fraudulent concealment defense despite a four-year delay between when the defendant learned some relevant facts and when it moved to amend. 46 F.3d 230, 235 (2d Cir. 1995). Defendants concede that "Plaintiff did not delay in seeking" to amend the Complaint to include an FLSA retaliation claim, and instead oppose amendment on the basis that the proposed claim is futile and would cause undue delay and undue prejudice. (ECF No. 108 at 2; ECF No. 133 at 12.)

Moreover, judicial economy is served by granting the Motion to Amend in full, permitting the Acting Secretary to file an Amended Complaint that pleads an FLSA retaliation

---

2000 (scheduling order requiring amendments to the pleadings by December 1, 2000) and Elec. Order, July 10, 2001 (noting plaintiff's request to amend the complaint, ECF No. 28 (same).

claim based on all three theories. All of the proposed allegations are made in conjunction with the Acting Secretary's claim that Defendants have retaliated against former Serene live-in aides by taking actions that have dissuaded, or are likely to dissuade, former live-in aides from participating in the Department's investigation and litigation against Serene for alleged FLSA violations. (Rev. Redline Am. Compl. ¶ 114–16.) Defendants have had notice of all three FLSA retaliation theories since the Motion to Amend was filed in December 2023, even before the parties stipulated to the scope of the retaliation discovery. (*See* ECF No. 106-1 ¶¶ 85, 115.) Moreover, the FLSA retaliation claim is "most efficiently litigated alongside" the other FLSA claims against Defendants. *See Verdone v. Am. Greenfuels, LLC*, No. 3:16-CV-01271 (VAB), 2017 WL 3668596, at *4 (D. Conn. Aug. 24, 2017) (recognizing, in the Rule 16 context, that "liberal amendment promotes judicial economy by making it possible to dispose of all contentions between parties in one lawsuit," and permitting plaintiff's retaliation claim to be amended to the complaint and litigated alongside other FLSA claims).

The Court thus finds that the Acting Secretary acted with diligence and that there is good cause to amend the Complaint as required by Rule 16. The Court now turns to whether the amendment should be permitted under Rule 15(a)(2).

### C.  Rule 15(a)(2) Analysis

As discussed above, Rule 15(a)(2) calls for granting leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts will grant leave under this rule absent "a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties." *Adlife Mktg.*, 2018 WL 4568801, at *1 (citing *Forman*, 371 U.S. at 182).

The Acting Secretary meets and exceeds the Rule 15(a)(2) standards. Defendants do not argue, much less show, any bad faith on the part of the Acting Secretary in seeking leave to

amend the Complaint to add an FLSA retaliation claim. (*See generally* ECF No. 108; Defs.'
Supp. Br.) Moreover, the record does not reflect that permitting such an amendment would cause
any undue delay in the litigation or prejudice to the Defendants. The parties have already
engaged in significant discovery on the retaliation claim, and the Acting Secretary does not
request the opportunity to conduct additional discovery. Because the parties' retaliation
discovery is complete, permitting amendment of the Complaint to include the FLSA retaliation
claim will not unduly delay the litigation or prejudice Defendants.

Finally, Defendants' contention that the proposed FLSA retaliation claim is futile is
belied by the record, which gives rise to triable questions of fact concerning whether Defendants
were aware of former live-in aides' protected activity and engaged in conduct that would, in
violation of the FLSA, dissuade them from sharing information with the Department and serving
as witnesses in this action. As discussed below, a number of these questions of fact material to
the proposed FLSA retaliation claim turn on the assessment of various witnesses' credibility,
which must be resolved at trial. *See Graham v. Kohl's Dep't Stores, Inc.*, No.
3:04CV949(MRK), 2005 WL 2256603, at *2 (D. Conn. Sept. 8, 2005) ("[C]redibility issues are
normally resolved by a jury based on the in-court testimony of witnesses, not by the Court as a
matter of law based solely on affidavits and depositions.") (citing *Rule v. Brine, Inc.*, 85 F.3d
1002, 1011 (2d Cir.1996)).

Thus, as discussed in detail below, because there is no showing of bad faith, undue delay,
undue prejudice or futility, the Acting Secretary has met the Rule 15(a)(2) requirements for
securing leave to amend.

**i.      Undue Delay and Undue Prejudice**

The Acting Secretary argues that amendment of the Complaint to add an FLSA

retaliation claim will not delay the litigation or cause Defendants undue prejudice because all

discovery on the retaliation issue is complete, "no trial date [has] been set by the court and no

motion for summary judgment [has been] filed." (Pl.'s Supp. Br. at 9–10.) The Acting Secretary

relies on *State Teachers Retirement Board v. Fluor Corp.*, where the Second Circuit affirmed the

trial court's order granting leave to amend after discovery closed. 654 F.2d 843, 856 (2d Cir.

1981). The Acting Secretary also relies on *Walsh v. Versa Cret Contracting Company*, where the

court granted the Secretary of Labor leave to add FLSA retaliation and obstruction claims after

the deadline to amend the complaint on the basis that there was no prejudice to the defendants

where "[t]he parties have not ventured far past discovery . . . no trial date has been set . . . nor

have any dispositive motions been filed . . . ." No. 21-05697, 2023 WL 3570699, at *7 (E.D.N.Y.

May 18, 2023).

In their December 29, 2023 letter opposing the Motion to Amend, which was filed *before*

the Court permitted the parties to engage in discovery on the issue of retaliation, Defendants

argue that amendment would cause prejudice because the proposed FLSA retaliation claim

"would require full-blown discovery . . . to fully develop the defense to this frivolous claim" and

would therefore "necessarily require Defendants to expend additional resources . . . ." (ECF No.

108 at 3.) Following discovery, Defendants concede that a trial date has not been set, but

nevertheless argue that permitting amendment of the Complaint to include an FLSA retaliation

claim will "delay the case further due to the need for additional discovery on the new claim(s)."

(Defs.' Supp. Br. ISO Opp. to Mot. to Amend ("Defs.' Supp. Br.") at 12, ECF No. 133.)

"[T]he need to conduct additional discovery is not, in itself, sufficient to constitute prejudice." *Margel v. E.G.L. Gem Lab Ltd.*, No. 04-CIV-1514 (PAC) (HBP), 2010 WL 445192, at *12 (S.D.N.Y. Feb. 8, 2010) (collecting cases). "The type of prejudice that warrants denial of leave to amend is usually such that it puts the opposing party at an unfair disadvantage, such as the addition of a new claim on the eve of trial." *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *12 (E.D.N.Y. Mar. 26, 2010) (brackets and quotation marks omitted).

Amending the Complaint to add an FLSA retaliation claim will not cause undue delay to the litigation or any prejudice to the Defendants. Here, as discussed above, the Acting Secretary requested leave to amend less than two months after learning most of the facts relevant to the proposed claim. *See supra* pp. 28–31. The parties have already engaged in fulsome discovery on the proposed retaliation claim, creating a factual record that includes two fact stipulations, document production, and depositions of nine witnesses—five for the Acting Secretary (Wage and Hour Investigator Daly and former Serene live-in aides Atta, Grant, Smith, and Peterkin) and four for Defendants (Manolias, Stauber, Condon, and Sirio).[7] As discussed above, the record gives rise to material questions of fact as to whether Serene representatives made calls to former live-in aides under the false pretense of enforcing DOH requirements, conducting a DOH audit, or inquiring about an unnamed grant to Serene, and whether the callers accurately informed these former employees about this litigation, their rights, and the potential adverse impact of signing the proposed declarations on their ability to recover unpaid wages from Serene through this

---

[7] As discussed above, the Court granted the Acting Secretary's motion to compel the production of the 115 declarations signed by former Serene live-in aides in response to the challenged calls by Serene representatives in the fall of 2023.

action. *See supra* pp. 15–22. Thus, Defendants have been granted ample opportunity to fully

develop their defenses to the proposed FLSA retaliation claim.

    Here, where discovery has closed and the parties were given the opportunity to conduct

discovery on the retaliation issues, there will be no undue delay to the litigation or prejudice to

Defendants by permitting amendment of the Complaint to include the proposed FLSA retaliation

claim. *Cf. Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) ("[W]e will be

most hesitant to allow amendment where doing so unfairly surprises the non-movant and

impedes the fair prosecution of the claim.").

### ii.   Futility

The Acting Secretary argues that ample evidence in the record establishes the prima facie

elements of the proposed FLSA retaliation claim. (Pl.'s Supp. Br. at 10–15.) Defendants argue

that the Motion to Amend should be denied because the proposed claim is futile. (Defs.' Supp.

Br. at 12–13.)

Here, where discovery has closed, the Court applies the summary judgment standard of

Rule 56, Fed. R. Civ. P., to determine whether the proposed FLSA retaliation claim is futile. *See*

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403–04 (S.D.N.Y.

2014), *aff'd sub nom.*, *APEX Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, 725

F. App'x 4 (2d Cir. 2018). The futility analysis "turn[s] on the question of whether the proposed

amended complaint would be subject to dismissal under Rule 56 . . . for lack of a genuine issue

of material fact." *Huber*, 2012 WL 6082385, at *5; *Stoner v. N.Y.C. Ballet Co.*, No. 99 Civ.

0196(BSJ), 2002 WL 523270, at *14 (S.D.N.Y. Apr. 8, 2002) (denying motion to amend where

the proposed claim "would immediately be subject to dismissal on a motion for summary

judgment"). The party opposing amendment bears the burden of showing that there is no genuine

question of material fact as to the proposed amendment in order to establish futility. *Blaskiewicz v. Cnty. of Suffolk*, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998). In applying a summary judgment standard, the court must draw all reasonable inferences and resolve all ambiguities in favor of the party seeking amendment—and against the party arguing that the proposed amendment is futile. *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023). To permit amendment, a court need only find that a summary judgment motion, based on the evidence presented concerning the amendment, "would not be so certain to be successful as to bar the proposed amendment as futile." *Huber*, 2012 WL 6082385, at *7 n.3.

Under Section 15(a)(3), it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). At summary judgment, the court applies the "burden-shifting" framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for FLSA retaliation claims. *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471–72 (S.D.N.Y. 2008) (citing *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988)). The plaintiff must first meet the "*de minimis*" burden of establishing a "prima facie case." *Torres*, 628 F. Supp. 2d at 472. This requires showing: "(1) participation in protected activity known to the defendant . . . ; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. Cty. of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see also Quintanilla v. Suffolk Paving Corp.*, No. 09-CV-5331 (AKT), 2019 WL 885933, at *19 (E.D.N.Y. Feb. 22, 2019) (applying this standard in the summary judgment context). Once the plaintiff meets this de minimis burden, "the burden then shifts to the [employer] to articulate a legitimate, non-

discriminatory reason for the employment action," and after that, "the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Mullins*, 626 F.3d at 53 (quotation marks omitted); *Quintanilla*, 2019 WL 885933, at *19. In other words, for Defendants to defeat the Acting Secretary's Motion to Amend, they must show that there is no genuine question of material fact as to whether the record demonstrates any one of the elements required for a prima facie case of FLSA retaliation.

It is well established that an employer can be liable for retaliation against former employees. *See Vazquez v. 142 Knickerbocker Enterprises, Corp.*, 13-CV-6085(EK)(PK), 2024 WL 1191157, at *14 (E.D.N.Y. Mar. 20, 2024); *cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). In *Robinson*, the Supreme Court unanimously held that Title VII's prohibition against retaliation covers former employees. *See* 519 U.S. at 346. The Court explained that "it would be destructive of [a] purpose of the [Title VII] antiretaliation provision for an employer to be able to retaliate with impunity against" workers whom the employer had first terminated. *See id.* The Second Circuit thus applies the same retaliation standard under the FLSA and Title VII. *See Mullins*, 626 F.3d at 53. Accordingly, courts in this circuit have applied *Robinson*'s holding in the FLSA retaliation context. *See, e.g.*, *Vazquez*, 2024 WL 1191157, at *14; *Li v. Oliver King Enters., Inc.*, No. 14-CV-9293, 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (collecting cases).

Defendants fail to show that there is no genuine issue of material fact as to whether Defendants engaged in retaliation in violation of the FLSA for three reasons. First, the record establishes the first element of a prima facie case of FLSA retaliation: that Defendants were

aware of protected activity by former live-in aides because the July 21, 2020 filing of the Complaint placed Defendants on notice that 337 different people, whom the Acting Secretary alleged by name to be former or current Serene employees owed back wages, have relevant information and therefore may share information with the Department or otherwise testify in this action. Second, there are material questions of fact as to the second and third elements of the prima facie FLSA retaliation claim: whether Defendants took adverse action by soliciting declarations to use against former employees' interests under circumstances that were misleading, deceptive, and coercive, and whether Defendants' solicitation efforts were causally connected to former live-in aides' potential participation in the Acting Secretary's FLSA investigation and litigation. The record also gives rise to material questions of fact as to whether Serene's claim of legitimate litigation preparation was a pretext for conduct intended to chill former live-in aides from participating in the Acting Secretary's FLSA litigation against Serene. These material questions of fact preclude the conclusion that the FLSA retaliation claim is futile.

### a. Protected Activity

The parties dispute whether the record gives rise to triable questions of fact as to whether former live-in aides participated in any protected activity known to Defendants—the first element of a prima facie FLSA retaliation claim. In its briefing, the Acting Secretary argues that Defendants knew of two forms of protected activity: first, that former Serene live-in aides were "speaking truthfully" to the Department (ECF No. 114-1 at 7) and "actively providing information" (Pl.'s Supp. Br. at 11–12; *see also* ECF No. 106 at 2; ECF No. 116 at 11–12); and second, that "all former Serene live-in home health aides for whom back wages have been calculated in this case are potential witnesses in ongoing litigation engaging in the protected activity of 'testif[ying] or [being] about to testify' in an FLSA proceeding. 29 U.S.C.

§ 215(a)(3)." (ECF No. 116 at 12; *see also* ECF No. 114-1 at 8; Pl.'s Supp. Br. at 12). The Acting Secretary also seeks to amend the Complaint to allege that Defendants were aware of a third form of protected activity: that former live-in aides "sought to report to Serene hours worked over and above those hours Defendants paid them for. . . ." (Rev. Redline Am. Compl. ¶¶ 85, 116(a)).

Defendants argue that the record does not show that Defendants knew of any protected activity for three reasons. First, Defendants contend they "did not know who participated in the protected activity of cooperating with Plaintiff." (ECF No. 108 at 2; ECF No. 115 at 3, 11.) Second, according to Defendants, former live-in aides' *anticipated* cooperation with the Acting Secretary or participation as potential witnesses in this action do not constitute protected activity because "Plaintiff has never disclosed its witnesses." (ECF No. 115 at 11.) Third, Defendants assert "there is no evidence that any former live-in aides made any actionable complaints to Defendants concerning overtime wages." (Defs.' Supp. Br. at 3.) Defendants appear to concede that a former live-in aide's effort to report unpaid time to Serene would constitute protected activity, but argue that there are no material questions of fact as to whether any former live-in aide actually made such a report. (*See id.*)

The Court's analysis begins with the text of the FLSA retaliation provision. Section 15(a)(3) protects an "employee" who "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in such a proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Although the text of the statute refers only to "employee," that term has long been

interpreted to include former employees, as noted above.[8] The plain text of Section 15(a)(3)

identifies the "fil[ing of] any complaint" as protected activity. In *Kasten v. Saint-Gobain*

*Performance Plastics Corp.*, the Supreme Court held that this term includes an employee's oral

and written complaints to an employer. 563 U.S. 1, 17 (2011).

Section 15(a)(3)'s plain text also protects an employee who "has testified or is about to

testify in any such proceeding" that is "under or related to this chapter" (i.e., the FLSA). 29

U.S.C. § 215(a)(3). Neither the Supreme Court nor the Second Circuit has addressed whether this

phrase includes employees who share information with the Department in the course of an

ongoing FLSA lawsuit or employees whom the Acting Secretary has identified by name in the

complaint as being owed back wages and who may therefore have relevant information and

receive compensation if the Acting Secretary prevails on the FLSA claims. I will now consider

whether such conduct constitutes protected activity under the plain text of Section 15(a)(3).

### 1. The phrase "has testified or is about to testify in [an FLSA] proceeding" is ambiguous

A statute generally "should be enforced according to its plain and unambiguous

meaning." *Greathouse v. JHS, Sec. Inc.*, 784 F.3d 105, 111 (2015). "The plainness or ambiguity

of statutory language is determined by reference to the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Id.* (quotation

marks omitted). "If the meaning is plain, the inquiry ends there." *United States v. Rowland*, 826

F.3d 100, 108 (2d Cir. 2016). When the plain text of a statute is ambiguous, a court must apply

"canons of statutory construction for assistance in interpreting the statute." *Id.* The court may

"resort to legislative history only if, after consulting canons of statutory [construction], the

---

[8] *See Han v. Shang Noodle House*, Inc., No. 20CV2266PKCVMS, 2022 WL 4134223, at *7
(E.D.N.Y. Sept. 12, 2022) ("[D]istrict courts in this Circuit have" held that the term "employees"
includes former employees); *Vazquez*, 2024 WL 1191157, at *14.

meaning remains ambiguous." *Id.* (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)); *see United States v. Peterson*, 394 F.3d 98, 105 (2d Cir. 2005) ("[E]ven if the statute were ambiguous, we would look to traditional canons of statutory construction to resolve the ambiguity, before looking to legislative history and interpretive regulations."). If the canons of statutory interpretation and legislative history do not resolve the ambiguity, the court will "afford[] some degree of weight to the interpretations of the agencies charged with enforcing the statute. *Greathouse*, 784 F.3d at 113.

The relevant sections of the FLSA statute do not define the phrase "has testified or is about to testify in [an FLSA] proceeding." 29 U.S.C. § 203 (defining terms); *id*. § 215(a)(3) (setting forth the prohibition against retaliation). Nor does the FLSA statute expressly define the terms "testify," "about," or "proceeding," or the phrase "is about to testify." *Id*. § 203.

The Court therefore looks to supplemental support and applies the canon that words are to be understood in their ordinary everyday meanings, unless context indicates that they bear a technical sense. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.") (quotation marks omitted); *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 184 (2d Cir. 2010) ("Statutory language, of course, has meaning only in context, . . . and so it is possible that Congress may use a general word in a sense that is more technical and limited than its standard definition") (quotation marks and citations omitted). Black's Law Dictionary defines "testify" as: (1) "[t]o bear witness"; (2) "to give evidence as a witness"; and (3)" "to make a solemn declaration, under oath or affirmation, in a judicial inquiry for the purpose of establishing or proving some fact." *Testify*, Black's Law Dictionary (12th ed. 2024). The common, ordinary

definition of the phrase "bear witness" is "to make a statement saying that one saw or knows something" and "to show that something exists or is true."[9] Black's Law Dictionary also defines "proceeding," when used outside of the bankruptcy context, to include the following:

> 1. The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. 2. Any procedural means for seeking redress from a tribunal or agency. 3. An act or step that is part of a larger action. 4. The business conducted by a court or other official body; a hearing.

*Proceeding*, Black's Law Dictionary (12th ed. 2024). Together, these definitions establish that the phrase "has testified . . . in [an FLSA] proceeding" identifies as protected activity an employee's statement about facts within their knowledge as part of "an act or step that is part of a larger" FLSA lawsuit. These definitions suggest, but do not firmly establish, that the phrase encompasses an employee's act of sharing information with a Department investigator or attorney in the course of ongoing FLSA litigation, outside the context of sworn testimony provided in court, by deposition, or through a written statement.

Black's Law Dictionary does not define "about to testify." The common definition of "about" is "reasonably close to, almost, on the verge of."[10] These definitions, along with those discussed above, establish that the phrase "about to testify in [an FLSA] proceeding" identifies as protected activity the situation where an employee is reasonably close to making a statement about facts within their knowledge as part of "an act or step that is part of a larger" FLSA lawsuit. These definitions suggest, but do not firmly establish, that the phrase encompasses the situation where an employee is reasonably close to sharing information with a Department

---

[9] *Bear Witness*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/bear%20witness (last visited July 13, 2024).

[10] *About*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/about?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited July 13, 2024).

investigator or attorney in the course of ongoing FLSA litigation, outside the context of sworn testimony scheduled to be provided in court, by deposition, or through a written submission.

Courts outside of the Second Circuit have interpreted the phrase "has testified . . . in [an FLSA] proceeding" to include written statements executed in the course of an FLSA lawsuit or investigation. In *Uronis v. Cabot Oil & Gas Corp.*, the Third Circuit held that "to 'testify' under Section 15(a)(3) includes the filing of an informational statement with a government entity," which in that case consisted of an employee's "consent to join a [FLSA] collective action." 49 F.4th 263, 273 (3d Cir. 2022). In *Goins v. Newark Hous. Auth.*, the court concluded that an employee "testified" under Section 15(a)(3) when she "act[ed] as a witness" by "submit[ing] a sworn statement pertaining to her overtime" in the course of a Department audit of the employer for FLSA violations, even in the absence of litigation. No. 15-cv-2195, 2019 WL 1417850, at *13–15 (D.N.J. Mar. 29, 2019). The Court is not aware, however, of any decisions in which a court interpreted the phrase "has testified . . . in [an FLSA] proceeding" to include protected activity in the form of oral statements.

Without specifically addressing the meaning of the phrase "has testified . . . in [an FLSA] proceeding," courts have more broadly found that employees' act of speaking to the Department during its investigation of FLSA violations constitutes protected activity. *See, e.g.*, *Perez v. ACME Universal, Inc.*, No. 12-00008, 2014 WL 1378241, at *3–4 (D. Guam Apr. 8, 2014) (interpreting Section 15(a)(3) to protect "participation in the Secretary's investigation," even where it is based on an employers' "mistaken belief" that an employee spoke to the Department); *Prewitt v. Factory Motor Parts, Inc.*, 747 F. Supp. 560, 563–64 (W.D. Mo. 1990) (finding that an employee's "telephone call to the Wage and Hour Division is conduct protected by [Section 15(a)(3)]"); *Daniel v. Winn-Dixie Atlanta, Inc.*, 611 F. Supp. 57, 58–59 (N.D. Ga. 1985)

43

("consulting" the Department about "suspicions" that an employer was not paying overtime was protected activity under Section 15(a)(3) even where the employee had not "fil[ed] a complaint or testif[ied] in any proceeding").

Moreover, courts outside the Second Circuit have reached different conclusions as to whether the phrase "is about to testify in [an FLSA] proceeding" includes an employee who is not scheduled for an interview, deposition, or other oral or written statement, but is reasonably anticipated to speak to the Department during an ongoing FLSA action. In *Ball v. Memphis Bar-B-Q Co.*, the court concluded that the "unambiguous meaning" of the phrase is that it refers to an employee who "is *scheduled* to testify in a then-pending FLSA proceeding." 34 F. Supp. 2d 342, 345 (E.D. Va. 1999), *aff'd*, 228 F.3d 360 (4th Cir. 2000) (emphasis supplied). By contrast, in *Uronis*, the Third Circuit found protected activity where an employer was alleged to be aware that an employee was a "putative [FLSA] collective member" and was "anticipated" to "provide evidence relating to" the ongoing FLSA action, even though the employee allegedly had neither told anyone of his plan to testify nor joined the action as a collective member. 49 F.4th at 267. In *Bowen v. M. Caratan, Inc.*, the court concluded that an employee "[was] about to testify" because "[the defendants] knew that [the Department] had identified the Plaintiff as someone whom the investigator wanted to interview in the course of the audit," even though there was no interview scheduled. 142 F. Supp. 3d 1007, 1021–23 (E.D. Cal. 2015). Similarly, in *French v. Oxygen Plus Corp.*, the court held that an employee "[was] about to testify" where the employee's emails were attached to FLSA complaint and employee's name would inevitably be

disclosed pursuant to Rule 26(a)(1), Fed. R. Civ. P., as a person with relevant knowledge. No. 3:13-cv-00577, 2015 WL 1467175, at *2 (M.D. Tenn. Mar. 30, 2015).[11]

In light of these interpretations, the Court concludes that the phrase "has testified . . . in [an FLSA] proceeding" is ambiguous as to whether it includes an employee who has shared information with the Department in the course of an FLSA action, but has not provided formal testimony through a written statement or orally at a deposition or in court. The Court also concludes that the phrase "is about to testify in [an FLSA] proceeding" is ambiguous as to whether it includes employees who may reasonably be anticipated to serve as a potential witness in an ongoing FLSA action, even though no interview with the Department or other oral or written testimony has been scheduled to take place. Thus, to interpret the language of Section 15(a)(3), the Court "must apply traditional tools of statutory interpretation," including "looking to the purpose of FLSA, and affording some degree of weight to the interpretations of the agencies charged with enforcing it." *Greathouse*, 784 F.3d at 113.

## 2. The Remedial Purpose of the FLSA

Congress declared its intention in the FLSA to "correct and as rapidly as practicable to eliminate" labor conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers, without substantially reducing employment or earning power." 29 U.S.C. § 202. To achieve this goal, the FLSA sets

---

[11] In *Perez v. Fatima/Zahra, Inc.*, the court applied Section 15(a)(3), without referring to any specific term in the statute, to find that threats made by an employer against employees "in anticipation of" the employees speaking to a Department investigator were "no less retaliatory" than action taken against an employee after cooperating with the Department. No. C 14-2337 CW, 2014 WL 2154092, at *2 (N.D. Cal. May 22, 2014). The court's analysis is premised on the notion that the protected activity consisted of the employer's reasonable anticipation that the employees could speak to a Department investigator who had visited the worksite. *Id.*

forth minimum wage standards, *id.* § 206, and establishes certain payroll practice requirements, *id.* §§ 207, 211(c). "Because the government cannot monitor every employer's payroll, [the] FLSA also creates an enforcement mechanism that relies in significant part on employees' complaints." *Greathouse*, 784 F.3d at 113 (citing *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)). Congress enacted Section 15(a)(3) to "prevent[ ] fear of economic retaliation from inducing workers quietly to accept substandard conditions" and to foster an atmosphere protective of employees who lodge such complaints. *Kasten*, 563 U.S. at 12 (quotation marks omitted).

The Second Circuit has "repeatedly affirmed that the remedial nature of the FLSA warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy." *Greathouse*, 784 F.3d at 113–14 (quotation marks omitted) (collecting cases). The FLSA's remedial goals counsel in favor of broadly construing the phrase "has testified . . . in [an FLSA] proceeding" to include employees who have shared information with the Department in the course of an FLSA action, even without a written statement or oral testimony in deposition or in-court. It also weighs in favor of construing the phrase "is about to testify in [an FLSA] proceeding" broadly to include employees who are reasonably anticipated to share information with the Department in the course of an FLSA action, even if no interview, statement, or other oral or written testimony is scheduled. *See, e.g.*, *Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 43 (1st Cir. 1999) (concluding that the "remedial and humanitarian purposes of [the FLSA] . . . would hardly be furthered by a narrow reading of [Section 15(a)(3)]") (quotation marks and citations omitted).

Prohibiting retaliation against former employees who share information with the Department in the course of ongoing FLSA litigation and against former employees who may

46

reasonably be anticipated to speak to the Department in such an action, even without a scheduled interview or other testimony, furthers the purposes of the FLSA by encouraging employees to share information with the Department, which is tasked with a crucial enforcement role. *See* 29 U.S.C. § 216(c) (authorizing the Secretary of Labor to enforce the FLSA); *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960) (recognizing that Congress enacted Section 15(a)(3) to promote "effective enforcement" of the FLSA by encouraging employees "to approach officials with their grievances").

The protective purpose of the FLSA, as recognized by the Supreme Court in *Kasten*, 563 U.S. at 11, and the Second Circuit in *Greathouse*, 784 F. 3d at 113–14, counsels in favor of interpreting the statutory phrase "has testified . . . in [an FLSA] proceeding" to include former employees who share information with the Department in the course of ongoing FLSA litigation, even without providing a written statement or oral testimony in deposition or in-court. These authorities also weigh in favor of interpreting the phrase "is about to testify in [an FLSA] proceeding" to include former employees who are reasonably anticipated to share information with the Department and Acting Secretary in the course of ongoing FLSA litigation, even if no interview, deposition, or in-court testimony is scheduled.

### 3.   Administrative Agencies' Interpretations of Section 15(a)(3)

The Court next considers the views of the Equal Employment Opportunity Commission ("EEOC") and the Secretary of Labor, as the authorities charged with enforcing the FLSA.[12] "The well-reasoned views of the agencies implementing a statute constitute a body of experience

---

[12] As discussed, Congress authorized the Secretary of Labor to enforce the FLSA's substantive provisions, 29 U.S.C. § 216(c). Like the Secretary of Labor, the EEOC is authorized to enforce the FLSA's retaliation provision as a part of its Equal Pay Act enforcement responsibilities. *Greathouse*, 784 F.3d at 114 n.12 (citing Reorganization Plan No. 1 of 1978, 5 U.S.C.App. § 1, p. 664).

and informed judgment to which courts and litigants may properly resort for guidance . . . ."

*Greathouse*, 784 F.3d at 114 (citing *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)) (quotation marks and brackets omitted). As the Second Circuit has explained:

> The weight afforded to an agency's interpretation that lacks the force of law—
> such as an agency manual or litigation document—depends on "the thoroughness
> evident in its consideration, the validity of its reasoning, its consistency with
> earlier and later pronouncements, and all those factors which give it power to
> persuade, if lacking power to control." In *Kasten*, the Supreme Court ascribed "a
> degree of weight" to the views of the EEOC and the Secretary, finding them
> "reasonable" and "consistent with the Act," and explaining that "[t]he length of
> time the agencies have held them suggests that they reflect careful consideration,
> not 'post hoc rationalizatio[n].'"

*Greathouse*, 784 F. 3d at 114 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) and

*Kasten*, 563 U.S. at 15–16).

The 2024 EEOC Compliance Manual,[13] a document designed to "provide[ ] guidance and

instructions for investigating and analyzing claims of retaliation under the statutes enforced by

the EEOC,"[14] including Section 15(a)(3),[15] provides that protected activity includes "*testifying,

assisting, or participating in any manner in an investigation*, proceeding, or hearing under the

applicable statute." § 4:10. EEOC Compliance Manual Section 8: Retaliation § 8–I(A) (July

2024) (emphasis supplied). The EEOC's inclusion of the terms "assisting, or participating in any

manner  in an investigation" counsels in favor of a broad interpretation of the phrase "has

testified or is about to testify in [an FLSA] proceeding," which includes employees who have

---

[13] The Supreme Court has described the EEOC Compliance Manual as "a body of experience
and informed judgment to which courts and litigants may properly resort for guidance" and noted
that it is "entitled to a measure of respect." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399
(2008) (quotation marks omitted).

[14] *Greathouse*, 784 F.3d at 115 (citing 2 EEOC Compliance Manual, Section 8: Retaliation § 8–
II(B)(1) (May 20, 1998)).

[15] *See* § 4:10. EEOC Compliance Manual Section 8: Retaliation § 8–I(A) n.4 (July 2024)
(providing guidance on the definition of "protected activity" under the Equal Pay Act, which
confers authority on the EEOC to enforce Section 15(a)(3) of the FLSA).

shared information with the Department and Acting Secretary during ongoing FLSA litigation, even without providing a written statement or oral testimony in deposition or in-court, and employees who are reasonably anticipated to do so, even if no interview, deposition, or in-court testimony is scheduled. The EEOC's 2024 position that protected activity broadly includes "participating in any manner . . . in an investigation" appears to be a longstanding one and is substantially the same as the EEOC's position in 1998. *Compare* § 4:10. EEOC Compliance Manual Section 8: Retaliation § 8–I(A) (July 2024) ("Protected activity consists of . . . filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under the applicable statute (the 'participation' clause).") *with* 2 EEOC Compliance Manual, Section 8: Retaliation § 8–II(B)(1) (May 20, 1998)[16] ("Protected activity includes 'participating' in an EEO process . . . . Participation in an EEO process is more narrowly defined to refer specifically to raising a claim, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under the EEO laws, but it is very broadly protected.").

The Secretary of Labor's litigation position on the question of whether Section 15(a)(3) broadly protects information sharing with the Department in FLSA investigations and potential future testimony by workers in ongoing FLSA litigation has also been consistent. The Secretary of Labor has taken the position in a number of cases across the country that Section 15(a)(3) prohibits retaliation against employees who speak to the Department in the course of an FLSA action, even without the end product of a sworn statement or testimony in deposition or in court, and employees who are reasonably anticipated to do so even if no interview with the Department

---

[16] *Available* https://my.vitallaw.com/?cpid=WKUS-Legal-Cheetah&uAppCtx=cheetah#/read/Labor/819bb4587c901000a7a8d8d385ad169402!csh-da-filter!WKUS-TAL-DOCS-PHC-%7B4C783A1C-FBF2-11E5-8E8C-74E5434FFA59%7D--WKUS_TAL_5036%23teid-924?searchItemId=&da=WKUS_TAL_5036 (last visited July 12, 2024).

or written or oral testimony has been scheduled. *See, e.g.*, *Scalia v. Unforgettable Coatings, Inc.*, 455 F. Supp. 3d 987, 993 (D. Nev. 2020) (where the Secretary moved for a preliminary injunction to enjoin retaliation because the employer made statements "intending to quash cooperation" with Department investigators); *Perez*, 2014 WL 1378241 at *3–4 (where the Secretary argued that an employer's "belie[f]" that an employee had spoken to the Department is protected activity giving rise to an FLSA retaliation claim); *Scalia v. F.W. Webb Co.*, No. 20-cv-11450-ADB, 2021 WL 1565508 at *2–4 (D. Mass. Apr. 21, 2021) (where the Secretary argued that there was protected activity because an employer sent emails to employees whom "they knew or had reason to believe had been contacted or would likely be contacted by the [Department] or who had spoken or were about to speak to [Department] representatives in the [FLSA] investigation . . . .").

For these reasons, the Court finds that the agencies' interpretation provides additional support for the view that "has testified . . . in a [FLSA] proceeding" includes former employees who have shared information with the Department in the course of an FLSA action, even outside of a written statement or testimony in deposition or court, and that "is about to testify in[an FLSA] proceeding" includes former employees who are reasonably anticipated by an employer to speak to the Department in the course of an FLSA action, even if no interview, statement, or other testimony is scheduled.

### 4. "[H]as Testified or is About to Testify in [an FLSA] Proceeding" Includes Employees Who Shared Information with the Department and Employees Reasonably Anticipated to Share Information with the Department or Otherwise Testify in Ongoing FLSA Litigation

Based on the analysis set forth above, I conclude that Section 15(a)(3) protects from retaliation former employees who have shared information with the Department in the course of an FLSA action and former employees who are reasonably anticipated to do so, even without a

scheduled interview, statement, or other testimony. This interpretation is consistent with the FLSA's text and remedial purpose, with the Supreme Court's approach in *Kasten*, and with Congressional design to encourage workers to report potential violations without fear of reprisal. This reading of the phrase "has testified . . . in [an FLSA] proceeding" also derives support from the consistent, longstanding interpretation of Section 15(a)(3) by the agencies charged with its enforcement.

I thus join other courts in finding that former employees' act of speaking to the Department in the course of an ongoing FLSA action constitutes protected activity under Section 15(a)(3). *See, e.g.*, *Perez*, at *3–4 (interpreting Section 15(a)(3) to protect "participation in the Secretary's investigation"); *Prewitt*, 747 F. Supp. at 563–64 (finding that Section 15(a)(3) protects an employee's "telephone call to the Wage and Hour Division"); *Daniel*, 611 F. Supp. at 58–59 (applying Section 15(a)(3) to protect an employee who "consult[s]" the Department about "suspicions" that an employer was not paying overtime). This protection applies even when the employer acts based on a "mistaken belief" that the employee spoke with the Department. *Perez*, 2014 WL 1378241, at *4. Additionally, my reading that the phrase "is about to testify in [an FLSA] proceeding" includes employees who are reasonably anticipated to share information with the Department in the course of ongoing FLSA litigation, even without a scheduled interview, statement, or other testimony, aligns with the decisions of other courts. *See Uronis*, 49 F.4th at 267 (finding protected activity where the complaint alleged the employer was aware the employee was a "putative [FLSA] collective member" even though the employee had neither told anyone of his plan to testify nor joined the collective); *French*, 2015 WL 1467175, at *2 (finding employee "[was] about to testify" where the employee's emails were attached to the complaint); *Fatima/Zahra, Inc.*, 2014 WL 2154092, at *2 (finding a likelihood of retaliation

where an employer acted against employees "in anticipation of" them speaking to a Department investigator).

### 5.   The Record Meets the Acting Secretary's De Minimis Burden of Showing Defendants' Awareness of Protected Activity

The Court now turns to whether the record at least gives rise to material questions of fact regarding Defendants' awareness of any of the three forms of protected activity discussed above: (1) former employees' act of sharing information with the Department in the course of this action; (2) former employees' anticipated sharing of information with the Department and other testimony in the course of this action, even without a schedule for any interview, statement, or testimony; and (3) former employees' complaints to Serene about unpaid overtime. The Acting Secretary has met her burden on a post-discovery Motion to Amend for each category of protected activity.

First, the record raises a material question of fact as to whether Defendants were aware of specific former Serene live-in aides who had provided information to the Department before Serene representatives questioned them about sleep and meal breaks and overtime reporting practices at the company and asked them to sign declarations disclaiming entitlement to unpaid wages. Stauber testified that Serene used the declaration-gathering process to find out which former live-in aides spoke to Department investigators and to inquire about the content of those conversations. (Stauber Dep. at 222:11–225:7.) Moreover, as noted above, Manolias and her staff testified that they explicitly told former live-in aides that they could not "participate" in this action against Serene if they signed the proposed declarations. (Stauber Dep. at 23:3–24:8, 127:10–130:2, 232:8–13, 237:25–238:6, 242:18–24; Manolias Dep. at 55:2–10; Condon Dep. at 58:2–16.) Additionally, in two declarations, former live-in aides report that they spoke with a Department investigator weeks or years before the date on which the declaration disclaiming

entitlement to unpaid wages was signed. (*See* ECF No. 132-12 at 4 ¶ 5 (Inez Deen Decl.), 16 ¶ 6 (Anang Adjorkor Decl.).)

Based on this evidence in the record, Defendants, Stauber, and Condon were aware that at least one former Serene live-in aide had shared information with the Department, but there are material questions of fact as to whether Defendants knew the identity of any specific former employee before initiating the declaration-gathering outreach challenged as retaliatory. If these questions are resolved in favor of the Acting Secretary, the Acting Secretary will have met the de minimis burden of demonstrating "participation in protected activity known to the defendant." *Quintanilla*, 2019 WL 885933, at *19; *see also Torres*, 628 F. Supp. 2d at 472 (describing plaintiff's burden to make a prima facie case as "*de minimis*").

Second, the record establishes that, before initiating the fall 2023 declaration-gathering efforts that are challenged by the Acting Secretary as retaliatory, Defendants were aware of protected activity by a significant number of former Serene live-in aides who were "about to testify in [an FLSA] proceeding." 29 U.S.C. § 215(a)(3). Since July 21, 2020, Defendants have been on notice of the names of 337 different people identified by the Acting Secretary as current and/or former Serene employees owed back wages for work done between 2017 and 2019 due to the FLSA violations alleged in the Complaint. (Compl. at 2; Compl. Ex. A.) The Complaint alleges that each of these workers would receive back wages if the Acting Secretary were to prevail in this action. (*Id.*; Compl. at 2.) Comparing the list of 337 Serene employees identified in the Complaint (Compl. Ex. A) with the names of former Serene live-in aides who signed declarations disclaiming entitlement to unpaid wages (ECF No. 132-12), the Court has identified 65 distinct names that appear in both sources as set forth in Appendix A of this Opinion. In other words, the record shows that Serene representatives contacted 65 former employees whom the

Complaint disclosed as people owed back wages—thereby identifying them as individuals with information relevant to the Acting Secretary's FLSA claims—in order to question them about issues at the heart of this action and to ask them to sign declarations containing stock language disclaiming entitlement to unpaid wages. Moreover, Manolias, Stauber, and Condon all testified that during their declaration-gathering calls, they told former employees that they could no longer "participate" in the Acting Secretary's FLSA litigation against Serene if they signed the proposed declarations. (Stauber Dep. at 23:3–24:8, 127:10–130:2, 232:8–13, 237:25–238:6, 242:18–24; Manolias Dep. at 55:2–10; Condon Dep. at 58:2–16.) The record thus establishes that Defendants were aware that the 65 former employees were reasonably anticipated to share information with the Department or to otherwise testify in this action.

These facts establish that Defendants were aware of former live-in aides' protected activity because, as discussed in detail above, an employee who has not yet shared information with the Department or otherwise testified in ongoing FLSA litigation, but who is reasonably anticipated to do so, engages in protected activity, even if no interview, statement or testimony had been scheduled. *See discussion supra* pp. 40–52; *Uronis*, 49 F.4th at 267 (finding protected activity where employer was alleged to be aware that an employee was a "putative [FLSA] collective member" and was "anticipated" to "provide evidence" in an ongoing action even though he had not told anyone of the plan to testify); *Bowen*, 142 F. Supp. 3d at 1021–23 (finding protected activity where the Department had identified the employee as someone whom the investigator wanted to interview during an audit, even without any scheduled interview or record of outreach by the investigator); *French*, 2015 WL 1467175, at *2 (finding protected activity where defendant was aware an employee's emails were attached to the complaint alleging FLSA claims).

Third, the record gives rise to material questions of fact, as to whether Defendants were aware that former Serene live-in aides engaged in protected activity by making an oral or written complaint to Defendants that they were owed overtime pay for interruptions in their sleep and/or meal breaks while working for the company. Grant testified that when working for Serene as a live-in aide, she reported on her time sheet that she was working more than thirteen hours a day and not receiving uninterrupted meal or sleep breaks. (*See* Grant Dep. at 34:5–24.) Grant was subsequently terminated for allegedly falsifying her time. (*Id.*) Grant maintains, however, that she was terminated for reporting her overtime hours. (*Id.* at 35:4–11.) Although Defendants challenge Grant's testimony (ECF No. 136 at 3), whether Grant testifies credibly on these issues is a question of fact that cannot be resolved on the written record. *See Graham*, 2005 WL 2256603, at *2; *see also infra* pp. 69–71.[17]

Defendants contend that the Acting Secretary cannot prevail on a Motion to Amend because Defendants "did not know who participated in the protected activity of cooperating with Plaintiff." (ECF No. 108 at 2; *cf.* ECF No. 115 at 11.) To be clear, the Court finds that there are material questions of fact as to whether Defendants knew the identities of any specific, former employee who had shared information with the Department *before* Serene representatives

---

[17] Additionally, Daly testified at deposition and through his declaration that former live-in aides told him that they reported to Serene interruptions in meal and/or sleep breaks and that Serene responded they should quit if they could not handle the work. (Daly Dep. at 22:2–12; *see* Daly Decl. ¶ 5.) Daly's testimony about what former employees reported to Serene is hearsay, and is therefore inadmissible on summary judgment unless the Acting Secretary demonstrates that it would be admissible at trial. *See Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (*per curiam*) (setting forth caselaw providing that affidavits submitted in opposition to a summary judgment motion "must be admissible themselves or contain evidence that will be presented in an admissible form at trial"). The Court does not resolve this issue because Grant's testimony about her personal experience raises a genuine question of material fact as to whether Defendants were aware that any former employee had made an oral or written complaint concerning unpaid overtime.

engaged in the challenged conduct. Contrary to Defendants' contention, however, the record at this stage does *not* establish that Defendants were *unaware* of any specific former live-in aide who had shared information with the Department before contacting former employees to solicit their signatures for declarations disclaiming entitlement to unpaid wages.

Defendants also argue that the former live-in aide workforce as a whole cannot be considered potential witnesses who are "about to testify" in this action because "Plaintiff has never disclosed its witnesses." (ECF No. 115 at 11.) This argument is belied by the Complaint, which put Defendants on notice in 2021 of the names of 337 current and former Serene employees whom the Acting Secretary alleges are owed back wages and liquidated damages from Serene due to the interruptions in their sleep and meal breaks. (Compl. at 2; Compl. Ex. A (listing former live-in aides).) That disclosure put Defendants on notice that those specific individuals had information relevant to an ongoing FLSA action and were thus reasonably anticipated to share information with the Department or otherwise testify in this action. *See Uronis*, 49 F.4th at 267; *French*, 2015 WL 1467175, at *2; *Fatima/Zahra, Inc.*, 2014 WL 2154092, at *2.

Finally, Defendants rely on *Kasten*, 563 U.S. 1, to argue that former live-in aides did not put Defendants on notice of any specific "complaint, forming the basis of the retaliation claim[,]" such as "actionable complaints to Defendants concerning overtime wages." (Defs.' Supp. Br. at 3.) There are genuine questions of material fact as to whether the written record and oral testimony shows that Grant's complaint to Serene of unpaid overtime was "sufficiently clear and detailed for a reasonable employer to understand it in light of both content and context." *Kasten*, 563 U.S. at 14. Resolving these questions involves credibility assessments that are inappropriate for a post-discovery Motion to Amend and need not be resolved. The Court draws all reasonable

inferences and resolves all ambiguities in favor of the Acting Secretary and finds that the record presents a material question of fact as to whether any complaint to Serene satisfies the Section 15(a)(3) standard for protected complaints to an employer. *See Cunningham*, 86 F.4th at 980. On the present record, a summary judgment motion challenging the third category of protected activity asserted by the Acting Secretary is "not . . . so certain to be successful as to bar the proposed amendment as futile." *Huber*, 2012 WL 6082385, at \*7 n.3.

For all of the reasons stated above, the record establishes Defendants' awareness of one from of protected activity—that 65 former Serene workers were reasonably anticipated to share information with the Department and/or otherwise testify in this FLSA action—and gives rise to genuine, triable issues about Defendants' awareness of two additional forms of protected activity that would support an FLSA retaliation claim.

### b. Adverse Action

The Second Circuit has established that employer conduct constitutes adverse action if it "well might have dissuaded a reasonable worker from making or supporting similar charges." *Mullins*, 626 F.3d at 53 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (brackets and quotation marks omitted). In cases of retaliation against former employees, "the category of conduct that constitutes actionable retaliation includes more than just adverse employment actions or ultimate employment decisions." *Vazquez*, 2024 WL 1191157, at \*14.

An employer's act of soliciting declarations containing conclusory language disclaiming entitlement to unpaid wages discourages protected activity, including the provision of truthful testimony about facts relevant to FLSA claims in ongoing litigation. *See Acosta v. Austin Elec. Servs. LLC*, 322 F. Supp. 3d 951, 962–64 (D. Ariz. 2018) (restraining employer from seeking future declarations and striking signed declarations waiving employees' claims to back-pay

because they were likely to deter employees from participating in the Secretary's FLSA action).

An employer's act of securing declarations that "may include false and/or misleading testimony,

constitutes an adverse employment action" under the FLSA's anti-retaliation provision. *Acosta v.*

*Sw. Fuel Mgmt., Inc.*, No. 16-4547, 2018 WL 739425, at *4 (C.D. Cal. Feb. 2, 2018), *aff'd in*

*relevant part and vacated in part on other grounds*, 2018 WL 2207997 (C.D. Cal. Feb. 20,

2018); *see also Perez v. La Bella Vida ALF, Inc.*, No. 8:14-2487, 2015 WL 12765538, at *1

(M.D. Fla. June 30, 2015) (issuing a TRO after employer offered employees payment in

exchange for releases and false declarations). Post-employment coercion also constitutes adverse

action. *See, e.g., Stih v. Rockaway Farmers Mkt., Inc.*, No. 22-3228, 2023 WL 2760492, at *6

(E.D.N.Y. Apr. 3, 2023) (denying motion to dismiss because the court "cannot say that, as a

matter of law, an attempt by a former employer to 'coerce' a former employee into signing legal

documents is not retaliation").

The Acting Secretary argues that the undisputed record establishes that Defendants

engaged in adverse action by: (1) asking former employees to sign declarations that purport to

disclaim entitlement to unpaid overtime wages, (2) using documents that misrepresent the terms

and conditions of these former employees' work at Serene, (3) making explicit offers of work in

exchange for signed declarations, (4) pressuring workers to sign template declarations to avoid

potential repercussions with DOH, and (5) not mentioning this litigation in these calls. (*See* Pl.'s

Supp. Br. at 13.) Defendants argue that there is no evidence of adverse action because: (1)

Serene employees testified that they told former live-in aides about the Acting Secretary's FLSA

litigation with Defendants; (2) former live-in aides testified that Serene did not "retaliate" against

them; (3) and Daly's testimony purportedly shows that he did not find evidence of retaliation.

(Defs.' Supp. Br. at 4–8.)

The record raises several material questions of fact as to whether Defendants engaged in any adverse action through conduct that "well might have dissuaded a reasonable worker from making or supporting" the FLSA claims in this action or similar claims or charges. *Mullins*, 626 F.3d at 53; *see Acosta*, 2018 WL 739425, at *4.

First, there are material questions of fact as to whether the 115 declarations signed by former Serene live-in aides include "false and/or misleading testimony" concerning entitlement to unpaid overtime pay and working conditions at Serene. *Acosta*, 2018 WL 739425, at *4. All of the declarations contain the disclaimer that "[t]here was no time in which I was not paid overtime to which I was entitled" and language identical to, or nearly identical to, the following stock language describing working conditions and practices concerning sleep time and meal breaks for former Serene live-in aides:

> As a live-in, I worked 13 hours in a 24-hour workday entirely in the home of patients approved by the New York case management system. I clocked in at the start of the workday and clocked out at the end. During my 24-hour workday, I knew I would receive three 1-hour uninterrupted breaks for breakfast, lunch, and dinner. I also knew that I would receive 8 hours of sleep, of which 5 hours were to be uninterrupted for calls to duty for patient-related care issues. Throughout the time I was at Serene, I knew I would be entitled to overtime pay if I did not receive three one-hour uninterrupted meal breaks or eight hours of sleep, with five of those hours being uninterrupted sleep time. I knew how to report these occurrences to the agency and that it was my responsibility to report these situations to Serene to receive overtime pay.

> When I started at Serene, I received an orientation on how to make the agency aware of shifts when it was not possible for me to receive either my three-hour uninterrupted breaks for meals or eight hours of sleep, of which five were uninterrupted. I was trained that the patient's medical or safety issues and care needs came first before my uninterrupted meal and sleep time. I was also told if such circumstances occurred, I should call my nursing supervisor while they were occurring. If the agency office was closed, I was to call the on-call coordinator and report these incidents to them immediately and then document these occurrences to ensure I received overtime pay.

> I can say with confidence that my experience with Serene Home Nursing Agency was always a positive one where I enjoyed earning a very good salary with

> benefits and was always treated with respect and dignity. The agency allowed me
> to work overtime each week, in which my weekly paycheck was accurately paid
> to me on a weekly basis.

(ECF No. 132-12 at 2–116.) All but two of the declarations include vague language stating that

the former employees who signed them understood that the documents "may be used in

connection with litigation with the Department of Labor." (*See id.* at 2–116.) Only five of the

115 declarations include a handful of additional sentences describing questioning by a

Department investigator about interruptions in meal and sleep breaks or a the number of times in

which the declarant experienced such interruptions. (*See* ECF No. 132-12 at 4 ¶ 5, 16 ¶ 6, 8 ¶ 5,

98 ¶ 5, 116 ¶ 5.)

Although Manolias and Stauber testified that the declarations were "tailored" to the

experience of each former live-in aide,[18] careful review shows that 108 of the 115 declarations

are nearly, if not entirely, identical, other than the date and the name, signature, and employment

dates of the declarant, presenting the same stock language in the exact same sequence. (*See* ECF

No. 132-12.) Even the seven declarations with the minor differences noted above contain the

same stock paragraphs presented in the same sequence. (*See* ECF No. 132-12 at 4, 8, 16, 36–37,

98, 116.)

Contrary to the litigation disclaimer in Atta's November 14, 2023 declaration, Atta

testified in deposition that he did not understand that the declaration could be used in this

litigation. (*See* Atta Dep. at 83:4–84:16.) Smith attested in her December declaration that Serene

asked her to sign a declaration containing untruthful statements. (*See* Dec. 2023 Smith Decl. ¶ 2,

ECF No. 102-6.) These facts, viewed in light of the record as a whole, give rise to material

questions of fact about whether Defendants engaged in adverse action by soliciting declarations

---

[18] Manolias Dep. at 59:14–60:22; Stauber Dep. at 108:16–23, 224:25–225:7.

that contain false and misleading information. *See Acosta*, 2018 WL 739425, at *4; *Acosta*, 322 F. Supp. 3d at 962–64.

Second, the record also gives rise to material questions of fact about whether Defendants engaged in adverse action by holding out the possibility of future work and/or offering certificates of good performance in exchange for signed declarations disclaiming entitlement to unpaid wages. Smith testified that Stauber asked if she would be interested in working for Serene again and followed up with an email requesting that she sign an inaccurate template statement. (Smith Dep. at 40:9–11, 73:8–74:18, 78:6–9, 96:15–19; First Smith Decl. ¶¶ 2, 4.) Smith also attested that a Serene representative called to ask her to sign a declaration within one hour of the call and said that she could receive a certification of good performance if she did so. (Second Smith Decl. ¶¶ 2–5.)[19] By contrast, Stauber testified that he did not hold out the possibility of future work and/or offer certificates of good performance in exchange for a signed statement, and that Smith affirmatively asked him about future work for Serene. (Stauber Dep. at 175:8–9, 179:12–16, 233:16–23, 237:6–9.)

There are also material questions of fact about whether Defendants mailed a letter in October 2023 to former live-in aides, pressuring them to sign the declarations by holding out the potential for future work. (*See* Smith Third Decl. at 3.) Manolias testified that Serene's Human Resources office sent an October 24, 2023 letter to hourly aides asking them to "update their employee file, with anticipation for some potential work," which is why Smith, who was a

---

[19] Daly testified that around six former Serene live-in aides reported to the Department that they were asked to sign documents containing untruthful information. (Daly Dep. at 126:16–25.) The Court does not rely on this testimony in resolving the Motion to Amend. As with Daly's testimony on other issues discussed in this Opinion, this testimony is hearsay and the Acting Secretary has not addressed the admissibility of this testimony at trial as required for the Court to credit it at this time. *See supra* pp. 54–55 & n.17.

former live-in aide and current hourly employee, received the letter. (*See* Manolias Dep. at 184:6–21.) Manolias also testified that Serene regularly sends letters of this nature. (Manolias Dep. at 188:12–19.) The timing and content of the letter, however, as well as the fact that it was sent to Smith and any other former live-in aides who sought to work for Serene as hourly aides, raises questions of fact as to whether the mailing contributed to adverse action in the form of pressure on former employees to sign declarations containing inaccurate or false statements.

Third, material questions of fact exist as to whether Defendants engaged in adverse action by pressuring former live-in aides to sign declarations to avoid potential repercussions with DOH and by questioning them about issues central to this FLSA litigation without notifying them of this action. It is undisputed that Serene callers mentioned DOH requirements during calls soliciting declarations. (Manolias Dep. at 104:16–105:3, 114:14–19, 115:6–13; Stauber Dep. at 180:10–19.) Grant testified that that a Serene caller referenced a DOH "quality control check," (Grant Decl. ¶ 2 (citing Phone Transcript at 3:7–9)), and Atta testified that Serene callers represented that the purpose of the calls were to close a DOH case relating to a former patient (Atta Dep. at 27:9–10).[20] None of the defense witnesses identified any specific DOH quality control check, requirement, or case closure process advanced by their calls to secure former live-in aides' signatures on declarations or to question them about working conditions at Serene. (*See, e.g.*, Manolias Dep. at 101:17–106:24 (where Manolias was unable to identify specific DOH requirements with which Serene attempted to comply when investigating Peterkin); Stauber Dep. at 184:11–22 (same).)[21] Former live-in aides were confused by callers' references to DOH and,

---

[20] *See also* Peterkin Decl. ¶ 3 ("[Tyler] said something about the Health Department").

[21] Although Defendants maintain that Stauber made a follow-up call to Peterkin concerning alleged DOH violations during her care of a patient, Defendants never provided any report of this investigation to DOH. *See supra* p. 17; Stauber Dep. at 183:22–184:14, 190:2–25.

as a result, the nature and purpose of the calls. (*See* Atta Dep. at 45:10–19; Grant Dep. at 15:12–18:14; Peterkin Dep. at 77:13–24.)

Fourth, there are numerous material questions of fact as to whether Serene representatives provided former employees accurate notice of this litigation, their rights, and the implications on their interests in recovering any unpaid overtime wages that may be owed to them from signing a declaration containing stock language about working conditions at Serene and the disclaimer that they were never "not paid overtime to which [they] were entitled." This Opinion has addressed in detail the evidence in the record giving rise to these genuine issues of fact, *see supra* pp. 15–22, and provides a summary of that evidence here.

The undisputed record shows that Defendants failed to provide a single former live-in aide with any written notice of this litigation, their rights, or the implications of signing declarations and that Serene representatives did not follow any scripts or guidelines when making calls to former employees to ensure that they accurately addressed these topics. *See supra* pp. 10–15, 18–22. Stauber, Manolias, and Condon testified that they told former employees that signing a declaration meant that they could not "participate" in this litigation—which is contrary to the FLSA. *Margel*, 2010 WL 445192, at *10; *Zomba*, 2001 WL 770926, at *1. Three former employees—Atta, Smith and Grant—testified that the Serene representatives did not tell them about this action before questioning them about working conditions at Serene, such as meal breaks, sleep time, and procedures for reporting overtime at the company. *See supra* pp. 19–20. Atta and Smith also testified that Serene representatives did not inform them about this action before asking them to sign declarations disclaiming that Serene owed them unpaid wages. *See supra id.*

63

The record thus contradicts Defendants' argument that there is no adverse action because defense witnesses testified that they informed former employees about this action when soliciting declarations. (Defs.' Supp. Br. at 4.) Viewing the record as a whole, there are numerous material questions of fact as to whether Serene representatives informed Smith and Atta about this litigation, their rights, and the implications of signing declarations at any point before asking them to sign declarations disclaiming entitlement to unpaid wages and addressing working conditions at Serene. The record thus gives rise to material questions of fact as to whether Serene representatives properly informed *any* of the former live-in aides whom they solicited to sign declarations about this litigation, their rights, and the implications of signing declarations addressing issues central to the FLSA claims brought on their behalf by the Acting Secretary in this action.

Fifth, the record also raises a material question of fact as to whether Defendants engaged in adverse action after live-in aides reported overtime hours to them. Grant testified that she was terminated for doing just that. (Grant Dep. at 35:4–11.) Termination is an adverse action under Section 15(a)(3) that "might well have dissuaded a reasonable worker from making or supporting similar charges" against Defendants. *Mullins*, 626 F.3d at 53. The question of whether Grant's testimony on this issue is not credible, as Defendants contend, is a question of fact that cannot be resolved on the written record. ECF No. 136 at 3; *see Graham*, 2005 WL 2256603, at *2*; see also infra* pp. 69–71.

Defendants' remaining arguments are unpersuasive. Defendants incorrectly contend that there are no questions of fact as to adverse action because Peterkin, Grant, and Atta did not testify in deposition that Serene "retaliated" against them in response to questions from defense counsel. (Defs.' Supp. Br. at 3–5.) "Retaliation" is a legal concept defined by Section 15(a)(3)

and caselaw interpreting the FLSA. When read in the context of the entire deposition transcripts, the specific answers identified by Defendants illustrate little, if anything. Not only do the transcripts suggest that witnesses may have been confused about the meaning of the term "retaliation," the one sentence answers quoted by Defendants do not eliminate the evidence in the record giving rise to material questions of fact concerning whether Defendants' conduct "might well have dissuaded a reasonable worker from making or supporting similar [FLSA] charges" against them. *Mullins*, 626 F.3d at 53.

Finally, Defendants argue that Daly's testimony shows that he did not find evidence that Serene engaged in any adverse action against live-in aides. (Defs.' Supp. Br. at 6–8.) Defendants focus on Daly's testimony concerning whether former live-in aides told him or showed him documents demonstrating that they experienced seizure of their passports or immigration documents, termination, disciplinary action, or other forms of adverse action. (*Id.*) As noted earlier in this Opinion, Daly's oral and written testimony about what former live-in aides told him about their efforts to report overtime to Defendants and any actions that followed is hearsay that is inadmissible on summary judgment—and therefore on this Motion to Amend—unless the Acting Secretary shows that it would be admissible at trial. *See Santos*, 243 F.3d at 683; *Summit Health*, 993 F. Supp. 2d at 403–04. At this stage, the Court finds that Grant's testimony is sufficient to raise a triable question of fact about whether former live-in aides experienced adverse action after reporting overtime hours to Defendants.

For all of these reasons, the record gives rise to numerous, genuine issues of material fact as to whether Defendants engaged in adverse action against former employees. A number of these factual questions turn on assessing whether witnesses for the Acting Secretary and the defense are providing credible, truthful testimony on certain issues. If these and other questions

are resolved in the Acting Secretary's favor, a reasonable fact finder could conclude that Defendants engaged in numerous adverse actions that might "dissuade[] a reasonable worker from . . . supporting" the FLSA claims in this action. *Mullins*, 626 F.3d at 53; *see also Acosta*, 2018 WL 739425, at *4 (securing false statements constitutes adverse action); *Stih*, 2023 WL 2760492, at *6 (recognizing that employer attempt "to coerce a former employee into signing legal documents" may be retaliation) (quotation marks omitted).

### c.  Causation

The third element required for a prima facie case of FLSA retaliation is to show "a causal connection between the protected activity and the adverse employment action." *Mullins*, 626 F.3d at 53; *Quintanilla*, 2019 WL 885933, at *19; *Torres*, 628 F. Supp. 2d at 473. A casual connection "may be established through evidence of retaliatory animus directed against a plaintiff by the defendant, or by showing that the protected activity was closely followed in time by the adverse action." *Mullins*, 626 F.3d at 53 (quotation marks omitted).

The Second Circuit has not established the standard for causation for FLSA retaliation claims. *See Fox v. Starbucks Corp.*, No. 21-2531, 2023 WL 407493, at *1, 1 n.1 (2d Cir. Jan. 26, 2023) (declining to determine whether a but-for causation standard applies to FLSA retaliation claims but holding that a plaintiff must at least show "that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate"); *cf. Walsh v. Ip*, No. 1:22-00886 (MAD/TWD), 2023 WL 3377629, at *3 (N.D.N.Y. May 11, 2023) (applying the "but-for" causation standard for Title VII claims to an FLSA retaliation claim). When applying the but-for standard, the retaliatory cause need not be the only cause. *See Vega v. Hempstead*, 801 F.3d 72, 91 (2d Cir. 2015) (Title VII's "[b]ut-for causation [standard] does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse

action would not have occurred in the absence of the retaliatory motive.") (brackets and quotation marks omitted).

The Acting Secretary argues that the undisputed record establishes causation because Defendants' witnesses testified that they used declaration-gathering calls "to probe workers' conversations with the Department and told workers who signed the declarations they could no longer participate in the litigation." (Pl.'s Supp. Br. at 14.) Serene argues that there is no evidence of a causal connection between any protected activity and adverse action because there is a lack of proof for either of the first two elements. (Defs.' Supp. Br. at 4.)

The record provides more than enough to raise a material question of fact as to the existence of a causal connection between the three asserted forms of protected activity and the adverse actions described above. First, as noted, Stauber testified that Defendants used the declaration-gathering process to determine which former live-in aides spoke to Department investigators and to inquire about the content of those conversations. (Stauber Dep. at 222:11–225:7.) Moreover, Stauber, Manolias, and Condon all testified that during their declaration-gathering calls, they told former employees that they could no longer "participate" in the Acting Secretary's FLSA litigation against Serene if they signed the proposed declarations. (Stauber Dep. at 23:3–24:8, 127:10–130:2, 232:8–13, 237:25–238:6, 242:18–24; Manolias Dep. at 55:2–10; Condon Dep. at 58:2–16.) This evidence raises questions of fact as to whether the Serene representatives' statements and actions in the declaration-gathering process were connected to the first two forms of protected activity: (1) Defendants' knowledge that specific former employees had already shared information with the Department, and (2) Defendants' knowledge that numerous former live-in aides named in the Complaint might do the same and/or provide other testimony in this action going forward.

Even in the face of Defendants' articulation of a legitimate non-retaliatory explanation—that Defendants sought to secure truthful declarations in preparation for summary judgment motion practice (Manolias Dep. at 26:7–27:4, 28:11–17)—the record raises material questions of fact as to whether Defendants' conduct was "more likely than not . . . motivated, at least in part, by an intent to retaliate" against former live-in aides. *Fox*, 2023 WL 407493, at *1, 1 n.1. Manolias testified that she explicitly instructed Stauber and Condon to inform former live-in aides that Defendants "were in litigation with the Department of Labor, wage and hour division, and that by them signing the declarations, that they ***would be not able to be a part of Department of Labor's lawsuit against Serene*** . . . ." (Manolias Dep. at 42:4–18, 45:9–24 (emphasis added).) And, as noted previously, Stauber, Manolias, and Condon all testified that they instructed former employees that they could no longer "participate" in the Department's FLSA litigation against Serene if they signed declarations. (Stauber Dep. at 23:3–24:8, 127:10–130:2, 232:8–13, 237:25–238:6, 242:18–24; Manolias Dep. at 55:2–10; Condon Dep. at 58:2–16.)

Viewing this testimony and the record in the light most favorable to the Acting Secretary, as I must do at this stage, the record raises questions of fact as to whether Defendants sought to mislead former employees into believing that they could never speak to the Department in the course of this FLSA action if they signed the template declarations. The record thus gives rise to triable questions of fact as to whether Defendants used false pretenses and coercive means to chill former live-in aides from participating in this lawsuit. *See, e.g.*, *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 266 (E.D.N.Y. 2018) (finding that plaintiff made a prima facie showing of retaliation and denying summary judgment because sufficient evidence created triable issue on pretext).

Second, there is a material question of fact as to whether Grant's report of overtime hours "was closely followed in time" by her termination. *Mullins*, 626 F.3d at 53; *see* Grant Dep. at 34:5–24, 35:4–11. If that question is resolved in the Acting Secretary's favor, there would be a causal connection between her alleged engagement in  protected activity and an adverse action. Although Defendants articulate a legitimate, non-retaliatory explanation—that Grant was terminated for falsifying time records—resolving the question of why Grant was terminated hinges on assessing the credibility of her testimony as opposed to that of defense witnesses, which must be resolved at trial. *See Graham*, 2005 WL 2256603, at *2. There are thus triable questions of fact as to whether Defendants' termination of Grant was "motivated, at least in part," by retaliatory intent. *Fox*, 2023 WL 407493, at *1, 1 n.1.

### d.  Credibility of Former Worker Witnesses

Finally, in support of their assertion of futility, during the June 18, 2024 status conference, Defendants made the overarching argument that the testimony of all four former worker witnesses must be rejected because these witnesses purportedly lack credibility. (Stat. Conf., June 18, 2024.) I presented the Defendants with the opportunity to identify specific evidence in the record demonstrating these witnesses' lack of credibility. (Elec. Order, June 20, 2024.) Defendants' supplemental letter on this issue identified purported inconsistencies in testimony by Atta, Peterkin, Grant, and Smith about issues outside the scope of the alleged retaliation: specifically, these workers' experiences with interruptions in their sleep and meal breaks, overtime reporting practices, and caring for patients while working for Serene. (*See generally* ECF No. 136.) Defendants also argue that Grant lacks credibility because she was fired from Serene for purportedly falsifying time sheets. (*See id*. at 3.) Defendants also submit, for the first time with their supplemental letter, declarations from two individuals who were not deposed

69

during the period of retaliation discovery: Leon, a former Serene respite aide; and Edwards, a Serene patient. (*See* ECF No. 136-1–2.)

The Acting Secretary responds that Defendants fail to point to any material inconsistencies in deposition testimony by Atta, Grant, Smith, and Peterkins about their experiences being contacted by Serene representatives during Defendants' fall 2023 declaration gathering efforts. (*See* ECF No. 137.) The Acting Secretary also argues that Serene terminated Grant after she reported her actual hours on her timesheet, and notes the impropriety of Defendants' last minute submission of new declarations in response to the Court's June 20, 2024 request. (ECF No. 137 at 2 (citing ECF No. 134-5 at 18).)

As noted throughout this Opinion, in ruling on the post-discovery Motion to Amend based on the written record, the Court does not need to resolve—and therefore does not resolve—any issues concerning witness credibility. The record is more than sufficient to show the existence of numerous triable questions of material fact concerning Defendants' alleged retaliation against live-in aides, including whether Defendants used false pretenses and coercive means to chill these former employees from participating in this lawsuit. Indeed, as discussed above, these material questions of fact exist even when crediting testimony by defense witnesses Manolias, Stauber, and Condon. *See supra* pp. 15–22.

Defendants' identification of purportedly inconsistent testimony by Atta, Grant, Smith, and Peterkin on issues outside the scope of the alleged retaliation fails to establish that these witnesses provided non-credible testimony about the alleged retaliation—particularly their descriptions of what Serene representatives said and did when calling to ask them about sleep and meal breaks and, in the case of Atta and Smith, when asking them to sign declarations disclaiming entitlement to unpaid wages. The Leon and Edwards declarations are improperly

submitted on reply and do not address the Court's request that Defendants identify inconsistencies in the testimony of Atta, Grant, Smith and Peterkin with respect to retaliation. *See Pagan v. Abbott Lab'ys, Inc.,* 287 F.R.D. 139, 143–44 (E.D.N.Y. 2012) ("[I]t is plainly improper" to submit new evidentiary material on reply and the Court has discretion as to whether it will consider documents filed in violation of procedural rules.) Even if the Court were to consider the Leon and Edwards declarations, they would only underscore what is already abundantly clear: Defendants' claim that the former worker witnesses are not credible raises questions for the factfinder at trial.

For all the reasons stated above, the proposed FLSA retaliation claim would survive a summary judgment motion and thus is not futile. *See Huber*, 2012 WL 6082385, at *7. Defendants have failed to show the Motion to Amend should be denied due to bad faith, undue delay, undue prejudice, or futility. *See Adlife Mktg.*, 2018 WL 4568801, at *1. The Motion to Amend is therefore granted. The numerous factual questions identified in this Opinion, particularly issues concerning witness credibility, must be resolved by the factfinder at trial.

## CONCLUSION

For the reasons set forth above, the Motion to Amend (ECF Nos. 106, 132) meets the requirements of Rule 16 and Rule 15 and is granted in full. The Amended Complaint (ECF No.

132-16) is accepted as the operative pleading, and the Acting Secretary shall file it on the docket forthwith. Defendants must respond to the Amended Complaint by August 5, 2024.

Dated: Central Islip, New York

July 15, 2024

                    _____/s/ Nusrat J. Choudhury_____
                          NUSRAT J. CHOUDHURY
                          United States District Judge

**APPENDIX A**

**Former Serene Employees Identified in the Complaint as Workers Owed Back Wages who Signed Declarations After Solicitation by Serene Representatives**

| Number | Full Name of Individual Listed in Complaint, Ex. A (ECF No. 1-1) | Date of Signed Declaration (ECF No. 132-12) | Declaration Citation (ECF No. 132-12) |
|---|---|---|---|
| 1 | Acka, Revonda | 11/13/2023 | ECF No. 132-12 at 97 |
| 2 | Acquah, Joana | 11/14/2023 | ECF No. 132-12 at 48 |
| 3 | Adjei Sechere, Josephine | 11/7/2023 | ECF No. 132-12 at 37 |
| | | 12/4/2023 | ECF No. 132-12 at 64 |
| 4 | Agyemang, Victoria | 12/6/2023 | ECF No. 132-12 at 45 |
| 5 | Akpalo, Jeannine | 12/6/2023 | ECF No. 132-12 at 26 |
| 6 | Ali, Bibi | 11/17/2023 | ECF No. 132-12 at 83 |
| 7 | Ama, Juliana | 11/28/2023 | ECF No. 132-12 at 12 |
| 8 | Amoah, Elizabeth | 12/4/2023 | ECF No. 132-12 at 39 |
| 9 | Anang, Maud | 12/4/2023 | ECF No. 132-12 at 16 |
| 10 | Animah, Akua Duodu | 11/17/2023 | ECF No. 132-12 at 91 |
| | | 11/20/2023 | ECF No. 132-12 at 92 |
| 11 | Antwi, Esther | 12/11/2023 | ECF No. 132-12 at 35 |
| 12 | Aquah, Joana | 12/5/2023 | ECF No. 132-12 at 47 |
| 13 | Archibald, Delores | 12/6/2023 | ECF No. 132-12 at 74 |
| 14 | Arhin, Georgina | 11/17/2023 | ECF No. 132-12 at 22 |
| 15 | Asante Danso, Gloria | 12/4/2023 | ECF No. 132-12 at 23 |
| 16 | Atta, Patrick | 11/14/2023 | ECF No. 132-12 at 10 |
| 17 | Audate, Cassandra | 11/13/2023 | ECF No. 132-12 at 105 |
| | | 11/11/2023 | ECF No. 132-12 at 108 |
| 18 | Basdeosing, Drupattie | 11/13/2023 | ECF No. 132-12 at 57 |
| 19 | Blessinger, Elisa | 11/24/2023 | ECF No. 132-12 at 38 |
| 20 | Boakyewaa, Georgina | 11/28/2023 | ECF No. 132-12 at 106 |
| 21 | Boateng, Samuel A. | 12/4/2023 | ECF No. 132-12 at 72 |
| 22 | Carpenter, Lara | 12/8/2023 | ECF No. 132-12 at 18 |
| 23 | Charles, Phania | 11/15/2023 | ECF No. 132-12 at 110 |
| 24 | Danquah, Richmond | 11/15/2023 | ECF No. 132-12 at 66 |
| | | 11/17/2023 | ECF No. 132-12 at 67 |
| 25 | Deen, Inez | 11/15/2023 | ECF No. 132-12 at 4 |
| 26 | Delva, Marie | 11/29/2023 | ECF No. 132-12 at 31 |
| 27 | Dixon, Isabella | 11/16/2023 | ECF No. 132-12 at 6 |
| 28 | Douilly-Guelce, Veronique | 11/28/2023 | ECF No. 132-12 at 42 |
| 29 | Dulus, Rochenie | 11/13/2023 | ECF No. 132-12 at 99 |
| 30 | Ford, Karen | 11/16/2023 | ECF No. 132-12 at 14 |
| 31 | Gil, Angela | 11/16/2023 | ECF No. 132-12 at 68 |
| 32 | Guerrido, Christine | 12/6/2023 | ECF No. 132-12 at 113 |

| Number | Full Name of Individual Listed in Complaint, Ex. A (ECF No. 1-1) | Date of Signed Declaration (ECF No. 132-12) | Declaration Citation (ECF No. 132-12) |
|---|---|---|---|
| 33 | Haruna, Salamatu | 12/4/2023 | ECF No. 132-12 at 44 |
| 34 | Heslop, Sylvia | 12/6/2023 | ECF No. 132-12 at 115 |
| 35 | Jean, Marie Stephania | 12/6/2023 | ECF No. 132-12 at 55 |
| 36 | Jeune, Judemyr | 11/13/2023 | ECF No. 132-12 at 52 |
| 37 | John Kyei, Baffour | 11/14/2023 | ECF No. 132-12 at 87 |
| 38 | Jones, Tyesha | 12/1/2023 | ECF No. 132-12 at 109 |
| 39 | Kwabi, Alice-Rose | 12/8/2023 | ECF No. 132-12 at 94 |
| 40 | Kyeremateng, Philipa | 11/13/2023 | ECF No. 132-12 at 81 |
| 41 | Laryea-Walker, Mona | 12/7/2023 | ECF No. 132-12 at 8 |
| 42 | Levine, Audrey | 11/12/2023 | ECF No. 132-12 at 85 |
| 43 | Lopez Naranjo, Alicia | 11/27/2023 | ECF No. 132-12 at 95 |
| 44 | Marine, Krystal | 11/28/2023 | ECF No. 132-12 at 103 |
| 45 | Morose, Pierre | 11/24/2023 | ECF No. 132-12 at 82 |
| 46 | Obas, Cassandra | 11/15/2023 | ECF No. 132-12 at 111 |
| 47 | Owusua, Susana | 11/18/2023 | ECF No. 132-12 at 114 |
| 48 | Paul, Shirly | 11/13/2023 | ECF No. 132-12 at 62 |
| 49 | Richards, Latoya | 11/29/2023 | ECF No. 132-12 at 30 |
| 50 | Roopnarine, Sarjudai | 11/15/2023 | ECF No. 132-12 at 79 |
| 51 | Saint Hilaire, Mireille | 11/27/2023 | ECF No. 132-12 at 7 |
| 52 | Sechere, Philip | 11/20/2023 | ECF No. 132-12 at 80 |
| 53 | Sells, Kadasia | 11/29/2023 | ECF No. 132-12 at 13 |
| 54 | Severino, Keila | 11/21/2023 | ECF No. 132-12 at 101 |
| 55 | St Vil Noel, Marie | 11/13/2023 | ECF No. 132-12 at 21 |
| 56 | Tomlinson, Sheena | 12/4/2023 | ECF No. 132-12 at 61 |
| 57 | Tutu, Bridgette | 11/13/2023 | ECF No. 132-12 at 84 |
| 58 | Valcourt, Catrine | 12/6/2023 | ECF No. 132-12 at 112 |
| 59 | Volcy, Isaac | 11/27/2023 | ECF No. 132-12 at 5 |
| 60 | Vorduagu, Vida | 11/14/2023 | ECF No. 132-12 at 46 |
| 61 | Weir Pace, Valrie | 11/22/2023 | ECF No. 132-12 at 41 |
| 62 | White, Veronica | 11/16/2023 | ECF No. 132-12 at 54 |
|  |  | 11/16/2023 | ECF No. 132-12 at 58 |
| 63 | Williams, Roberta | 11/22/2023 | ECF No. 132-12 at 98 |
| 64 | Williams, Rosemarie | 11/13/2023 | ECF No. 132-12 at 43 |
| 65 | Wright, Tysharra | 12/1/2023 | ECF No. 132-12 at 40 |