**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Vincent N. Micone, III, Acting Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>-v-<br><br>Sarene Services, Inc. d/b/a Serene Home Nursing Agency; Irene Manolias, Individually,<br><br>Defendants. | 2:20-cv-3273<br>(NJC) (ST) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

This case concerns claims brought by the Acting Secretary of Labor, Vincent N. Micone, III ("Acting Secretary"),[1] on behalf of the U.S. Department of Labor (the "Department"), against Sarene Services Inc., d/b/a Serene Home Nursing Agency ("Sarene")[2] and Irene Manolias ("Manolias," and collectively, "Defendants") under provisions of the Fair Labor Standards Act of 1938 (the "FLSA"). (Am. Compl., ECF No. 139.) The FLSA permits the Acting Secretary to enforce the statute's minimum wage and overtime provisions, 29 U.S.C. § 216(c), and to seek injunctive relief for violations of such provisions, *id*. § 217. The Amended Complaint alleges that Defendants failed to pay certain former employees—home health aides who provided

---

[1] Vincent N. Micone III ("Acting Secretary" or "Plaintiff") was substituted for Julie A. Su in this action when Micone became the Acting Secretary of Labor for the Department on January 20, 2025. Fed. R. Civ. P. 25(d).

[2] The documents in the record refer to Sarene Services, Inc. alternately as "Sarene" and "Serene." I refer to Sarene Services, Inc. as "Sarene," unless directly quoting a document that refers to this entity as "Serene."

services to Sarene clients requiring live-in care seven days a week ("live-in aides")—minimum and overtime wages, failed to keep accurate time records, and retaliated against these workers in violation of various FLSA provisions, *id*. §§ 206, 207, 211(c), 215(a)(2), 215(a)(3), and 215(a)(5) ("Sections 6, 7, 11(c), 15(a)(2), 15(a)(3), and 15(a)(5)," respectively). (Am. Compl.)

Before the Court is Defendants' Motion to Preclude the Expert Report and Testimony of the Acting Secretary's Expert, Jennifer M. Reckrey, MD ("Motion to Preclude Reckrey"), and the Acting Secretary's Motion to Exclude Defendants' Expert, Adam E. Block, PhD ("Motion to Preclude Block"). (Defs.' Mot. Preclude Expert Rpt. Test. Pl.'s Expert Reckrey ("Defs.' Mot. Reckrey"), ECF No. 167; Pl.'s Mot. Exclude Defs.' Expert Block ("Pl.'s Mot. Block"), ECF No. 165; Pl.'s Notice Mot. Exclude Defs.' Expert Block, ECF No. 168.)

Defendants' Motion to Preclude Reckrey is denied in part and granted in part. Dr. Jennifer M. Reckrey ("Reckrey") possesses the knowledge, skill, training, and experience to opine on the following topics: (1) the complex medical needs of Sarene's patients receiving 24-hour live-in home care; (2) the nature and timing of tasks carried out by live-in aides to meet the needs of these patients, and whether care plans address these issues; (3) whether Sarene had systems to help live-in aides manage their work and take meal and sleep breaks without interruption; and (4) the likelihood that live-in aides cared for Sarene patients outside of their compensated hours. Reckrey's report sets forth a number of opinions reached through the application of her knowledge, skill, training, and experience in these areas to specific evidence in the record.

Reckrey is precluded, however, from opining on the following: (1) the *frequency* by which Sarene live-in aides experienced call-to-duty interruptions to their meal and sleep breaks, including whether such interruptions were "common"; (2) live-in aides' perception of being

compensated for shifts—rather than hours—worked, but only to the extent that this opinion is based on information other than Defendants' aide activity sheets; (3) whether Sarene treated punitively live-in aides who reported working outside compensated hours or discouraged live-in aides from reporting such work; and (4) that managed long-term care companies' approval of live-in 24-hour care for a patient does not mean that care only occurs during compensated times. As discussed below, Reckrey's opinions on the first three topics are precluded under Rule 702 of the Federal Rules of Evidence ("Fed. R. Evid.") because she relied on insufficient facts or data in reaching these opinions and under Rule 703, Fed. R. Evid., because she reached them through reliance on inadmissible evidence not shown to be the kinds of facts or data on which an expert in her field would reasonably rely in forming opinions on these subjects. Reckrey is precluded from opining on the fourth topic because it is irrelevant to the facts of consequence in this litigation under Rule 401, Fed. R. Evid., and is therefore inadmissible under Rule 402, Fed. R. Evid.

The Acting Secretary's Motion to Exclude Block is granted in its entirety for two main reasons. First, Block is unqualified to offer many of his opinion under Rule 702. For example, Defendants fail to show that Block possesses the requisite knowledge, skills, training, or experience in the provision of health or personal care to patients served by live-in aides such that he can opine on the medical conditions or care needs of Sarene patients assisted by live-in aides.

Second, even where Block may be qualified, his opinions are irrelevant under Rules 402 and 702, lack a sufficient basis in facts or data under Rule 702(b), are the result of unreliable principles and methods under Rule 702(c), or are precluded under Rule 403, Fed. R. Evid., because any probative value is substantially outweighed by the risk of confusing the issues, misleading the jury, wasting time, or unfair prejudice against the Acting Secretary. Thus, under

one or more of the Federal Rules of Evidence, Block may not opine on: (1) legal conclusions; (2) the medical conditions or care needs of Sarene patients served by the company's live-in aides; (3) New York's managed long-term care system; (4) Sarene's purported compliance with the procedures and regulations governing managed long-term care; (5) the potential macroeconomic consequences of a jury determination that Defendants have violated the FLSA; (6) any procedures by which Sarene could have sought external funding to compensate live-in aides for overtime during the relevant time period; (7) Sarene's purported payments to live-in aides who reported call-to-duty interruptions to meal and sleep breaks during the relevant period; (8) the investigation conducted by the Wage and Hour Division ("WHD") of the Department preceding this litigation; (9) Sarene's internal Skype messages; (10) Sarene's quality improvement surveys; (11) the adequacy of Sarene's system for live-in aides to report their work hours; and (12) handwritten logs documenting live-in aides' calls to Sarene's call center. Block is therefore precluded from being offered as an expert at trial.

## FACTUAL BACKGROUND

Sarene is a home health care agency, which provides live-in aides to patients requiring live-in care seven days a week. (*See* Am. Compl. ¶¶ 5–6; 33–34.) Manolias is the owner and chief executive officer of Sarene. (*Id.* at ¶¶ 8–10; Irene Manolias Feb. 29, 2024 Dep. ("Manolias 2024 Dep.") 34:6, 221:6, ECF No. 134-1.) Defendants' former live-in aides provided Sarene's client patients with personal and medical care, including toileting, washing, administering medication, and feeding. (Am. Compl. ¶ 35.)

In January 2019, the Wage and Hour Division ("WHD") of the Department opened an investigation into Sarene's compliance with the FLSA. (*See* Stahl Decl. ¶ 6, ECF No. 185.) During that investigation, the WHD gathered statements from Sarene's live-in aides. (Pl.'s

Opp'n Defs.' Mot. Exclude Pl.'s Expert Reckrey ("Pl.'s Reckrey Resp.") at 14, ECF No. 174.)

The WHD also compiled a log of phone calls between its investigator and Sarene live-in aides.

(WHD Call Log, ECF No. 174-6.)

The Amended Complaint alleges that Defendants paid live-in aides for only a set number

of hours—12.5 hours per day from March 15, 2017 through mid-2019, and 13 hours per day

from mid-2019 to the present—even though these employees worked longer hours. (Am. Compl.

¶¶ 41, 43.) The Amended Complaint also alleges that Defendants failed to maintain accurate

time records for live-in aides from at least March 2017 through at least the filing of the Amended

Complaint in July 2024, in violation of the FLSA's recordkeeping requirements. (*See id.* at 2,

¶¶ 69–73.) According to the Amended Complaint, former Sarene live-in aides "are owed

millions of dollars in unpaid back wages and liquidated damages" due to Defendants' alleged

FLSA violations "between 2017 and 2020." (*Id.* at 3.) Exhibit A to the Proposed Joint Pre-Trial

Order provides the names of 506 different people who are alleged to have worked for Sarene as

live-in aides from March 19, 2017 to December 31, 2020, the specific time period for which the

Acting Secretary is seeking damages at trial. (Proposed Joint Pre-Trial Order, Ex. A, ECF No.

182-1; Proposed Joint Pre-Trial Order at 5.)

The Amended Complaint also brings an FLSA retaliation claim under Section 15(a)(3),

alleging three types of retaliation: first, during fall 2023, Defendants solicited sworn declarations

containing false statements from former live-in aides against their interests and under misleading

and coercive circumstances (*see* Am. Compl. ¶¶ 87–100, 102, 116); second, Defendants

attempted to interfere with this litigation by discouraging employees from speaking with the

Department (*see id*. ¶¶ 86, 100–102, 116); and third, since the filing of this litigation in 2020,

Defendants have taken punitive measures against live-in aides who sought to report unpaid hours

to Sarene, including comments discouraging such reports, disciplinary verbal warnings, and termination (*see id*. ¶¶ 85, 116).

## PROCEDURAL HISTORY

The Secretary of Labor initiated this action on July 21, 2020. (Compl., ECF No. 1). On July 15, 2024, I granted the Acting Secretary's motion to amend the Complaint. (Opinion & Order, ECF. No. 138.) The Amended Complaint, filed on July 16, 2024, is the operative complaint in this action. (Am. Compl.)

On December 13, 2024, the parties filed a Proposed Joint Pre-Trial Order confirming that there are 506 former live-in aides whose work hours and compensation are the subject of this litigation. (Proposed Joint Pre-Trial Order at 5; *see also* Proposed Joint Pre-Trial Order, Ex. A.)

## I.  Defendants' Production of 49 Sarene Patient Files Pursuant to Court Order

Pertinent to the Court's resolution of the pending motions, during the discovery process, which lasted from November 2020 through December 2023, the parties required the intervention of Magistrate Judge Steven Tiscione, to whom the management of pre-trial discovery was referred, to resolve numerous disputes. One of these disputes concerned the adequacy and timing of Defendants' response to the Acting Secretary's request for documents concerning the patients served by the live-in aides whose compensable work time is the subject of this action. (*See* Pl.'s Mot. Compel, ECF No. 27; June 8, 2021 Ltr., ECF No. 27-1.)

As part of Phase 1 Discovery, on November 20, 2020, the Acting Secretary served on Defendants a request for production seeking, among other things, Sarene's live-in aides' "Time Sheets," which Sarene calls "aide activity sheets." (Pfitsch Decl., Ex. I ("Nov. 20, 2020 Disc. Req. Ltr") at 1, ECF No. 184-2; Pfitsch Decl., Ex. D ("Kristine Manolias Dep.") at 87:6–10.) On

January 26, 2021, Defendants responded by producing only two aide activity sheets. (Pfitsch Decl. ¶ 12.)

In Phase 2 Discovery, the Acting Secretary again requested (1) all aide activity sheets, (2) documents provided to live-in aides regarding the timing of tasks listed on aide activity sheets, including what Sarene refers to as "plans of care," and (3) documents related to managed long-term care companies that provided insurance coverage for live-in aide services, which the parties refer to as "MLTC-related documents." (*See id.* at ¶ 13; Pfitsch Decl., Ex. J ("Defs.' Objs. Resps. Pl.'s First Reqs. Produc.") ¶¶ 11, 20, 26–30, 32–33.) On May 24, 2021, Defendants responded that each of these document requests was "overbroad and unduly burdensome." (Defs.' Objs. Resps. Pl.'s First Reqs. Produc. ¶¶ 11, 20, 26–30, 32–33.)

On October 29, 2021, the Acting Secretary filed a motion to compel ("Oct. 2021 Motion to Compel"), which raised a number of disputes, including the concern that Defendants failed to produce the requested documents and failed to provide information about the volume of the full set of documents. (Pl.'s Mot. Compel.) Defendants opposed, arguing that it would be burdensome to provide the requested documents. (Defs.' Resp. Opp'n Pl.'s Mot. Compel, ECF No. 28.) Specifically, Defendants contended that complying with these requests "would involve the review of at least 500 patient files"—also referred to as "charts"—which were stored in a mix of hard paper and digital copies that were not text-searchable. (*Id.* at 2.)

On November 15, 2021, Judge Tiscione held a hearing addressing numerous discovery disputes, including those raised in the Acting Secretary's Oct. 2021 Motion to Compel. (Min. Order, Nov. 15, 2021 Mot. Hr'g ("Nov. 2021 Order"), ECF No. 29; Nov. 15, 2021 Mot. Hr'g Tr., ECF No. 195.) At the hearing, the Acting Secretary asked the Court to order Defendants to produce "100 full patient files that span the time period from 2017 to 2021," which "would

7

include all of the documents, or many of the documents about which" the parties had "some outstanding dispute as to volume, documents that defendants have produced only samples of as agreed between the parties and documents for patients that have been identified through third-party discovery as having responsive documents in their patient file." (Nov. 15, 2021 Mot. Hr'g Tr. 3:14–22.) The Acting Secretary stated, "it sounds like there are 500 patient files, so we think 20 percent is a reasonable sample." (*Id.* 3:23–25.) The Acting Secretary also requested that the 100 patient files include the files of specific Sarene patients identified "as having additional responsive information about aides having worked during sleep time, et cetera, through third party discovery." (*Id.* 4:14–16.) Defendants responded that they were not opposed to producing some number of patient files, but that locating and producing 100 files would be burdensome because "100 out of 500 is quite a large sample" and would require "hundreds of hours" of staff time to locate and review the files. (*Id.* 5:13–16, 6:1–2.) Defendants characterized the Acting Secretary's request for 100 patient files as "a fishing expedition." (*Id.* 6:6–7.)

Responding to the Court's questions about the relevance of the documents in the patient files, the Acting Secretary explained that the files contain information about "the tasks, the frequency of tasks, and . . . the medical needs of the patients that show the un-compensated time that the aides are working," "managed long-term care documents, authorizations and essentially lists of—information about the patients' needs and the tasks that [the live-in aides] perform," and patient care plans. (*Id.* 7:25–8:6; 8:12–16.) In response to Defendants' arguments about the burden of producing 100 patient files, counsel for the Acting Secretary explained:

> [W]e've conferred with defendants from the very beginning that we would accept samples of these documents and the whole premise was that we would then evaluate what we needed of those documents with a clear understanding that obviously we would need more than just the few samples the defendants have produced.

And we have, because of the sampling, we've narrowed the list of documents that we need a fuller production for. We're not seeking every patient. We're also not seeing a kind of additional production that would require a substantive review of the files.

So the more potentially narrower but more burdensome for them a way to choose the patient files would be if it was all digitized search terms that would reveal specific situations. But that doesn't seem possible given the way defendants have stored the documents and some are on paper and some are digitized.

And so we are settling for 20% across the board as opposed to—in addition to the particular patients that have been identified through third-party subpoenas [to managed long-term care companies] rather than a real substantive, something that would require someone to read each patient file and see if certain issues have emerged for that particular patient. So we're still in for the sampling mode and we've been trying to find a way to make it less burdensome on defendants to produce these files to us.

(*Id.* 9:12–10:13.)

Judge Tiscione resolved the parties' dispute by ordering Defendants to produce 50 patient files. (*Id.* 12:21–22; *see also* Nov. 2021 Order.) Defendants requested that the Court allow Defendants to include among the 50 patient files the files of specific patients the Acting Secretary had previously identified through third-party discovery. (Nov. 15, 2021 Mot. Hr'g Tr. 13:5–8.) Judge Tiscione granted Defendants' request and instructed the Acting Secretary, "Give [Defendants] a list of the ones that you want and then they'll add random ones." (*Id.* 13:18–19.) Judge Tiscione then clarified that the remaining files selected by Defendants "have to span the time period that [the Acting Secretary was] looking for . . . the rest won't be random . . . ." *Id.* 13:23–14:2.)

Ultimately, Defendants produced 50 full patient files, which included one duplicate file, yielding 49 unique patient files. (Jan. 14, 2025 Joint Ltr. at 1, ECF No. 196.) Of those 49 patient files, 24 were for patients whose files the Acting Secretary specifically requested based on the Department's review of third-party discovery productions by managed long-term care

companies. (*Id.* at 2; Nov. 15, 2021 Mot. Hr'g Tr. 5:14–16.) The remaining 25 files were randomly selected by Defendants. (*See* Jan. 14, 2025 Joint Ltr. at 2.)

## II.    The Provision of 44 Patient Files to Plaintiff's Expert, Reckrey

The Acting Secretary provided 44 of the 49 Sarene patient files to Reckrey for her review. (*Id.* at 2.) Reckrey relied on her analysis of these 44 patient files to reach certain conclusions described in her report and rebuttal report. (Expert Report Jennifer M. Reckrey, MD ("Reckrey Rpt.") at 1–2, ECF No. 167-3; Rebuttal Expert Report Adam E. Block, PhD ("Reckrey Rebuttal"), ECF No. 174-4.) Based on this analysis, Reckrey opined that cognitive impairment, gait impairment/ambulation issues, polypharmacy (defined as taking four or more medications concurrently), and incontinence were prevalent conditions among the group and contributed to their "high levels of care needs" and need for "high levels of assistance with a wide variety of tasks." (Reckrey Rpt. at 4–6.)

## III.    The Parties' Motions to Exclude Expert Testimony

On November 12, 2024, Defendants filed the Motion to Preclude Reckrey pursuant to Rules 702–705, Fed. R. Evid., and the *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), line of cases. (Defs.' Mot. Reckrey). The Acting Secretary opposed the motion on December 2, 2024. (Pl.'s Opp'n Defs.' Mot. Exclude Pl.'s Expert Reckrey ("Pl.'s Reckrey Resp."), ECF No. 174.) Defendants filed a reply on December 10, 2024. (Defs.' Reply Mem. Supp. Mot. Preclude ("Defs.' Reckrey Reply"), ECF No. 177.) The Acting Secretary sought and received permission to file a sur-reply on the basis that Defendants' reply introduced new arguments about the regulations and standards governing New York's managed long-term care system and procedures for determining the appropriate level of personal care services for patients in New York. (ECF No. 187 at 1; Elec. Order, Dec. 23, 2024.) The Acting Secretary filed a sur-

reply on December 30, 2024. (Pl.'s Sur-Reply Opp'n Defs.' Mot. Preclude ("Pl.'s Reckrey Sur-Reply"), ECF No. 188.)

On November 12, 2024, the Acting Secretary filed a Motion to Preclude Block under Rules 702–705 and the *Daubert* line of cases. (Pl.'s Mot. Block). The Defendants opposed the motion on December 2, 2024 (Defs.' Mem. Opp'n Pl.'s Mot. Preclude Defs.' Expert Rpts. Test. Block ("Defs.' Block Resp.") Reply, ECF No. 172.) The Acting Secretary filed a reply on December 10, 2024. (Pl.'s Reply Supp. Exclude Defs.' Expert Block ("Pl.'s Block Reply"), ECF No. 178.)

## IV.    The Court's Request for Supplemental Information

On January 3, 2025, the Court issued an Order directing the parties to submit a joint letter stating their positions on the following:

> 1) [H]ow the[] 44 patient files [reviewed by Reckrey] were selected, including background information about how many patient files the Acting Secretary requested and how many Defendants actually produced in the discovery process, and any motion practice relating to the production of patient files;
>
> 2) [W]hether the full complement of patient files produced by Defendants in the discovery process are, or are not, representative of all Serene patients served by the company's former 24-hour live-in aides; and
>
> 3) [W]hether the 44 patient files reviewed by Dr. Reckrey are, or are not, representative of all Serene patients served by the company's former 24-hour live-in aides.

(Elec. Order, Jan. 3, 2025.) The parties submitted a joint response, which describes the procedural history discussed above, as well as the parties' positions on whether the 49 patients whose files were produced by Defendants as a result of Judge Tiscione's November 15, 2021 Order are representative of all Sarene patients served by the company's former live-in aides. (Jan. 14, 2025 Joint Ltr.; *see also* Nov. 2021 Order.) The letter also indicated that the Acting Secretary had failed to provide Reckrey with five of the 49 disclosed patient files "due to

11

administrative oversight." (Jan. 14, 2025 Joint Ltr. at 2.) The Acting Secretary noted that it had provided Reckrey with the five remaining patient files following the Court's issuance of the January 3, 2025 Order. (*Id.*)

Reckrey reviewed the five additional patient files and executed a sworn declaration, which the Acting Secretary attached to the parties' joint letter. (Jan. 14, 2025 Joint Ltr., Ex. 1 ("Reckrey Decl."), ECF No. 196-1.) In the declaration, Reckrey updated certain conclusions set forth in her report to reflect her analysis of all 49 unique patient files produced by Defendants in response to Judge Tiscione's November 21, 2021 Order.

### V. The *Daubert* Hearing

On February 11, 2025, I held a *Daubert* hearing on Defendants' Motion to Preclude Reckrey's opinions. (Min. Entry, Feb. 11, 2025.) I asked Reckrey about her review of the 49 patient files, including whether she was aware that 24 had been selected by the Acting Secretary and 25 had been randomly selected by the Defendants. Specifically, I asked if Reckrey had "independently reviewed the 25 files that were randomly selected by the Defendants." (Feb. 11, 2025 Hr'g Tr. 80:21–22, ECF No. 208.) Reckrey responded that during her review she did not know which of the 49 patient files were selected by the Acting Secretary and which were selected by the Defendants. (*See id.* 28:22–29:3, 80:23–81:9.)

At the end of the hearing, the Acting Secretary offered for Reckrey to review the 25 patient files that had been randomly selected by Defendants and supplement her opinions about the four medical conditions that she found were prevalent in the full group of 49 patients— cognitive impairment, gait impairment/ambulation issues, polypharmacy, and incontinence. I permitted Reckrey to provide a supplemental declaration and Defendants to provide a response. (*See id.* at 104:18–105:5; Min. Entry, Feb. 12, 2025.)

On February 12, 2025, the Acting Secretary filed a letter attaching a supplemental declaration from Reckrey. (Feb. 12, 2025 Ltr., ECF No. 205; Reckrey Suppl. Decl., ECF No. 205-1.) Reckrey's supplemental declaration set forth her opinions regarding the prevalence of cognitive impairment, gait impairment/ambulation issues, polypharmacy, and incontinence among the 25 patients whose files were selected for production by Defendants, the 24 patients whose files were selected for production by the Acting Secretary, and the combined set of 49 patients. (Reckrey Suppl. Decl. ¶¶ 7–9.) On February 14, 2025, Defendants responded to the supplemental Reckrey declaration, arguing that they "are unable to confirm the accuracy of the representations" in the declaration because Reckrey did not identify by name the specific patients among the 25 randomly selected by Defendants who, in her view, suffer from cognitive impairment, gait impairment/ambulation issues, polypharmacy, or incontinence. (ECF No. 206.)[3]

## LEGAL STANDARDS

Rule 702 governs the admissibility of expert testimony. The Supreme Court has made clear that the district court has a gatekeeping function under Rule 702: it is charged with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[4]

First, expert testimony, like other evidence, is relevant under Rule 401 where it has "any tendency to make the existence of any fact that is of consequence to the determination of the

---

[3] Defendants' response does not make sense in the context of Reckrey's finding that all of the patients whose files she analyzed suffered from incontinence. (*See* Reckrey Suppl. Decl. ¶ 9.) Defendants fail to explain why Reckrey needed to identify specific patients with this medical condition in order for Defendants to critique her assessment where her opinion is that *all* 49 Sarene patients suffered from incontinence.

[4] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

action more probable or less probable than it would be without the evidence." *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024).

Second, to determine whether expert testimony has a sufficiently reliable foundation to be admissible at trial, a court must consider the "indicia of reliability identified in [Rule] 702." *Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021). Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[5] Thus, the Court must determine whether: (1) the proposed expert is sufficiently qualified to testify about the proposed subject matter, (2) the expert's testimony is

---

[5] Rule 702 was amended effective December 1, 2023. "Nothing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. Instead, one purpose of the amendment was to emphasize that:

> [j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments; *see also In Re: Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 22-md-2043, 2024 WL 3357608, at *13–14 (S.D.N.Y. July 10, 2024).

reliable, and (3) testimony about the proposed subject matter will assist the trier of fact. *See Nimely v. City of New York*, 414 F.3d 381, 395–97 (2d Cir. 2005).

## I.    Qualification

To determine whether a witness qualifies as an expert, courts "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *In Re: Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, No. 22-md-3043, 2024 WL 3357608, at *14 (S.D.N.Y. July 10, 2024) (citing *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). In determining whether a witness has the relevant experience, courts consider "the degree to which that experience was developed for litigation." *Id.*; *see also In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 440 (S.D.N.Y. 2016) ("*Mirena I*"), *aff'd* 713 F. App'x 11, 15 (2d Cir. 2017) ("*Mirena II*") (affirming exclusion of experts who "lacked pre-litigation expertise" and "developed their theories for the purposes of this litigation"). If the witness does not possess superior knowledge, education, experience, or skill in the relevant area, the court must exclude their testimony. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240–41 (S.D.N.Y. 2018) ("*Mirena III*"), *aff'd* 982 F.3d 113, 124 (2d Cir. 2020) ("*Mirena IV*").

## II.    Reliability

In addition to the indicia of reliability identified in Rule 702, a trial court may consider the criteria enumerated in *Daubert*, "some or all of which might prove helpful in determining the reliability of a particular scientific theory or technique." *Clerveaux*, 984 F.3d at 233.The *Daubert* factors are: (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate and the existence and maintenance of standards controlling the technique's operation;

and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[W]hile a court need not consider the Daubert factors, it does not abuse its discretion in doing so." *Mirena IV*, 982 F.3d at 124.

Although "Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Mirena IV*, 982 F.3d at 123. The *Daubert* factors do not constitute a "definitive checklist or test." *Daubert*, 509 U.S. at 594. Proffered expert testimony can fail all four *Daubert* factors and still be admitted; however, in those circumstances, a court must "carefully scrutinize, pause, and take a hard look at the expert's methodology." *Mirena III,* 341 F. Supp. 3d at 240. So long as an expert's analysis is reliable "at every step," it is admissible. *Mirena IV*, 982 F.3d at 123. But "*any* step that renders the analysis unreliable . . . *renders the expert's testimony inadmissible*." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis added). Thus, it is not only *appropriate* for a district court "to take a hard look at . . . experts' reports"; rather, it is "*required* to do so to ensure reliability." *Mirena IV*, 982 F.3d at 123 (emphasis added). "[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Ultimately, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Although the Supreme Court in *Daubert* emphasized that the court's inquiry under Rule 702 must focus "solely on principles and methodology, not on the conclusions that they

16

generate," 509 U.S. at 595, it later clarified that "conclusions and methodology are not entirely

distinct from one another." *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997)

("*Joiner*"). Thus, although:

> [t]rained experts commonly extrapolate from existing data[,] nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* Where, however, an expert "otherwise reliably utilizes scientific methods to reach a

conclusion, lack of textual support [for an expert's opinion] may go to the weight, not the

admissibility of the expert's testimony." *Mirena IV*, 982 F.3d at 124. A "minor flaw in an

expert's reasoning or a slight modification of an otherwise reliable method will not render an

expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*,

509 U.S. at 596.

## III.    Bases for Expert Opinions

Rule 703 governs the bases for an expert's opinions. "An expert may base an opinion on

facts or data in the case that the expert has been made aware of or personally observed." Fed. R.

Evid. 703. An expert may rely on facts and data in forming admissible opinions even if the facts

and data themselves are not admissible at trial "[i]f experts in the particular field would

reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Id*. "But if

the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose

them to the jury only if their probative value in helping the jury evaluate the opinion

substantially outweighs their prejudicial effect." *Id*.

17

## IV.    Assistance to the Trier of Fact

Under Rule 403, "[e]vidence may be excluded 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,' or 'misleading the jury.'" *United States v. Scales*, No. 21-cv-3071, 2023 WL 8643279, at *3 (2d Cir. Dec. 14, 2023) (citing Fed. R. Evid. 403). "[A] court must be extra careful when weighing the 403 factors." *Id.* at *4. "[E]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## DISCUSSION:
## DEFENDANTS' MOTION TO EXCLUDE DR. JENNIFER M. RECKREY

As discussed, Reckrey has provided an initial report, a rebuttal report, a declaration, and a supplemental declaration. (Reckrey Rpt.; Reckrey Rebuttal; Reckrey Decl.; Reckrey Suppl. Decl.) Defendants have moved to exclude Reckrey's testimony in full. I grant the motion in part and deny it in part, as detailed below.

## I.    Dr. Jennifer M. Reckrey's Background and Qualifications

Reckrey holds an M.D. from Stony Brook University School of Medicine and is a board-certified family medicine physician and geriatrician. (Reckrey CV at SOL008331, ECF No. 174-2.) She has more than twelve years of experience providing primary care to homebound patients, including patients with "complex medical illness and high levels of functional needs including many with dementia." (Reckrey Rpt. at 2.) This experience includes requesting and ordering care plans for home care patients. (Reckrey Dep. 16:21–18:7, ECF No. 167-4; Feb. 11, 2025 Hr'g Tr. 18:23–20:3.) Since 2022, Reckrey has also "acted as a consultant for Empire BlueCross

BlueShield (formally Integra Managed Care)"[6] and has reviewed appeals from decisions on applications for home care. (Reckrey Rpt. at 3; Reckrey Dep. 10:15–13:9.)

In her clinical practice, Reckrey "routinely interact[s] not only with patients and families, but also with home care workers, licensed home care service agencies, Medicaid managed long-term care organizations [("MLTCs")], home care nurses, and other community-based health care providers." (Reckrey Rpt. at 2; *see also* Reckrey Dep. 30:11–31:16.)

Reckrey's area of expertise is the provision of medical care to patients with complex care needs who live in the community and the mechanisms for providing care to them, including home care. She has published approximately 45 peer-reviewed studies, including 32 in the last 10 years, exploring various aspects of home-based care for elderly patients. (Reckrey Rpt. at 3, 12–14; Reckrey CV at SOL008337–40.) She is the first author on 18 publications addressing various aspects of home care, with a focus on home-based primary care and other team-based models of care. (Reckrey CV at SOL008337–40.) She has authored numerous articles addressing issues related to how paid caregivers provide care to home-bound patients. (*Id.*)[7] As of the time

---

[6] Empire BlueCross BlueShield has since changed its name to Anthem BlueCross BlueShield. *See Frequently Asked Questions (FAQs)*, Anthem Blue Cross, https://www.anthembluecross.com/faq (last visited Mar. 4, 2025).

[7] *See, e.g.*, Jennifer M. Reckrey, et al, *Beyond Functional Support: The Range of Health-Related Tasks Performed in the Home By Paid Caregivers in New York*, 38 Health Affairs 927 (2019) [https://doi.org/10.1377/hlthaff.2019.00004]; Jennifer M. Reckrey, et al, *Paid Caregiver Communication With Homebound Older Adults, Their Families, and the Health Care Team*, 60 Gerontologist 745 (2020) [https://doi.org/10.1093/geront/gnz067]; Emma K. Tsui, Jennifer M. Reckrey, et al, *Training to Reduce Home Care Aides' Work Stress Associated with Patient Death: A Scoping Review*, 23 J. Palliative Medicine 1243 (2020) [https://doi.org/10.1089/jpm.2019.0441]; Jennifer M. Reckrey, *COVID-19 Confirms It: Paid Caregivers Are Essential Members of the Healthcare Team*, 68 J. Am. Geriatric Soc'y 1679 (2020) [https://doi.org/10.1111/jgs.16566]; Jennifer M. Reckrey, *Caring Together: Trajectories of Paid and Family Caregiving Support to Those Living in the Community with Dementia*, 77 J. Gerontology: Soc. Scis. S11 (2022) [https://doi.org/10.1093/geronb/gbac006].

she submitted her initial report, the National Institute of Health was providing Reckrey funding to research home care workers' role in caring for people with dementia living at home. (Reckrey Rpt. at 3.) She has presented her work at meetings of the Gerontological Society of America and the American Academy of Home Care Medicine. (*Id.*) She has also presented at webinars sponsored by the Palliative Care Research Cooperative, LeadingAge, and the AWARD Network. (*Id.*)

Reckrey served on the faculty of the Icahn School of Medicine at Mount Sinai from 2012 through 2024. (Reckrey Decl. ¶ 1.) In January 2025, Reckrey began a new faculty role at the NYU Grossman School of Medicine. (*Id.*)

Reckrey has received several honors throughout her career. She was awarded the Dan Gilden Creative Investigator Award of the American Academy of Home Care Medicine in recognition of the innovation of her research and its impact on the home care field. (Reckrey Rpt. at 3.) Reckrey was also "appointed 'Physician Champion' for the Mount Sinai Performing Provider System's 'Hospital Home Care Collaboration' project from 2016–2017." (*Id.*) She was named an American Academy of Hospice and Palliative Medicine Research Scholar in 2019. (*Id.*)

Reckrey has not previously served as an expert witness in litigation. (Reckrey Dep. 6:2–4.) Her engagement with the issues in this action began when the Acting Secretary retained her and asked for her opinion on four main questions:

> 1. How likely is it that Serene's live-in home health aides cared for patients at night? . . . .
>
> 2. How likely is it that Serene's live-in home health aides were at times not able to take one or more hour-long uninterrupted meal breaks per day for themselves because of their patients' needs? . . . .

3. Do patients' plans of care comprehensively reflect patient's nighttime and mealtime needs?

4. Should Serene have known it was likely that their live-in home health aides cared for patients at night and were unable to take one or more hour-long uninterrupted meal breaks per day for themselves with the frequency that you describe above?

(Reckrey Rpt. at 1.)

## II.  Dr. Jennifer M. Reckrey's Expert Report, Declaration, and Supplemental Declaration

Reckrey's initial report is based on her qualitative analysis of documents produced in this litigation, including 44 of the patient files Sarene produced in response to Judge Tiscione's November 15, 2021 Order. (*Id.*; *see also* Nov. 2021 Order.) These patient files include some or all of the following documents: initial nursing assessments; home health certifications; plans of care (also known as care plans); supervisory nursing assessment forms, home health service agreements; documents by which patients acknowledge the receipt of information; documents assigning insurance benefits; emergency plans; aide activity sheets (time sheets); duty sheets reflecting HHAeXchange data; and miscellaneous faxes, letters and other communications from Sarene staff and patient physicians. (Reckrey Rpt. at 2.)

Prior to preparing her initial report, Reckrey also reviewed the following materials:

(1) Transcripts of the depositions of Defendant Manolias and Kristine Manolias;[8]

(2) Exhibits used during those depositions;

(3) The Complaint in this case;[9]

---

[8] The Court understands that the "Kristi Manolias" whose deposition transcript Reckrey listed as one of the documents she reviewed in preparing her report is Kristine Manolias. (*See* Reckrey Rpt. at 1.)

[9] Reckrey does not identify whether she reviewed the original complaint (ECF No. 1) or the Amended Complaint (ECF No. 139.) (*See* Reckrey Rpt. at 1–2.)

(4) Defendants' Answer;

(5) Redacted statements from Sarene employees taken during WHD's investigation of Sarene;

(6) A redacted WHD "narrative";

(7) A WHD "file produced during Phase 1 discovery"; and

(8) Communications produced by Defendants from the HHAeXchange platform and Skype.

(*Id.* at 1–2.) Finally, Reckrey also reviewed the documents produced by managed long-term care companies, including "some or all of the following":

(1) New York State Uniform Assessment System assessments;

(2) Personal Care Needs Assessment tables;

(3) Health care certification and plan of care;

(4) Appeal requests;

(5) SA request and decision;[10]

(6) Initial Adverse Determination—denial notice;

(7) Call center contact notes; and

(8) Letters and miscellaneous communications.

(*Id.* at 2.) During the *Daubert* hearing, Reckrey testified that she reviewed documents in patient files that were produced by managed long-term care companies, as well as other managed long-term care documents not contained in patient files. (Feb. 11, 2025 Hr'g Tr. 100:3–20.)

In her initial report, Reckrey reached the following opinions based on her review of 44 Sarene patient files: (1) 36 of the 44 patients had documentation of some form of dementia, forgetfulness, confusion, disorientation, and impaired judgment; (2) 42 of 44 patients had

---

[10] During the *Daubert* hearing, Reckrey was unable to explain to the Court what the "SA request and decision" refers to. (Feb. 11, 2025 Hr'g Tr. 72:20–73:4.)

22

documentation of some form of gait impairment, falls, or need for support while walking; (3) 42 of 44 patients had documentation of polypharmacy (taking four or more medications concurrently); and (4) all 44 patients had documentation of incontinence. (Reckrey Rpt. 4–5).

Reckrey summarizes her opinions on the questions posed by the Acting Secretary as follows:

1. Clients had high levels of care needs (e.g., many conditions that impact function) and required high levels of assistance with a wide variety of tasks, many of which could occur at any time or involved observing clients for changes in status. It is likely that Serene's live-in home care workers cared for patients at night several times a week. Times spent performing individual tasks at night-time likely varied (e.g., taking someone to the bathroom takes longer than responding verbally to a client request) but night-time interruptions were commonplace.

2. Clients had high levels of care needs (e.g., many conditions that impact function) and required high levels of assistance with a wide variety of tasks, many of which could occur at any time or involved observing clients for changes in status. It is likely that Serene's live-in home care workers routinely missed most if not all of their hour-long uninterrupted meal breaks on a daily basis.

3. Static Care Plans reflect tasks expected of aide for care of client, but do not reflect timing of those needs or variability in needs over time. Care Plans do not specify when tasks should occur nor is there any documented effort on the part of Serene to help home care workers navigate complex care needs to carve out meal or nighttime breaks. As a result, Care Plans do not meaningfully inform us whether or not home care workers provide care outside of the 13 compensated hours.

4. Given the client complexity and the existing processes for approving 24-hour live-in care by MLTCs, Serene should have known that it was likely that their live-in home care workers cared for patients at night and were unable to take one or more hour-long uninterrupted meal breaks per day for themselves. Serene had no systems in place to help home care workers manage their extensive and nuanced tasks during the 24-hour period or to support home care workers to take mandated break times. Time sheets for home care workers did not evaluate the actual hours worked during the day or the times spent in breaks or meals and perpetuated the expectation that a shift was a shift for live-in 24-hour aides. Given Serene appears to have discouraged rather than encouraged home care workers to report hours worked outside of the 13 compensated hours, the fact that these hours were not immediately reported to Serene does not change the fact that Serene should have known that it was likely that their live-in home care workers cared for patients outside of compensated hours.

(Reckrey Rpt. at 10–11.)

Reckrey also filed a rebuttal report responding to the opinions set forth in the report of Defendants' expert, Adam Block. (Reckrey Rebuttal). As discussed below, Block is precluded from testifying at trial to the opinions set forth in his report and rebuttal report because he is unqualified to offer many of his opinions under Rule 702 and, even where he may be qualified, his opinions are irrelevant under Rules 402 and 702, lack a sufficient basis in facts or data under Rule 702(b), are the result of unreliable principles and methods under Rule 702(c), or are precluded under Rule 403 because any probative value is substantially outweighed by the risk of confusing the issues, misleading the jury, wasting time, or unfair prejudice against the Acting Secretary. *See* Discussion Block § III; Fed. R. Evid. 402, 403, 702. Therefore, Reckrey's rebuttal report is also precluded as irrelevant. *See, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-cv-7372, 2020 WL 4251229, at *9 (S.D.N.Y. Feb. 19, 2020) (precluding as irrelevant an expert's rebuttal opinion criticizing an adverse party's expert's opinion once the adverse party's expert opinion was precluded).

Following her review of the five additional patient files that were not initially provided to her, Reckrey provided the Court with a declaration on January 14, 2025. (Reckrey Decl.) In the declaration, Reckrey presents opinions concerning relevant medical conditions prevalent among the 49 Sarene patients whose files she reviewed: (1) 40 of 49 patients had documentation of some form of dementia, forgetfulness, confusion, disorientation, or impaired judgment; (2) 47 of 49 patients had documentation of some form of gait impairment, falls, or need for support while walking; (3) 47 of 49 had documentation of polypharmacy (taking four or more medications concurrently); and (4) all 49 patients had documentation of incontinence. (*Id*. ¶ 8.)

24

In her supplemental declaration, filed on February 12, 2025, Reckrey provides opinions concerning the prevalence of the same medical conditions among the 25 patients randomly selected by Defendants, the 24 patients selected by the Acting Secretary, and the combined set of 49 patients whose files she reviewed. (Reckrey Suppl. Decl. ¶¶ 7–9.)

## III.    Defendants' Motion to Exclude Reckrey's Opinions

Defendants move to exclude Reckrey's opinions on three grounds: first, Defendants argue that she is not qualified to offer her opinions; second, Defendants contend that Reckrey's opinions are based on insufficient data and an unreliable methodology; and third, Defendants argue that Reckrey's testimony would not assist the jury and would be prejudicial. I address each argument below.

### A.    Defendants' Challenges to Reckrey's Qualifications

Defendants assert that Reckrey is unqualified under Rule 702 to offer expert opinions as to the amount of care required for Sarene's live-in patients during a 24-hour period because she has not served as an expert before, has never spent 24 hours with a live-in aide in a home, has no knowledge of a live-in aide's practical ability to take sleep and meal breaks outside of the time periods when assistance is required, and lacks knowledge of New York regulations related to live-in home health care. (Defs.' Reckrey Mot. at 3–6; Defs.' Reckrey Reply at 1–4.)

At the *Daubert* hearing, Defendants raised a new argument, contending that Reckrey is not qualified to offer opinions on the amount of time required for live-in aides to carry out tasks to meet the needs of Sarene's live-in patients. (Feb. 11, 2025 Hr'g Tr. 106:10–107:17.) According to Defendants, Reckrey testified that she does not know how long it takes live-in aides to complete certain tasks, is not aware of empirical research on this issue, and applied no

25

reliable methodology to reach her opinions on this issue. (*Id.* 35:14–19, 106:10–107:17, 109:1–20.)

The Acting Secretary asserts that Reckrey is qualified to provide expert opinions on the "complex medical needs of Serene's patients receiving 24-hour live-in homecare." (Pl.'s Reckrey Resp. at 3.) In support, the Acting Secretary cites the following information: (1) Reckrey's twelve years of clinical experience as "a board-certified family medicine physician and geriatrician . . . providing primary care to homebound patients," including patients receiving 24-hour live-in care; (2) Reckrey's 45 peer-reviewed studies about home-based patient care; and (3) her regular interaction with stakeholders across the home care industry, including patients, their families, homecare workers, licensed home care service organizations, and managed long-term care companies and other community-based health care providers. (*Id.* at 3–4.) The Acting Secretary also emphasizes Reckrey's firsthand experience as a physician and geriatrician requesting home care for patients, reviewing care plans, and helping patients appeal managed long-term care company determinations, and as a consultant for Integra Managed Care reviewing appeals. (*Id.* at 4.)

The Acting Secretary argues that Defendants mischaracterize Reckrey's anticipated expert testimony as an analysis of "the total number of hours that aides worked or slept." (*Id.*) The Acting Secretary contends that Reckrey actually "opines that because Serene's patients require a high level of assistance with activities of daily living, their caregivers—in this case live-in aides—are likely to experience call-to-duty interruptions often enough to make consistently obtaining three one-hour meal breaks and eight hours of sleep, five of them uninterrupted, per 24-hour shift unrealistic." (*Id.*)

The Acting Secretary also argues that Reckrey's lack of knowledge of specific New York regulations governing the provision of home health care and lack of prior experience serving as an expert in litigation are not relevant for this Court to determine whether she is qualified to serve as an expert in this case. (*Id.* at 5–6.)

Considering the parties' arguments and Reckrey's submissions and testimony in her deposition and at the *Daubert* hearing, Reckrey is amply qualified to offer opinions on issues relevant to this litigation, including the following:

(1) the complex medical needs of Sarene's patients receiving 24-hour live-in home care;

(2) the nature and timing of tasks carried out by live-in aides to meet the needs of these patients, and whether care plans address these issues;

(3) whether Sarene had systems to help live-in aides manage their work and take meal and sleep breaks without interruption; and

(4) the likelihood that live-in aides cared for Sarene patients outside of their compensated hours.

First, Reckrey has extensive education, training, experience, skill, and knowledge concerning the subject matter of this litigation. She has more than twelve years of experience as a board-certified family medicine physician and geriatrician, providing primary care to homebound patients with "complex medical illness and high levels of functional needs including many with dementia." (Reckrey Rpt. at 2.) In this capacity, Reckrey has worked "not only with patients and families, but also with home care workers, licensed home care service agencies, Medicaid managed long-term care organizations, home care nurses, and other community-based health care providers." (*Id.*; *see also* Reckrey Dep. 30:11–31:16.) Further, she has experience requesting and ordering care plans for such patients and has reviewed appeals of care plans as a consultant for Integra Managed Care. (Reckrey Dep. 10:15–12:7, 16:21–18:7, 45:3–16; Feb. 11, 2025 Hr'g Tr. 18:23–20:3.)

Reckrey also has an extensive body of research and writing on issues relevant to this litigation. She has published 45 peer reviewed articles regarding various aspects of home-based care for elderly patients. (Reckrey Rpt. at 3, 12–14; Reckrey CV at SOL008337–40.) Indeed, her research and writing in this area is impressive. Her work includes the following: (1) *Trajectories of Paid and Family Caregiving Support to Those Living in the Community with Dementia* in the Journal of Gerontology; (2) *Beyond Functional Support: The Range of Health-Related Tasks Performed in the Home by Paid Caregivers in New York* in Health Affairs; (3) *Paid Caregiver Communication With Homebound Older Adults, Their Families, and the Health Care Team* in the Gerontologist; and (4) *COVID-19 Confirms It: Paid Caregivers Are Essential Members of the Healthcare Team* in the Journal of the American Geriatrics Society. (Reckrey CV at SOL008337–40.)[11]

Based on her education, training, and work as a clinician and researcher, Reckrey has developed extensive knowledge of, and experience with the following: (1) the complex medical and personal care needs of patients who need 24-hour live-in homecare; (2) the practical realities of providing such care in the home setting; (3) care plans for these patients; and (4) the procedures of both the managed long-term care companies that provide insurance coverage for home care and care providers like Sarene. Reckrey's opinions address precisely these issues.

Defendants' attacks on Reckrey's qualifications are unpersuasive. First, Defendants fail to support with legal authority their argument that Reckrey is not qualified simply because she has not previously testified as an expert in a litigation. The Second Circuit has made clear that an expert's lack of prior experience as a testifying expert is irrelevant to the expert's qualification

---

[11] *See also supra* note 7.

28

because even "the most qualified expert must have [their] first day in court." *United States v. Locascio*, 6 F.3d 924, 937 (2d Cir. 1993).

Second, Reckrey is not required to have past experience directly administrating 24-hour live-in home care in order to offer opinions relevant to facts of consequence in this litigation: (1) the complex medical needs of Sarene's patients receiving 24-hour live-in home care; (2) the nature and timing of tasks carried out by live-in aides to meet the needs of these patients, and whether care plans address these issues; (3) whether Sarene had systems to help live-in aides manage their work and take meal and sleep breaks without interruption; and (4) the likelihood that live-in aides cared for Sarene patients outside of their compensated hours. Although Reckrey has not worked as a live-in aide herself, she has education, training, and broad experience working with patients requiring live-in home care as a primary care physician and geriatrician with twelve years of experience treating homebound patients and researcher studying the provision of health and personal care in the home setting. Thus, contrary to Defendants' contention, Reckrey has developed through her training and experience "knowledge of an aide's practical ability to take sleep and meal breaks outside of the time periods that assistance is required." (Defs.' Mot. Reckrey at 5.)[12]

Third, despite what Defendants argued at the *Daubert* hearing, Reckrey's knowledge, training, and experience qualify her to present opinions on the nature and timing of tasks carried

---

[12] Moreover, even where "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (finding expert witness qualified when his experience, knowledge, and training was related to the general subject matter, but not to specific question at issue).

out by live-in home care aides to meet the needs of Sarene's patients assigned to 24-hour live-in care. Reckrey has extensive experience treating patients who require live-in care, interviewing live-in aides about the care needs of their homebound patients, and conducting home visits during which she has spoken to live-in aides about their experiences and their patients. (Feb. 11, 2025 Hr'g Tr. 7:5–24; 34:9–23.) Defendants' arguments about her *qualifications* to opine about the timing of patient care tasks boil down to a rehearsal of their arguments about the *reliability* of her opinions about the timing of tasks, which I address later in this Opinion.

For these reasons, under Rule 702, Reckrey is qualified by knowledge, skill, experience, training, and education to render opinions regarding: (1) the complex medical needs of Sarene's patients receiving 24-hour live-in home care; (2) the nature and timing of tasks carried out by live-in aides to meet the needs of these patients, and whether care plans address these issues; (3) whether Sarene had systems to help live-in aides manage their work and take meal and sleep breaks without interruption; and (4) the likelihood that live-in aides cared for Sarene patients outside of their compensated hours.

B. Defendants' Challenges to the Reliability of Reckrey's Opinions

Defendants argue that Reckrey's opinions are not based on reliable data and methodology for five main reasons. First, Defendants contend that Reckrey did not apply a methodology generally accepted by the scientific community, because she did not rely on a specific scientific technique to analyze documents and her method of analysis has not been peer-reviewed. (Defs.' Mot. Reckrey at 6–7.) Second, Defendants argue that Reckrey's analysis lacks precision such that there is no way to determine an error rate. (*Id.* at 8.) Third, Defendants argue on reply that Reckrey failed to review specific "data and methodologies that should have been reviewed," specifically those contained within a New York regulation, N.Y. Comp. Codes R. & Regs. tit. 18

§ 505.14. (Defs.' Reckrey Reply at 4.) Fourth, Defendants criticize Reckrey's determination that the aide activity sheets for Sarene live-in aides do not accurately reflect whether these workers received uninterrupted sleep and meal breaks. (*Id*. at 8–9.) According to Defendants, the aide activity sheets reflect live-in aides' "affirmative[] represent[ation] that they received all lawfully required break times," and that there is "no evidence in any of the materials reviewed by Dr. Reckrey that indicated that a live-in aide did not take their break at a later time if a first attempt to do so was interrupted."(Defs.' Mot. Reckrey at 9–10.) Fifth, at the *Daubert* hearing, Defendants raised a new argument, not presented in their briefing, that Reckrey's opinions concerning the time required for live-in aides to complete certain tasks is not based on any empirical research and cannot be quantified, as per Reckrey's testimony at the hearing. (Feb. 11, 2025 Hr'g Tr. 106:10–107:17.)

The Acting Secretary argues that Reckrey's opinions are based on reliable data and methodology for four main reasons. First, Reckrey applied reliable qualitative analytic methods because she reached her opinions by applying her extensive experience as a practicing geriatrician and researcher to analyze Sarene's patient files and other record evidence. (Pl.'s Reckrey Resp. at 2–3, 6–8; Jan. 14, 2025 Joint Ltr. at 2–3.) According to the Acting Secretary, Defendants take a far too "rigid application of the four *Daubert* factors," requiring Reckrey's qualitative analysis to meet the standards used to evaluate quantitative technical or scientific analytic methods. (Pl.'s Reckrey Resp. at 7–8.) Second, the Acting Secretary asserts that Reckrey reliably applied her clinical and research experience to conduct a case-by-case review of Sarene live-in care patient files and opine that "Serene patients receiving live-in care had high care needs that made call-to-duty interruptions to meal and sleep breaks clinically reasonable." (*Id.* at 8–10.) Third, with respect to Reckrey's "opinion that Serene's patient care plans do not reflect

31

the full scope of patient care needs or tasks performed by live-in aides," the Acting Secretary argues that Reckrey reliably applied her experience as a physician "sign[ing] numerous care plans" for homebound patients to analyze Sarene's care plans for the patients whose files she reviewed. (*Id.* at 10–12.) Fourth, the Acting Secretary argues that Reckrey's opinion that Sarene should have known live-in aides were experiencing call-to-duty interruptions to their sleep and meal breaks is reliable because it is based on Reckrey's review of Sarene's patient files and "documents memorializing aide reports about their experiences with interrupted meal and sleep breaks." (*Id.* at 12.) The Acting Secretary further contends that Reckrey relied on both that review and her "clinical experience caring for patients in the context of the New York managed long-term care system" to reliably conclude that "it would be 'clinically obvious' to a medical provider like Serene that patients requiring such high levels of care will sometimes require assistance outside of compensated hours, *even if* asked to assume that aides did not affirmatively report interruptions." (*Id.* at 12–13 (emphasis in original) (quoting Reckrey Rpt. at 6).)

Below, I address each argument in turn.

### a. *Reckrey's Ability to Rely on Certain Documents*

As a threshold matter, I address the extent to which Reckrey may rely on certain documents in the record in formulating her opinions. As previously noted, Rule 703 provides that, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. An expert may base an opinion on inadmissible evidence, "[i]f experts in the particular field would *reasonably rely* on those kinds of facts or data in forming an opinion on the subject." *Id.* (emphasis added).

Reckrey explains throughout her report that, to reach her various conclusions, she relied on her review of serval categories of documents, including: patient files, aide activity sheets, care

plans, twelve statements from Sarene's former live-in aide employees provided to the WHD, a log of 59 calls from Sarene live-in aides compiled during the WHD's investigation, Sarene's HHAeXchange and Skype communications, and the transcripts of the depositions of Defendant Manolias and Kristine Manolias. (Reckrey Rpt. at 1–2; *see also* Feb. 11, 2025 Hr'g Tr. 38:22–39:22.) As discussed in above, the patient files Reckrey reviewed contain, among other things, initial nursing assessments, aide activity sheets, and care plans. *See supra* Discussion Reckrey § II. The aide activity sheets document care tasks live-in aides must complete for their patients during each 24-hour shift, while the care plans document patients' medical diagnoses, medication, diet and nutritional requirements, and functional limitations. (*See, e.g.*, DEF015569 (aide activity sheet); DEF015490 (care plan).)

As a primary care physician and geriatrician with twelve years of experience treating homebound patients, Reckrey routinely reviews the types of documents contained in Sarene patient files, including nursing assessments and care plans. (Feb. 11, 2025 Hr'g Tr. 78:22–79:1.) Reckrey testified that, in her role as a clinician, she routinely reviews patient files and approves patient care plans. (*Id.* 78:8–19, 18:23–19:19.) Under Rule 703, Reckrey may base her expert opinions on review of Sarene patient files and care plans because she has actually reviewed these documents in forming her opinions and these are precisely the types of documents on which an expert on the complex medical needs of patients receiving 24-hour live-in care would "reasonably rely" in forming opinions. Fed. R. Evid. 703; *see also Bermudez v. City of New York*, No. 15-cv-3240, 2019 WL 136633, at *13 (E.D.N.Y. Jan. 8, 2019) (citing *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 483 (E.D.N.Y. 2011)) (permitting a physician expert to base his opinions on his review of plaintiff's medical records).

Reckrey may not, however, rely on the twelve employee statements or call log compiled during the WHD investigation to reach her opinions. As a threshold matter, these documents are not independently admissible. In the parties' Proposed Joint Pre-Trial Order, Defendants indicated that they would seek to admit the WHD's full investigation file, which includes the employee statements and WHD call log, into evidence at trial as proposed Defense Exhibit DX-JJ. (Proposed Joint Pre-Trial Order at 51, ECF No. 182.) In response, the Acting Secretary filed a motion in limine to preclude admission of the WHD investigation file. (Pl.'s Mot. Lim. at 54–56, ECF No. 184.) I ruled that the investigation file is irrelevant to the facts of consequence in this case under Rule 401 and therefore inadmissible under Rule 402. (Feb. 7, 2025 Hr'g Tr. 95:5–99:23, ECF No. 212.) I explained:

> Contrary to [Defendants'] assertion that, . . . the adequacy of the [WHD] investigation may bear directly on the credibility of the Acting Secretary's claims, . . . the jury must assess the strength of the Acting Secretary's case in chief, and [Defendants'] defenses, by evaluating the credibility of witnesses who will testify at trial[] and determining the weight to assign, if any, to different pieces of admissible evidence.

> Defendants raise the concern that perhaps defendants' own resistance to responding to discovery requests in the course of this litigation, and the Acting Secretary's resulting resort to discovery motion practice to secure documents, such as aide activity reports and patient files, may have . . introduced b[ias] or failed to capture the full scope of the defendants' practices. . . .

> Whether or not defendants engaged in conduct that influenced the evidentiary record developed as the parties proceed to trial, the evidence regarding the adequacy of the [WHD's] investigation is irrelevant under Rule 401, and therefore, inadmissible under Rule 402.

(*Id.* 97:17–98:6.) I also ruled that the WHD investigation file, including the twelve employee statements and WHD call log, is inadmissible under Rule 403 because any probative value of admitting this evidence is substantially outweighed by the danger of confusing the issues,

misleading the jury, wasting time, and unfair prejudice to the Acting Secretary under Rule 403. I explained:

> Questioning witnesses about whether or not the [WHD] followed the interview protocols laid out in Exhibit DX-PP and why the [WHD] made certain decisions in its investigative process, risks confusing the issues, wasting jury time, and distracting the jury from the issues in dispute that it must resolve. Notably, Exhibit DX-JJ is lengthy and introducing it into evidence promises to waste juror time.

> The jury will likely be confused about whether the focus of the litigation is assessing the strength of [WHD]'s investigation, as opposed to the facts that must be found about whether Serene's live-in aides did or did not work more than 13 hours per 24-hour shift during the relevant period[, w]hether any such time was uncompensated, whether Serene recorded live-in aides times worked[, a]nd whether [D]efendants engaged in retaliation.

(*Id.* 98:23–99:15.) Accordingly, the twelve employee statements and WHD call log are inadmissible evidence at trial under Rules 401 and 403.

Moreover, while experts may base their opinions on otherwise inadmissible facts or data if those facts or data are the kind on which an expert in the field would "reasonably rely" in forming an opinion, Fed. R. Evid. 703, Reckrey's testimony at the *Daubert* hearing confirms that the twelve employee statements and WHD call log do not meet this standard. Reckrey testified that she does not review or rely on employee statements or notes of the kind set forth in the WHD call log in either as a clinician treating homebound patients or as a researcher studying the provision of health and personal care in the home setting. (Feb. 11, 2025 Hr'g Tr. 76:18–77:16.) She also testified that, in the course of her research, she conducts "semi-structured interviews," reviews notes of such interviews conducted by a research coordinator, and analyzes the information "to understand key themes and draw conclusions"—an analytic process called

thematic saturation.[13] Reckrey, however, did not explain either in her report or during the

hearing how she applied that or any other research methodology to her review of the employee

statements and WHD call log.

Reckrey may base her opinions on the deposition testimony of Defendant Manolias and

Kristine Manolias because this testimony is likely admissible at trial. The statements by these

witnesses constitute opposing party statements under Rule 801(d)(2) because Defendant

Manolias is an opposing party in this action and Kristine Manolias was deposed as a designee of

Defendant Sarene under Federal Rule of Civil Procedure 30(b)(6). Fed. R. Evid. 801(d)(2)(A),

(C). Further, to the extent Defendant Manolias's or Kristine Manolias's testimony at trial is

inconsistent with their prior deposition testimony, the statements would also be admissible as

declarant witness's prior statements. *See* Fed. R. Evid. 801(d)(1) (permitting the admission of a

declarant's inconsistent prior statement where the "declarant testifies and is subject to cross-

examination" and where the prior statement was "given under penalty of perjury . . . in a

deposition").

Similarly, Reckrey may rely on the HHAeXchange communications that she reviewed

because I have already ruled that these communications are admissible at trial. (Feb. 7, 2025

Hr'g Tr. 8:14–13:13.) Specifically, I found that the HHAeXchange communications are

admissible as self-authenticating business records under Rules 803(6) and 902(11), both because

the parties stipulated that the records are Sarene's authentic business records and because the

---

[13] The transcript of the February 11, 2025 *Daubert* hearing incorrectly states that Reckrey called
the process "semantic saturation." (Feb. 11, 2025 Hr'g Tr. 101:3–102:2.) Reckrey actually called
it "thematic saturation."

Acting Secretary provided a certification of a custodian or other qualified witness as required by Rule 902(11). (*Id.* 13:10–13.)

Finally, Reckrey may rely on the Skype communications and aide activity sheets to the extent that the Acting Secretary is able to lay a foundation for them at trial. The Acting Secretary has not shown that these documents are the types of facts or data on which an expert in Reckrey's field would reasonably rely in forming an opinion. Nevertheless, should the Acting Secretary be able to lay a foundation for these documents at trial, they will be admissible evidence on which Reckrey may base her opinions under Rule 703.

### b. *Reckrey Report Section V: Reckrey's Opinion that 49 Sarene Patients had Complex Care Needs Impacting their Need for Care*

#### i. **Reckrey's Opinions**

Reckrey opines in Section V of her report that Sarene's patients had "complex care needs . . . that impacted their need for home care outside of the compensated 13 hours in a 24-hour period" and that it was "not always possible" for live-in aides to address these needs "within compensated hours." (Reckrey Rpt. at 6.)

Reckrey based this opinion on her review of the files of 44 patients served by Sarene's former live-in aides. (*Id.* at 4, 6.) She also reviewed files for five additional Sarene patients who were served by live-in aides and reached the same conclusion. (*See id.*; Reckrey Decl. ¶ 6–8.) For each of these 49 patients, Reckrey reviewed the full patient file maintained by Sarene, which includes the company's initial nursing assessments and care plans, and where available, assessments of patient needs by managed long-term care companies, appeals requesting approval for additional hours of care, and miscellaneous letters and communications. (Reckrey Rpt. at 1–2; *see also* Reckrey Decl. ¶ 6.)

Reckrey concluded that, based on her review of the patient files, the vast majority of these 49 patients experienced four medical issues that impact the likelihood that a live-in aide caring for the patient may experience a call-to-duty interruption to a meal or sleep break. (Reckrey Rpt. at 6; *see also* Reckrey Decl. ¶ 8.) Specifically, Reckrey concluded that: (1) 40 of 49 patients had documentation of some form of dementia, forgetfulness, confusion, disorientation, or impaired judgment; (2) 47 of 49 patients had documentation of some form of gait impairment, falls, or need for support while walking; (3) 47 of 49 patients had documentation of polypharmacy (taking four or more medications concurrently); and (4) all 49 patients had documentation of incontinence. (Reckrey Decl. ¶ 8.)

Reckrey describes how the symptoms associated with these conditions may impair live-in aides from taking uninterrupted meal and sleep breaks. (Reckrey Rpt. at 5–6.) For example, patients suffering from dementia may experience "day-night reversal," where the "person with dementia is up at night and sleeps in the day." (*Id.* at 5.) Reckrey also explains that patients with both "urinary urgency and gait impairment may need frequent and unpredictable home care worker support to use the bathroom" and that patients with gait impairment and polypharmacy have risk of falls which requires live-in aides to be available to support the patients "any time they attempt to walk." (*Id.*)

### ii.  **Analysis**

The opinions set forth in Section V of Reckrey's report are the "product of reliable principles and methods" grounded in Reckrey's qualitative analysis of 49 Sarene patient files. Fed. R. Evid. 702(c). Reckrey reliably applied her extensive knowledge and clinical experience as a primary care physician and geriatrician with twelve years of experience treating homebound patients to specific record evidence—the 49 patient files, which yielded her opinion that Sarene's

live-in patients experienced one or more medical conditions that influence the level of assistance

required from a live-aide. *See* Fed. R. Evid. 702(c); *Bermudez*, 2019 WL 136633, at *13 (citing

*Deutsch*, 768 F. Supp. 2d at 483); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762

(3d Cir. 1994) ("[E]valuation of the patient's medical records, like performance of a physical

examination, is a reliable method of concluding that a patient is ill even in the absence of a

physical examination."). Moreover, Reckrey's conclusions concerning the types of medical

conditions prevalent amongst the 49 Sarene patients whose files she reviewed are based on a

reliable methodology because this methodology can easily be tested for validity by another

physician with similar knowledge, training, skill, and experience. *See Daubert*, 509 U.S. at 593–

94.

    c.   ***Reckrey Report Conclusions #1 and #2: Opinion that all Sarene Clients Assisted by Live-In Aides had High Levels of Care Needs and Required High Levels of Assistance with a Wide Variety of Tasks***

    i.   **Reckrey's Opinions**

Based on her analysis of 49 Sarene patient files and opinion that these patients

experienced medical conditions that impact the care needed from a live-in aide, Reckrey

concludes more broadly, in Conclusions #1 and #2 of her report, that *all* patients served by

Sarene's live-in aides experienced "high levels of care needs (e.g., many conditions that impact

function)" and required high levels of assistance addressing a wide variety of issues, many of

which would occur without warning or would require observing clients for a change in their

status. (Reckrey Rpt. at 10–11.) Based on this conclusion, Reckrey opines that it would "not

always [be] possible" for Sarene live-in aides to get their mandated sleep and meal breaks. (*Id.* at

6.) More specifically, Reckrey opines that the complex care needs of Sarene's clients require

live-in aides to work more than 13 hours within a 24-hour shift (i.e., outside of their

compensated hours) in order to meet these needs, making it unrealistic for live-in aides to always meet patient care needs within compensated hours. (*Id.* at 6.)

Reckrey's opinions thus raise the question of whether the sample of 49 Sarene patient files is representative of all Sarene patients served by the company's former live-in aides. If the sample is indeed representative, then Reckrey has relied on sufficient facts or data and a reliable methodology under Rule 702 to opine that the prevalence of certain medical conditions in the 49 Sarene patients whose files were reviewed also applies to all patients served by Sarene live-in aides during the relevant period and impairs these workers ability to take meal and sleep breaks without call-to-duty interruptions.

### ii.    **The Parties' Positions**

The Acting Secretary argues that the 49-patient file sample should be deemed representative of the relevant population of approximately 500 Sarene patients because Defendants had a significant role in developing the sampling method ordered by Judge Tiscione and chose half the files included in the sample, and because there is no meaningful difference in the prevalence of the medical conditions identified by Reckrey between the patients chosen by Defendants and the patients chosen by the Acting Secretary. (*Id.* at 3–4.) First, the Acting Secretary argues that the 49 files are representative of all Sarene patients served by the company's former live-in aides because Defendants chose half the sample and because Reckrey's review of the 49 patient files revealed that the medical conditions she found pertinent were prevalent in nearly all of the files, regardless of whether they were randomly selected by Defendants or identified by the Acting Secretary through third-party discovery. (Jan. 14, 2025 Joint Ltr. at 3; *see also* Reckrey Decl. ¶ 8.) According to the Acting Secretary, the 49-patient sample is representative of the larger group of around 500 patients "at least with respect to the

characteristics analyzed by Dr. Reckrey." (Jan. 14, 2025 Joint Ltr. at 3.) Second, and contrary to Defendants' contention in their briefing, the Acting Secretary notes that the 24 patients selected by the Acting Secretary were identified through discovery obtained from not one, but three different managed long-term care companies—AgeWell, Fidelis, and Extended Managed Long Term Care—not just one. (*Id.* at 3 n.3.) Third, the Acting Secretary appears to argue that I should deem the 49 patient files to be representative of the full group because Defendants refused to provide more files. (*Id.* at 3–4.) In support, the Acting Secretary recounts the following procedural history: (1) Defendants resisted producing patient files, repeatedly citing the burden of producing full patient files in response to the Acting Secretary's request for a sample of 100 patient files, which would have represented around 20% of Sarene patients served by live-in aides; (2) because of Defendants' resistance, the Acting Secretary filed a Motion to Compel production of the patient files; and (3) Judge Tiscione resolved the Acting Secretary's Motion to Compel with an order requiring Defendants to produce only 50 patient files and permitting Defendants to include in that sample the files for 24 patients whom the Acting Secretary had specifically identified. (*Id.*; *see also* Procedural History § I.)

Defendants contend that the 49-patient sample is not representative because the Acting Secretary identified 24 of the 49 patients and requested that the sample consist of patients served by live-in aides over the years of 2017 through 2021, rather than 2017 through 2020, which is the time period for which the Acting Secretary seeks damages at trial. (*Id.* at 4.) Defendants argue that "the 2021 files do not fall within the ambit of the Acting Secretary's case." (*Id.*) Defendants also assert that they "believe that all 24 files designated by the Acting Secretary's case came from a singular managed long-term care provider and thus illustrates . . . the polarized nature of

the production."[14] (*Id.*) Defendants offer no explanation for why they produced 49 rather than 50 unique patient files.

During the *Daubert* hearing, Reckrey testified that she did not know which of the 49 patient files she reviewed were selected by the Acting Secretary and which were selected by the Defendants. (Feb. 11, 2025 Hr'g Tr. 28:22–29:3, 80:23–81:9.) Reckrey testified that while reviewing the 49 patient files she did not "see any patterns to suggest there was a group that . . . had more or less care needs." (*Id.* 29:9–12.) At the end of the hearing, I requested that the Acting Secretary file Reckrey's supplemental analysis regarding the prevalence of the four medical conditions—cognitive impairment, gait impairment/ambulation issues, polypharmacy, and incontinence—in the 25 patient files randomly selected by the Defendants. (*Id.* at 104:23–105:5.)

Reckrey's supplemental declaration, filed on February 12, 2025, identified her opinions about how many patients experienced each of the four categories of medical conditions within the 25 patients selected by Defendants, the 24 patients selected by the Acting Secretary, and the full group of 49 patients. (Reckrey Suppl. Decl. ¶¶ 7–9.) Reckrey's finding are summarized below.

---

[14] Defendants also argue that the Acting Secretary biased the sample by not initially providing Reckrey all 49 unique patient files. (Jan. 14, 2025 Joint Ltr. at 4.) Because Reckrey has reviewed all 49 files and confirmed that her conclusions remain the same based on this larger data set, this critique is moot. (*See* Reckrey Decl. ¶¶ 5, 7–8.)

**Table 1: Prevalence of Medical Conditions Among Sarene Patients Served by Live-In Aides[15]**

|  | Cognitive Impairment | Gait Impairment/ Ambulation Issues | Polypharmacy | Incontinence |
|---|---|---|---|---|
| **All 49 Patient Files** | 40 (81.6%) | 47 (95.9%) | 47 (95.9%) | 49 (100.0%) |
| **25 Patient Files Selected by Defendants** | 20 (80.0%) | 23 (92.0%) | 25 (100.0%) | 25 (100.0%) |
| **24 Patient Files Selected by the Acting Secretary** | 20 (83.3%) | 24 (100.0%) | 22 (91.7%) | 24 (100.0%) |

(*Id.*)

### iii.    **Analysis**

Reckrey's analysis of the 25 patient files Defendants randomly selected supports her conclusion that the vast majority of these patients experienced one or more of the four different medical conditions that Reckrey identified as impacting the likelihood that a live-in aide caring for the patient may experience a call-to-duty interruption to a meal or sleep break. (*Id.*; *see also* Reckrey Rpt. at 4–6.) Specifically, Reckrey concludes that: (1) 20 (80.0%) of the 25 patients selected by Defendants and 20 (83.3%) of the 24 patients selected by the Acting Secretary had documentation of some form of dementia, forgetfulness, confusion, disorientation, or impaired judgment; (2) 23 (92.0%) of patients selected by Defendants and 24 (100.0%) of those selected by the Acting Secretary had documentation of some form of gait impairment, falls, or need for support while walking; (3) 25 (100.0%) of patients selected by Defendants and 22 (91.7%) patients selected by the Acting Secretary had documentation of polypharmacy (taking four or

---

[15] The percentages set forth in this table were calculated by the Court.

more medications concurrently); and (4) all 49 (100.0%) patients had documentation of incontinence, regardless of whether they were selected by Defendants or the Acting Secretary. (Reckrey Suppl. Decl. ¶¶ 7–9.)

Defendants' argument that the group of 25 patients selected by Defendants are not representative of all relevant patients because it includes patients with files from 2021 is unpersuasive. Defendants have not identified the specific number of files that are partially or wholly from 2021. Reckrey testified at the *Daubert* hearing that she found no "distinction in terms of the care needs" of patients who received care from live-in aides in 2021 in comparison to those served from 2017 to 2020. (Feb. 11, 2025 Hr'g Tr. 86:13–17.)

Moreover, Defendants' own discovery conduct led to the ultimate production of only 25 patient files randomly selected by Defendants, as discussed throughout this Opinion and Order. During discovery, the Acting Secretary sought files for patients served by Sarene live-in aides from 2017 through 2021 because the Complaint, filed in July 2020, alleged continuing violations. (*See* Compl. at 2.) The Acting Secretary initially requested the production of *all* documents in specific categories, including all aide activity sheets and care plans, but Defendants opposed the requests, arguing that the review and production of all documents in the identified categories would be burdensome as it would require Defendants to search all patient files to find the relevant documents. (*See* Defs.' Resp. Opp'n Pl.'s Mot. Compel at 2.) In an effort to compromise, the Acting Secretary offered to accept 100 full patient files instead of insisting on the original request for all aide activity sheets, care plans, and other documents. (*See* Nov. 15, 2021 Mot. Hr'g Tr. 2:19–4:6; Nov. 2021 Order.) Had Defendants produced all documents as requested, the Acting Secretary would have been in a position to provide Reckrey for her review only those documents for patients served by live-in aides from 2017 through 2020, the time

44

period for which the Acting Secretary seeks damages at trial, rather than for the period from 2017 through 2021. (*See* Proposed Joint Pre-Trial Order at 5.) Finally, Judge Tiscione's resolution of the Acting Secretary's Oct. 2021 Motion to Compel specified that the 25 files selected by Defendants would span the 2017–2021 timeframe—a decision that could not be revisited when the Acting Secretary decided to pursue at trial only damages for alleged violations from 2017 through 2020. (*See* Nov. 2021 Order.) In light of this important procedural history, Defendants' argument that the sample of 25 patient files randomly selected and produced by Defendants is skewed because it includes an unspecified number of files for patients served in 2021 is without merit.

Therefore, Reckrey's opinions set forth in Conclusions #1 and #2 of her report, which state that *all* patients served by Sarene's live-in aides experienced "high levels of care needs (e.g., many conditions that impact function)" and "required high levels of assistance with a wide variety of tasks, many of which would occur at any time or required observing clients for a change in their status," are based on a reliable methodology. These opinions are supported by Reckrey's close analysis of the full patient files for 25 patients randomly selected by Defendants, which represents 5% of all patients served by Sarene's live-in aides during the relevant time period. (Reckrey Rpt. 10–11; *see also* Reckrey Suppl. Decl. ¶ 7.) These opinions are also independently supported by Reckrey's close analysis of the full files for 49 patients, which includes the 25 patients randomly selected by Defendants and the 24 patients identified by the Acting Secretary as ordered by Judge Tiscione in response to Defendants' repeated claims that producing additional files would be too burdensome. (*See* Reckrey Decl. at ¶ 7; Reckrey Suppl. Decl. at ¶ 9.)

Caselaw in the FLSA context supports this conclusion. In *Anderson v. Mt. Clemens Pottery Co.*, the Supreme Court held, "where the employer's records are inaccurate or inadequate . . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. 680, 687 (1946). The Second Circuit has held that a plaintiff "need not present testimony from each underpaid employee; rather, it is well-established that [a plaintiff] may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA." *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("*S. New England Telecomms.*"). In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court reaffirmed the use of representative evidence in FLSA cases as a means of "fill[ing] an evidentiary gap created by the employer's failure to keep adequate records." 577 U.S. 442, 456 (2016). The Supreme Court acknowledged in *Tyson* that, "[i]n many cases, a representative sample is the only practicable means to collect and present relevant data establishing a defendant's liability." *Id*. at 455.

Representative evidence can include a sample of employee testimony as well as samples of other relevant evidence, such as time and pay records. *Id.* at 450. In *Tyson*, for example, plaintiffs presented an expert's study to prove the hours employees worked. *Id*. The Supreme Court found that, "[r]ather than absolving the employees from proving individual injury, the representative evidence," i.e., the expert's sampling study, "was a permissible means of making that very showing." *Id*. at 457.

Moreover, the Second Circuit has recognized that "the weight to be accorded evidence is a function not of quantity but of quality . . . and that, depending on the nature of the facts to be proved, a very small sample of representational evidence can suffice." *S. New England*

46

*Telecomms.*, 121 F.3d at 67–68. Thus, for example, testimony by as few as 3% of employees of a larger workforce has been sufficient to establish an entitlement to recovery. *See, e.g. Mt. Clemens Pottery Co.*, 328 U.S. at 687 (reversing circuit court holding that testimony of eight of around 300 employees was insufficient to establish entitlement to recovery); *Monroe v. FTS USA, LLC*, 860 F.3d 389, 410 (5.7% ratio of testifying witnesses to non-testifying witnesses is "well above the range commonly accepted by courts as sufficient evidence, especially where other documentary and testimonial evidence is presented") (collecting cases); *Su v. E. Penn Mfg. Co.*, No. 18-cv-1194, 2023 WL 7336368, at *5 (E.D. Pa. Nov. 7, 2023) (39 employees testified, verdict in favor of 11,780 employees), *appeal docketed*, 24-1046 (3d Cir. Jan. 9, 2024); *Reich v. Waldbaum, Inc.*, 833 F. Supp. 1037, 1040, 1042 (S.D.N.Y. 1993), *rev'd in part on other grounds*, 52 F.3d 35 (2d Cir. 1995) (37 employees testified, back wages awarded to over 262 employees).

In light of these authorities, Reckrey's conclusion that *all* patients served by Sarene's live-in aides during the relevant period experienced "high levels of care needs (e.g., many conditions that impact function)" and required high levels of assistance with a wide variety of tasks is based on sufficient facts or data under Rule 702 for three reasons. (Reckrey Rpt. at 10–11.)

First, this conclusion is supported by Reckrey's review of Sarene's files for 25 patients randomly selected by Defendants, which translates to files for 5% of the patients served by Sarene live-in aides during the relevant time period. In the context of representative actions under the FLSA, evidence concerning comparable, or even smaller, sample sizes of employees has supported representative claims brought on behalf of large groups of employees. *See, e.g. Mt. Clemens*, 328 U.S. at 387 (overturning circuit court holding that testimony of 2.7% of employees

was insufficient to establish entitlement to recovery); *Monroe*, 860 F.3d at 410 (testimony by 5.7% of witnesses found to be "well above the range commonly accepted by courts as sufficient evidence"); *E. Penn Mfg. Co.*, 2023 WL 7336368, at *5 (39 employees testified in action resulting in verdict for 11,780 employees); *Bryant v. Milhorat*, No. 09-cv-1751, 2013 WL 12368616, at *10 (E.D.N.Y. Sept. 30, 2013) (finding expert's testimony admissible despite that the expert only reviewing the relevant documentation for 28 of 318 patients since "the small sample size is not a bar to admissibility").

Second, Reckrey's conclusion that *all* patients served by Sarene's live-in aides experienced "high levels of care needs" and required high levels of assistance with a wide variety of tasks is also supported by her review of all 49 patient files produced by Defendants (i.e., the 25 patient files selected by Defendants and the 24 patient files requested by the Acting Secretary), which translates to 10% of the patients served by Sarene live-in aides during the relevant time period. As addressed above, the medical conditions identified by Reckrey as prevalent among the 25 patients randomly selected by Defendants were also prevalent, to roughly the same degree, amongst the 24 patients whose files the Acting Secretary specifically requested. Reckrey Suppl. Decl. ¶ 9; *see also supra* tbl.1. Reckrey testified that there was no meaningful difference in the prevalence of these conditions in any of the three groups: the 25 patients selected by Defendants, the 24 patients selected by the Acting Secretary, or the full group of 49 patients. (Feb. 11, 2025 Hr'g Tr. 83:20–84:11.) Therefore, Reckrey's conclusions concerning the high care needs of all Sarene patients served by live-in aides is supported by her review of the full files for all 49 Sarene patients produced by Defendants, notwithstanding the fact that 24 of the files in this group were initially identified by the Acting Secretary.

Third, Reckrey testified that, whether based on her review of all 49 patient files or the subset of 25 patient files randomly selected by Defendants, her conclusion regarding the high care needs of *all* Sarene patients served by live-in aides is supported by sufficient facts or data because the "constellation of care needs" of these patients was consistent with her observations over the course of more than twelve years of experience as a geriatrician treating patients receiving 24-hour live-in care and as a researcher studying the provision of personal and health care to patients in the home setting. (Feb. 11, 2025 Hr'g Tr. 81:16–83:19; *see also* Reckrey Rpt. at 2.)

Defendants' argument that Reckrey's opinions about the care needs of all Sarene live-in patients is not supported by the size of the sample of patient files she reviewed thus goes to the weight of her opinions and analysis, and not to admissibility. *See Valelly v. Lynch*, No. 19-cv-7998, 2024 WL 4476088, at *14 (S.D.N.Y. Oct. 11, 2024) ("Arguments regarding a small sample size go to the weight of the testimony and not its admissibility."); *see also Bryant*, 2013 WL 12368616, at *10 (finding that the small size of the sample reviewed by an expert "is not a bar to admissibility" of expert opinion).

Therefore, Reckrey's opinions set forth in Conclusions #1 and #2 that *all* Sarene live-in patients experienced "high levels of care needs (e.g., many conditions that impact function)" and "required high levels of assistance with a wide variety of tasks" are based on sufficient facts and data under Rule 702. (Reckrey Rpt. at 10–11.) Accordingly, Defendants' motion to exclude Reckrey's opinions is denied as to these opinions and the corresponding portions of her report and Supplemental Declaration. This includes the following portions:

(1) pages 4–5 of Section V and the last paragraph on page 6 of Reckrey's initial report;

(2) the portions of Conclusions #1 and #2 stating that *all* Sarene live-in patients experienced "high levels of care needs (e.g., many conditions that impact function)"and "required high levels of assistance with a wide variety of tasks," and

(3) the contents of her Supplemental Declaration.

(Reckrey Rpt. 4–6, 10–11; Reckrey Suppl. Decl.)

### d. *Reckrey Report Section VI and Conclusion #3: The Scope of Care Plans*

#### i.  **Reckrey's Opinions**

In Section VI of her report, Reckrey opines that Sarene's patient "Care Plans provide an outline of tasks . . . but do not fully reflect all care provided" and do not fully "describe what care in the home looks like on a day-to-day basis." (Reckrey Rpt. at 8.) Reckrey's Conclusion #3 similarly states:

> Static Care Plans reflect tasks expected of aide for care of client, but do not reflect timing of those needs or variability in needs over time. Care Plans do not specify when tasks should occur nor is there any documented effort on the part of Serene to help home care workers navigate complex care needs to carve out meal or nighttime breaks. As a result, Care Plans do not meaningfully inform us whether or not home care workers provide care outside of the 13 compensated hours.

(*Id.* at 11.) Reckrey reached these opinions by reliably applying her knowledge, skill, and experience as a geriatrician and researcher to analyze Sarene's care plans for patients served by the company's live-in aides.

As discussed, Reckrey has more than twelve years of experience as a primary care physician and geriatrician treating homebound patients, including patients with "complex medical illness and high levels of functional needs including many with dementia." (Reckrey Rpt. at 2.) This experience includes requesting and ordering care plans for home care patients. (Reckrey Dep. 16:21–18:7; Feb. 11, 2025 Hr'g Tr. 18:23–20:3.) Since 2022, Reckrey has also

"acted as a consultant for Empire BlueCross BlueShield (formally Integra Managed Care)."[16] (Reckrey Rpt. at 3.) In this role, Reckrey reviews patients' appeals of the managed long-term care company's decisions about care, including about homecare, to determine if the initial determinations should be overturned, upheld, or partially overturned. (Feb. 11, 2025 Hr'g Tr. 75:14–76:5.) Reckrey applied the knowledge, skill, and expertise drawn from these experiences when reviewing Sarene's care plans for patients requiring live-in care.

Reckrey's resulting opinion is that while Sarene's care plans include information on what tasks a patient will need, they do not address how long those tasks take or when during each 24-hour period the tasks will be handled. (Reckrey Rpt. at 11.) She also concludes that care plans do not address the variability that exists with respect to when and how specific tasks must be performed on a day-to-day basis and any changes that take place following adoption of a care plan and before revision of that care plan due to a change in medical condition or the expiration of six months. (*Id.* at 7–8, 11.)

### ii.    The Parties' Positions

In their briefing, Defendants make two arguments in seeking to preclude Reckrey's opinions about the limited informational value of care plans. First, Defendants contend that her conclusions are based on her personal bias against New York State's utilization of what Defendants call "13-hour care plans," under which a patient receives care from one live-in aide working a 24-hour shift rather than two aides splitting a 24-hour shift. (*See* Defs.' Mot. Reckrey at 6.) Second, Defendants argue that the care plans provide significant information about the care provided to a live-in aide's patient because they were developed through Medicaid providers'

---

[16] Empire BlueCross BlueShield is now known as Anthem BlueCross BlueShield. *See supra* note 6.

analysis of each patient's individual needs. (*Id.* at 7.) Defendants further contend that the care plans were developed in compliance with a New York regulation, which reserves 13-hour care plans for patients whose "need for assistance is []sufficiently [in]frequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight-hour period of sleep." (*Id.* (citing N.Y. Comp. Codes R. & Regs. tit. 18, § 505.14) (brackets inserted to correct Defendants' misquoting of the regulation in its brief).)

At the *Daubert* hearing, Defendants raised for the first time a third challenge to Reckrey's opinions concerning the limited informational value of care plans, arguing that Reckrey did not rely on empirical research or any other reliable foundation to opine on the duration of time required for various patient care tasks. (Feb. 11, 2025 Hr'g Tr. 106:10–20.) Specifically, Defendants point to (1) Reckrey's lack of awareness of any empirical studies regarding the timing and duration of patient care tasks, (2) her admission that the timing and duration of patient care tasks vary and are not easily quantifiable, and (3) her failure to compile quantitative data analyzing Sarene's live-in aides' time to complete patient care tasks. (*Id.* at 106:10–107:8, 109:12–20; 110:14–16.)

### iii.    **Analysis**

Defendants' arguments are unconvincing. First, Defendants fail to point to anything in the record that shows Reckrey harbors bias against decisions to assign patients to live-in care provided by one aide working a 24-hour shift rather than to continuous personal care provided by two aides who split a 24-hour shift, which is referred to as "split-shift" care. (*See* Defs.' Mot. Reckrey at 6.) Defendants have not identified any statements by Reckrey—at any point in the context of this litigation, anywhere in her 45 academic publications, or at any point in her

career—revealing any such bias against New York's use of 13-hour care plans for patients assigned to care by a single live-in aide working 24-hour shifts.

Second, Defendants' motion to exclude the opinions set forth in Section VI and Conclusion #3 of Reckrey's report, like their response to the Acting Secretary's motion in limine No. 10, boils down to the unpersuasive argument that because insurance companies approve Sarene patients for live-in care provided by an aide working a 24-hour shift rather than for continuous personal care provided by two aides who split a 24-hour shift, it is virtually impossible for live-in aides to experience call-to-duty interruptions in their sleep and meal breaks. (Defs.' Mot. Reckrey at 7–8; Defs.' Mem. L. Opp'n Pl.'s Mot. Lim. 17–21, ECF No. 190.) Defendants mischaracterize Reckrey's opinion as a rejection of New York State's regulatory framework and the decisions of managed long-term care companies to approve Sarene patients for personal care provided by a live-in aide working a 24-hour shift. (Pl.'s Sur-Reply at 1–2.) Reckrey draws no such conclusions.

Moreover, Defendants' attack on the reliability of Reckrey's opinions about what care plans convey rest on certain assumptions that may or may not be true. Defendants argue that because a New York regulation requires Medicaid providers to develop care plans that *conceivably permit* live-in aides to take sleep and meal breaks during 24-hour shifts, in practice, Sarene's live-in aides *actually took* these breaks without call-to-duty interruptions during the relevant time period. (Defs.' Mot. Reckrey at 7.) Defendants assume, for example, that a patient will not experience changes in their medical conditions before Sarene's revision of the patient's care plan, which would impair the live-in aide's ability to take meal and sleep breaks without call-to-duty interruptions between revisions. Reckrey testified, for example, that care plans may not be revised for periods as long as six months at a time. (Feb. 11, 2025 Hr'g Tr. 75:7–13)

Third, Defendants' argument that Reckrey failed to rely on empirical research or data to opine on the duration of time required for various patient care tasks is unconvincing. Reckrey has more than twelve years of experience as a geriatrician treating patients receiving 24-hour live-in care, including patients with "complex medical illness and high levels of functional needs," and has experience as a researcher studying the care provided by health aides, including live-in aides, to homebound patients. (Reckrey Rpt. at 2.) Reckrey assessed a specific type of record evidence—care plans—which she has experience requesting and ordering for home care patients. (Reckrey Dep. 16:21–18:7; Feb. 11, 2025 Hr'g Tr. 18:23–20:3.) Applying her extensive knowledge and experience to her analysis of the care plans, Reckrey concludes that the care plans do not provide information on the timing or duration of patient care tasks or how both may vary depending on the patient's needs and other factors. Reckrey's admission that the duration of patient care tasks is difficult to quantify does not undermine her conclusion that the care plans themselves do not convey information about variability in the timing and duration of patient care tasks.

Therefore, Reckrey's opinions regarding the limited information that can be gleaned from the Sarene care plans are reliable in light of Reckrey's application of her education, training, experience, and knowledge as a family medicine physician and geriatrician who has treated numerous homebound patients on care plans and who has approved such care plans to analyze Sarene's care plans for its live-in patients. Accordingly, Defendants' motion to exclude Reckrey's opinions is denied as to Section VI and Conclusion #3 of her report. (Reckrey Rpt. at 7–8; 11.)

### e. *Reckrey Report Section VII and Conclusions #1 and #2: Live-In Aides' Provision of Care Outside Compensated Hours*

#### i. **Reckrey's Opinions**

In Section VII of her report, Reckrey opines that the high care needs of Sarene patients served by live-in aides caused them to experience call-to-duty interruptions that made it "likely" that they "frequently did not get their meal breaks and uninterrupted nighttime sleep." (Reckrey Rpt. at 8–9.) Reckrey further opines that live-in aides did not get "regular mealtime breaks . . . on a daily basis" and experienced "[n]ighttime interruptions . . . several times a week," with some live-in aides having "nighttime interruptions . . . on a daily basis." (*Id.*) In Conclusion #1, Reckrey likewise concludes: "It is likely that Serene's live-in [aides] cared for patients at night several times a week" and that "night-time interruptions were commonplace." (*Id.* at 11.) In Conclusion #2, Reckrey concludes: "It is likely that Serene's live-in [aides] routinely missed most if not all of their hour-long uninterrupted meal breaks on a daily basis." (*Id.*)

Reckrey based the opinions in Section VII and these portions of Conclusions #1 and #2 of her report on her review of statements by twelve former Sarene live-in aides and a log of phone calls with live-in aides compiled during the WHD investigation. (*Id.* at 8–9.) In these statements, and as described in the notes in the WHD call log, live-in aides describe working more than 13 hours each day. (*Id.*) Reckrey also based her opinions on her clinical knowledge of the specific types of interruptions to sleep and meal breaks that live-in aides would experience while caring for patients "with high levels of functional care needs along with cognitive impairment, gait impairment, incontinence, and other conditions." (*Id.*) Finally, Reckrey relied upon her earlier conclusion that patient care plans do not reflect the full scope of patient care needs and task performed by live-in aids. (*Id.* at 9.)

### ii.    **The Parties' Positions**

The Acting Secretary argues that these opinions are admissible because Reckrey is simply "provid[ing] *critical medical background information* about the general care needs of Serene's homebound patients to help the jury contextualize lay witness testimony about the hours that Serene's live-in aides worked." (Pl.'s Reckrey Resp. at 15 (emphasis added).)

Defendants argue that Reckrey's opinions regarding the "frequency with which Sarene's patients interrupted the sleep and meal breaks of [live-in aides] is not founded in reliable data or methodologies," because Reckrey did not review the data and methodologies that "are expressly contained" within N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14. (Defs.' Reply at 4, *see also* 7–8.) The New York regulation outlines the process for "determining whether a patient can receive personal care services in a live-in setting" and the placement of a patient into the appropriate level of care, including care by one live-in aide working a 24-hour shift versus split-shift care by two aides who each work 12-hour shifts during a 24-hour period. (*Id.* at 4, *see also* 4–7.)

### iii.    **Analysis**

Contrary to the Acting Secretary's contention, Reckrey's opinions in Section VII of her report that "it is likely that home care workers *frequently* did not get their meal breaks and uninterrupted nighttime sleep" goes beyond providing medical background information and information about the care needs of patients. (Reckrey Rpt. at 9 (emphasis added).) Reckrey's opinions are primarily based on her analysis of twelve employee statements and the WHD call log. (Reckrey Rpt. at 8–9; *see* Feb. 11, 2025 Hr'g Tr. 86:22–87:10.) Reckrey does not explain what methodology she applied to analyze the employee statements, but instead simply provides quotations from them. (Reckrey Rpt. at 8–9.) Based on those statements and her prior, supported opinion that Sarene's live-in patients had complex medical needs, Reckrey concludes that it was

"not always possible" for live-in aides to take their sleep and meal breaks and that therefore "it is likely that home care workers *frequently* did not get their" breaks. (*Id.* at 6–9 (emphasis added).)

"A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Reckrey does not explain how she makes the jump from concluding that "it is not always possible" for live-in aides to take their sleep and meal breaks due to the high medical care needs of patients to reach the broader conclusion that "it is likely that home care workers *frequently* did not get their" breaks. (Reckrey Rpt. 6, 9 (emphasis added).) In particular, Reckrey does not explain what methodology she applied to conclude that the employee statements she quoted, which are drawn from statements by only twelve former live-in aides, or the WHD call log are representative of all live-in aides who worked for Sarene during the relevant time period. (*See id.* at 8.)

Moreover, Reckrey testified at the *Daubert* hearing that she based her opinions about the frequency by which live-in aides experienced call-to-duty interruptions to their sleep and meal breaks largely on her review of employee statements and WHD call log. (*See* Feb. 11, 2025 Hr'g Tr. 86:22–88:10.) As discussed above, the employee statements and WHD call log are inadmissible and the Acting Secretary has not shown that experts in Reckrey's field would reasonably rely on such facts or data in forming opinions on the subject under Rule 703. *See supra* Discussion Reckrey § III.B.a. Therefore, Reckrey's opinions about the frequency by which live-in aides experienced call-to-duty interruptions to meal and sleep breaks based solely or largely on this inadmissible evidence are precluded under Rule 703.

Reckrey is thus precluded from testifying that Sarene's live-in aides "frequently" did not get their mandated meal and sleep breaks or "frequently provided care outside of the 13 hours for which they received compensation." Reckrey Rpt. at 8–9; *see id.* at 11; *see also Mirena IV*, 982

F.3d at 123 (to be admissible, an expert's analysis must be reliable "at every step"); *Amorgianos*,

303 F.3d at 267 ("[A]ny step that renders the analysis unreliable . . . renders the expert's

testimony inadmissible.") Reckrey may testify, however, that the complex medical needs of

Sarene's live-in aide patients made it difficult for Sarene live-in aides to take sleep and meal

breaks without call-to-duty interruptions or impaired their ability to do so based on her review of

patient files, which include patient care plans. (Reckrey Rpt. at 9.)

  To the extent that Defendants challenge these opinions through their belated argument,

which was raised for the first time at the Daubert hearing, that Reckrey lacks an adequate

foundation and relies on unreliable principles or methods to form opinions about the duration of

patient care tasks performed by live-in aides, these arguments are unpersuasive. As discussed,

Reckrey reliably applied her knowledge and experiences as a geriatrician who has requested and

ordered care plans and as a researcher who studies the provision of care to homebound patients,

including care provided by live-in aides, to reach the limited conclusion that Sarene's care plans

do not provide information about when patient care tasks must be carried out, how long those

tasks will take for a specific patient, or any variability in the timing or duration of patient care

tasks in light of other factors. Defendants' belated argument suggests that Reckrey is drawing

specific conclusions about how long certain patient care tasks will take. Reckrey draws no such

conclusions in her report or rebuttal report, and the record reflects her opinion that there is

variability in the timing and duration of tasks, such as the task of assisting a homebound patient

with using the bathroom. (Feb. 11, 2025 Hr'g Tr. 35:8–13.)

  As a result, I exclude the portions of Reckrey's Conclusion #1 that state, "It is likely that

Sarene's live-in [aides] cared for patients at night *several times a week*" and that "night-time

interruptions were *commonplace*," as well as the portion of Reckrey's Conclusion #2 that states,

"It is likely that Serene's live-in [aides] routinely missed *most if not all* of their hour-long uninterrupted meal breaks *on a daily basis*." (Reckrey Rpt. at 11 (emphasis added).) Further, all of the opinions set forth in Section VII of Reckrey's report are excluded with the exception of the opinions contained in the following passage, which are based on Reckrey's analysis of Sarene patient files:

> The simple list of tasks in a Care Plan doesn't account for the complexities of providing care and simply provides a long list of tasks to accomplish. As described above, these tasks including things that could happen at any time (e.g., help with ambulating, incontinence, need to go to the toilet) and things that are by definition continuous throughout the day and night (e.g., "observe and report"). Because there were no systems in place to by Serene to support, advocate for, or monitor these breaks, home care workers were left to decide how to provide needed care.

(Reckrey Rpt. at 8.)

As discussed above, Reckrey reached the subset of opinions set forth in this paragraph by reliably applying her knowledge and experience as a geriatrician and researcher on the provision of health and personal care to homebound patients to analyze Sarene patients' care plans. *See supra* Discussion Reckrey §§ III.B.a, III.B.d. Therefore, Reckrey's opinions set forth in this paragraph are admissible. Moreover, as noted, Reckrey may also opine that the complex medical needs of Sarene's live-in aide patients made it difficult for Sarene live-in aides to take sleep and meal breaks without call-to-duty interruptions or impaired their ability to do as this opinion is also based on her review of patient files. (Reckrey Rpt. at 9.)

### f.  Reckrey Report Section VII and Conclusion #4: Sarene's Knowledge of Call-to-Duty Interruptions to Live-In Aides' Sleep and Meal Breaks

Reckrey offers five opinions in Section VIII of her report, . As explained below, some of these opinions are admissible because they are based on the application of a reliable

methodology to evidence in the record and the evidence is the type of information on which an expert in Reckrey's field may reasonably rely under Rule 703. Other opinions are not supported and are thus inadmissible.

### i. Reckrey's First and Second Opinions

First, Reckrey opines that live-in aides "were perceived as working a 'shift' rather than working a certain number of hours in a 24-hour period. This meant that care provided outside of the 13 paid hours (i.e., care at night-time, care during meal-breaks) was not routinely tracked or compensated for; a shift was a shift." (Reckrey Rpt. at 9.) To reach this conclusion, Reckrey primarily relied on employee statements, the call log compiled during the WHD investigation, and Sarene's aide activity sheets. (Reckrey Dep. 118:19–119:13, 120:11–121:14.) Specifically, Reckrey cites statements in which live-in aides described the "variation in the hours they worked over time," indicated that they "did not expect" to be "compensated for extra time worked[,] and assumed pay within a given time period would be stable and related to the number of shifts worked." (Reckrey Rpt. at 9.)

Second, Reckrey opines that while aide activity sheets used by Sarene's live-in aides varied, at no time did the aide activity sheets include "opportunities for home care workers to track actual hours worked (e.g., the time when breaks started and stopped, when time when sleep started and stopped)," which "perpetuated [the notion] that a shift was a shift." (*Id.* at 9–10.) Likewise, in the third sentence of Conclusion #4, Reckrey opines that since the aide activity sheets "did not evaluate the actual hours worked during the day or the times spent in breaks or meals and perpetuated the expectation that a shift was a shift." (*Id.* at 11.) Reckrey based this opinion on her analysis of Sarene's aide activity sheets used during the relevant period. (*Id.* at 9.)

While Defendants do not make a specific argument against Reckrey's first opinion in Section VIII regarding live-in aides' perception of being compensated for shifts rather than hours, Defendants generally argue that Reckrey's "disregard of the [aide activity sheets] utilized by individual live-in aides" leads to a fundamental flaw in her conclusions. (Defs.' Mot. Reckrey at 9.) Defendants contend that the aide activity sheets "included numerous fields regarding various issues relating to the patient's care and the aides' ability to take breaks so as to ensure compliance with New York State's rules and regulations." (*Id.*) Defendants focus on the version of the aide activity sheet Sarene began using in April 2019, which specifically asked live-in aides if "1) they received 8 hours of sleep, 5 of which was uninterrupted; 2) they received an hour for breakfast; 3) they received an hour for lunch; and 4) they received an hour for dinner." (*Id.*) Defendants assert that those aide activity sheets were completed by live-in aides themselves, and that Reckrey's purported decision to "disregard" them was improper. (*Id.* at 9–10.) Defendants also argue that "there exists no evidence in any of the materials reviewed by Dr. Reckrey that indicated that a live-in aide did not take their break at a later time if a first attempt to do so was interrupted." (*Id.* at 10.)

The Acting Secretary argues that Reckrey did not "disregard" the aide activity sheets, but instead found that these documents do not show whether live-in aides experienced call-to-duty interruptions to their meal and sleep breaks for the following reasons: (1) the aide activity sheets generally "contained no place to report, or instructions about reporting, sleep or meal breaks whatsoever until April 2019"; and (2) the "later iterations [of the aide activity sheets] still did not instruct aides to track actual hours worked or inform aides that they could be paid for reporting interruptions." (Pl.'s Reckrey Resp. at 13. (citing *Mirena I*, 169 F. Supp. 3d. at 419).) The Acting Secretary argues that since the live-in aide statements that Reckrey reviewed show that "virtually

every aide who provided a statement or interview captured in WHD's Call Log reported an almost total inability to take meal breaks during the day," it was reasonable for Reckrey to treat those statements as "affirmative representations" of live-in aides' working conditions over any contrary representations in the aide activity sheets. (Pl.'s Reckrey Resp. at 14.)

As explained above, Reckrey may not rely on the twelve employee statements or the call log compiled during the WHD investigation into Sarene because they are inadmissible and Reckrey's testimony establishes that statements by live-in aides and brief notes of phone calls with live-in aides about their working conditions are not the type of facts or data on which an expert in her field "would reasonably rely . . . in forming an opinion on the subject." Fed. R. Evid. 703; *see also supra* Discussion Reckrey § III.B.a. Moreover, neither Reckrey nor the Acting Secretary has shown that the twelve employee statements or the WHD call log convey experiences that are representative of the experiences of all live-in aides employed by Sarene during the relevant time period. *See* Fed. R. Evid. 702(b) (requiring expert testimony to be "based on sufficient facts or data"). Accordingly, Reckrey is precluded from opining about live-in aides' perception of being compensated for shifts—rather than hours—worked.

With regard to her second opinion in report Section VIII and the third sentence of Conclusion #4, Reckrey's review of live-in aides' aide activity sheets reliably supports her opinion that none of the versions of the aide activity sheets used by Sarene from 2017 through the end of 2020 provided live-in aides the ability to indicate the "actual hours worked" and perpetuate an understanding that "payment was for the shift [live-in aides] worked rather than hours they worked." (Reckrey Rpt. at 9; *see also id.* at 11.) As Reckrey explained, none of the versions of the aide activity sheet asked live-in aides how many hours they worked, nor did they ask aides to provide the times when they started or ended work or when they started or ended a

62

break. (*Id.* at 9.) Reckrey recognized that various versions of the aide activity sheets asked live-in aides only to indicate "that a 13-hour shift was completed," "to attest to a statement that they received breaks," or "to report via a yes/no checkbox that they received breaks each day." (*Id.*) Reckrey testified that even with the addition of these questions, aide activity sheets still did not ask live-in aides to affirmatively identify the number of hours worked or the precise times they stopped or started working. (Feb. 11, 2025 Hr'g Tr. 95:26–96:17.) Accordingly, Reckrey may testify that the aide activity sheets failed to provide any "opportunities for home care workers to track actual hours worked (e.g., the time when breaks started and stopped, when time when sleep started and stopped" and "did not evaluate the actual hours worked during the day or the times spent in breaks or meals and perpetuated the expectation that a shift was a shift." (Reckrey Rpt. at 9, 11.)

### ii.    **Reckrey's Third Opinion**

Third, Reckrey opines in Section VIII of her report that when live-in aids reported time worked outside of compensated hours, they were "treated punitively" and opines in the fourth sentence of Conclusion #4 that Sarene "*discouraged* rather than *encouraged*" live-in aides from reporting such hours. (*Id.* at 10–11 (emphasis in original).) To reach these opinions, Reckrey relied on "notes," which indicate "that when home care workers did find a way to report time outside of their compensated hours they were 'investigated'" and that some were terminated if their reports were not "substantiated." (*Id.* at 10.) During her deposition and the *Daubert* hearing, Reckrey testified that she relied on one of the documents the Acting Secretary provided her to reach these conclusions but was unable to identify the specific document. (Reckrey Dep. 112:11–114:14; Feb. 11, 2025 Hr'g Tr. 96:20–97:11.)

Defendants seek to preclude these opinions, arguing that Reckrey reached her conclusions by improperly disregarding Sarene's aide activity sheets, which were "updated at times based upon existing regulations set forth by New York State." (Defs.' Mot. Reckrey at 10.) Defendants further argue that none of the documents reviewed by Reckrey "would support a conclusion that Defendant Sarene, either directly or indirectly, discouraged employees from accurately reporting interruptions to their sleep and/or break schedules." (*Id.* at 13.)

In response, the Acting Secretary points to Reckrey's conclusion that the aide activity sheets discouraged live-in aides from reporting interruptions to sleep and meal breaks to "explain the reasoning" for Reckrey's conclusion that Sarene should have known, given its patients' high care needs, that these employees would need to work outside of their 13 compensated hours. (Pl.'s Reckrey Resp. at 18–19.)

Reckrey is precluded from opining that Sarene "treated punitively" live-in aides who reported work outside of compensated hours and that Sarene "discouraged rather than encouraged" live-in aides from reporting uncompensated work time. (*Id.* at 10–11.) In response to questioning during her deposition and at the *Daubert* hearing, Reckrey was unable to recall the specific document(s) on which she relied to reach these opinions (Reckrey Dep. 112:11–114:14; Feb. 11, 2025 Hr'g Tr. 97:12–23; *see also* Reckrey Rpt. at 10–11.) As a result, Reckrey cannot demonstrate that she relied on sufficient facts or data to reach these opinions as required by Rule 702(b). Furthermore, even if Reckrey could identify the facts or data on which she relied, the Acting Secretary has not shown that such facts or data are admissible at trial or, if inadmissible, that an expert in Reckrey's field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

### iii. <u>Reckrey's Fourth Opinion</u>

Fourth, in Section VIII and Conclusion #4 of her report, Reckrey opines that "MLTC approval of live-in 24-hour care clearly does not mean that care only occurs during compensated times." (Reckrey Rpt. at 10.) Defendants argue that this conclusion is a challenge to managed long-term care companies' assessments of whether "a particular patient will receive a 13-hour Care Plan as opposed to a 24-hour Care Plan." (Defs.' Mot. Reckrey at 7.) Defendants assert that Sarene's live-in aides "would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep" due to the operation of New York regulations, which reserve 13-hour care plans for patients whose "need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight-hour period of sleep." (*Id.* (citing N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14).)

The Acting Secretary disagrees, arguing "that the actions of third parties like MLTCs are not at issue" in this case and that Defendants' reliance on managed long-term care companies' assessments are "attempts to mislead the jury and put irrelevant policy matters on trial by casting the *predictive* algorithm used to approve live-in care as *actual*, individualized determinations that aides never worked more than 13 hours per shift." (Pl.'s Reckrey Resp. at 11 (emphasis in original).) The Acting Secretary asserts that Reckrey's opinion—that the decision of managed long-term care companies to approve a patient for live-in 24-hour care does not mean that the live-in aide only works during compensated hours—is provided only to rebut Defendants' "false claims" that care plans created by these companies or signed off by a primary care doctor demonstrate that live-in patients' needs categorically do not require live-in aides to work more than 13 compensated hours per shift. (*Id.* at 11–12.)

As previously noted, I granted the Acting Secretary's motion in limine No. 10 to preclude Defendants from introducing evidence or adducing testimony regarding New York's managed long-term care system, its regulations and procedures, and the approval of patients for insurance coverage for long-term care. (Feb. 7, 2025 Hr'g Tr. 41:1–25.) I found some of the proffered evidence to be entirely irrelevant to the claims and defenses in this action under Rule 401 and thus inadmissible under Rule 402. (*Id.* 37:4–7.) I explained:

> Defendants provide lengthy and detailed information concerning the regulations and procedures governing the managed long-term care system and how different actors are involved in approving patients for insurance coverage for live-in care. Such testimony and evidence risks confusing the jury and misleading them to think that this action is about whether patients were or were not designated to the appropriate level of care by managed long-term care companies[,] and the level of care to which they were designated was live-in 24-hour personal care services under 18 New York Code of Regulations 505.14(a)(4). . . . That is not the issue in this case.

(*Id.* 38:10–40:2.)

Further, I also found that that even if some of the evidence regarding New York's managed long-term care system is relevant, it would be inadmissible under Rule 403 because its probative value is substantially outweighed by a danger of confusing the issues, misleading the jury, wasting time, and causing unfair prejudice to the Acting Secretary. (*Id.* 38:4–9.) Specifically, I explained that:

> the length and details concerning the Managed Long-Term Care regulations and procedures described by [D]efendants . . . underscore the very real risk of confusing the issues, misleading the jury, wasting time during trial, and unfair prejudice to the Acting Secretary. . . .[T]his action is not about whether New York's Managed Long-Term Care system is, ["]a role model to the country,["] whether Sarene complied with Managed Long-Term Care regulations and processes or about whether Sarene's patients were placed in the appropriate level of care by those involved in approving insurance coverage for personal care services.

(*Id.* 38:10–40:25.)

Reckrey is thus precluded from opining that "MLTC approval of live-in 24-hour care clearly does not mean that care only occurs during compensated times." (Reckrey Rpt. at 9.)[17]

### iv.   Reckrey's Fifth Opinion

Fifth, Reckrey opines that "Sarene should have known that provision of care outside of the compensated hours was . . . quite likely to occur over the course of care given the complex care needs of clients," and that live-in aides did not report time worked outside compensated time because "Serene perpetuated the expectation that a shift is a shift." (*Id.* at 10.) Reckrey also opines in the first sentence of Conclusion #4 that "Serene should have known that it was likely" live-in aides "cared for patients at night and were unable to take one or more hour-long uninterrupted meal breaks per day for themselves." (*Id.* at 11.) Reckrey reaches these opinions based on her opinions about the "complex" care needs of Sarene patients, which are in turn based on her review of Sarene patient files, her knowledge of "the existing process for approving 24-hour live-in care by MLTC approval process," and her opinion that Sarene perpetuates "the expectation that a shift is a shift." (*Id.* at 10–11.)

---

[17] To the extent Defendants open the door at trial to Reckrey's opinion that "MLTC approval of live-in 24-hour care clearly does not mean that care only occurs during compensated times," this opinion is reliably based on Reckrey's application of her experience and knowledge of how managed long-term care companies make decisions to assign patients to different levels of care, as well as her conclusions regarding the high care needs of Sarene patients assisted by live-in aides and the limited information set forth in care plans about the duration and timing of live-in aides' daily activities—opinions that I found reliable as addressed above. (Reckrey Rpt. at 10; *see also supra* Discussion Reckrey §§ III.B.c–d, III.B.f.iii.) Defendants are cautioned, however, that they are to strictly abide by my ruling granting the Acting Secretary's motion in limine No. 10. I have made clear in my oral ruling on that motion and in this Opinion that Defendants are precluded from introducing evidence or adducing testimony regarding the New York managed long-term care system, its regulations and procedures, and the approval of patients for insurance coverage for long-term care under Rule 403.

Defendants argue that these opinions are "largely a summary" of her other opinions. (Defs.' Mot. Reckrey at 13.) The Acting Secretary argues that Reckrey relied on "her years of experience caring for homebound patients alongside aides" and "reviewed the aide activity sheets in the context of other evidence in Serene's patient files" to "reliably conclude[] that the complex care needs of Serene's patient population gave Defendants reason to know that aides worked beyond the 13 hours Serene compensated." (Pl.'s Reckrey Rep. at 14.)

Reckrey's conclusion that "Sarene should have known that provision of care outside of the compensated hours was not just a possibility, but something that was *quite likely* to occur over the course of care given the complex care needs of clients" is reliably supported by Reckrey's other reliable opinions and is therefore admissible. (Reckrey Rpt. at 10 (emphasis added).) This opinion is primarily based on the following two opinions: (1) Reckrey's opinion about the prevalence among Sarene's live-in patients of four categories of medical conditions that require live-in aides to provide high levels of assistance with a wide variety of tasks, *see supra* Discussion Reckrey § III.B.c; and (2) Reckrey's opinion that Sarene failed to provide live-in aides a means to report their actual hours worked on the various aide activity sheets in place from 2017 through 2020, *see supra* Discussion § III.B.f.i. (Reckrey Rpt. at 9–10; *see also* Feb. 11, 2025 Hr'g 30:5–31:2, 95:4–20.) These are all opinions that I have found to be reliable. It is not "too great [an] analytical gap" for Reckrey to conclude that Sarene should have known that its live-in aides would be working outside of the compensated hours, given their clients' complex care needs. *Joiner*, 522 U.S. at 146.

Accordingly, the following opinions set forth in Section VIII and Conclusion #4 of Reckrey's report are admissible:

- Sarene's aide activity sheets lacked any "opportunities for home care workers to track actual hours worked (e.g., the time when breaks started and stopped, when

68

time when sleep started and stopped," which "perpetuated the expectation that a shift was a shift" (Reckrey Rpt. at 9, 11).

- "Serene should have known that provision of care outside of the compensated hours was not just a possibility, but something that was *quite likely* to occur over the course of care given the complex care needs of clients" is reliably supported by Reckrey's other reliable opinions and is therefore admissible. (*Id.* at 10 (emphasis added).)

- "Serene should have known that it was likely that their live-in home care workers cared for patients at night and were unable to take one or more hour-long uninterrupted meal breaks per day for themselves." (*Id.* at 11.)

Reckrey is precluded, however, from opining about live-in aides' perception of being compensated for shifts—rather than hours—worked and about whether Sarene "treated punitively" live-in aides who reported working outside compensated hours or "discouraged" live-in aides from reporting such work. (*Id.* at 9–11.) As discussed, these opinions are based on the inadmissible employee statements and WHD call log and the Acting Secretary has not shown that Reckrey's reliance on such information otherwise satisfies Rule 703. Reckrey is also precluded from opining that that "MLTC approval of live-in 24-hour care clearly does not mean that care only occurs during compensated times" because I have precluded evidence about the New York's managed long-term care system under Rules 402 and 403.

### C. Defendants' Arguments that Reckrey's Testimony Would Not Assist the Jury and Would Be Unfairly Prejudicial

Defendants assert that the following conclusions drawn by Reckrey would not assist the jury because these opinions are either overly imprecise to the point of being meaningless or are otherwise unreliable: (1) Reckrey's opinion that Sarene's patients had "complex care needs . . . that impacted their need for home care outside of the compensated 13 hours in a 24-hour period" and that these needs were "not always possible" for live-in aides to address "within compensated hours"; (2) Reckrey's opinion "that Sarene's patient Care Plans do not reflect the

full scope of patient care needs or tasks performed by live-in aides" and do not fully "describe what care in the home looks like on a day-to-day basis," and (3) Reckrey's opinion that it is "likely that home care workers frequently did not get their meal breaks and uninterrupted nighttime sleep. (Reckrey Rpt. at 6, 8, 9; *see also* Defs.' Mot. Reckrey at 10–13.) Defendants also argue that in Conclusion #4, Reckrey summarizes her first three Conclusions "in a charged proclamation devoid of factual support." (Defs.' Mot. Reckrey at 13.) Specifically, Defendants take issue with the fourth sentence of Conclusion #4, where Reckrey states that Sarene "*discouraged* rather than *encouraged* home care workers to report hours worked outside of the 13 compensated hours." (Reckrey Rpt. at 11.)

The Acting Secretary responds that Reckrey's testimony on each of the identified issues is "highly relevant" to the question of whether "live-in aides experienced regular call-to-duty interruptions which prevented them from receiving 11 hours of time to themselves per shift" and "provide[s] critical medical background . . . to help the jury contextualize lay witness testimony about the hours that Serene's live-in aides worked" and "about patient care needs." (Pl.'s Reckrey Resp. at 15–16.)

Reckrey's opinions that are the result of the reliable application of her knowledge, skill, training, and experience as a primary care physician and geriatrician with twelve years of experience treating homebound patients and/or as a researcher studying the provision of health and personal care to patients in a home care setting withstand a Rule 702(a) and Rule 403 analysis.

First, Reckrey's opinions set forth in Section V and Conclusions #1 and #2 of her report that Sarene's patients had "complex care needs . . . that impacted their need for home care outside of the compensated 13 hours in a 24-hour period" and that these needs were "not always

70

possible" for live-in aides to address "within compensated hours" are helpful to the jury and permissible under Rule 403. (Reckrey Rpt. at 6; *see also id.* at 10–11.) Defendants argue, without merit, that this subject matter "is a lay person's issue" better addressed by "the testimony of live-in aides who can speak with specificity." (Defs.' Mot. Reckrey at 11.) Live-in aide witnesses called at trial may provide testimony concerning their personal experiences. Nevertheless, the opinions at issue are sufficiently specific and based on Reckrey's application of the extensive knowledge and skill she has developed as a primary care physician, geriatrician, and researcher to the analysis of information contained in Sarene live-in patients' files, which include nursing assessments and care plans. Moreover, Reckrey's opinions would assist the jury by providing contextual information about the complexity and nature of Sarene's live-in patients' medical needs and the impact of those needs on live-in aides' ability to take meal and sleep breaks without call-to-duty interruptions. The probative value of these opinions is significant. Defendants fail to show how these opinions would confuse the issues, mislead the jury, or result in any unfair prejudice to Defendants under Rule 403.

Second, Reckrey's opinion in Section VI of her report "that Sarene's patient Care Plans do not reflect the full scope of patient care needs or tasks performed by live-in aides" and do not fully "describe what care in the home looks like on a day-to-day basis," and the corresponding opinion in Conclusion #3, are also helpful for the jury and permissible under Rule 403. (Reckrey Rpt. at 8; *see also id.* at 11.) Defendants argue that these opinions do not require an expert and that aide activity sheets—not Sarene's care plans for patients—indicate whether or not live-in aides took meal and sleep breaks. (Defs.' Mot. Reckrey at 11–12.) Here too, Reckrey has reached her opinions through the application of her knowledge, training, skill, and experience as a clinician treating homebound patients and researcher who studies the provision of health and

personal care in the home setting to specific documents in the record: Sarene's care plans for patients served by live-in aides. The opinions at issue will provide the jury with reliable contextual information about what information can and cannot be gleaned about whether live-in aides experienced call-to-duty interruptions during meal and sleep breaks from the care plans created by Sarene for these patients. Although Defendants believe that other evidence—namely, the aide activity sheets—is more probative of the number of hours worked by live-in aides, that is an issue for cross-examination. Defendants fail to show that Reckrey's opinions concerning care plans would confuse the issues, mislead the jury, or result in any unfair prejudice to Defendants under Rule 403.

Third, as discussed above, with respect to the opinions set forth in Section VII of Reckrey's report, I have already precluded Reckrey from opining about the *frequency* by which Sarene live-in aides experienced call-to-duty interruptions to their meal and sleep breaks such that they worked more than the number of hours for which they were compensated. This opinion is based on Reckrey's review of the twelve employee statements and the WHD call log, which are inadmissible and not shown to be the type of facts or data on which experts in Reckrey's field would reasonably rely. *See supra* Discussion Reckrey § III.B.a. Therefore, I do not determine whether such testimony about the frequency of interruptions would assist the jury or whether it should be precluded under Rule 403.

Fourth, with respect to Section VIII of Reckrey's report, where she opines that Sarene should have known that its live-in aides were working a greater number of hours than those for which they were compensated, I have determined that certain opinions are based on the application of a reliable methodology to record evidence, while other opinions are not. *See supra* Discussion Reckrey § III.B.f. Reckrey formed reliable opinions that none of the various

iterations of the aide activity sheets Sarene used from 2017 through 2020 permit a live-in aide to

indicate the actual hours they worked and that the high care needs of Sarene's patients would

impair live-in aides' ability to take sleep and meal breaks without call-to-duty interruptions.

Defendants focus on Reckrey's statement that "Sarene appears to have discouraged rather than

encouraged" live-in aides from reporting hours worked outside of the compensated hours. (Defs.'

Mot. Reckrey at 13.) Because I have precluded this opinion due to the fact that Reckrey

unreliably reached this conclusion based on review of twelve employee statements and the WHD

call log, I need not determine whether such testimony would assist the jury or whether it should

be precluded under Rule 403.

## DISCUSSION:
## THE ACTING SECRETARY'S MOTION TO EXCLUDE DEFENDANTS' EXPERT
## ADAM E. BLOCK, PHD

Block has provided an initial report, dated May 11, 2023, and a rebuttal report, dated

June 9, 2023. (Block Rpt. at 1, ECF No. 165-3; Rebuttal of "Expert Report by Jennifer M.

Reckrey" ("Block Rebuttal") at 1, ECF No. 165-4.)

### I.    Adam E. Block's Background and Qualifications

Block is a "health economist with 20+ years of experience principally focused on [the]

utilization of health care services, health insurance, prices of health care services, as well as

current US health care policy issues." (Block Rpt. at 3, ECF No. 165-3.) He received his PhD in

Health Policy with a concentration in Economics from Harvard University. (*Id*. at 5) Block is

currently "an Associate Professor of Health Policy and Management at New York Medical

College," teaching masters and doctoral level courses on health economics and health regulation.

(*Id.* at 3, 5.) Since 2017, Block has conducted research and teaching in the area of health

economics with a "focus[] on evaluating the performance of managed care plans and efficient

73

utilization of health care services." (*Id.* at 5.) During this time, he has also "published papers in academic journals including Pharmacoeconomics and the Journal of General Internal Medicine, the Journal of Graduate Medical Education, Managed Care, and the American Journal of Accountable Care." (*Id.*)

From 2013 to 2015, Block "was the Director of Medical Economics and Provider Reimbursement at Fidelis Care, the largest Medicaid HMO in New York State." (*Id.* at 6.) Fidelis Care, now owned by Centene, was a large plan that provided insurance coverage for managed long-term care. (*Id.* at 6–7.) In his role at Fidelis Care, Block worked to implement the Uniform Assessment System ("UAS") standards at the organization. (*Id.* at 7.) From 2015 to 2017, Block worked for Montefiore Health System, which also operated a managed long-term care plan. (*Id.*)

In his initial report, Block explains that he was retained by Defendants to do the following:

(1) "provide an overview of the value of New York State's managed long-term care program and the impact on New York State and other state long term care programs if the allegations of violation of Department of Labor regulations [in this action] are determined to be true," and

(2) "evaluate the methods used by the Department of Labor and supporting witnesses and determine their validity in drawing a reliable conclusion based on [his] experience as a health services researcher."

(Block Rpt. at 8.)

In his rebuttal report, Block states that he was also retained to "provide a rebuttal to the report of Dr. Jennifer Reckrey by validating the methods, assumptions and conclusions using [his] experience as a professor of public health and experience in the managed long-term care industry in New York State." (Block Rebuttal at 8.)

## II.    Adam E. Block's Expert Report and Rebuttal Report

Block offers the following ten opinions, which are summarized in Section I of his initial report:

(1) "[T]he driver of decision-making for the level of care needed by the patient is not determined by Serene, but by operative systems in place based on data analysis and physician evaluation." (Block Rpt. at 3.)

(2) "[W]hile it is possible that live in aides may have unique daily routines when caring for their patients, Serene Home Nursing Agency has acted in accordance with Department of Labor regulations." (*Id.*)

(3) "[I]f there were a case where a live in had a potential violation, live ins were provided the necessary education and resources . . . by Serene to report otherwise." (*Id.*)

(4) "[T]he evidence brought forth supports the notion that Serene has acted in accordance with Department of Labor regulations when viewed through a statistical lens." (*Id.* at 3–4.)

(5) "The Department of Labor has singled out Serene as being complicit in withholding pay from employees." (*Id.* at 4)

(6) "Serene has acted in good faith and abides by regulatory compliance with the case management program that has been in existence for 90 years." (*Id.*)

(7) "While the Department of Labor's complaint is directed against Serene, the complaint's language is directed against the [New York State Department of Health's] long term care program, in spite [of] its history in New York State and successful defense of legal challenges in the New York State court of appeals." (*Id.*)

(8) "The complaint alleges violations in hours based on generalizations about needs of patients with certain disease states, not based on the actual outcomes of patients." (*Id.*)

(9) "It is operationally impossible for the live in program, that has benefited tens of thousands of people during their most vulnerable times[,] to exist if violations of labor standards are assumed based only on patient diagnosis." (*Id.*)

(10) "Some examples that were outlined in the complaint did not occur and others may have occurred but are not in violation of FLSA." (*Id.*)

Much of Block's rebuttal report is copied verbatim from his initial report. In Section I of his rebuttal report, Block repeats the first seven opinions set forth in Section I of his initial

report. Block also offers the following two opinions, the first of which is only a slight

modification of the eighth opinion set forth in Section I of his initial report:

(1) "The complaint alleges violations in hours based on generalizations made *by Dr. Jennifer Reckrey* about needs of patients with certain disease states, not based on the actual outcomes of patients." (Block Rebuttal at 4 (emphasis added to show the only modification of this opinion between Block's initial report and rebuttal report).)

(2) By drawing conclusions upon out of context extracted keywords and lack of acknowledgement to the practices in place for determining a patient's level of care and recording the breaks in which aides are entitled to, leveraging these arguments jeopardizes tens of thousands of people of receiving the care needed in their most vulnerable times. (*Id.*)

Block also summarizes his opinions seeking to rebut Reckrey's opinions in Section V[18] of his

rebuttal report as follows:

(1) "Serene has provided multiple avenues and resources to aides to accurately report the time that they work and to access the assistance needed with work out of their scope, all while ensuring they are properly compensated." (Block Rebuttal at 22.)

(2) "Serene would increase profits for the times that the aides worked more than 13 hours in a shift by receiving additional compensation from the MLTC. If Serene were to refuse to upgrade the level of care required for its patients, it would be leaving hundreds of thousands of dollars on the table that they could be compensated for by billing for the shifts performed by registered nurses." (*Id.* at 22–23.)

(3) "It appears that in review of [aide activity sheets] and patient reports, Dr. Reckrey has reviewed cherry picked keywords that remove critical context and color to situations, allowing her to create conclusions based on partial narratives." (*Id.* at 23.)

(4) "The evaluation process in which a patient's level of care determined has been able to capture the complexity of patient care, and to challenge the legitimacy of Serene's policies is a direct attack on the New York State Department of Health standards and all

---

[18] There are two Sections in Block's rebuttal report labelled "I.": "I. INTRODUCTION AND SUMMARY OF OPINIONS" and "I. EXPERT'S BACKGROUND AND QUALIFICATIONS." (Block Rebuttal at 3–4.) For the purposes of this Opinion and Order, the section titled "I. EXPERT'S BACKGROUND AND QUALIFICATIONS" will be referenced as Section "II.," and the subsequent sections of the rebuttal report will be referenced as "III. SCOPE OF ENGAGEMENT & MATERIALS CONSIDERED," "IV. REVIEW OF THE RECKREY REPORT," and "V. CONCLUSION" (*See id.* at 4, 8, 22.)

other MLTCs that provide care to tens of thousands of people across New York State." (*Id.*)

(5) "By allowing for flexible care plans, the New York State Department of Health has allowed for humane treatment for both the patient and the aide, while ensuring that the quality of care remains deliverable. To belittle the complexity of patient care into a regimented schedule, Dr. Reckrey and the Department of Labor's conclusions leave the livelihood of both patients and aides at risk." (*Id.*)

## III.    The Acting Secretary's Motion to Exclude Block's Opinions

As a threshold matter, the Acting Secretary argues that Block is not qualified to offer opinions on four topics addressed in his initial report and rebuttal report: (1) the New York managed long-term care system and its procedures; (2) whether managed long-term care plans will provide modified authorization if a patient needs more than 13 hours of care during a given day; (3) whether Sarene's practices have been vetted by the New York State Department of Health ("NYDOH"); and (4) whether, based on a review of Sarene patient files, patients served by live-in aides had high care needs. (Pl.'s Mot. Block at 21–24.)

The Acting Secretary also moves to exclude Block's testimony and opinion as set forth in his initial report and rebuttal report on the following five grounds:

First, the Acting Secretary seeks to exclude opinions set forth in Block's initial report, rebuttal report, and deposition testimony that present legal conclusions, including the ultimate legal conclusion in this case: whether evidence in the record demonstrates that Defendants violated the FLSA. (Pl.'s Mot. Block at 1, 3–4.)

Second, the Acting Secretary seeks to exclude Block's opinions about the macroeconomic consequences of a determination that Defendants violated the FLSA's overtime and recordkeeping requirements as speculative, based on "a set of false assumptions about the facts" of this case, and unsupported by any research. (*Id.* at 6–8.) The Acting Secretary also argues that these opinions are irrelevant to the question of whether Defendants violated the

FLSA's requirements, would confuse the issues and mislead the jury, would be unduly prejudicial to the Acting Secretary, and amount to an impermissible inability to pay defense. (*Id.* at 4–6.)

Third, the Acting Secretary contends that Block's opinions regarding Sarene's purported compliance with New York labor laws and NYDOH regulations are irrelevant, would confuse the issues, and would mislead the jury because at issue in this case is whether Defendants violated the FLSA—not New York law or regulations. (*Id.* at 8–11.) The Acting Secretary points specifically to Block's testimony regarding the "predictive value" of New York regulations that govern the placement of patients in 24-hour live-in care and exclude from 24-hour live-in care patients who require more than 13 hours of care per day. (*Id.* at 9.) The Acting Secretary argues that these opinions would mislead the jury by implying that New York has approved Defendants to pay live-in aides for only 13 hours of work during each 24-hour shift, that compliance with New York regulations always means compliance with the FLSA, and that the predictive algorithm used in New York to approve patient care levels "amounts to an actual determination that aides did not work more than the 13 hours Serene paid." (*Id.* at 9–10.) The Acting Secretary also contends that Block's opinions regarding New York court decisions about "New York State's 13-hour rule" would mislead the jury into believing that New York has tacitly approved of Sarene's practices with respect to recordkeeping and the compensation of live-in aides. (*Id.* at 10.)

Fourth, the Acting Secretary argues that Block's testimony about statistics is irrelevant and rife with impermissible legal conclusions because: (1) it is based on Block's analysis of the WHD's investigation, not the evidence that will be presented at trial; and (2) Block's opinion

implies that statistical significance is the only way to prove the Acting Secretary's FLSA overtime claim. (*Id.* at 11–13.)

Fifth, the Acting Secretary argues that Block's opinions "are not based on case-specific evidence from Serene but instead on assumptions from his general understanding of the [home health] industry and vague economic principles" and that his testimony impermissibly seeks to bolster "fact witnesses with the gloss of a health economist." (*Id* at 13–14.) Specifically, the Acting Secretary points to Block's opinions "about whether Serene maintained an adequate system for aides to report time worked," which Block testified during his deposition that he reached based on his "general experience" rather than from a review of Sarene's aide activity sheets, training and guidance materials, and policies. (*Id.* at 14–19.) The Acting Secretary also argues that Block has an insufficient basis for his conclusions about Sarene's call logs and internal Skype messages, payments to live-in aides as compensation for sleep and meal break interruptions, the managed long-term care system and its procedures, and NYDOH procedures. (*Id.* at 20–22.)

A. **The Acting Secretary's Challenges to Block's Qualifications**

The Acting Secretary argues that Block is not qualified to opine on New York's managed long-term care system and its procedures generally, to opine specifically that managed long-term care plans will provide modified authorization if a patient needs more than 13 hours of care on a given day, or to opine that the NYDOH has vetted Sarene's practices. (Pl.'s Mot. Block at 21–22.) The Acting Secretary also argues that Block is unqualified to testify about the care needs of Sarene patients assisted by live-in aides because of his lack of medical expertise, which is underscored by his deposition testimony that he "ha[s] no medical training" and did not review

the patient files because he thought "it would be inappropriate" as a "non-clinician." (Block Aug. 18, 2023 Dep. 33:20–21, 45:3–10; Pl.'s Mot. Block at 24–25.)

Defendants argue that while Block might not know the specific procedure Sarene would follow to receive compensation from New York to pay for the time a live-in aide who worked more than 13 hours in one day, his experience qualifies him to opine that such a procedure exists. (Defs.' Block Resp. at 21–22.) Further, Defendants argue that there is no reason Block should be precluded from testifying about the certification process that agencies like Sarene must complete to become licensed by the NYDOH. (*Id.* at 21.) Finally, Defendants do not argue that Block is qualified to review Sarene's patient files, but nevertheless contend that Block permissibly opines that Reckrey's conclusion that "patient care needs are regularly in excess of thirteen (13) hours"—a conclusion she reached based on her review of patient files—amounts to "a challenge to the care classifications of Sarene's patients" determined by the patients' treating physicians and managed Medicaid providers. (*Id.* at 22–23.)

As discussed, Block is a health economist with more than two decades of experience working on health care policy issues in the United States, including issues related to health insurance and the utilization and price of health care services. (Block Rpt. at 3, 5.) He has a PhD in Health Policy with a concentration in Economics from Harvard University and currently teaches courses on health economics and health regulation as an Associate Professor of Health Policy and Management at New York Medical College. (*Id.*) Since 2017, Block has conducted research in and taught health economics with a "focus[] on evaluating the performance of managed care plans and efficient utilization of health care services." (*Id.* at 5.) Block has also "published papers in academic journals including Pharmacoeconomics and the Journal of

80

General Internal Medicine, the Journal of Graduate Medical Education, Managed Care, and the American Journal of Accountable Care." (*Id.*)

Block has experience working for two separate managed long-term care plans in New York. From 2013 to 2015, Block "was the Director of Medical Economics and Provider Reimbursement at Fidelis Care, the largest Medicaid HMO in New York State," which also had "a large plan that provided insurance coverage for managed long term care." (*Id.* at 6–7.) In that role, Block worked to implement the Uniform Assessment System ("UAS") standards at Fidelis Care. (*Id.* at 7.) From 2015 to 2017, Block worked for Montefiore Health System, which also operated a managed long-term care plan. (*Id.*)

Block has not been directly involved in the process by which a home health care agency requests compensation for a live-in aide who worked more than 13 hours a day and is not familiar with the specific process Sarene could have used to request such compensation for the workers that are the subject of this litigation. Nevertheless, his experience working at two managed long-term care companies—Fidelis Care and Montefiore Health System—provides him with the knowledge to testify that such a process exists and to form opinions more broadly about the New York managed long-term care system and its procedures.[19] Similarly, Block's work at Fidelis Care and Montefiore and his research on the performance of managed care plans and the efficient utilization of health care services over the past seven years provides him with the experience and knowledge to testify about the state licensing process for home health care agencies in New York and that the NYDOH regulates and monitors these agencies. As discussed

---

[19] *See Stagl.*, 117 F.3d at 80 (finding expert witness qualified when his experience, knowledge, and training was related to the general subject matter, but not to specific question at issue).

in detail below, however, Defendants have failed to demonstrate the relevance of Block's

testimony on any of these subjects. *See infra* Discussion Block § III.B.d.

Finally, Block is unqualified to opine on the medical conditions or care needs of Sarene

patients served by the company's live-in aides. Block lacks any medical training or experience in

treating homebound patients, whether as a medical doctor, nurse, aide, or other health or personal

care provider. Furthermore, there is no evidence that in his work as a health care economist,

Block regularly reviews or analyzes patient charts, including the types of documents included in

the Sarene patient charts: initial nursing assessments, care plans, or aide activity sheets. (*See*

Block Rpt. at 4–8.) Block admits that he "ha[s] no medical training" and that he did not review

any of the Sarene patient files. (Block Aug. 18, 2023 Dep. 33:20–21, 45:3–10.) Therefore, Block

lacks the knowledge, skill, training, and experience to provide opinions about the care needs of

Sarene patients served by live-in aides, the medical conditions prevalent among these patients,

and the impact of those medical conditions on these patients care needs. *See Mirena III*, 341 F.

Supp. 3d at 240–41 ("[I]f the witness does not possess superior knowledge, education,

experience, or skill in the relevant area, the Court must exclude his or her testimony.").

B. **The Acting Secretary's Challenges to Block's Opinions**

   a. ***Block's Opinions Concerning Legal Issues, Including Two of the Three Ultimate Legal Conclusions in this Case***

      i. **The Parties' Positions**

The Acting Secretary argues that throughout Block's report, rebuttal report, and

deposition testimony, Block offers testimony about numerous legal issues and conclusions,

including opinions about two of the three ultimate legal conclusions in this case—whether

Defendants violated the FLSA's overtime and recordkeeping requirements. (Pl.'s Mot. Block 3–

4.) The Acting Secretary cites numerous pages of Block's report, rebuttal report, and deposition

testimony in support of this characterization. (Block Rpt. at 4, 19, 22, 27, 32–33, 35–36, 38–39; Block Rebuttal at 10–11, 16–17, 19–20; Block July 7, 2023 Dep. 14–16, 18.)

Defendants argue that Block has not testified, and will not testify, about the ultimate legal issues in this case for three reasons. (Defs.' Block Resp. at 5.) First, Defendants assert that the Acting Secretary is seeking to preclude Block's testimony "because of a single response to an overly broad and open-ended" question posed during his deposition. When asked to "list all of the opinions that [he has] reached in the matter," Block responded with his "big picture" opinions. (*Id.* (quoting Block July 7, 2023 Dep. 14:9–13).) According to Defendants, Block presented an opinion about an ultimate legal question because the Acting Secretary asked him, as a follow up question, whether he "believed that Sarene 'acted in accordance with Department of Labor Regulations.'" (*Id.* (quoting Block July 7, 2023 Dep. 15:12–14).) Defendants contend that if Block had been questioned differently, he would have explained the "individual components" that formed his "big picture conclusion," including his opinion that "based upon documents he reviewed, Sarene's live-in aides typically worked no greater than thirteen (13) hours and during the limited exceptions where they worked a greater number of hours, payroll records reflected that they were paid for the additional time worked." (*Id.* at 6.)

Second, Defendants argue that Block's testimony about the ultimate legal conclusions in this action were a response to Reckrey's "impermissible testimony and findings," and point to two opinions in her report: (1) her opinion that "it is likely that Serene's live-in home care workers routinely missed most if not all of their hour-long uninterrupted meal breaks on a daily basis"; and (2) her opinion that Sarene "discouraged rather than encouraged home care workers to report hours worked outside of the 13 compensated hours." (*Id.* (citing Reckrey Rpt. at 11).)

####    ii.    __Analysis__

"As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 305 (E.D.N.Y., 2022). "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. Courts have permitted expert testimony on a parties' compliance with regulations only in a limited set of cases in which the regulations were relevant and had a "complicated nature," and the expert's testimony would be helpful to the trier of fact to understand the "complex regulatory process." *Mirena I*, 169 F. Supp. 3d at 467 (denying motion to preclude expert in state law diversity action where expert testified to party's compliance with FDA regulation). In general, however, courts have precluded expert opinions regarding an entity's compliance with regulations. *See, e.g.*, *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) (finding that the expert's "industry customs and practices testimony may include a discussion of regulatory rules and other guidelines, however, *[the expert] may not opine as to whether such rules and guidelines were violated*") (emphasis added); *In re M/V MSC FLAMINIA*, No. 12-cv-8892, 2017 WL 3208598, at 18, 35–36 &*8 n.8 (S.D.N.Y. July 28, 2017) (precluding testimony from several experts regarding compliance with regulations and codes because they were impermissible "legal conclusions").

Contrary to Defendants' characterizations, Block reaches impermissible legal conclusions *throughout* his initial report and rebuttal report. First, in Section I of his initial report and Section I of his rebuttal, Block states that it is his "economic and professional opinion, based on [his] diverse experience in healthcare legislation, that while it is possible that live in aides may have

unique daily routines when caring for their patients, *Serene Home Nursing Agency has acted in accordance with Department of Labor regulations.*" (Block Rpt. at 3 (emphasis added); Block Rebuttal at 3 (emphasis added).) He also opines that "the evidence brought forth supports the notion that *Serene has acted in accordance with Department of Labor regulations* when viewed through a statistical lens" and that "*Serene has acted in good faith and abides by regulatory compliance* with the case management program that has been in existence for 90 years." (Block Rpt. at 3 (emphasis added); Block Rebuttal at 3 (emphasis added).) In Section I of his initial report, Block also states that some examples of violations of labor standards "may have occurred but *are not in violation of FLSA.*" (Block Rpt. at 4 (emphasis added).)

Second, in Subsection VI.B of his initial report, Block discusses the legal implications of a March 2010 New York Department of Labor opinion interpreting its Miscellaneous Industries and Occupations Minimum Wage Order and *Andryeyeva v. New York Health Care, Inc.*, 124 N.E.3d 162 (2019), a New York Court of Appeals decision. *Id.* at 19–20; *see also* New York Department of Labor Ltr. Op., RO-09-0169, March 11, 2010. *Andryeyeva* upheld the New York Department of Labor's interpretation of the Wage Order "as applied to employees assigned to 24-hour shifts," to permit employers "to exclude up to 11 hours for sleep and meal breaks from compensable hours." *Andryeyeva*, 124 N.E.3d at 174. The court observed that the New York Department of Labor's interpretation aligned "the state's requirements with the federal approach" under the FLSA. *Id.* Block opines that Sarene has not violated the FLSA because it has complied with the legal standards set forth in *Andryeyeva* and the New York Department of Labor's opinion letter based on Sarene's aide activity sheets, training materials, policies, and NYDOH onsite surveys. (*Id.* at 20–22.)

Third, in Subsection VII.A of his initial report, Block presents legal opinions on two of the three ultimate legal issues in this action—whether Defendants violated the FLSA's overtime and recordkeeping requirements. He opines:

> There is no conclusive evidence that live in aides employed by Serene during the period in question were [not] compliant with § 506.14, meaning they received 8 hours of sleep, and 3 one-hour meal breaks each day, and the rare occasions where this was not the case were sufficiently infrequent and *therefore were compliant with the FLSA Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5).* In these sufficiently infrequent cases where it was possible for an aide to be awake providing care for patients beyond 13 hours of work, *Serene has provided compensation for approximately 10 shifts out of tens of thousands.*

(*Id.* at 28 (emphasis added).)[20]

Fourth, in Subsection VI.A of his initial report, Block opines that, since "Serene has been a [licensed health care services agency] in good standing in one of the most heavily regulated industries in the health care sector . . . [t]his stellar record indicates that *Serene is generally in compliance with New York State Department of Health standards.*" (*Id.* at 17 (emphasis added).) Block presents this same opinion in Subsection IV.B of his rebuttal report. (Block Rebuttal at 14 (opining that "Serene has been a [licensed health care services agency] in good standing in one of the most heavily regulated industries in the health care sector" and has been "in compliance with New York State regulations").)[21]

---

[20] As noted in the first sentence of the quotation from Section VII.A of Block's initial report, Block omits the word "not" from the first clause of the sentence. (Report at 28.) This appears to be a typographical error in light of the remainder of the sentence and the other portions of Block's initial report in which he opines that Defendants have complied with the FLSA's requirements.

[21] As discussed below, Block's opinions on Defendants' compliance with NYDOH standards is also irrelevant under Rule 401, and therefore inadmissible under Rules 402 and 702, and constitutes impermissible character evidence under Rule 404(b). *See infra* Discussion Block § III.B.c.

Defendants fail to show that Block's aforementioned opinions are anything other than inadmissible legal conclusions. First, Defendants' assertion that Block only offered such opinions in response to the Acting Secretary's questioning during Block's deposition is patently contradicted by the face of Block's initial report and rebuttal report, which plainly state the following legal conclusions: (1) that Sarene has "acted in accordance with Department of Labor regulations" (Block Rpt. 3–4; Block Rebuttal at 3–4); (2) that Sarene did not violate the FLSA, including FLSA Sections 6, 7, 11(c), 15(a)(2) and 15(a)(5), during the relevant time period (Block Rpt. 4, 28; Block Rebuttal at 18–19); (3) that Sarene has acted in good faith (Block Rpt. at 4; Block Rebuttal at 4); (4) that Sarene has complied with NYDOH licensing requirements (Block Rpt. at 17; Block Rebuttal at 14–15, 18); and (5) that Sarene has complied with regulatory requirements for case management (Block Rpt. at 4, 23, 28, 38; Block Rebuttal at 4, 14–15, 18–19). Indeed, Block's initial and rebuttal reports are replete with legal conclusions. Moreover, Block's initial report and rebuttal report were issued on May 11, 2023 and June 9, 2023, respectively—well before Block's July 7, 2023 deposition. (Block Report at 1; Block Rebuttal at 1; Block July 7, 2023 Dep. 1.) Defendants' critique of two questions posed by the Acting Secretary during Block's deposition fails to account for the sheer quantity and scope of inadmissible legal opinions that Block seeks to offer at trial.

Second, I have already precluded the two opinions of Reckrey that Defendants assert permit Block to offer legal conclusions in rebuttal, rendering Block's impermissible legal conclusions out of scope. As discussed above, under Rules 702 and Rule 703, Reckrey is precluded from offering opinions about the following: (1) the frequency by which live-in aides experienced call-to-duty interruptions to meal and sleep breaks during the relevant time period; and (2) whether Sarene "discouraged rather than encouraged home care workers to report hours

worked outside of the 13 compensated hours." *See supra* Discussion Reckrey §§ III.B.e, III.B.f.ii. Defendants generally contend that Block may offer legal conclusions in rebuttal to these two specific opinions (which are now precluded) and do not distinguish between any of the numerous legal conclusions offered in his initial report, rebuttal report, and deposition testimony. (Defs.' Block Resp. at 6.)

None of the legal conclusions offered by Block are admissible rebuttal evidence because the opinions they seek to rebut are themselves precluded. In this respect, Block's legal conclusions are irrelevant to any fact of consequence in this action under Rule 401 and are therefore inadmissible under Rule 402. *See, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-cv-7372, 2020 WL 4251229, at *9 (S.D.N.Y. Feb. 19, 2020) (precluding as irrelevant an expert's rebuttal opinion criticizing an adverse party's expert's opinion once the adverse party's expert opinion was precluded); *United States Sec. & Exch. Comm'n v. Mudd*, No. 11-cv-9202, 2016 WL 2593980, at *7 n.14 (S.D.N.Y. May 4, 2016) (same); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *9 (S.D.N.Y. Sept. 16, 2015) (same).

Accordingly, Block is precluded from testifying about legal conclusions, including: (1) two of the three ultimate legal conclusions in the case—whether Defendants complied with the FLSA's overtime and recordkeeping requirements; (2) Sarene's purported compliance with New York State licensing requirements and regulations for managed care; (3) Sarene's good faith; and (4) Sarene's compliance with NYDOH licensing requirements. Block Rpt. at 3–4, 17, 23–24, 27–28, 38; Block Rebuttal at 3–4, 10, 14–15, 18–19; *see also Bilzerian*, 926 F.2d at 1294; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d at 305.

### b. *Block's Opinions Rebutting Reckrey's Analysis of Sarene Patient Files*

#### i. **Block's Opinions**

Throughout his initial report, Block offers opinions to rebut Reckrey's opinion that Sarene's patients receiving care from live-in aides had high levels of care needs and required high levels of assistance with a wide variety of tasks, which Reckrey based on her analysis of Sarene patient files.[22] In Subsection VI of his initial report, in the context of discussing the New York State managed long-term care system's processes and regulations, Block opines that "Reckrey's report broadly generalizes" that all patients "had certain ailments and without examining any of the individual patients" concludes "that the ailments generally require a higher level of care than having a live in aide." (Block Rpt. at 17.) In Section VI.E of his initial report, Block critiques Reckrey's opinions regarding the prevalence of four medical conditions among Sarene live-in patients that, in her opinion, impair live-in aides' ability to get sleep and meal breaks without call-to-duty interruptions. Specifically, he opines that Reckrey failed to "get[] into details on the severity of each patient" and that "each of these impairments have dramatic degrees and many people with each of these live full lives completely independently." (Block Rpt. at 26.)

#### ii. **Analysis**

As previously addressed, Block lacks the knowledge, skill, training, and experience to offer opinions about the medical conditions or care needs of Sarene patients served by live-in aides. He is therefore unqualified to offer opinions criticizing Reckrey's analysis of Sarene patient files or her opinions based on that analysis. (*See generally* Block Rpt. § VI.) For example,

---

[22] Block appears to have reviewed Reckrey's initial report before preparing his initial report. For this reason, both Block's initial and rebuttal reports critique Reckrey's opinions and analyses set forth in her initial report.

Block is unqualified to opine that Reckrey fails to provide sufficient "detail[]" about the "severity" of each patient's conditions, that each of the medical conditions identified by Reckrey can vary in severity by "dramatic degrees," and that many people with these conditions can "live full lives completely independently." (*Id*. at 26.) *See supra* Discussion Block § III.A.

Moreover, Block's opinions on these topics are also precluded under Rule 702 because they are not "based on sufficient facts or data." Fed. R. Evid. 702(b). Block testified that he did not review a single one of the 49 Sarene patient files analyzed by Reckrey. (Block Aug. 18, 2023 Dep. 33:20–21, 45:3–10.) Block is therefore precluded from criticizing Reckrey's analysis of patient files and the opinions she reached based on that analysis.

Accordingly, under Rule 702, Block is precluded from opining about Reckrey's analysis of Sarene patient files and the medical conditions and care needs of Sarene patients served by live-in aides, including by offering the following opinions: (1) that Reckrey fails to provide sufficient "detail[]" about the "severity" of each patient's conditions, (2) that each of the medical conditions identified by Reckrey can vary in severity by "dramatic degrees," and (3) that many people with these conditions "live full lies completely independently" as set forth in Section VI.E. of his initial report. Block is also precluded from opining that Reckrey "broadly generalizes" that all patients "had certain ailments," that Reckrey did not "examin[e] any of the individual patients," and "that the ailments generally require a higher level of care than having a live in aide." (*Id.* at 17.)

### c. *Block's Opinions Regarding the New York Managed Long-Term Care System's Procedures and Regulations and Sarene's Purported Compliance*

#### i. **Block's Opinions**

A significant portion of Block's initial report and rebuttal report concern detailed background information and an overview of New York's managed long-term care system, the

system's procedures and governing regulations, and Sarene's purported compliance with these

procedures and regulations as well as other laws. Block's opinions on these topics concern same

subject matter addressed by the Acting Secretary's motions in limine Nos. 10 and 11, which I

granted at the February 7, 2025 hearing. (*See* Pl.'s Mot. Lim., ECF No. 184; Feb. 7, 2025 Hr'g

Tr. at 41:1–5; 50:11–19.) I held that some of Defendants' evidence about these topics is

irrelevant under Rule 401 and therefore inadmissible under Rule 402. I also held that to the

extent any of this evidence is relevant under Rule 401, it is nevertheless precluded under Rule

403 because its probative value is substantially outweighed by the risk of confusing the issues,

misleading the jury, and unfair prejudice to the Acting Secretary. These rulings are pertinent to

my analysis of the admissibility of Block's opinions and rebuttal opinions concerning New

York's managed long-term care system, procedures, and governing regulations, and Sarene's

purported compliance with these procedures and regulations. These opinions are set forth in

Section IV and Subsections VI.A, VI.B, VI.C, and VI.D[23] of Block's report and Subsections

IV.B and IV.D of his rebuttal report. (Block Rpt. at 8–25; Block Rebuttal at 11–18, 20–22.)

In report Section IV, Block offers testimony about the history, funding, and growth in

costs of managed long-term care in the United States, New York's managed long-term care

system, and how other states have modeled their systems on New York's system. (*Id.* at 8–14.)

Block also opines, "Serene Home Nursing Agency is a licensed home care agency and a

daughter company of the New York State Department of Health. Serene provides long-term care

---

[23] Section VI of Block's initial report is broken up into several subsections, but the lettering for
these subsections are incorrectly listed as "A.," "B.," "C.," and then again as "A." and "B." (*See*
Block Rpt. at 15, 18, 19, 22, 24.) For the purposes of this Opinion and Order, the second
Subsection VI.A and Subsection VI.B. of Block's initial report will be referred to as Subsections
"VI.D" and "VI.E." (*See id.* at 22, 24.)

services under the direction of the highly regulated NYSDOH and the intricate case management processes in place." (*Id.* at 12.)[24]

In report Subsection VI.A, Block discusses the New York managed long-term care system and its patient case management process, including the Uniform Assessment System-NY Community Assessment, NYDOH regulations, and Sarene's purported compliance with these regulations. (*Id.* at 15–19.) Block opines that since "Serene has been a [licensed health care services agency] in good standing in one of the most heavily regulated industries in the health care sector . . . . This indicates that Serene is generally in compliance with New York State Department of Health standards." (*Id.* at 17.) Block opines that given Sarene's compliance with NYDOH regulations, the Acting Secretary's allegation that Sarene violated the FLSA "yields the conclusion" that the New York State managed long-term care system's provision of live-in care "must be out of compliance with FLSA." (*Id.*) Block opines, "Serene has never faced a regulatory sanction from the New York State Department of Health since its inception in 2009." (*Id.* at 18.) Block also discusses the NYDOH's regulations used to assess patients' needs, touting their "high positive predictive value in assessing the level of care needed for a particular patient." (*Id.* at 19.) Block further opines, "Patients who receive live in care are predicted by the UAS report-based evaluation that they will not need more than 13 hours a day and if there is a need that exceed[s] the time guidelines that it is 'sufficiently infrequent.'" (*Id.* (quoting N.Y. Comp. Codes R. & Regs. Tit. 18 § 505.14).)

---

[24] In Section IV of his initial report, Block also opines about the macroeconomic consequences on the live-in care industry of a requirement that live-in aides receive compensation for 24-hours of care rather than 13-hours, which Block contends would be the result if Defendants are found liable for FLSA violations in this case. (*Id.* at 13–14.) This opinion is discussed below. *See infra* § III.B.d.

Subsection IV.B of Block's rebuttal report, much like Subsection VI.A of his initial report, presents Block's opinions concerning New York's managed long-term care system, its governing regulations and the patient case management process, and Sarene's purported compliance with these processes and regulations. (Block Rebuttal at 11–12.) Block characterizes Reckrey's conclusions about the care needs of Sarene's live-in patients as "inconsistent with New York State Department of Health standards, which Serene Home Nursing Agency follows" and with the recommendations of the primary care physicians treating these patients. (*Id.* at 12.) Block again opines, as he did in his initial report, that "Serene has been a [licensed health care services agency] in good standing in one of the most heavily regulated industries in the health care sector," that Sarene has been "in compliance with New York State regulations," and that "while the Department of Labor in this case has alleged a violation of FLSA, Serene has never faced a regulatory sanction from the New York State Department of Health since its inception in 2009." (*Id.* at 14, 17–18.)

In Subsection VI.C of his initial report, Block presents opinions about the financial incentives for home care agencies to recommend patients for higher levels of care and to encourage their live-in aides to work more compensable hours. (*Id.* at 22.) Block opines that "Serene has no prior sanctions regarding live ins not being properly compensated from either the US Department of Labor or the New York State Department of Labor," and that Sarene is in compliance with New York regulations requiring that its patients present "sufficiently infrequent" calls to duty to live-in aides. (*Id.* at 23.)

In Subsection VI.D of his initial report, Block offers opinions concerning the compliance of Sarene care plans with NYDOH safety guidelines and regulations, which he characterizes as preventing live-in aides from clocking in and out for meal and sleep breaks, and how the care

plans for Sarene patients provided live-in aides "flexibility" by not identifying specific times for breaks. (*Id.* at 24–25.) Subsection III.D of Block's rebuttal report is almost identical to Subsection VI.D of Block's initial report, with the addition of an opinion characterizing Reckrey's opinion that care plans do not provide information on the timing or variability of patient care tasks as "contradictory" to her opinions regarding the need for break tracking mechanisms. (*Id.* at 24–26 (citing Reckrey Rpt. at 11).) Block opines that the variability of the timing of patient care tasks is inherent to live-in care and that there are "procedures in place to both report instances of additional care needed and frequent [external] reviews . . . to determine a patients' change in level of care." (*Id.*)

###    ii.    <u>Relevance Analysis</u>

The Acting Secretary argues that that Block's testimony regarding New York's managed long-term care system, the system's procedures and governing regulations, and Sarene's purported compliance with these procedures and regulations as well as other laws must be precluded as irrelevant under Rule 702 because "neither statutory or regulatory scheme is at issue here." (Pl. Mot. Block. at 5, 8–10.) Defendants fail to respond to this relevance argument. Instead, Defendants assert that Block must be permitted to testify about the predictive algorithm New York State uses to develop patient care plans in order to provide necessary background for the jury and to rebut Reckrey's purported opinion that "Sarene's patients cannot be properly cared for under a 13-hour Care Program and would require additional hours of care" and her opinion "that Sarene's patients require care such that it would cause live-in aides to miss 'most if not all of their hourlong uninterrupted meal breaks on a daily basis.'" (*Id.* at 9–10.)

As discussed during the February 7, 2024 hearing, I ruled that some of Defendants' proffered evidence about New York's managed long-term care system is irrelevant under Rule

401 and therefore inadmissible under Rule 402. Here, too, Block's lengthy description of New York's managed long-term care system (including its procedures and governing regulations), NYDOH regulations, and New York labor laws and his opinions concerning Defendants' asserted compliance with these regulations and laws are irrelevant to the issues the jury must resolve in this action: (1) whether Defendants' former live-in aides experienced call-to-duty interruptions to sleep and meal breaks, (2) whether Defendants compensated them for that work time, (3) whether Defendants kept required records about live-in aides actual work time, and (4) whether Defendants retaliated against worker witnesses in the course of this litigation. Accordingly, the opinions set forth in Section IV and Subsections VI.A, VI.B, VI.C, and VI.D of Block's initial report and Subsections IV.B and IV.D of his rebuttal report are irrelevant under Rule 401 and therefore inadmissible under Rule 402.

### iii.    <u>Rule 403 Analysis</u>

The Acting Secretary argues that Block's opinions about the New York managed long-term care system and its procedures and governing regulations, New York labor laws, and NYDOH regulations, and opinions about Sarene's purported compliance with those procedures, regulations, and laws must also be precluded under Rule 403. (Pl. Mot. Block at 8–11.) The Acting Secretary asserts that Block's opinions on these issues would mislead the jury to believe three things: first, that "New York State has approved Serene to pay just 13 hours a shift to live-in aides, even if the aides work more hours"; second, that "compliance with social services regulations governing patient care always entails compliance with the FLSA"; and third, that "New York State's *predictive* algorithm used to approve live-in care amounts to an *actual* determination that aides did not work more than the 13 hours Serene paid." (*Id.* at 9–10 (emphasis in original).) According to the Acting Secretary, any probative value of Block's

opinions on these topics is substantially outweighed by a risk of confusing the issues and misleading the jury.

Defendants contend that Block's proposed testimony does not claim that New York State has "authorized Sarene to pay its employees for less hours than they have worked" but instead describes the processes in place to "address[] what is to occur when employees work more than thirteen (13) hours" so that live-in aides are paid for overtime work. (Defs.' Block Resp. at 9.) Defendants further argue that Block does not imply that compliance with New York social service regulations results in compliance with the FLSA, and that he seeks to testify that his "factual conclusions . . . support a finding that Defendants had not violated the FLSA." (*Id.* 9–10.) Defendants also assert that Block's opinions regarding the predictive algorithm used by New York State to develop patient care plans are offered to provide necessary background for the jury and to rebut Reckrey's opinions. (*Id.* at 9–10.)

To the extent any portions of the background information and opinions offered by Block on these topics are relevant, they are nevertheless precluded under Rule 403. The probative value of the lengthy and detailed background information and opinions that Block offers on these topics is substantially outweighed by the risk of confusing the issues and misleading the jury to believe that this action is about whether New York's managed long-term care system is beneficial, whether Sarene patients were designated to the appropriate level of care under this system, and whether Defendants complied with NYDOH regulations and New York labor laws. By contrast, the issues the jury must actually resolve in this action are: (1) whether Defendants' former live-in aides experienced call-to-duty interruptions to sleep and meal breaks, (2) whether Defendants compensated them for that work time, (3) whether Defendants kept required records

about live-in aides actual work time, and (4) whether Defendants retaliated against worker witnesses in the course of this litigation.

Therefore, Block's opinions set forth in Section IV and Subsections VI.A, VI.B, VI.C, and VI.D. of his initial report and Subsections IV.B and IV.D. of his rebuttal report are precluded under Rule 403.[25]

### d. *Block's Opinions About the Potential Macroeconomic Consequences of a Finding that Defendants violated the FLSA*

#### i. **Block's Opinions**

In Section VIII and Subsection IV.D of his initial report, Block sets forth opinions concerning the potential macroeconomic consequences of a determination that Defendants are liable for violating the FLSA. (Block Rpt. at 13–14, 36–37.) Likewise, in Section I of his initial report and Section I of his rebuttal report, Block opines: "It is operationally impossible for the live in program . . . to exist if violations of labor standards are assumed based only on patient diagnosis." (Block Rpt. at 4, Block Rebuttal at 4.)

---

[25] Although not raised by the Acting Secretary, Block's numerous opinions suggesting that Defendant Sarene is law abiding and that Defendants Sarene and Manolias acted in accordance with that trait by complying with New York labor laws, NYDOH regulations, and procedures and regulations concerning New York's managed long-term care system are opinion testimony that seek to bolster Sarene's character, rather than simply provide background information. (*See* Block Rpt. at 12, 17–18, 20–25; Block Rebuttal at 11–12, 14, 17–18, 21.) Such character evidence is impermissible. *See* Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Like all character evidence, it "tends to distract the trier of fact from the main question of what actually happened on the particular occasion" at issue in the trial. *Feighan v. Resource Systems Group Inc.*, No. 20-cv-3759, 2023 WL 4623123, at *10 (D.D.C. July 19, 2023) (finding that Rule 404 applies to corporations and citing exemplar cases). Defendants fail to show that these opinions are offered for a permissible purpose under Rule 404(b), such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Thus, Block's opinions on these issues raise the same concerns as the evidence I precluded under Rule 404(a) in granting the Acting Secretary's motion in limine No. 13.

## ii.  **The Parties' Positions**

The Acting Secretary makes five arguments for the preclusion of Block's opinions about the potential downstream macroeconomic consequences in the event Defendants are found liable for violating the FLSA's overtime and recordkeeping requirements:

(1) Block's opinions on these topics "are well outside the scope of this litigation and fail to meet FRE 702(a)'s requirement that expert testimony assist the jury with relevant matters." (Pl.'s Mot. Block at 5)

(2) "Block's macroeconomic analysis . . . is inadmissible under Rule 702(b) because it is based on a set of false assumptions about the facts." (*Id.* at 6.)

(3) Block's macroeconomic conclusions are precluded under Rule 702 because they are "purely speculative and unsupported." (*Id.* at 7.)

(4) These opinions are precluded under Rule 403 because any probative value is outweighed by the danger of unfair prejudice and confusing the issues for the jury. (*Id.*)

(5) "Block's predictions of 'catastrophic potential consequences' . . . amount to an inability to pay defense, which is inapplicable in FLSA cases and thus irrelevant here." (*Id.* (citing Block Rpt. at 36).)

(*See generally* Pl.'s Mot. Block at 4–8.) Defendants do not address the Acting Secretary's arguments with any specificity and, instead, argue generally that Block's opinions about the macroeconomic consequences of a finding of liability in this action are offered to rebut Reckrey's opinions. (Defs.' Block Resp. at 6–8.)

## iii.  **Analysis**

Sections VIII and IV.D of Block's initial report contain speculative conclusions that finding Defendants liable for FLSA violations in this case will undermine and lead to the collapse of the home health care industry and New York's managed long-term care system for providing insurance coverage for home health services. (Block Rpt. at 13–14, 36–37.) None of the opinions offered in these parts of Block's report seek to rebut any specific opinion offered in Reckrey's report. (*See id.*) Block does not even cite Reckrey's report when reaching his opinions

about the purported macroeconomic consequences of a finding of liability in this action in Sections VIII and IV.D of his initial report. (*See id.*)

Rather, Block opines that any finding that Defendants are liable under the FLSA for failing to pay live-in aides for call-to-duty interruptions to meal breaks and sleep time *must necessarily* be based on the assumption that Sarene's patients placed in 24-hour live-in care should have been placed in a higher level of care provided by two aides working 12-hour split-shifts during each 24-hour period. (*See id.*) Based on this analytic leap, Block presents numerous opinions about the potential disastrous economic consequences of shifting *all* home care that is currently provided by live-in aides who are compensated for 13 hours of work during each 24-hour period to a model requiring two aides who perform 12-hour split-shifts per 24-hour period. (*See id.*)

Under Rule 702, I must "ensure[] that an expert's testimony both rests on a reliable foundation and is *relevant* to the task at hand." *Daubert*, 509 U.S. at 597 (emphasis added). Block's proposed testimony regarding the potential macroeconomic consequences of a jury finding that Defendants have violated the FLSA does not have "any tendency to make the existence of any fact that is of consequence to the determination" that Defendants' compliance with the FLSA's recordkeeping, overtime, and non-retaliation requirements "more probable or less probable." *Amorgianos*, 303 F.3d at 265. These potential macroeconomic consequences are irrelevant to the issues the jury must resolve in this action: (1) whether Defendants' former live-in aides experienced call-to-duty interruptions to sleep and meal breaks, (2) whether Defendants compensated them for that work time, (3) whether Defendants kept required records about live-in aides actual work time, and (4) whether Defendants retaliated against worker witnesses in the course of this litigation.

Therefore, Block's opinions regarding the potential macroeconomic consequences of a jury verdict in favor of the Acting Secretary in this action are irrelevant to any fact of consequence to the claims and defenses under Rule 401 and are therefore inadmissible under Rules 402 and 702. *See* Fed. R. Evid. 401–402, 702. These opinions are also precluded under Rule 403 because any probative value from Block's sweeping, speculative, and unsupported opinions about the potential macroeconomic consequences of a finding that Defendants violated the FLSA is substantially outweighed by the danger of confusing the issues, misleading the jury to believe that this action is an evaluation of the legitimacy or propriety of New York's managed long-term care system for assigning homebound patients to different levels of care, wasting time, and unfair prejudice to the Acting Secretary.

Accordingly, Block is precluded from testifying regarding the potential macroeconomic consequences of a jury determination that Defendants have violated the FLSA as he sets forth in Section I, Subsection IV.D, and the entirety of Section VIII of his initial report. He is also precluded from opining that "[i]t is operationally impossible for the live in program . . . to exist if violations of labor standards are assumed based only on patient diagnosis." (Block Rpt. at 4, Block Rebuttal at 4.)[26]

### e. *Block's Opinions Regarding Sarene's Purported Ability to Seek Reimbursement for Overtime Hours Worked by Its Live-in Aides*

#### i. Block's Opinions

In Subsection VI.C of his initial report, Block opines that Sarene is able to seek and secure reimbursement from managed long-term care companies for paying live-in aides for any

---

[26] This opinion is also precluded under Rule 702(b) because it is based on Block's unsupported assumption that a jury determination that Defendants are liable for FLSA violations would be "based only on patient diagnoses." (Block Rpt. at 4.)

hours worked beyond 13 hours per 24-hour shift. Specifically, Block opines that in New York, licensed home care services agencies receive "more revenue for deployment of more hours," and that Sarene would therefore have a "incentive to . . . recommend that patients that require a higher level of care receive it." (*Id.* at 22.) Block also opines that on the days that a live-in aide must work more than 13 hours, managed long-term care companies will reimburse Sarene to pay the live-in aide for that additional work time. (*Id.* at 23.) These opinions concern the same subject matter as the evidence that I precluded in granting the Acting Secretary's motion in limine No. 13. (*See* Pl.'s Mot. Lim., ECF No. 184.)

### ii.   Analysis

During the February 7, 2025 hearing on the parties' motions in limine, I ruled that Defendants' proffered evidence that Sarene may seek and receive reimbursement on the days when their live-in aide employees worked more than 13 hours during a 24-hour shift is irrelevant to the claims and defenses in this action under Rule 401 and inadmissible under Rule 402. (Feb. 7, 2025 Hr'g Tr. 69:9–71:11) I also ruled that even if the proffered evidence were relevant to Defendants' defense that they lacked an incentive not to compensate former Sarene live-in aides for work time or to retaliate against these former employees in this litigation, the probative value of such evidence would be substantially outweighed by the danger of confusing the issues, misleading the jury, and unfair prejudice to the Acting Secretary. (*Id.* 70:22–71:4.)

For the same reasons, Block's opinions regarding Sarene's ability to seek reimbursement from managed long-term care companies to pay live-in aides for overtime hours worked are irrelevant to any fact of consequence to the claims and defenses in this action. As I explained at the February 7, 2025 hearing, whether Sarene had the ability to pay its former employees overtime from March 2017 to December 2020 is not at issue in this litigation. (*Id.* 70:15–18.)

101

Defendants argue, unpersuasively, that Block's opinions on the issue of Sarene's ability to seek reimbursement support their defense that Defendants lacked an incentive to violate the FLSA's overtime and anti-retaliation provisions. (Defs.' Block Resp at 17.) Whether Defendants could seek external funding to pay live-in aides for call-to-duty interruptions to meal and sleep breaks relates to the factual question of whether Defendants were able to pay overtime compensation to these employees—not whether Defendants *did in fact pay* its live-in aides for any overtime hours worked during the relevant time period. The issue of Defendants' ability to pay is simply irrelevant. *See Torres v. Am. R.R. Co. of Porto Rico*, 157 F.2d 255, at 256 (1st Cir. 1946), *cert. denied sub. nom. American R.R. Co. of Puerto Rico v. Romero*, 329 U.S. 782 (1946) (recognizing in the FLSA context that "[w]hether enforcement of the statutory rights of appellants will benefit or injure them, their employer, or the community is legally immaterial"); *Hodgson v. Taylor*, 439 F.2d 288 (8th Cir. 1971) (holding that the financial difficulties of an employer did not authorize the withholding of a decree prohibiting the withholding of unpaid back wages found due). Moreover, as the Acting Secretary points out, Defendants did not once seek reimbursement from any managed long-term care company to pay a live-in aide for overtime between March 2017 and December 2020. (Pl.'s Block Reply at 7 (citing Kristine Manolias Dep. 196).) Finally, Defendants' ability to seek overtime reimbursement from managed long-term care companies is also irrelevant to the question of whether Defendants retaliated against any of Sarene's former live-in aides through their declaration-gathering campaign, by discouraging live-in aides from speaking with the Department, and by taking punitive measures against live-in aides who sought to report unpaid work hours to the company. Block's opinions on these issues are therefore irrelevant under Rule 401 and inadmissible under Rules 402 and 702. *See* Fed. R. Evid. 401–402, 702.

In addition, any probative value from Block's opinions on these issues to any fact of consequence to the claims or defenses in this action is substantially outweighed by the danger of confusing the issues, wasting time, unfair prejudice to the Acting Secretary, and misleading the jury to believe that this action concerns whether Sarene could afford to pay live-in aides for more than 13 hours per 24-hour shift. The opinions at issue are therefore also inadmissible under Rule 403.

Accordingly, Block is precluded from testifying about whether licensed home care services agencies receive "more revenue for deployment of more hours" and about any procedures by which Sarene could have sought external funding to provide compensation to live-in aides for overtime worked during the relevant period, as set forth in Subsection VI.C of his initial report.

**f.   _Block's Opinions Regarding Sarene's Purported Payment to Live-In Aides Who Reported Call-to-Duty Interruptions to Meal and Sleep Breaks_**

In Section VII.A of his initial report, Block opines that, during the relevant time period, Sarene paid live-in aides who worked more than 13 hours in a 24-hour shift. (Block Rpt. at 28.) The Acting Secretary seeks to preclude this opinion on the basis that while Block relies on a specific payroll document to reach this opinion in his initial report, he testified in his deposition that the document in question did _not_ support the conclusion that Sarene paid a live-in aide for working more than 13 hours during a 24-hour shift. (Pl.'s Mot. Block at 20; _see also_ Block July 7, 2023 Dep. 105:3–108:25, 146:1–5.) In response to questioning during his second deposition, which took place more than one month after his first deposition, Block was unable to explain which document actually supports his opinion that Sarene compensated live-in aides who worked more than 13 hours during a 24-hour shift. (Block Aug. 18, 2023 Dep. 86:15–90:23.)

103

Defendants argue that while Block "acknowledge[ed] that the cited portion of records did not contain the information that led him to" his conclusion, Block purportedly "identified in the record the methodology he used to reach" it. (Defs.' Block Resp. at 21.) Defendants further contend that the document at issue purportedly shows that Sarene paid a live-in aide for more than 13 hours during a 24-hour shift because it indicates that the employee was paid for more than 91 hours of work in a single week. (*Id.*) However, Defendants fail to identify the document that Block relied upon in reaching his opinion that Sarene compensated live-in aides who worked more than 13 hours during a 24-hour shift. (*Id.*)

Defendants' argument is unsupported and unconvincing. In his initial report, Block cited a specific payroll document and relied upon it to reach his opinion that Sarene had made payments to specific live-in aides who had worked more than 13 hours during a 24-hour shift. (Block Rpt. 28 n.41 (citing DEF019641–DEF019653).) By Block's own admission during his first deposition date, however, the cited document does not support this opinion. (Block July 7, 2023 Dep. 105:3–108:25, 146:1–5.) As noted, Block failed to cure this defect when questioned again during his second deposition, which took place more than one month after his first deposition. (Block Aug. 18, 2023 Dep. 86:15–90:23.) Because Block has failed to identify the basis for his opinion and has had ample time to do so, he has failed to show that this opinion is based on sufficient facts or data as required by Rule 702(b) and is the product of reliable principles and methods under Rule 702(c). Accordingly, under Rule 702, Block is precluded from testifying that from March 2017 to December 2020, Sarene paid overtime compensation to live-in aides who worked more than 13 hours during a 24-hour shift.

**g. _Block's Opinions Regarding the Wage and Hour Division's ("WHD") Investigation Preceding This Litigation_**

**i.    Block's Opinions**

In Section VII.A of his initial report, Block sets forth his opinions about the quality of the WHD's investigation into Sarene's potential FLSA violations. Block first opines that the Acting Secretary has insufficient evidence that Defendants violated the FLSA. (Block Rpt. at 28.) Block then opines that "the verbal interviews performed by [WHD investigator] Nicole Stahl do not have the statistical power to show based on the small number performed are a representative sample," and then identifies what he views as shortcomings in Stahl's investigative methods— interviews and surveys—and conclusions. (_Id._ at 28–34.) Block specifically opines that WHD investigator Stahl modified 25% of employee statements months after they were initially created. (_Id._ at 33–34.) Block does not, however, explain whether he based this opinion on all of the employee statements gathered by Stahl or only the employee statements that pertained to live-in aides.[27]

**ii.    The Parties' Positions**

The Acting Secretary moves to preclude Block's opinions critiquing the WHD's investigation into FLSA violations by Sarene and the materials Reckrey reviewed from that investigation, which are set forth in Subsection VII.A of Block's Report. (Pl.'s Mot. Block at 10– 13; Pl.'s Block Reply at 7–8.) First, the Acting Secretary argues that these opinions are irrelevant because the Acting Secretary will not offer the investigation report as evidence at trial but will instead offer testimony by employee witnesses and other evidence. (Pl.'s Mot. Block at 12.)

---

[27] At the _Daubert_ hearing, counsel for the Acting Secretary explained that Stahl gathered statements from live-in aides as well as other employees, but that only twelve statements were made by employees who worked as live-in aides for Sarene. (Feb. 11, 2025 Hr'g Tr. 27:10–22.)

Second, the Acting Secretary argues that Block's statistical analysis set forth in Subsection VII.A of his initial report conflates the question of statistical significance with the legal standard for an FLSA violation, which usurps the role of the jury. (Pl.'s Mot. Block at 11–13.)

Defendants contend that the opinions at issue are admissible because they concern Block's critique of evidence gathered by the Acting Secretary during the WHD investigation, not the quality of the WHD investigation itself. (Defs.' Block Resp. at 12–13.) Further, Defendants assert that Block's opinions do not amount to an opinion about whether the evidence demonstrates an FLSA violation. (*Id.* at 12.)

### iii.    **Analysis**

The Acting Secretary does not intend to offer the WHD investigative file on Sarene as evidence at trial, and this action does not concern the adequacy of the WHD investigation into Sarene. After the conclusion of the WHD investigation, the Acting Secretary commenced this litigation, which led to more than three years of discovery on the claims brought under the FLSA's overtime, recordkeeping, and anti-retaliation provisions and the defenses to these claims. At trial, the parties will have the opportunity to offer witnesses who will testify as well as other evidence gathered during the course of this extensive period of discovery. Block's opinions critiquing the WHD's investigative methods are therefore irrelevant to any fact of consequence to the claims or defenses in this action. *See Donovan v. Red Ball Interior Demolition Corp.*, No. 81-cv-1302, 1982 WL 2052, at *1 (S.D.N.Y. Sept. 21, 1982) (denying Defendants' request for discovery on the Secretary of Labor's investigation in an FLSA action, reasoning that the "thoroughness and quality of the plaintiff's investigation will not be an issue at trial" and that the determination of the alleged FLSA violation "depend[s] on the evidence adduced at trial").

Block's opinions critiquing the employee statements and other materials created during the WHD investigation seek to rebut Reckrey's reliance on these materials in reaching certain opinions in her report. As discussed above, however, under Rules 702 and 703, Reckrey is precluded from offering at trial opinions she reached based entirely or primarily on her review of the twelve employee statements and WHD call log. *See supra* Discussion Reckrey § III.B.a. Therefore, Block's rebuttal to Reckrey's opinions that rely on the WHD investigation materials—the employee statements and WHD call log—is irrelevant to any fact of consequence to the claims or defenses in this action. Accordingly, Block is precluded under Rules 402 and 702 from testifying about the inadequacy of the WHD's investigative methods and the insufficiency of the evidence gathered during the WHD investigation to prove FLSA violations—including the lack of representativeness of the verbal interviews performed by Stahl and what Block characterizes as Stahl's modification of employee statements.

### h. *Block's Opinions about the Import of Sarene's Internal Skype Messages*

#### i. **Block's Opinions**

In Subsection VI.E of his initial report and Subsection IV.A of his rebuttal report, Block opines that Sarene's internal Skype messages do not show that Defendants violated the FLSA and critiques Reckrey's purported reliance on Sarene's internal Skype messages to conclude that live-in aides frequently provided care outside their compensated hours. (Block Rpt. at 26–28; Block Rebuttal at 9–11.) Specifically, in Subsection VI.E of his initial report, Block contends that "none of these [internal Skype messages] indicated a 13-hour violation as in full review," and Subsection IV.A of his rebuttal report, Block contends that "Reckrey's report did not refer to any identifiable violations from the thousands of time sheets and on-call after hours records because there were none that would indicate that Serene violated the law." (Block Rpt. at 27;

Block Rebuttal at 10.) He asserts that the opinions in Section VII of Reckrey's report, titled "Home Care Workers Frequently Provide Care Outside of Compensated Hours," were based in part on Reckrey's review of Sarene's internal Skype messages. (Block Rpt. at 26; Block Rebuttal at 9.)

Block also opines more broadly that the Skype messages do not show that Defendants violated the FLSA because "even if something was discussed in Skype about a patient, the information in Skype is twice removed from the source first because it comes from the office staff and second because it is between office staff and another office staff that does not provide direct patient care." (Block Rebuttal at 10; *see also* Block Rpt. at 27–28.)

ii.    **The Parties' Position**

The Acting Secretary seeks to preclude Block from offering these opinions under Rule 702 on the basis that Block has an insufficient basis for these opinions. (Pl.'s Mot. Block at 21.) According to the Acting Secretary, Block has reviewed too few—"about 30–50 . . . out of thousands of pages"—of the Skype messages to reach such broad opinions. Further, Block's conclusion that the Skype messages lack probative value usurps the role of the Court as the adjudicator of the admissibility of evidence and the role of the jury as the evaluator of evidence. (*Id.*)

Defendants argue that Block is not advocating for the exclusion of the Skype messages as evidence at trial. (Defs.' Block Resp. at 21.) According to Defendants, Block simply opines that he did not find that the Skype messages were a reliable source of information to form his opinions because they were authored by Sarene staff, rather than live-in aides themselves. (*Id.*)

108

### iii.    **Analysis**

Block's opinion, presented in Subsection VI.E of his initial report and Subsection IV.A of his rebuttal report, that Section VII of Reckrey's report was based in part on her review of Sarene's internal Skype messages is irrelevant and thus inadmissible under Rules 402 and 702(a). Section VII of Reckrey's report does not reference or quote Sarene's internal Skype messages in any way. (*See* Reckrey Rpt. at 8–9.) Instead, in that section of her report, Reckrey provides quotes from employee statements and the call log gathered during the WHD investigation into Sarene. (*Id.*) Reckrey only references Sarene's internal Skype messages in Section V of her report, titled "Clients Receiving Live-In Care at Serene had High Care Needs." (Reckrey Rpt. at 4–6.) There, Reckrey notes that Sarene patient files contained various types of documents, including some of Sarene's internal Skype messages, and opines that, based on her review, the Skype messages "did not speak meaningfully to day-to-day care from" live-in aides. (*Id.* at 6.)

Moreover, Block's opinion that Sarene's internal Skype messages do not show that Defendants violated the FLSA is precluded under Rule 702 both because it is based on insufficient facts or data and because it is not the product of reliable principles and methods. Fed. R. Ev. 702(b)–(c). Block testified that he reviewed only a "snapshot" of "between 30–50" of Sarene's internal Skype messages. (Block Aug. 18, 2023 Dep. 122:5–16.) But Defendants do not dispute the Acting Secretary's characterization that Defendants produced "thousands of pages of Skype messages." (Pl.'s Mot. Block at 21; *see* Defs.' Block Resp. at 21.) Block cannot broadly conclude that none of the Skype messages produced in this action provide evidence supporting a finding that a live-in aide was not compensated for a call-to-duty interruption to a meal or sleep break based on his review of only "30–50" pages out of thousands of pages of these messages.

(*Id.* at 122:15–16; 124:10–24.) Block has not explained why that sample was representative of all of Sarene's internal Skype messages or what methodology he used to conclude that Sarene's internal Skype messages do not contain any evidence that could show an FLSA violation. (*Id.* at 124:10–125:25.)

Accordingly, Block is precluded from offering opinions regarding Sarene's internal Skype messages under Rules 402 and 702.

### i. *Block's Opinions About Sarene's Quality Improvement Surveys*

#### i. **Block's Opinions**

In Subsection VII.C of his initial report, Block discusses his analysis of two Sarene "quality improvement surveys" conducted in August 2021 and October 2021, which involved "a Serene representative visit[ing] live ins to ask a series of questions to determine actual numbers worked in a 24-hour period." (Block Rpt. at 35.) Block opines that responses to the survey show that "most of [the responding aides] worked 6 to 8 hours a day, not 13." (*Id.* at 36.) The surveys were conducted more than eight and ten months, respectively, after December 31, 2020—the end of the time period relevant to the Acting Secretary's damages claims. (*Id.*) Twelve of the 29 live-in aides employed by Sarene at the time responded to the survey conducted from August 22, 2021 through August 28, 2021. (*Id.*) Eleven of the 22 live-in aides employed by Sarene at the time responded to the survey conducted from October 21, 2021 through October 30, 2021. (*Id.* at 36–37.)

#### ii. **Analysis**

Block's opinions about the 2021 quality improvement surveys are irrelevant under Rule 401 and therefore inadmissible under Rules 402 and 702 because the surveys were conducted

well after the time period relevant to the Acting Secretary's overtime and record keeping claims in this action: March 2017 to December 31, 2020.

Just as importantly, neither Block nor Defendants demonstrate that responses by twelve of the 29 live-in aides employed by Sarene during the August 2021 survey or the responses by eleven of the 22 live-in aides employed by Sarene during the October 2021 survey represent the work experiences of the 506 live-in aides on whose behalf the Acting Secretary seeks damages in this action. (Block Rpt. at 35–36.) Block does not even explain why response rates of 41% for the August 2021 survey and 50% for the October 2021 survey are sufficiently representative to form the basis for conclusions about all live-in aides employed at the time, much less all 506 former employees at issue in this action, which concerns a different time period. (*Id.*) Therefore, any opinions that Block reaches based on the results of the 2021 quality improvement surveys are inadmissible under Rule 702(b) and (c) as based on insufficient facts or data and as the product of unreliable principles and methods.

Finally, any probative value of Block's analysis of the 2021 quality improvement surveys or his opinion that the survey responses indicate that most live-in aides were working six to eight hours each day is substantially outweighed by the danger of misleading the jury about the timeframe of the alleged FLSA violations at issue in this action and unfair prejudice to the Acting Secretary. To the extent that the surveys accurately capture the working hours of Sarene's live-in aides in August and October 2021, notwithstanding Block's failure to explain that the survey results were representative, there may be any number of reasons why Sarene's live-in aides may have worked fewer hours per each 24-hour shift in 2021 compared to 2017 through 2020. Block's analysis of Sarene's 2021 quality improvement surveys and his opinions about what the survey results show are therefore also inadmissible under Rule 403.

Accordingly, Block is precluded from offering these opinions under Rules 402, 702, and 403.

### j. *Block's Opinions About the Adequacy of Sarene's Systems for Live-in Aides to Report Hours Worked*

#### i. **Block's Opinions**

In Subsections VI.B, VI.C, and VII.B of his initial report, Block opines that Sarene maintained an adequate system for live-in aides to report hours worked. (Block Rpt. at 20–21, 23–24, 35.) Block opines that Sarene provided adequate training and guidance to live-in aides regarding their entitlement to three one-hour meal breaks and sleep breaks and supported adequate policies and procedures for live-in aides to report any call-to-duty interruptions to these breaks. In Section I of his initial report and Section I of his rebuttal report, Block opines that "if there were a case where a live in had a potential violation, live ins were provided the necessary education and resources . . . by Serene to report otherwise." (Block Rpt. at 3; Block Rebuttal at 3.) In Subsection VI.C of his initial report, Block opines:

> Live ins working for Serene Home Nursing Agency are provided both NYS case management policies and policies implemented by Serene that go above and beyond to ensure that they can report patients who have required additional care in real time. It is a part of Serene's formal policy that all live ins are educated in sleep and meal time decisions and based on the decision (Andr[yeyeva]) Activity sheets have been modified to include a section to allow the aide to document deficiencies in these areas.

(Block Rpt. at 23 (quotation marks and citations omitted).)

In both Section XI of his initial report and Subsection IV.C of his rebuttal report—which are nearly identical—Block opines that "[o]nce a patient is assigned to live in at Serene, live ins are provided both policies that are utilized by the NYS Case management system and other procedures Serene has in [sic] beyond those to ensure aides received the proper wages and overtime pay." (Block Rpt. at 38; Block Rebuttal at 18–19.) In Subsection IV.B of his rebuttal

report, Block opines that "Serene . . . must have multiple policies, processes, and trainings in place for aides that bring awareness to their responsibility to call the agency during these call to duty interruptions and to speak with the on call nurse" and that Sarene has "numerous reporting processes and trainings to the aides themselves regarding call to duty incidents." (Block Rebuttal at 16, 18.)

## ii.    **The Parties' Positions**

The Acting Secretary argues that these opinions should be precluded because they are based on incomplete information and because Block filled gaps in the information with unfounded assumptions and speculation. (Pl.'s Mot. Block at 14–19; *see also* Block Rpt. 20–21, 23–24, 35.) Concerning Block's review of Sarene's aide activity sheets, the Acting Secretary argues: (1) that Block's review was incomplete and based on unfounded assumptions; (2) that Block failed to review any of Sarene's training and guidance materials about live-in aides' hours, pay, and breaks; and (3) that Block was unaware of how Sarene's policies changed over time. (Pl.'s Mot. Block at 14–19.) Further, the Acting Secretary argues that Block's opinion regarding the adequacy of Sarene's training, guidance, and policies concerning the provision of meal and sleep breaks to live-in aides and procedures for reporting call-to-duty interruptions must be precluded because it is not based on a review of the actual training Sarene provided live-in aides during the relevant time period, but instead on Block's "general understanding of the industry" and of regulatory processes in New York. (Pl.'s Mot. Block at 17–18.) Further, the Acting Secretary argues that Block's conclusion that Sarene had a policy in place for live-in aides to report call-to-duty interruptions to meal and sleep breaks is based on insufficient facts or data and ignores changes in Sarene's policies during the relevant time period. (*Id.* at 18–19.) In support of these arguments, the Acting Secretary points to other portions of Block's initial report

in which he indicates that he actually reviewed Sarene's training, guidance, and policies—including Subsection VI.B, where he opines that it was "Serene policy . . . that an aide is to call and report when the interruption is occurring to Serene's on-call coordinator of not being able to receive 8 hours of sleep in which 5 were uninterrupted or three 1-hour meal breaks." (Block Rpt. at 21, *see also id.* at 23.)

Defendants argue that Block's opinion that Sarene maintained an adequate system for live-in aides to report hours worked is properly supported by his review of aide activity sheets because he was shown 167 aide activity sheets from various years during his deposition and reviewed 166 aide activity sheets that use a later version of the document "when preparing his report." (Defs.' Block Resp. at 15–16.)

Defendants also assert that Block made permissible assumptions to "conclude[] that Sarene's employees received training in compliance with New York State's requirements based upon the contents of the Company's policy manual with [sic] affirmed that all required trainings were issued." (Defs.' Block Resp. at 14.) Further, Defendants contend that, based on his knowledge and experience, Block can opine "that Sarene's trainings has [sic] been reviewed and approved by New York State" since (1) the State "appoints regulatory reviewers and they make sure the trainings address all critical areas of concern," and (2) because review of training materials is required for Sarene to be a licensed home care services agency. (*Id.*)

### iii. **Analysis**

#### *(1) Aide Activity Sheets (Time sheets)*

Block testified that he reviewed Sarene's aide activity sheets for "[l]ess than an hour." (Block Dep. July 7, 2023 at 64:15–17.) Based on that review, Block interpreted live-in aides' signatures on the aide activity sheets to signify that these workers affirmatively stated that they

114

received uninterrupted sleep and meal breaks. (Block Dep. July 7, 2023 50:10–52:2.) Block testified to holding this opinion even when informed during his deposition that some aide activity sheets do *not* contain text indicating that by signing the aide activity sheet, the aide was acknowledging that they received eight hours of sleep, with five hours uninterrupted, and one-hour breaks for breakfast, lunch, and dinner. (*Id.*) Further, emphasizing the importance of the fact that live-in aides signed the aide activity sheets, Block opines that the fact that "100% of aides signed off in real-time . . . indicat[es] zero violations of the 13-hour rule."[28] (Block Rpt. at 35.)

Neither Block nor Defendants identify the specific versions of Sarene's aide activity sheets on which Block based his opinion that Sarene maintained an adequate system for live-in aides to report hours worked or even which versions he reviewed prior to writing his initial report. (*See* Defs.' Block Resp. at 16.) The record reflects that Sarene used at least ten different versions of the aide activity sheets between March 2017 and December 2020. (Proposed Plaintiff's Exhibit PX-7A (providing eighteen examples demonstrating at least ten different versions of the document).) Defendants and Block fail to specify whether the "latter versions" of the aide activity sheets reviewed by Block include the version that "had fields wherein employees were to specifically confirm that they received their three (3) hour long meal breaks and that they also received eight (8) hours of total sleep with five (5) hours being uninterrupted." (Defs.' Block Resp. at 15.) Defendants and Block also fail to specify whether Block reviewed an even later version of the aide activity sheet, which "required that employees explicitly verify that

---

[28] Based on Block's deposition testimony, I understand his reference to violations of the 13-hour rule to refer to the situation where a live-in aide does not receive three one-hour meal breaks or 8 hours of sleep with 5 hours of uninterrupted sleep during a 24-hour shift and is not compensated for more than 13 hours of work. (Block July 7, 2023 Dep. 112:19–113:9.)

they had received at least five (5) hours of uninterrupted sleep and one (1) hour long uninterrupted meal breaks for breakfast, lunch, and dinner" and which "provided instructions by which employees were to report if they did not receive their uninterrupted sleep and meal breaks." (*Id.*) Even if Block did review the two specific versions of the aide activity sheet that asked employees about whether they received meal and sleep breaks, the record confirms that these versions were *not in effect* between March 2017 and April 2019. (*See* Pl.'s Block Reply at 9; *see*, *e.g.*, Proposed Ex. PX-7B at DEF 012560.) Moreover, Defendants concede that "earlier versions" of Sarene's aide activity sheets "did not require that employees report specifically on the breaks they received." (Defs.' Block Resp. at 15.) Finally, Block set forth his opinions that Defendants maintained an adequate system for live-in aides to report hours worked in his May 11, 2023 initial report and June 9, 2023 rebuttal report months before he reviewed the 167 aide activity sheets that counsel for the Acting Secretary showed him in the course of his July 7, 2023 deposition.

Thus, Block did not review any Sarene aide activity sheets that were in use at any time from March 2017 to April 2019 before formulating his opinion that Sarene maintained an adequate system for live-in aides to report hours worked. Accordingly, Block is precluded under Rule 702(b) and (c) from opining that Sarene maintained an adequate system for live-in aides to report hours worked from March 2017 to April 2019 because this opinion is neither based on sufficient facts or data nor reached through reliable principles and methods.

Furthermore, Defendants also fail to show that Block's opinion that Sarene maintained an adequate system for live-in aides to report hours worked from May 2019 to December 2020 is based on sufficient facts or data under Rule 702(b) and reliable principle and methods under Rule 702(c). Defendants argue that Block "properly concluded" that Sarene's aide activity sheets

116

show that live-in aides typically worked no more than 13 hours based on his review of "latter versions" of the aide activity sheets. (Defs.' Block Resp. at 16.) In his deposition, Block testified that he would conclude that live-in aides' signatures on aide activity sheets served as an affirmative report that these workers had received required meal and sleep breaks regardless of whether the aide activity sheet even asked live-in aides to indicate whether they received sleep or meal breaks. (*See* Block July 7, 2023 Dep. 51:17–52:2.) Block's deposition testimony demonstrates that the basis for his opinion is that these workers *signed* the aide activity sheets, *regardless of the content* of the specific version of the aide activity sheet at issue.

Block fails to explain the weight he places on live-in aides' signatures on aide activity sheets with anything other than what the Acting Secretary appropriately calls "pop economics." (Pl.'s Mot. Block at 16.) Specifically, Block opines in Subsection VI.C of his initial report that since "[e]mployees seek to maximize their wage," if live-in aides did not report call-to-duty interruptions to their sleep and meal breaks on aide activity sheets or through one "of the different methods in which an employee can request additional pay for hours," these workers would be "in violation of one of the tenets of modern economics" by not "attempt[ing] to be paid for all hours worked." (Block Rpt. at 24.) Block offers no facts, data, or citations to academic research or any other authority to support these opinions. Nor does he identify any economic theory applied to reach these opinions. Block's conclusions are based only on his *ipse dixit*. He assumes that Sarene's former live-in aides must have sought to maximize their wages by reporting all call-to-duty interruptions to meal and sleep breaks, ignoring any number of alternative explanations for failure to report interruptions, such as live-in aides' lack of training or guidance about how and when to report compensable work time, lack of understanding of their rights under the FLSA to overtime wages for call-to-duty interruptions to meal and sleep

breaks, and any fear of retaliation for reporting overtime. Defendants' assertion that Block's opinions in Subsection VI.C of his initial report are based on his professional experience does not change this conclusion, and only confirms that Block's opinions on these issues are inadmissible as *ipse dixit*. (*See* Defs.' Block Mot. at 17.)

Finally, Block did not speak to a single live-in aide when reaching his opinion that Sarene maintained an adequate system for live-in aides to report their work hours based on his review of aide activity sheets. Nevertheless, he concluded that a live-in aide's signature on an aide activity sheet meant that the worker received sleep and meal breaks without any call-to-duty interruptions during the 24-hour period addressed in the aide activity sheet. Block's conclusion that a live-in aide must have actually received meal and sleep breaks without any call-to-duty interruptions based solely on the fact that worker signed the aide activity sheets—regardless of whether the particular aide activity sheet elicited this information—is "simply too great an analytical gap." *Joiner*, 522 U.S. at 146.

Block's opinions on these topics are therefore precluded under Rule 702(b) and (c) because they are based on insufficient facts or data and are the product of unreliable principles and methods.

### (2) *Training, Guidance, and Policies*

Based on a "*rigorous examination* of the facts on which [Block] relies" to reach his opinions about the adequacy of Sarene's training, guidelines, and policies concerning live-in aides' entitlement to sleep and meal breaks and procedures for reporting call-to-duty interruptions, I find that Block has failed to rely "on sufficient facts or data" as required by Rule 702(b). *Mirena IV*, 982 F.3d at 123. To reach his conclusion that Sarene's training and guidance apprised live-in aides that they were entitled to three one-hour meal breaks and sleep breaks and

that Sarene had a policy and procedures for these workers to report call-to-duty interruptions, Block admits to relying on his "general understanding of the industry," not on Sarene's actual training, guidelines, and policies in effect during the relevant time period. (Block July 7, 2023 Dep. 81:6–82:16.) Block also testified that he has never attended a Sarene training on these topics and that he has not reviewed any of Sarene's applicable training materials. (*Id.*)

As support for his opinions on the adequacy of Sarene's training, guidelines, and policies on these issues, Block asserts in his initial report that documents titled "Sarene Internal Company Policies" and "Serene Home Nursing Agency Policy and Procedure Manual: Policy II-24" show that Sarene educated live-in aides about their entitlement to meal and sleep breaks and how to report call-to-duty interruptions. (Block Rpt. 23 n.33 & 34.) When asked about these documents in his deposition, however, Block was unable to direct counsel to the specific documents he relied upon and failed to identify the version of Sarene's manual that he reviewed. (Block July 7, 2023 Dep. 83:23–84:7; 96:14–97:4.) Defendants' assertion that Block's inability to provide this information during his deposition was due to his "inability to recall from memory alone" is not persuasive. (Defs.' Block Resp. at 19.) Defendants have had ample time to identify the documents at issue in their opposition to the Motion to Preclude Block and have failed to do so.

I also find unpersuasive Defendants' contention that Block relied on sufficient information to reach his opinions that Defendants provided adequate training and guidance to live-in aides and sustained adequate policies and procedures for these workers to report call-to-duty interruptions. First, when pressed, Block conceded that the version of Sarene's policy manual on which he relied did not go into effect until after March 26, 2019, two years into the time period relevant to this case. (Block July 7, 2023 Dep. 99:22–102:8; *see also* Block Rpt. at 21, 23.) Second, Defendants admit that Block does "not explore the frequency with which

119

Sarene's employees are trained or the manner in which Company's policies are provided to the employees themselves." (Defs.' Resp. Block at 20.) Third, Defendants fail to identify for the Court any of the materials cited by Block in support of these opinions. (*See* Defs.' Block Resp. at 19.)

Block testified that there was no "specific time period" for which he reviewed Sarene's training, guidelines, policies, and procedures to reach the opinion that "it is a part of Serene's formal policy that all live ins are educated in sleep and meal time decisions," even though he conceded that Sarene's policies "evolved over time" and that he was unaware of how Sarene's trainings changed during the relevant period. (Block July 7, 2023 Dep. 95:11–96:13.) Block also testified that he "never asked" any Sarene staff whether they "tell[] aides that they are paid for 13 hours" of work. (*Id.* 82:23–83:4.) Instead, he "assumed" that a hiring manager would have informed aides of this fact and that from his "understanding of economics . . . people know how much they're being paid for and how much they're being paid when they accept a job." (*Id.* 82:17–22; 83:1–4.) Furthermore, when directly asked during his deposition, Block explained that his opinion that Defendants educated live-in aides about their right to sleep and meal breaks was based on "Sarene meeting the New York State requirements." (*Id.* 85:9–14.)

Block's opinions that Sarene provided adequate training and guidance to live-in aides regarding their right to meal and sleep breaks and adequate policies and procedures for these workers to report call-to-duty interruptions to these breaks are therefore inadmissible because they lack an adequate basis in facts or data under Rule 702(b). Block's testimony underscores that he failed to review sufficient training materials, guidelines, or policies to support these conclusions. There is no basis for Block's opinion that Sarene's training, guidelines, and policies on these topics were adequate during the period from March 2017 through March 26, 2019

120

because Block's opinions are based on his review of a Sarene policy manual that only went into effect on or after March 26, 2019. (*See* Block July 7, 2023 Dep. 99:22–102:8.) Moreover, Block also lacks an adequate foundation in facts or data for his opinion that Sarene had adequate training, guidelines, policies, and procedures on these topics between March 26, 2019 and December 31, 2020 because Block and Defendants have failed to show the following: (1) that the Sarene policy manual Block reviewed actually included any purported policy and procedure by which live-in aides could report call-to-duty interruptions to their meal and sleep breaks to Sarene's on-call coordinator; (2) that the policy manual was actually provided to Sarene's live-in aides; and (3) that there were any other training materials or guidance provided to live-in aides regarding their entitlement to meal and sleep breaks and procedures for reporting call-to-duty interruptions between March 26, 2019 and December 31, 2020.

Accordingly, Block is precluded under Rule 702(b) from offering opinions about whether Sarene provided sufficient training and guidance to its live-in aides regarding their entitlement to meal and sleep breaks and whether Sarene provided adequate policies and procedures so that live-in aides could report call-to-duty interruptions to these breaks, including the opinions set forth in Sections I, VI.C, and IX of his initial report and Sections I, IV.B, and IV.C of his rebuttal report. (Block Rpt. at 3, 23, 38; Block Rebuttal 3, 16, 18–19.)

### k.  *Block's Opinions Regarding Sarene's Handwritten Logs Documenting Live-in Aides' Calls to Sarene's Call Center*

#### i.  **Block's Opinions**

Block opines in Section IV.C of his initial report that Sarene "require[d] aides to report in real time through a call center that ensures the proper care is being provided" and testified in his deposition that there is no evidence in the handwritten logs documenting calls by live-in aides to

this call center that Sarene's violated the FLSA.[29] (Block Rpt. at 23; Block July 7, 2023 Dep. 116:2–7.)

### ii.  **The Parties' Positions**

The Acting Secretary argues that these opinions should be precluded under Rule 702(b) because they are based on insufficient facts or data. (Pl.'s Block Mot. at 20.) Specifically, the Acting Secretary argues that Block reached these opinions by relying solely on his review of "20–50 pages of Serene's [handwritten] call logs (out of over 3500 [pages])" documenting calls by live-in aides to the Sarene call center. (*Id.*)

Defendants argue that during Block's two-day deposition, the Acting Secretary did not show Block a single call log that indicated an FLSA violation. (Defs.' Block Resp. at 20.) Further, Defendants contend that Block understood that it was Sarene's policy for aides to report call-to-duty interruptions to sleep and meal breaks to the call center. (*Id.*) Defendants only offer an aide activity sheet used later in the relevant time period to support the argument that Sarene had such a policy. (*Id.* (citing DEF 000877).)

### iii.  **Analysis**

Here, Rule 702 precludes Block's broad opinion that there is no evidence of any violation of the FLSA's overtime or recordkeeping requirements in the 3,500 pages logging calls by Sarene live-in aides to the company's call center. During his deposition, Block testified to "skimming" only 20 to 50 pages of the more than 3,500 handwritten pages to reach his opinion that the logs do not demonstrate that Sarene violated the FLSA. (Block July 7, 2023 Dep. 116:2–

---

[29] Block testified that the handwritten logs did not "have evidence that there was a 13-hour violation." (Block Dep. July 7, 2023 116:6–7.) As stated above, I understand a 13-hour rule violation to refer to the situation where a live-in aide is not compensated for call-to-duty interruptions to meal and sleep breaks. *See supra* Discussion Block § III.B.a.

118:11.) Block was unable to identify any Sarene training, guideline, or policy documents that he reviewed, which instructed live-in aides to report call-to-duty interruptions to sleep and meal breaks to the call center. (*Id.* at 120:15–25; 92:18–94:11.)

Based on his own testimony, Block reviewed only roughly .6% to 1.4% of the 3,500 pages of call logs produced in this litigation. Block has failed to explain why review of such a small sample is sufficient to support his sweeping conclusion that there is no evidence to support an FLSA violation anywhere in the 3500 pages logging calls by live-in aides to Sarene's call center. Contrary to Defendants' contention that Block's opinion on this issue is admissible unless the Acting Secretary can identify a specific call log showing a failure to pay overtime or keep required records, Defendants must show that Block's opinions are based on sufficient facts or data as required by Rule 702(b) and reached through application of reliable principles and methods under Rule 702(c). Here, Defendants fail to meet either burden.

Accordingly, Block is precluded under Rule 702(b) and (c) from testifying that the logs of live-in aides' calls to Sarene's call center do not contain evidence of FLSA violations. Block has already been precluded from testifying that Sarene had a policy that "require[d] aides to report in real time through a call center that ensures the proper care is being provided." Block Rpt. at 23; *see also supra* Discussion Block § III.B.j.iii(2).

C.  Block's Rebuttal of Reckrey Contains Inadmissible Opinions

As explained throughout this Opinion and Order, significant portions of Block's rebuttal report are identical to his initial report. In Section V of his rebuttal report, Block offers five opinions to rebut the opinions set forth in Reckrey's initial report. (Block Rebuttal at 22–23.) I have already found that all five rebuttal opinions are inadmissible for the reasons discussed above. Below is a summary.

Block's first rebuttal opinion is that "Serene has provided multiple avenues and resources to aides to accurately report the time that they work and to access the assistance needed with work out of their scope all while ensuring they are properly compensated." (Block Rebuttal at 22.) As explained above, Block failed to rely on sufficient facts or data to reach his opinion that Sarene provided sufficient training and guidance to live-in aides regarding their right to meal and sleep breaks and adequate policies and procedures for live-in aides to report call-to-duty interruptions to these breaks. *See supra* Discussion Block § III.B.j.iii(2). For the same reasons, Block is precluded from testifying to his first rebuttal opinion under Rule 702(b) and (c).

Block's second rebuttal opinion is that:

> Serene would increase profits for the times that the aides worked more than 13 hours in a shift by receiving additional compensation from the managed long-term care company. If Serene were to refuse to upgrade the level of care required for its patients, it would be leaving hundreds of thousands of dollars on the table that they could be compensated for by billing for the shifts performed by registered nurses.

(Block Rebuttal at 22–23.)[30] As explained above, Block's opinions regarding any mechanism by which Sarene could have sought external funding to compensate live-in aides for overtime worked are irrelevant to any of fact of consequence in this action under Rule 401 and are therefore inadmissible under Rules 402 and 702. *See supra* Discussion Block § III.B.e. In addition, any probative value from Block's opinions on this issue is substantially outweighed by the danger of confusing the issues, misleading the jury, wasting time, and unfair prejudice to the Acting Secretary under Rule 403. Accordingly, Block is precluded from testifying to his second rebuttal opinion.

---

[30] It is unclear whether Block made a typographical error when referring to "registered nurses" in his second rebuttal conclusion. I understand him to have meant live-in aides, the only group of Sarene employees relevant to this action.

124

Block's third rebuttal opinion is that "[i]t appears that in review of [aide activity sheets] and patient reports, Dr. Reckrey has reviewed cherry picked keywords that remove critical context and color to situations, allowing her to create conclusions based on partial narratives." (Block Rebuttal at 22.) First, as noted earlier, Block lacks the knowledge, skills, training and experience to analyze Sarene patient files and has not reviewed a single Sarene patient file in this case. *See supra* Discussion Block § III.A. Second, and also noted earlier, Block has failed to review a sufficient number of aide activity sheets and call logs to reach any reliable conclusions. *See supra* Discussion Block §§ III.B.j.iii(1); III.B.k. Additionally, as I have explained in my evaluation of Reckrey's opinions, any weaknesses in her analysis of Sarene's aide activity sheets and patient files are appropriately addressed through cross-examination. *See supra* Discussion Reckrey §§ III.B.b, III.B.f. Accordingly, Block is precluded from testifying to his third rebuttal opinion because he is unqualified to offer this opinion under Rule 702(a) and the opinion is based on insufficient facts or data under Rule 702(b).

Block's fourth rebuttal opinion is that "[t]he evaluation process in which a patient's level of care determined has been able to capture the complexity of patient care, and to challenge the legitimacy of Serene's policies is a direct attack on the New York State Department of Health standards and all other MLTCs that provide care to tens of thousands of people across New York State." (Block Rpt. at 23.) As discussed at length, this fourth rebuttal conclusion is another iteration of Block's opinion set forth in his initial report that a finding that Defendants are liable in this action will have a negative macroeconomic impact the home health industry in New York. *See supra* Discussion Block § III.B.d. Block is precluded from offering these opinions, which are pure speculation because such opinions are irrelevant to any fact of consequence to the claims and defenses in this action under Rule 401 and are therefore inadmissible under Rules 402 and

702. *See id.* Furthermore, the probative value of any such opinions is substantially outweighed by the danger of confusing the issues, misleading the jury, wasting time, and unfair prejudice to the Acting Secretary under Rule 403. *See id.* Accordingly, Block is precluded from testifying to his fourth rebuttal conclusion under Rules 402, 702, and 403.

Block's fifth rebuttal opinion is that "[b]y allowing for flexible care plans, the New York State Department of Health has allowed for humane treatment for both the patient and the aide, while ensuring that the quality of care remains deliverable. To belittle the complexity of patient care into a regimented schedule, Dr. Reckrey and the Department of Labor's conclusions leave the livelihood of both patients and aides at risk." (Block Rpt. at 23.) Block challenges Reckrey's opinions that Sarene patients served by live-in aides experienced high care needs and required assistance with a wide variety of tasks, which is based on her analysis of Sarene patient files. Block suggests that Reckrey's opinions conflict with the NYDOH's predictive assessment that the care needs of Sarene patients served by live-in aides can be met during the 13 hours for which live-in aides are compensated during each 24-hour period. As discussed, Block is not qualified to offer opinions on the medical conditions or care needs of Sarene patients. *See supra* Discussion Block § III.A. Block is not a physician and has not provided medical, health, or personal care to home bound patients in any capacity. *See id.* He therefore lacks sufficient knowledge, skills, training, and experience in assessing the care needs of homebound patients. *See id.* Accordingly, Block is precluded from testifying to his fifth rebuttal opinion because he is unqualified to offer this opinion under Rule 702(a), the opinion is based on insufficient facts or data under Rule 702(b), and it is the product of unreliable principles and methods under Rule 702(c).

As discussed above, each opinion in the summary of conclusions in Section I of Block's rebuttal report is inadmissible and Block is precluded from testifying about any of these opinions. *See supra* Discussion Block § III.B.

## CONCLUSION

Defendants' Motion to Preclude the Expert Report and Testimony of the Acting Secretary's Expert, Jennifer M. Reckrey, MD (ECF No. 167), is denied in part and granted in part. As addressed in detail above, Reckrey is precluded from offering opinions about the following at trial:

(1) the *frequency* by which Sarene live-in aides experienced call-to-duty interruptions to their meal and sleep breaks (Reckrey Rpt. at 8–9; 11 (emphasis added));

(2) live-in aides' perception of being compensated for shifts—rather than hours—worked (*id.* at 9);

(3) whether Sarene "treated punitively" live-in aides who reported working outside compensated hours or "discouraged" live-in aides from reporting such work (*id.* at 10–11); and

(4) that "MLTC approval of live-in 24-hour care clearly does not mean that care only occurs during compensated times" (*id.* at 9).

Moreover, Defendants' Motion to Exclude Reckrey is denied with respect to all other opinions set forth in Reckrey's initial report, declaration, and supplemental declaration.

I grant the Acting Secretary's Motion to Exclude Defendants' Expert Adam E. Block, PhD (ECF No. 165), in its entirety. Block is therefore precluded from being offered as an expert or rebuttal expert at trial.


Dated: Central Islip, New York
       March 8, 2025


                                        */s/ Nusrat J. Choudhury*
                                        NUSRAT J. CHOUDHURY
                                        United States District Judge

127