**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Lori Chavez-DeRemer, Secretary of Labor, United States Department of Labor,<br><br>                                    Plaintiff,<br><br>              -v-<br><br>Sarene Services, Inc. d/b/a Serene Home Nursing Agency; Irene Manolias, Individually,<br><br>                                    Defendants. | 2:20-cv-3273<br>(NJC) (ST) |

## <u>MEMORANDUM & ORDER</u>

NUSRAT J. CHOUDHURY, United States District Judge:

The Secretary of the United States Department of Labor ("Secretary") brings this action under the Fair Labor Standards Act of 1938 ("FLSA") against Defendants Sarene Services, Inc. ("Sarene"), a company that provides home health aide services, and Irene Manolias, the company's owner (collectively "Defendants"). The Secretary brings claims to enforce the FLSA's overtime, recordkeeping, and anti-retaliation provisions, 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), 215(a)(3), 215(a)(5), 216, 217, on behalf of more than 500 workers whom Defendants formerly employed as home health aides—workers known as "live-in" aides because they worked 24-hour shifts in the homes of Sarene patients.

On April 1, 2025, a jury trial commenced in this action. On April 11, 2025, Defendants filed a motion in limine seeking to offer seven additional, previously undisclosed witnesses to provide testimony in order to impeach the trial testimony of certain worker witnesses who had testified on behalf of the Secretary during the first eight days of trial. (Defs.' Ltr., ECF No. 259.) None of the seven witnesses had been disclosed to the Secretary as persons with discoverable

information in the course of discovery under Rules 26(a) or 26(e) of the Federal Rules of Civil Procedure. Nor had Defendants disclosed these witnesses to the Secretary in the Initial Joint Pre-Trial Order (ECF No. 182) filed on December 13, 2024, in any filings or communications following the Secretary's disclosure on February 14, 2025 of the identities of the worker witnesses who would be called by the Secretary to testify at trial, or in the Revised Joint Pre-Trial Order (ECF No. 225) filed on March 18, 2025. On April 13, 2025, the Secretary filed a written submission opposing Defendants' motion in limine. (Pl.'s Resp., ECF No. 261.)

For the reasons discussed below, Defendants' motion is denied in part and granted in part. Defendants may offer Patient Representative F.M., Patient Representative C.S., Carol Probst, and Patient Representative K.C. as impeachment witnesses at trial to testify as to the specific topics identified below. Defendants are precluded from offering Patient Representative M.S., Patient Representative D.S., and Patient Representative T.M. as witnesses because the record makes clear that Defendants offer these previously undisclosed witnessed as general rebuttal witnesses—not impeachment witnesses. Further, Defendants fail to identify the specific trial testimony of the Secretary's worker witnesses that would be contradicted by these witnesses.

## BACKGROUND

### I.    The Court's Prior Decision on Defense Impeachment Witnesses Ingrid Leon and Patient S.E.

Defendants' current motion in limine is not the first time this Court has been confronted with the question of whether witnesses disclosed by Defendants long after the close of discovery and the Secretary's disclosure of worker witnesses may testify at trial. The Secretary filed a previous motion in limine to preclude defense witnesses Ingrid Leon and Patient S.E., which raised the same issues as those raised here. (ECF Nos. 184-1, 210.) During the March 31, 2025

2

pre-trial conference, I ruled that Defendants are permitted to call Ingrid Leon and Patient S.E. at

trial to provide testimony to impeach anticipated testimony by the Secretary's proposed

witnesses Nekita Smith and Jennifer Grant, respectively. (*See* Min. Entry, Mar. 31, 2025.)

I found that the parties agreed that Defendants did not timely disclose Leon and Patient

S.E. as persons with discoverable information as required by Rules 26(a) and 26(e). I then

evaluated whether Defendants should be precluded from offering Leon and Patient S.E. as

rebuttal witnesses under Rule 37(c) of the Federal Rules of Civil Procedure by analyzing the

factors set forth in *Chamberlain Estate of Chamberlain v. City of White Plains*:

> (1) the party's explanation for the failure to comply with the discovery order;
> (2) the importance of the testimony of the precluded witness;
> (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and
> (4) the possibility of a continuance.

960 F.3d 100, 117 (2d Cir. 2020). I ruled that Defendants may call Ingrid Leon and Patient S.E.

to impeach specific anticipated testimony by Nekita Smith and Jennifer Grant, but precluded

Leon and Patient S.E. from providing any testimony beyond specific impeachment testimony

under Rule 37(c) of the Federal Rules of Civil Procedure. (*See* Min. Entry, Mar. 31, 2025.)

## II.    Defendants Proffer of Seven Impeachment Witnesses During Trial

On April 10, 2025, Defendants informed the Court that they seek to offer the testimony

of witnesses to impeach the testimony of the Secretary's worker witnesses who had thus far

testified at trial. (Trial Tr. 1942–46.) I permitted Defendants to file a motion in limine addressing

the admissibility and foundation for offering each of the proposed impeachment witnesses. (*Id.*

1947–48, 1953–55.)

Defendants filed a letter brief in support of their motion in limine on April 11, 2025,

arguing for permission to offer seven additional trial witnesses who were not disclosed to the

Court or the Secretary until after the start of trial. (Defs.' Ltr.) Defendants assert that each of these seven proposed witnesses are offered "to impeach specific testimony provided by [the Secretary's] worker witnesses for the first time at trial" (*Id.* at 2.)

The Secretary filed a response on April 13, 2025. (Pl.'s Resp.) The Secretary argues that Defendants should be precluded from calling these seven witnesses on grounds that vary depending on the specific witness, including that Defendants offer the witnesses for impeachment on collateral matters and that a number of witnesses are being offered to provide broad rebuttal testimony, rather than testimony that would specifically impeach testimony provided by worker witnesses at trial. (*Id.*)

Defendants filed a reply letter on April 13, 2025. (Defs.' Reply, ECF No. 263.)

## LEGAL STANDARDS

Rule 26(a)(1) requires the disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, *unless the use would be solely for impeachment*." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e). Evidence offered solely for impeachment therefore falls within an exception to the disclosure requirements of Rules 26(a) and 26(e).

In *Friedman v. Rehal*, the Second Circuit explained that impeachment evidence is "evidence that is offered to discredit a witness to reduce the effectiveness of her testimony by

4

bringing forth evidence which explains why the jury should not put faith in her testimony." 618 F.3d 142, 153 (2d Cir. 2010) (cleaned up). Calling a witness to impeach the testimony of another witness normally involves eliciting contradictory testimony from the impeaching witness. The doctrine of "impeachment by contradiction, which operates as a limited exception to Rule 608(b)," "provides that when a witness puts certain facts at issue in his testimony, the [opposing party] may seek to rebut those facts, including by resorting to extrinsic evidence if necessary." *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010) (quotation marks omitted). In *Ramirez*, the Second Circuit concluded that the district court did not abuse its discretion by permitting the government to "impeach by contradiction" through a witness who contradicted defendant's statement on direct examination to a non-collateral matter. *Id.* at 501. By contrast, the Circuit concluded that the district court improperly permitted testimony by a witness whose testimony did not contradict the defendant's actual testimony provided on direct or cross-examination. *Id.*

The Second Circuit's decision in *United States v. Casamento,* 887 F.2d 1141 (2d Cir. 1989), is instructive on the distinction between impeachment and rebuttal testimony. In *Casamento*, a defendant testified that he worked as a precious stones broker, thereby "[i]mplicitly . . . deny[ing] that he had any connection to narcotics trafficking." *Id.* at 1172. To rebut this implication, the trial judge allowed the prosecution to offer evidence that the defendant's name and telephone number had been found on a person from whom officers seized six kg of cocaine. *Id.* at 1171–72. Although the seized evidence did not directly contract defendant's testimony as to his employment, the Second Circuit affirmed, ruling that linking the defendant to a drug trafficker "who clearly was involved both in importing activities and drug trafficking" was proper *rebuttal* testimony. *Id.* at 1172.

5

Finally, "it is well-settled that a trial judge has broad discretion to prevent a defendant from calling witnesses for impeachment purposes on collateral matters." *Nappi v. Yelich*, 793 F.3d 246, 252 n.3 (2d Cir. 2015) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

## DISCUSSION

### I.    Defendants May Not Offer Previously Undisclosed Witnesses as Rebuttal Witnesses

Each of the seven witnesses Defendants propose as impeachment witnesses were never disclosed as individuals likely to have discoverable information that the Defendants may use to support their defense. (*See* Defs.' Ltr.) Defendants maintain that they had no way of identifying these individuals, who are patient representatives and a private aide, at any point before the Secretary's worker witnesses testified at trial. (Trial Tr. 2109.)

This argument is unpersuasive. Since the inception of this lawsuit, Defendants have known the names of the workers on whose behalf the Secretary has pursued this action both because the workers' names are identified in an appendix to the initial Complaint and because the workers are Defendants' own former employees. (*See* Compl. Ex. A, ECF No. 1-1.) Defendants know the identities of the patients who were served by their former live-in aides and also know the patient representatives with whom they were in contact when serving these patients. This information lies squarely within Defendants' custody and control. Defendants nevertheless maintain that they had no way of identifying the patient representatives and private aides who could serve as witnesses to impeach the trial testimony of the Secretary's witnesses at any point before the witnesses testified. (Trial Tr. 2109.)

Defendants rely on the fact that the Secretary did not disclose the identities of worker witnesses who would be called to testify at trial until 45 days before trial. I ordered the Secretary to disclose her worker witnesses 45 days before trial in light of the informant's privilege. *See In*

6

*re United States*, 565 F.2d 19, 22–24 (2d Cir. 1977) (describing the informant's privilege as "an ancient doctrine with its roots in the English common law founded upon the proposition that an informer may well suffer adverse effects from the disclosure of his identity . . . . Courts have long recognized, therefore, that, to insure cooperation, the fear of reprisal must be removed and that the most effective protection from retaliation is the anonymity of the informer.") (citations omitted). As Defendants are aware, in July 2024, as this case proceeded closer to trial, I balanced Defendants' legitimate interest in trial preparation against the Secretary's legitimate interest in maintaining the confidentiality of individuals who had shared or were sharing information with the Secretary and required the Secretary to disclose the identities of worker witnesses no later than September 27, 2024. *See* Min. Entry, Jul. 19, 2024; *see also Su v. Versa Cret Contracting Co.*, No. 21-cv-5697, 2024 WL 1704695, at *3, *10 (E.D.N.Y. Apr. 19, 2024) (entering a protective order preventing the disclosure of the names of employee-informant witnesses in a Fair Labor Standards Action brought by the Secretary of Labor prior to 45 days before trial based on the informant's privilege). Following the rescheduling of the trial date, the deadline was set to February 14, 2025, 45 days prior to the start of trial. (ECF No. 159 at 2.)

However, to the extent that Defendants may not have been aware before the close of the main discovery period in this action in December 2023 or the close of the retaliation claim discovery in April 2024, Defendants should have become aware that the patient representatives and private aides whom they seek to call as trial witnesses were people likely to have discoverable information when the Secretary disclosed the identity of her worker witnesses on February 14, 2025. Instead of disclosing these seven witnesses as soon as practicable after February 14, 2025, or even *at any point* during the 45 days prior to trial, Defendants disclosed this list of seven witnesses for the first time on or around the eighth day of trial.

The issue, of course, is that Rule 26(a)(1) requires the disclosure of the identities of individuals "likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1). Moreover, Rule 26(e) imposes a continuing obligation on parties to "supplement or correct" Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e).

As is clear from the record, Defendants failed to supplement their Rule 26(a) disclosures in a timely manner, as required by Rule 26(e), to include the seven witnesses they now seek to offer as witnesses at trial. Accordingly, I find that Defendants violated Rules 26(a) and 26(e) with respect to these seven witnesses.

I must therefore determine whether to preclude Defendants from calling each of these seven individuals as rebuttal witnesses under Rule 37(c) by analyzing the four *Chamberlain* factors. *See Chamberlain*, 960 F.3d at 117. *See Chamberlain*, 960 F.3d at 117.

As to the first factor, Defendants have not offered any reason why they failed to disclose these seven witnesses as individuals with discoverable information. At trial, Defendants asserted that they identified these witnesses in the initial Joint Pre-Trial Order by including the generic statement that Defendants "reserve the right to call any patients, patient representatives, patient family members, individuals who resided in the residence of the patient, or respite aides relating to any former employee called by Plaintiff as a witness." (ECF No. 182 at 31; ECF No. 225 at 30; Trial Tr. 1944.) Because a general, catch-all statement of this kind does not satisfy Rules 26(a) or 26(e), the first factor weighs in favor of precluding Defendants from calling the seven

individuals as rebuttal witnesses. As to the second factor, Defendants have stated that the testimony by these proposed witnesses is needed to impeach the credibility of several of the Secretary's worker witnesses. I find that the second factor weighs slightly against preclusion. With respect to the third factor, the Secretary will experience prejudice should these seven witnesses be allowed to testify as broad rebuttal witnesses because Defendants failed to disclose them as witnesses on whose testimony they may rely in their defense during the more than three years of fact discovery in this case and, consequently, the Secretary did not get the opportunity to depose them or conduct follow-up discovery. I find that the third factor therefore weighs in favor preclusion. Finally, the fourth factors weighs heavily in favor preclusion because discovery closed one year ago and we are in the middle of a four-week jury trial. Taken together, the *Chamberlain* factors counsel for precluding Defendants from calling any of the seven previously undisclosed witnesses in order to provide general rebuttal testimony.

Because "preclusion is a harsh sanction," *Bermudez v. City of New York*, No. 15-cv-3240, 2019 WL 136633, at *15 (E.D.N.Y. Jan. 8, 2019), I "inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses" before implementing a preclusionary sanction. *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988). Viewing the record as a whole, I find that there are no less drastic sanctions than precluding Defendants from offering these seven witnesses as witnesses at trial for any purpose, except for impeachment by specific contradiction. *See Ramirez*, 609 F.3d at 499–501 ("[I]mpeachment by contradiction . . . provides that when a witness puts certain facts at issue in his testimony, the [opposing party] may seek to rebut those facts, including by resorting to extrinsic evidence if necessary.")

I now analyze Defendants' proffered testimony by each of the seven previously undisclosed witnesses to determine whether Defendants have laid a proper foundation for offering these witnesses at trial for impeachment purposes only.

## II. Defendants' Offer of Undisclosed Individuals as Impeachment Witnesses

### 1. Patient Representative F.M.

#### i. The Parties' Positions

Defendants seek to offer the testimony of Patient Representative F.M. to impeach the testimony of Patrick Atta. (Defs.' Ltr. at 2–3.) Patient Representative F.M. is the son of Patient F.M. (*Id.* at 2.) Patient F.M. was the patient to whom Atta was assigned while working for Sarene. (*Id.*)

Defendants seek to offer Patient Representative F.M.'s testimony to impeach Atta's testimony that Patient F.M. would hallucinate once per week, that the hallucinations would last four days, and that Patient F.M.'s son (i.e., Patient Representative F.M.) would only visit two to three times per week for 20 to 30 minutes each time. (*Id.*)

Defendants state: "[Patient Representative] F.M. is expected to testify that his father did not suffer from hallucinations as described by Mr. Atta." (*Id.* at 3.) Additionally, "[Patient Representative] F.M. is expected to testify that he would regularly relieve Mr. Atta so that he could leave the home to go on long walks to the post office, which is believed to be approximately three (3) miles away from patient's residence—walks which greatly exceeded the twenty (20) or thirty (30) minutes referenced by Patrick Atta." (*Id.*)

The Secretary argues that Defendants have failed to identify the specific testimony by Atta on a topic on which Patient Representative F.M. would have personal knowledge such that he may offer testimony that actually impeaches Atta's testimony by contradiction. (Pl.'s Resp. at

10

2–3.) The Secretary asserts the Defendants are actually offering Patient Representative F.M. as a witness to provide rebuttal testimony, which should be precluded under Rule 37 and the *Chamberlain* factors. (*Id.*)

On reply, Defendants argue that Patient Representative F.M. would testify that he visited more frequently and for longer periods of time than those identified by Atta in his testimony and that this testimony would impeach Atta's testimony that Atta only received 20 to 30 minutes to himself two or three times per week. (Defs.' Reply at 2.) Defendants also assert that Atta purportedly testified at his deposition that Patient F.M.'s hallucinations lasted four to five hours at night, not 4 days as he testified at trial. (*Id.*)[1]

### ii. Analysis

First, reviewing the portions of the trial transcript Defendants have cited in their briefs, I see that Atta testified that he would only have time to himself when his patient's son was in Patient F.M.'s home. (Trial Tr. 167–68.) Atta testified that his patient's son would visit "Maybe twice a week or three times a week" and would stay for "twenty, 30 minutes." (*Id.* 168.) Atta testified that Patient F.M.'s son would sometimes be at Patient F.M.'s home when Atta was providing care for the patient. (*Id.* 250.) Atta testified that his patient would hallucinate once a week and it would take four days to go away. (*Id.* 187–88.)

Patient Representative F.M.'s anticipated testimony would specifically contradict only Atta's testimony that his patient's son would visit "Maybe twice a week or three times a week"

---

[1] Defendants mischaracterize Atta's deposition testimony. In response to a question about how long he stayed up with his patient when his patient experienced hallucinations at night, Atta responded that he did not sleep for four or five hours when his patient hallucinated. (Atta Dep. 30.) Contrary to Defendants' characterization, Atta did not testify in deposition that the hallucinations lasted only four or five hours at night. (*Id.*)

and would stay for "twenty, 30 minutes," and Atta's testimony that his patient would experience hallucinations once a week that lasted for four days. (*Id.* at 168, 187–88.) Patient Representative F.M. has personal knowledge, as Patient F.M.'s son, to testify to the frequency and length of his own visits to Patient F.M.

Since Atta testified that he was only able to take time to himself when Patient F.M.'s son visited, impeaching Atta's testimony to the frequency and length of the visits is relevant to a fact of consequence in this action—whether Atta was able to receive three one-hour meal breaks without interruption. This is not a collateral matter.

Second, with respect Patient F.M's hallucinations, I find that Patient Representative F.M. has personal knowledge to contradict Atta's testimony that Patient F.M.'s hallucinations lasted four days. To the extent that Patient Representative F.M. testifies that he visited his father, Patient F.M., more often than the two to three times a week to which Atta testified and that Patient Representative F.M. did not observe his father hallucinate over the course of four consecutive days, but instead a shorter period of time, that testimony would contradict Atta's testimony about the length of Patient F.M.'s hallucinations.

Atta's testimony regarding the four-day length of Patient F.M.'s hallucinations has a tendency to make it more probable that Atta was not able to receive three one-hour meal breaks without call-to-duty interruptions. Therefore, Patient Representative F.M.'s testimony undermining Atta's testimony on this specific issue would address a fact of consequence to the claims and defenses in this action—not a collateral issue.

Third, Atta testified that Patient F.M.'s son did not visit at night. Defendants proffer that Patient Representative F.M. would testify that he visited more frequently and for longer than Atta testified. But Defendants have *not* proffered that Patient Representative F.M. will testify

12

that he visited his father during sleeping hours. Therefore, under Rule 602 of the Federal Rules of Evidence, Patient Representative F.M. does not have the personal knowledge to testify as to Atta's general ability to take sleep breaks or the specific impact of F.M.'s hallucinations on Atta's ability to get eight hours of sleep at night with five hours uninterrupted.

Fourth, because Atta did not testify as to where he went when he left Patient F.M.'s home for any meal breaks, Patient Representative F.M. may not testify about this issue. During the April 15, 2025 conference prior to the start of trial, Defendants represented that Patient Representative F.M. has personal knowledge about how Atta used any free time based on his discussions with Atta. (Trial Tr. 2272–73.) Defendants have not shown that such hearsay satisfies any exception to the rule against the admission of hearsay at trial. *See* Fed. R. Evid. 803. Moreover, because Atta did not testify as to where he went during any meal breaks that he was able to take when Patient Representative F.M. was with his patient, there is no basis for specific contradiction on this issue.

Accordingly, Defendants are permitted to call Patient Representative F.M. at trial only to impeach the specific testimony of Atta as to the frequency and length of the visits by Patient Representative F.M. to Patient F.M.'s home and the duration of Patient F.M.'s hallucinations. Due to lack of personal knowledge, under Rule 602, Patient Representative F.M. is precluded from testifying about Atta's ability to take sleep breaks, whether Atta experienced interruptions to his sleep, or the specific impact of F.M.'s hallucinations on Atta's ability to get eight hours of sleep at night with five hours of uninterrupted sleep. Nor may Patient Representative F.M. testify about where Atta went during any daytime breaks when Patient Representative F.M. was with his father, Patient F.M.

## 2. **Patient Representative C.S.**

### i. *The Parties' Positions*

Defendants seek to offer the testimony of Patient Representative C.S. to impeach the testimony of worker witness Nina Osei. (Defs.' Ltr. at 3.) Patient Representative C.S. is the son of Patient E.S., who was one of three patients to whom Nana Osei was assigned to while working for Sarene. (*Id.*) Defendants offer testimony by Patient Representative C.S. to impeach two areas of Osei's testimony: (1) her testimony that she checked in on Patient E.S. twice during the night that this patient fell out of bed; and (2) her testimony that "there was no room for her to sleep in the home, and, as a result, she had to sleep on the floor." (*Id.* (citing Trial Tr. 970).) Specifically, Defendants state: "[Patient Representative] C.S. will testify that he observed video footage which reflected that his mother had fallen out of bed at approximately 10:15 p.m. on August 15, 2017, that his mother was crying and calling for help for hours, and that, at no point, did Ms. Osei ever respond to his mother's calls for assistance." (*Id.*) Defendants also assert that "[Patient Representative] C.S. will testify that there was a private room for aides to sleep in within the home." (*Id.*)

The Secretary argues that Patient Representative C.S.'s personal knowledge of what transpired the night his mother fell out of bed is based on "his viewing of a purported video recording," which has not been produced and may or may not have captured Nana Osei checking in on Patient E.S. (Pl.'s Resp. at 3.) The Secretary contends that Defendants proffer testimony by Patient Representative C.S. in lieu of offering the video itself in an attempt to make an end-run around Rule 613(b) of the Federal Rules of Evidence's requirement that a witness be "given an opportunity to explain or deny" a prior inconsistent statement, as well as Rule 1002 of the

14

Federal Rules of Evidence's requirement that an original recording be admitted "to prove its content." (*Id.*)

The Secretary argues that the proffered testimony of Patient Representative C.S. would not specifically contradict Nana Osei's testimony regarding her checking in on Patient E.S. because Nana Osei's testimony was "imprecise with respect to timing, and Defendants failed to develop her testimony on cross examination about when exactly she checked her patient in the night." (*Id.*)

The Secretary also contends that the proffered testimony of Patient Representative C.S. would not specifically contradict Nana Osei's testimony regarding where she was supposed to sleep. (*Id.* at 4.) The Secretary asserts that Defendants mischaracterize Nana Osei's testimony, and that Nana Osei did not testify that there was no room for her to sleep, but instead that she did not "*see* any room" in which she was supposed to sleep. (*Id.* (emphasis added).) Given that it was Nana Osei's first day at Patient E.S.'s home and that neither the departing aide nor Patient E.S. provided Nana Osei with an orientation, the Secretary asserts that Patient Representative C.S.'s anticipated testimony would not directly contradict Nana Osei's statement that she did not "see" any room she was supposed to sleep in. (*Id.*)

On reply, Defendants assert that Patient Representative C.S. has personal knowledge including through his viewing of the video recording and that Nana Osei herself testified that she learned of the existence of the video recording from Patient Representative C.S. (Pl.'s Resp. at 2.) Defendants point to Nana Osei's trial testimony where defense counsel asked, "Is it accurate that you did not tend to the patient between 10:15 at night and 8:15 in the morning?" and Nana Osei responded, "No, it's not." (*Id.* (quoting Trial Tr. 997).) Defendants also point to Nana Osei's testimony that the video recording was incorrect because she visited the patient's room

15

twice during the night, as well as her testimony that she "didn't have a place to sleep at all" and had to sleep on the floor. (*Id.* at 2–3 (quoting Trial Tr. at 969–70, 997–98).)

       *ii.  Analysis*

Nana Osei testified she "did not see any room that [she] was supposed to sleep in" and that she "slept on the floor." (Trial Tr. 969–70.) She also testified, however, "I didn't have any place to sleep at all." (*Id.* 969.) When asked by Defendants' counsel, "Is it accurate that you did not tend to the patient between 10:15 at night and 8:15 in the morning?," Nana Osei responded "No, it's not." (*Id.* 997.) Nana Osei also denied the accuracy of the video recording of her patient falling out of bed and testified that she did not write that the video recording was inaccurate on the Employee Corrective Action Form she was shown during the meeting in which her employment at Sarene was terminated. (*Id.* 997–98.)

Concerning the provision of private sleeping quarters to Nana Osei, Patient Representative C.S.'s proffered testimony would not directly contradict Nana Osei's testimony that she did not "see" any room for her to sleep in. (Trial Tr. 969.) However, the proffered testimony of Patient Representative C.S. "that there was a private room for aides to sleep in within the home" would contradict Nana Osei's testimony that she "didn't have any place to sleep at all." (Defs.' Ltr. at 3; Trial Tr. 969.) Thus, this specific portion of the proffered testimony is proper impeachment on a non-collateral issue.

I now turn to the proffered testimony of Patient Representative C.S. relating to the care needs of Patient E.S., which is a non-collateral issue as it relates to Nana Osei's testimony concerning her ability to receive eight hours of sleep, five hours of which are uninterrupted due to her provision of patient care. Patient Representative C.S.'s anticipated testimony that he "observed video footage which reflected that his mother had fallen out of bed at approximately

16

10:15 p.m. on August 15, 2017, . . . and that, at no point, did Ms. Osei ever respond to his mother's calls for assistance" would specifically contradict Nana Osei's testimony in which she stated that it was inaccurate that she did "not tend to the patient between 10:15 at night and 8:15 in the morning." (*Id.*; Trial Tr. 997.) It would also contradict her testimony that "In the middle of the night, I heard her crying and things like that. I went in and I opened the door. I woke up once, honestly, and I went to check up on her." (*Id*. 971.)

Defendants' submissions and oral arguments on this issue underscore that Patient Representative C.S.'s personal knowledge of whether Nana Osei did or did not respond to Patient E.S.'s calls for assistance is entirely based on the video that was apparently recording what happened in Patient E.S.'s room during the night in question. It is unclear whether the visual frame of the video or the audio captured whether an individual opened the door to Patient E.S.'s room to check in on her, although it may be presumed that the video depicts Patient E.S. when in bed and also possibly when on the floor of the room. Defendants previously sought to introduce the video as evidence at trial, but after meeting and conferring with the Secretary, reported that they no longer wished to do so.

Based on the representations made to the Court about the video and the proffered testimony, Patient Representative C.S.'s testimony about what the video did or did not show is more prone to error than seeking admission of the video itself. *See* Fed. R. Ev. 1002 ("An original . . . recording . . . is required in order to prove its content unless these rules or a federal statute provides otherwise."). Accordingly, the parties are ordered to meet and confer regarding the submission of the video for the jury's viewing to resolve the question of whether Nan Osei truthfully testified that it was inaccurate that she did "not tend to the patient between 10:15 at night and 8:15 in the morning" (Trial Tr. 997) and that she went into Patient E.S.'s room "[i]n

17

the middle of the night . . . and I opened the door" in order to check in on the patient (*Id.* 971). To the extent the parties wish to explore a factual stipulation concerning the contents of the video, they may do so.

Accordingly, Patient Representative C.S. is permitted to testify at trial "that there was a private room for aides to sleep in within the home." (Defs.' Ltr. at 3.) He is precluded from testifying that he did not see Nana Osei check in on his mother from 10:15 at night to 8:15 in the morning when reviewing the video recording.

### 3. **Carol Probst**

#### i. *The Parties' Positions*

Defendants seek to offer the testimony of Carol Probst to impeach the testimony of Susan Wojtanowski. (*Id.*) Probst was a private care nurse who cared for the patient Wojtanowski testified was her primary case. (*Id.*)

Defendants offer Probst to impeach Wojtanowski's testimony that her primary patient, a relative of Defendant Manolias, could be "destructive," that "she did a lot of yelling," and "a lot of slamming," and that the patient "locked herself in the bedroom a lot." (*Id.* (quoting Trial Tr. 1710).) Defendants also seek to impeach Wojtanowski's testimony that she never slept in the bedrooms at any of her cases, including her primary case, and that she did not remember if a bedroom was made available for her. (*Id.* (citing Trial Tr. 1708–09).)

Defendants assert that Probst can "testify that the patient . . . was not destructive, did not do a lot of yelling or slamming," and "did not lock herself in her bedroom." (Defs.' Ltr. at 4.) Defendants state that Probst "will testify that Ms. Wojtanowski had a private bedroom in the home," and "that she came to the home four or five times per week and for 5 to 6 hours per day, at which time, Ms. Wojtanowski was either fully or partially relieved from duties." (*Id.*)

The Secretary argues that Probst's anticipated testimony would not specifically contradict Wojtanowski's testimony regarding her primary patient's behavior because Wojtanowski testified about the patient's behavior at night—not during the day when Probst came to assist. (Pl.'s Resp. at 4–5 (citing Trial Tr. 1710–12.)) According to the Secretary, Probst does not have personal knowledge of the patient's nighttime behavior and thus must be precluded from testifying under Rule 602. (*Id.* at 5.)

The Secretary also argues that Probst's anticipated testimony that Wojtanowski had a private bedroom at the home of her primary patient does not contradict Wojtanowski's testimony, because Wojtanowski testified that she did not recall if she had a private bedroom at her primary patient's home. (*Id.* (citing Trial Tr. at 1688–89, 1708–09).)

The Secretary further argues that Probst should be precluded from testifying about whether Wojtanowski was partially or fully relieved from her duties during Probst's shifts because Probst, a private caregiver who was not employed by Sarene, lacks the personal knowledge of Wojtanowski's job duties at Sarene. (*Id.* at 5–6.) Further, the Secretary asserts that it is unclear whether Probst even observed Wojtanowski perform her duties given that Wojtanowski testified that Probst took the patient outside of the home during her visits. (*Id.*) Even if Probst was present in the home when Wojtanowski cared for the patient, the Secretary asserts that Defendants' fail to proffer that Probst observed whether or not Wojtanowski was performing other duties for the patient like cleaning and laundry. (*Id.*)

On reply, Defendants assert that the Secretary mischaracterizes Wojtanowski's testimony regarding the timing of her primary patient's behaviors and that Probst would not testify to the hours she was not present. (Defs.' Reply at 3–4.) Defendants argue that Probst need not have "intimate personal knowledge of the terms and conditions of" Wojtanowski's employment to

19

testify that she personally observed Wojtanowski leave the home for hours at a time, take meal breaks, and use the private bedroom in the home. (*Id.*) Defendants also assert that Wojtanowski may be impeached for not recalling having a bedroom in the home, considering she testified that she cared for her primary patient for 50 or 60 percent of the two years she spent working with Sarene. (*Id*. at 4.)

      *ii.  Analysis*

First, Probst may testify that she personally observed that Wojtanowski had a private bedroom at the home. When asked whether she had a bedroom at her primary client's home, Wojtanowski answered "No." (Trial Tr. 1708.) When asked as a follow up "Was a bedroom made available to you?" she responded, "I don't remember." (*Id.*) Wojtanowski also testified that she did not sleep in another aide's bed even when one was available for her over the course of her ten to twelve fill-in cases due to a personal preference. (*Id.* 1708–09.)

Nevertheless, the parties' joint proposed jury instructions indicate that an employer must provide an employee with private quarters in a homelike environment and that if an employee does not have a private place to sleep, the full eight-hour sleep period must be paid. (ECF No. 219 at 10.)

Probst's testimony that she personally observed that Wojtanowski had a private bedroom at the home would contradict Wojtanowski's testimony that she did not. This speaks to whether Wojtanowski had adequate sleeping facilities and, as per the parties' jointly proposed jury instruction on bona fide sleep periods, is not collateral to the facts of consequence in this action.

Second, Probst may testify that she came to the home four or five times per week and for five to six hours per day because Wojtanowski testified that Probst came to the home for "a couple of hours for the day. Anywhere—if I'm not mistaken, if I remember, maybe 3 to 4

hours." (Trial Tr. 1687.) Probst's proffered testimony that she came to the home four or five times per week and for five to six hours per day thus may contradict Wojtanowski's own testimony. Moreover, Probst's proffered testimony addresses whether Wojtanowski was able to get three one-hour, uninterrupted meal breaks each day and is thus not testimony on a collateral issue.

While Probst may testify as to the specific issues I have identified, there are two areas of her proffered testimony that are not impeachment, and concern extend into precluded rebuttal testimony.

First, Probst may not testify that Wojtanowski was fully or partially relieved from her duties when Probst was present at Wojtanowski's primary patient's home. While it may be that Probst observed Wojtanowski leaving the patient's home, testimony to that fact would not contradict Wojtanowski's testimony. Wojtanowski has already admitted that she was able to leave the home when Probst was visiting. (*See* Trial Tr. 1686.) Furthermore, Wojtanowski testified that when Probst was present, she could leave the house to get herself "some food, or spend a little time while [Probst] took the client out for a while." (*Id.*) Wojtanowski also testified that she did other duties for her primary patient when Probst was with the patient. (*Id.* 1687.) Most importantly, Wojtanowski testified that the reason Probst came to her primary patient's house was "to relieve [her] for a while." (*Id.*) Wojtanowski testified that she used "just about" the entire time the private nurse (i.e. Probst) was there to do other tasks,[2] the other portions of

---

[2] Specifically, when asked what she did "while the private aide was with the patient," Wojtanowski testified as follows:

> A. Well, I caught up with laundry, cleaned the floors, cleaned the bathroom, do the laundry.

her testimony account for the fact that Probst's service permitted Wojtanowski some time for herself. (*Id.*)

Second, Probst may not testify that Wojtanowski's primary patient "was not destructive, did not do a lot of yelling or slamming, [and] did not lock herself in her bedroom" due to the timeframe implicated by Wojtanowski's testimony on these issues and Probst's lack of personal knowledge. (Defs.' Ltr. at 4.)

When asked if her primary patient was a "good sleeper," Wojtanowski testified that the described behaviors would occur "from the *late nighttime to early morning hours* . . . every day and night [she] was there." (Trial Tr. 1710, 1712 (emphasis added).) Defendants have not proffered in either of their two letter briefs or their arguments in court that Probst was present *at any point* in the patient's home from the "late nighttime to early morning hours." (*Id.* 1712.) As noted, Wojtanowski cited this specific timeframe when testifying that her primary patient exhibited the behaviors at issue. Probst therefore lacks the necessary personal knowledge under Rule 602 to specifically contradict Wojtanowski's testimony on this point.

Instead, Defendants argue that "Ms. Probst should be permitted to testify *if* she personally observed any such behavior for the patient." (Defs.' Reply at 3 (emphasis added).) Defendants fail to lay a proper foundation for Probst to impeach Wojtanowski's testimony about her patient's behavior by specific contradiction.

Accordingly, Defendants are permitted to call Probst at trial only to impeach the specific testimony of Wojtanowski identified above. Probst is permitted to testify (1) that Wojtanowski

---

Q. The entire time that the private aide was with the client?
A. Just about. Just about.

(Trial Tr. 1686.)

was provided a private bedroom at her primary patient's home, and (2) that Probst came to the home of Wojtanowski's primary patient four or five times per week and for five to six hours at a time.

### 4.  Patient Representative M.S.

#### i.  The Parties' Positions

Defendants seek to offer the testimony of Patient Representative M.S. to testify that when Wojtanowski cared for his mother, Patient J.S., Wojtanowski was provided and used a private bedroom. (Defs.' Ltr. at 4.)

The Secretary asserts that it is unclear whether Patient Representative M.S. will testify that Wojtanowski slept in a private bedroom or simply used it to store her belongings. (Pl.'s Resp. at 6.) If it is the latter, then the Secretary asserts that there is no contradiction because Wojtanowski testified that she used bedrooms in roughly half her cases to store her belongings. (*Id.* (citing Trial Tr. 1688–89).) If it is the former, the Secretary asserts that the Defendants have not represented that Patient Representative M.S. has personal knowledge of where Wojtanowski slept. (*Id.*)

The Secretary also asserts that Patient Representative M.S.'s testimony would be collateral to this action as whether Wojtanowski slept in or simply stored her belongings in a private bedroom because it would be irrelevant to determining whether Defendants were obligated to pay Wojtanowski overtime for the nights Wojtanowski worked. (*Id.*)

On reply, Defendants clarify that they seek to offer Patient Representative M.S. to impeach "Wojtanowski's specific testimony that she never slept in beds during her case assignments." (Defs.' Reply at 4.) Defendants assert Patient Representative M.S. has personal

23

knowledge of where Wojtanowski slept in his mother's home based on conversations with Wojtanowski and direct observations of Wojtanowski. (*Id.*)

During oral argument on April 14, 2025, the Secretary raised an additional argument: that, insofar as Defendants' proposed witnesses' personal knowledge is based on conversations with other people, this would be impermissible hearsay testimony. (Trial Tr. 2272.) Defendants did not dispute this argument and asserted that their impeachment witnesses had personal knowledge based on observations and would not rely on hearsay. (*Id.* 2272–73.)

       *ii.   Analysis*

Patient Representative M.S.'s proffered testimony that Wojtanowski slept in a bed at Patient J.S.'s home would only contradict her testimony that she did not ever *sleep* in a bed in a private bedroom during assignments with Sarene. Wojtanowski testified that "Maybe about half" of her "fill in patients had a bedroom for the permanent aide." (Trial Tr. At 1687.) At no point did Wojtanowski testify specifically about not having a bed at Patient J.S.'s home. Therefore, Patient Representative M.S.'s proffered testimony that Wojtanowski was provided a bedroom at his mother's home would not specifically contradict Wojtanowski's testimony.

Additionally, the fact of whether Wojtanowski did or did not sleep in any bed that was provided to her at Patient J.S.'s home is a collateral issue. It is not probative of whether adequate sleeping facilities *were provided* to Wojtanowski for use when she served as a Sarene live-in aide, which she does not deny was the case at times. Whether Wojtanowski availed herself of any adequate sleeping facilities provided to her is irrelevant to determining whether Defendants were obligated to pay her for her work during the night.

Accordingly, Defendants are precluded from calling Patient Representative M.S. to provide impeachment testimony at trial.

**5. Patient Representative K.C.**

*i. The Parties' Positions*

Defendants seek to offer testimony by Patient Representative K.C. to impeach the testimony of both Taibat Kareem and Vida Osei. Patient Representative K.C. is the daughter of Patient J.C., a patient to whom both Kareem and Vida Osei were assigned while employed by Sarene. (Defs.' Ltr. at 4.) Defendants proffer that Patient Representative K.C. will contradict Vida Osei's testimony that she never received eight hours of sleep, with five hours uninterrupted, due to the need to change Patient J.C.'s diapers twice per night. (*Id.* (citing Trial Tr. 815).) Defendants also proffer that Patient Representative K.C. will testify that Patient J.C. "was prescribed medication that generally resulted in her sleeping through the course of the night without assistance or interruption." (*Id.*) Defendants represent that Patient Representative K.C. will "testify that she and her siblings visited for much longer than the thirty (30) minutes referenced by" Vida Osei, and that "during visits [Patient Representative K.C.] made to her mother's residence," Vida Osei "spent time in her private bedroom." (*Id.*) Finally, Defendants proffer that Patient Representative "K.C. will testify that one [of] her siblings took [Patient] J.C. to all of her medical appointments which permitted time for meal breaks for both" Kareem and Vida Osei when they were assigned to care for Patient J.C. (*Id.*)

With respect to Kareem, the Secretary asserts that Defendants do not point to any proffered testimony by Patient Representative K.C. that would contradict specific testimony by Kareem at trial. (Pl.'s Resp. at 6.)

With respect to Vida Osei, the Secretary argues the Defendants have not shown that Patient Representative K.C. has the personal knowledge required by Rule 602 to contradict Vida Osei's testimony that she assisted her patient with toileting at night. (*Id.* (citing Trial Tr. 817).)

25

The Secretary asserts that Patient Representative K.C. did not reside in the Patient J.C.'s home and was not present at night when Vida Osei provided assistance to Patient J.C. (*Id.*) According to the Secretary, Patient Representative K.C. therefore lacks personal knowledge of whether Patient J.C.'s prescribed medication actually caused her to sleep through the night such that Patient J.C. did not require assistance from live-in aides with toileting during that time. (*Id.* at 6–7.) The Secretary also asserts that, as a lay witness, Patient Representative K.C. cannot testify about the side effects of specific medication. (*Id.* at 7.) Finally, the Secretary argues that there is no specific contradiction between Vida Osei's testimony concerning family visits and Patient Representative K.C.'s anticipated testimony. (*Id.*)

On reply, Defendants argue that Patient Representative K.C. had personal knowledge of whether medication caused Patient J.C. to sleep at night based on direct observation *and* discussions with Vida Osei and Patient J.C. (Defs.' Reply at 4.) Defendants also assert that Patient Representative K.C.'s proffered testimony—that Vida Osei was able to spend time in her own living quarters when Patient Representative K.C. visited and that Patient Representative K.C.'s siblings took Patient J.C. to medical appointments—contradicts Vida Osei's testimony that she never had time to herself during the day. (*Id.* (citing Trial Tr. 817).)

With respect to Kareem, Defendants assert on reply that Kareem testified that she never received five hours of uninterrupted sleep and was not able to take meal breaks outside the presence of her patients. (*Id.* (citing Trial Tr. 601).) Defendants assert that Patient Representative K.C.'s testimony would contradict this testimony by showing that Kareem had time in the home without Patient J.C. when the Patient J.C. was attending medical appointments with her daughter or daughters. (*Id.*)

*ii.   Analysis*

As a preliminary matter, Patient Representative K.C. is precluded from testifying at trial about what Vida Osei or Patient J.C. said to her as Defendants have not shown that such hearsay is admissible under any hearsay exception set forth in Rule 803 of the Federal Rules of Evidence.

Furthermore, Patient Representative K.C. does not have personal knowledge required under Rule 602 to testify about whether or not her mother, Patient J.C., was awake at night and required assistance from Vida Osei because Patient Representative K.C. was not physically present in the home during the nights when Vida Osei was assigned to the patient. Nor has Patient Representative K.C. been qualified as a medical expert under Rule 702, Fed. R. Evid., to opine on the general side effects of medication on her mother, much less the impact of that medication, if any, on the toileting needs of the patient during nighttime hours.[3] As a lay witness, Patient Representative K.C. lacks the knowledge, skills, training and/or experience required to offer such opinions. Moreover, Defendants have not proffered that Patient Representative K.C. physically observed the side effects of any medication on Patient J.C. during the nighttime hours when Vida Osei was assigned to the patient.

Contrary to Defendants' representation, Vida Osei did not only testify that Patient J.C.'s children would visit her for thirty minutes at a time. Vida Osei testified that one of Patient J.C.'s children would visit once a month, and that those visits would last from Friday evening to Sunday afternoon. (Trial Tr. 818.) She also testified that Patient J.C.'s other children would come to visit for thirty minutes. (*Id.*) Accordingly, Patient Representative K.C. may testify that

---

[3] In at least one case in the Second Circuit, a nurse has been designated as an expert under Rule 702. *See, e.g., AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 1:17-cv-598, 2022 WL 2643583, at *2 (N.D.N.Y. July 8, 2022).

she and certain siblings visited Patient J.C. for longer than the thirty minutes described by Vida

Osei only to the extent that Patient Representative K.C. does not address any visits by either

herself or a sibling that took place once a month and lasted from Friday evening to Sunday

afternoon.

Additionally, Patient Representative K.C. may testify that "[Vida] Osei regularly spent

time in her own private living quarters during time periods [that Patient Representative K.C.]

visited the home." (Defs.' Reply at 4.) In response to questioning, Vida Osei responded as

follows:

Q. Were you able to go to another room and have time to yourself during the day?
A. You don't have to do that.

The proffered testimony by Patient Representative K.C. would contradict Vida Osei's testimony

that she was not able to go to another room, such as her private living quarters, to have time for

herself during the day.

However, Defendants fail to lay the required foundation for other portions of Patient

Representative K.C.'s proffered testimony, including testimony that one of her siblings took

Patient J.C. to all of her medical appointments, which enabled Kareem and Vida Osei to

experience uninterrupted meal breaks when assigned as a live-in aide to this patient. Defendants

have not identified any specific testimony by either Kareem or Vida Osei that would be

contradicted by the proffered testimony. Neither Kareem nor Vida Osei testified that Patient J.C.

did not travel outside of the home to attend medical appointments with the assistance of a child.

To the extent that this happened, any child accompanying Patient J.C. to medical appointments

would not have been physically in the home to observe whether Kareem or Vida Osei used the

time to complete other live-in aide responsibilities or to take uninterrupted meal breaks.

Moreover, Defendants have not represented that the medical appointments occurred during time

periods where Kareem had her meal breaks or that Patient J.C. ate her own meals during the time that she left the home to attend medical appointments. Thus, the proffered testimony does not contradict Kareem's testimony that she would not take meal breaks outside the presence of her patients and that she understood that she was not allowed to leave her patient when on a meal break.

Accordingly, Patient Representative K.C. may testify only on the following topics: (1) that she and her siblings visited for much longer than thirty minutes to impeach Osei's testimony, except she is precluded from testifying about any visits by a sibling that constituted a monthly visit that lasted from Friday evening to Sunday afternoon; (2) that Vida Osei regularly spent time in her own private living quarters during time periods that Patient Representative K.C. visited the home.

**6.  Patient Representative D.S.**

*i.  The Parties' Positions*

Defendants offer the testimony of Patient Representative D.S., the daughter of Patient R.S., to impeach the testimony of Odura "Doris" Oguntunde. Patient R.S. was the patient to whom Oguntunde referred as her fifth patient during her trial testimony. (Defs.' Ltr. at 4.) Defendants state that Patient Representative "D.S. is a registered nurse who will testify to her father's condition" and "that her father did not prevent Ms. Oguntunde from getting sleep or meal breaks." (*Id.*)

The Secretary argues that Defendants do not point to a specific portion of Oguntunde's testimony they seek to contradict with Patient Representative D.S.'s testimony, and that Defendants' decision to highlight Patient Representative D.S.'s experience as a registered nurse indicates that Defendants seek to impermissibly elicit expert testimony through a lay witness

29

about conditions common to many of Sarene's patients. (Pl.'s Resp. at 7.) The Secretary asserts that Defendants did not timely offer Patient Representative D.S. as an expert witness as required by Rule 26, Fed. R. Civ. P., and that she may not provide lay testimony that is based on scientific, technical, or other specialized knowledge under Rule 701(c), Fed. R. Evid. (*Id.*) The Secretary also asserts that Defendants have not shown that Patient Representative D.S. has personal knowledge of Oguntunde's breaks, highlighted by the fact that Patient R.S.'s file shows that he lived alone. (*Id.*)

On reply, Defendants only assert that Patient Representative D.S. will testify "that her father did not regularly wake up and walk around the house during the night time as alleged by Ms. Oguntunde." (Defs.' Reply at 4 (citing Trial Tr. 1570).)

    *ii.  Analysis*

Oguntunde testified that Patient R.S., her fifth patient, did not "sleep at all" and that he "want[ed] to be walking around the house" "all the time," which interrupted her sleep breaks. (Trial Tr. 1570.) Oguntunde testified that she would have to "follow him around . . . with the wheelchair to see where he's going so he won't harm himself or fall down with the wheelchair." (*Id.*)

Defendants have not proffered that Patient Representative D.S. has personal knowledge to contradict Oguntunde's testimony. Defendants have not shown that Patient Representative D.S. was ever present in the home when Oguntunde was assigned to Patient R.S. To the contrary, Defendants' patient files indicate that Patient R.S. lived alone. (*See* Pl.'s Resp. at 7 (citing DEF015145–46, DEF015155–56, DEF015252–53).) On reply, Defendants do not rebut the Secretary's arguments that:

    -  Patient R.S. lived alone;

- Patient Representative D.S. did not directly observe Patient R.S.'s nighttime behaviors or their impact on Oguntunde's ability to receive sleep breaks at night; or
- Defendants have highlighted Patient Representative D.S.'s status as a registered nurse in an effort to offer impermissible testimony on medical issues by a lay witness who was not disclosed as an expert or found to be qualified to serve as an expert by knowledge, skill, training, or experience.

(*See generally* Defs.' Reply.)

Patient Representative D.S. therefore lacks the personal knowledge required under Rule 602 to offer testimony that would specifically contradict Oguntunde's testimony that her fifth patient did not "sleep at all" and that his walking around the house at night interrupted her sleep breaks. Trial Tr. 1570; *see* Fed. R. Evid. 602. Defendants are therefore precluded from calling Patient Representative D.S. to provide impeachment testimony at trial.

### 7. <u>Patient Representative T.M.</u>

#### i. *The Parties' Positions*

Defendants seek to offer testimony by Patient Representative T.M. to impeach the testimony of Abigail Boayke-Boateng. (Defs.' Ltr. at 4–5.) Patient Representative T.M. is the daughter of Patient C.M., a patient to whom Boayke-Boateng was assigned while working as a live-in aide for Sarene. (*Id.* at 4.) Specifically, Defendants proffer that Patient Representative "T.M. will testify that she herself regularly cooked and fed her mother—providing breaks for Ms. Boakye-Boateng. [Patient Representative] T.M. will also testify that Ms. Boakye-Boateng oftentimes spent much of the day in her private bedroom, reli[e]ved from duty." (*Id.* at 5.) Defendants also represent that Patient Representative T.M. will testify "that Boakye-Boateng took naps on the couch in the home or in her bedroom during the day—contributing to her eight (8) hour sleep allotment." (*Id.*)

The Secretary argues there is "no specific contradiction between Abigail Boakye-Boateng's trial testimony and the purported impeachment testimony that Defendants seek to

offer." (Pl.'s Resp. at 8.) According to the Secretary, Boakye-Boateng "testified that she cared for approximately 17 patients," and that because she testified generally to her experience across patients, it is unclear which of her statements applied to Patient C.M. (*Id.* (citing Trial Tr. 1428).) The Secretary asserts that while Boakye-Boateng testified that her meal breaks were interrupted by patient care needs for the "majority of clients" about "twice or three times" per day, she also admitted that these interruptions did not occur with all of her patients. (*Id.* (citing Trial Tr. 1442).) The Secretary also argues that Boakye-Boateng did not testify about whether she napped during the day when her sleep time was interrupted. (*Id.*)

On reply, Defendants argue that Patient Representative T.M.'s testimony would be offered "to impeach Ms. Boakye-Boateng's testimony concerning a lack of meal breaks." (Defs.' Reply at 5.) Defendants also proffer that Patient Representative T.M. would testify that Boakye-Boateng took naps on the couch in the home or in her private bedroom during the day, contributing to her eight-hour sleep allotment and demonstrating that she was relieved from duty during certain periods of the day. (*Id.*) According to Defendants, Patient Representative T.M.'s testimony would undermine the credibility of Boakye-Boateng's testimony that the majority of her meal breaks were interrupted two to three times per day. (*Id.* (citing Trial Tr. at 1442).)

### ii. Analysis

Boakye-Boateng testified that for the "*majority of the clients,* because of their situation," her "meals were interrupted." (Trial Tr. at 1442 (emphasis added).) Boakye-Boateng testified that her meal breaks were interrupted "[e]ither twice or three times because of the client's condition because the clients that [she] was taking care of . . . was incontinent and . . . need[ed] assistance to go to the bathroom and stuff like that." (*Id.*) On direct examination, the Secretary followed up and asked, "Was that true for all of your patients?" Boakye-Boateng responded,

"*No*. Like, one of my clients that I remember because of the mental condition that she had and she was also having the skin disease, she needs much water to be hydrated, and that was what was happening during the day, yeah, and at night, too." (*Id.* (emphasis added).) She then testified, "And some, too, were interrupted but not like that one that I'm referring to. Some would be twice, some would be once, yeah." (*Id.* 1442–43.)

As shown in the text above, Boakye-Boateng did not specify which of her specific patients were included in her testimony about the "majority of [her] clients" whose care needs caused her to experience interruptions to meal breaks. (*Id.* at 1442) Further, Boakye-Boateng also clearly testified she did *not* experience daily interruptions to her meal breaks with respect to *all* of the patients she served while working as a live-in aide for Sarene. (*Id.*)

Defendants have failed to direct the Court to any portion of Boakye-Boateng's testimony that would be specifically contradicted by the Patient Representative T.M.'s proffered testimony. Testimony that Boakye-Boateng received meal breaks when assigned to Patient J.C. does not contradict her testimony about not receiving meal breaks when assigned to a "majority" of her clients. Nor do Defendants show how Patient Representative T.M.'s proffered testimony that Boakye-Boateng took daytime naps that purportedly contributed to her sleep time when assigned to Patient J.C. contradicts Boakye-Boateng's testimony concerning interruptions to her *meal breaks*.[4] Indeed, Defendants' argument improperly conflates sleep breaks and meal breaks. (*See* Defs.' Reply at 5.)

---

[4] Moreover, Defendants fail to show why any such naps do not fall within compensable time under 29 CFR § 785.18, which provides as follows:

> Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry. They promote the efficiency of the employee and are customarily paid for as

Accordingly, it is clear that Patient Representative T.M.'s testimony would not serve as impeachment evidence, but as broad rebuttal evidence. As discussed earlier, because Patient Representative T.M was not timely disclosed pursuant to Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure, Defendants are precluded from offering her as a rebuttal witness at trial. In light of Defendants' failure to lay the proper foundation for Patient T.M. to serve as an impeachment witness, I preclude Defendants from calling Patient Representative T.M. as a witness at trial.

## CONCLUSION

For the reasons set forth above, I preclude Defendants from calling any of the seven newly disclosed witnesses to testify at trial for general rebuttal purposes. I further preclude Defendants from calling Patient Representative M.S., Patient Representative D.S., and Patient Representative T.M. to testify at trial due to Defendants' failure to lay the proper foundation for these witnesses to impeach the testimony of the Secretary's worker witnesses through specific contradiction. However, I allow Defendants to offer Patient Representative F.M., Patient Representative C.S., Carol Probst, and Patient Representative K.C. to testify at trial for the limited impeachment purposes described above.

Dated: Central Islip, New York
       April 16, 2025

                                              _/s/ Nusrat J. Choudhury_____
                                              NUSRAT J. CHOUDHURY
                                              United States District Judge

---

working time. **They must be counted as hours worked**. **Compensable time of rest periods may not be offset against other working time** such as compensable waiting time or on-call time.

29 CFR § 785.18 (emphasis added).