**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Lori Chavez-DeRemer, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>-v-<br><br>Sarene Services, Inc. d/b/a Serene Home Nursing Agency; Irene Manolias, Individually,<br><br>Defendants. | 2:20-cv-3273 (NJC) (ST) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

The Secretary of the United States Department of Labor brought this action to enforce the Fair Labor Standards Act of 1938 ("FLSA") against Defendants Sarene Services, Inc. ("Sarene"), a company that provides home health services, and Irene Manolias, the company's owner (collectively "Defendants"). (Am. Compl., ECF No. 139.) The Amended Complaint brings claims to enforce the FLSA's overtime, recordkeeping, and anti-retaliation provisions on behalf of more than 500 workers whom Defendants formerly employed as home health aides. (*See id.* (bringing claims under the FLSA, 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), 215(a)(3), 215(a)(5), 216, 217).) These workers are known as "live-in" aides because they worked 24-hour shifts in the homes of Sarene patients. (*Id.*)

On April 5, 2025, after a four-week trial, the jury rendered a verdict in favor of the Secretary, finding Defendants liable for violating the FLSA's overtime and recordkeeping provisions from March 19, 2017 through December 31, 2020 and for violating the FLSA's anti-retaliation provisions. On September 4, 2025, the Court held a one-day bench trial regarding the

sole issue remaining in the litigation: whether the imposition of liquidated damages should be reduced under 29 U.S.C. § 260 due to any good faith of the Defendants. (Min. Entry, Sept. 4, 2025.) This Opinion and Order presents the Court's findings of fact and conclusions of law following the bench trial.

For the reasons explained below, the imposition of liquidated damages will not be reduced pursuant to 29 U.S.C. § 260. Securing such a reduction requires demonstrating Defendants' good faith and that it was objectively reasonable for Defendants to believe that they were not violating FLSA's requirements with respect to their live-in aide employees. Neither is true here.

The ample evidentiary record shows that Defendants' conduct and omissions causing their failure to keep records of live-in aides' actual hours worked and to pay these workers overtime wages for work performed during meal and sleep breaks were not in good faith. Not only did Defendants fail to take active steps to learn about their FLSA recordkeeping and overtime obligations for their live-in aide employees, they also failed to take active steps to comply with those requirements. The steps that Defendants did take, including their haphazard and confusing use of "Job Description" forms to purportedly obtain workers' agreement that Defendants would deduct eleven hours of time during each 24-hour shift as non-compensable, were not taken in good faith.

Moreover, it was objectively unreasonable for Defendants to believe that they were complying with the FLSA's requirements in light of their obviously deficient and confusing recordkeeping practices, failure to seek legal guidance, and failure to actually investigate live-in aides' reports of work performed during meal and sleep breaks. Indeed, out of a workforce of more than 500 people, Defendants did not pay a single live-in aide overtime wages on even one

occasion for an interrupted meal or sleep break during the nearly four-year-long period at issue in this action. While good faith and objective reasonableness are both required to secure a reduction of liquidated damages, Defendants have not met either standard as detailed below.

## PROCEDURAL HISTORY

### I. Pre-Trial Proceedings and the Jury Trial

The Secretary filed this action on July 21, 2020, alleging that Defendants failed to keep accurate time records and to pay hundreds of former live-in aide employees minimum and overtime wages in violation of various provisions of the FLSA, 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), and 215(a)(5). (Compl., ECF No. 1.) After more than three years of discovery, on October 13, 2023, this case was reassigned to my docket. (Elec. Order, Oct. 13, 2023.)

On July 15, 2024, I granted the Secretary's motion to amend the Complaint (ECF Nos. 106, 132), which sought to add a FLSA retaliation claim under 29 U.S.C. § 215(a)(3). (ECF No. 138.) The Secretary filed the Amended Complaint on July 16, 2024. (Am. Compl., ECF No. 139.)

A jury trial was first scheduled to begin in this action on March 31, 2024, and was later moved to April 1, 2024. (Trial Sch. Order at 3, ECF No. 159; Elec. Order, Dec. 16, 2024.) On November 14, 2024, the Secretary filed a letter requesting that the Court conduct a bench trial to determine whether liquidated damages should be reduced under 29 U.S.C. § 260 due to any good faith of the Defendants, in the event that a jury were to find that Defendants violated the FLSA's overtime provision and are liable for unpaid overtime compensation and liquidated damages under 29 U.S.C. § 219(c). (ECF No. 169.) On December 6, 2024, I granted the Secretary's application, relying on the Second Circuit's decision in *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1063 (2d Cir. 1988), which provides that the issue of an employer's good faith defense to

liquidated damages for unpaid overtime wages in violation of 29 U.S.C. § 216(c) is "within the discretion of the district judge" under 29 U.S.C. § 260. (Min. Entry, Dec. 6, 2024.)

On December 13, 2025, the parties filed motions in limine seeking to preclude their adversaries from offering certain proposed witness testimony and exhibits during the jury trial. (ECF Nos. 181, 184.) The Secretary's seventh motion in limine sought to preclude documents and witnesses that were untimely disclosed by Defendants, including proposed defense exhibit DX-LL, which consists of 28,785 pages of Sarene employee onboarding documents. (MIL at 25–31, ECF No. 184-1.) Within DX-LL are a series of documents entitled "HHA/PCA Live-in Aide Job Description Agreement," to which the parties refer as the "Job Description." (*See, e.g.*, DX-LLLLLL, ECF No. 308-1.)

On February 7, 2025, I held oral argument on the parties' motions in limine and granted the Secretary's motion to preclude Defendants from introducing DX-LL into evidence during the jury trial, applying the test set forth in the Second Circuit's decision in *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 117 (2d Cir. 2020). (Feb. 7, 2025 Hr'g Tr. 136:20–23, ECF No. 212.) I reserved decision on whether Defendants could use DX-LL and the nearly 30,000 pages of additional untimely disclosed documents to impeach the testimony of the Secretary's trial witnesses. (*Id.* 134:13–135:5.)

On March 31, 2025, I held a pre-trial conference during which I heard argument and held that Defendants may use any "signed statements by worker witnesses that constitute prior inconsistent statements, and are within the portions of the exhibits at issue that were not disclosed during discovery," which include the Job Description. (Mar. 31, 2025 Hr'g Tr. 17:9–13.)

On April 1, 2025, I commenced a four-week jury trial on the Secretary's recordkeeping, overtime, and retaliation claims. (Min. Entry, Apr. 1, 2025; Second Proposed Jury Tr. JPTO, ECF No. 225.[1]) Defendants sought to impeach the credibility of all of the Secretary's worker witnesses, each of whom previously worked for Defendants as live-in aides. (*See, e.g.*, Jury Trial Tr. 108:5–113:10; 432:25–435:13; 652:3–653:2.) For each worker witness, Defendants sought to use a copy of the Job Description featuring the signature of that witness, arguing that the signed Job Description contained statements inconsistent with the witness' trial testimony. (*See, e.g.*, *id.*)

On April 25, 2025, the jury rendered a verdict finding Defendants liable for violating the FLSA's overtime and recordkeeping provisions from March 19, 2017 through December 31, 2020 ("the relevant period") and for violating the FLSA's anti-retaliation provisions in the course of gathering declarations from former Sarene live-in aides—the workers on whose behalf the Secretary is pursuing this action. (Min. Entry, Apr. 25, 2025; Jury Verdict Sheet, ECF No. 284; Second Proposed Jury Tr. JPTO, ECF No. 225 at 5.) Pursuant to the jury's verdict, Defendants are liable for unpaid overtime compensation and liquidated damages under 29 U.S.C. § 219(c), statutory damages for the FLSA recordkeeping violation, and $46,200 in punitive damages for violation of the FLSA's anti-retaliation provision. (Jury Verdict Sheet.)

## II. The Bench Trial

On June 25, 2025, I ordered the parties to submit a proposed schedule for the submission of a joint pre-trial order for the bench trial describing proposed witnesses and exhibits, the scope of witness testimony, and evidentiary objections, and a proposed schedule for briefing the issue

[1] The Second Proposed Jury Trial JPTO amended the parties' First Proposed Jury Trial JPTO, filed December 13, 2024. (ECF No. 182.)

of whether liquidated damages should be reduced under 29 U.S.C. § 260. (Elec. Order, June 25, 2025.) On July 2, 2025, the parties filed a joint letter outlining the proposed witness testimony and exhibits they sought to offer into evidence during the hearing, as well as objections to the other side's proffered testimony and exhibits. (First Proposed Bench Tr. JPTO, ECF No. 295.)

On July 14, 2025, I held a teleconference concerning the proposed pre-trial order for the bench trial and heard the parties' objections concerning the scope of witness testimony and exhibits proffered by the opposing side. (Min. Entry, July 15, 2025.) Plaintiffs argued that much of the witness testimony and exhibits Defendants sought to offer were duplicative of evidence introduced during the jury trial or irrelevant to the issue of Defendants' good faith defense. Defendants argued that they sought to offer only non-duplicative witness testimony and exhibits relevant to their good faith defense. I noted that significant portions of the proposed witness testimony identified by Defendants were duplicative of testimony offered and admitted during the jury trial, such as Defendants' intention to offer worker witness Inez Deen, who had already testified at trial. I required the parties to meet and confer regarding their objections and ruled that the parties were prohibited from offering witness testimony or exhibits at the bench trial that were duplicative of evidence admitted during the jury trial because the Court is fully cognizant of the full evidentiary record at trial. (Min. Entry, July 15, 2025.) I scheduled the bench trial for September 4 and 5, 2025, and required the parties to file simultaneous post-hearing briefs setting forth proposed findings of fact and conclusions of law by October 3, 2025. (*Id.*)

The parties submitted a July 21, 2025 letter reporting to the Court that they had conferred and resolved all objections to the scope of witness testimony and exhibits as reflected in a revised proposed pre-trial order for the bench trial. (Second Proposed Bench Tr. JPTO, ECF No.

299.) I accepted the revised proposed pre-trial order as the operative document notifying the Court of the witnesses and exhibits that each side intended to proffer at the bench trial.

Although the Court had set aside two days for the bench trial, it lasted only around three hours on September 4, 2025. (Min. Entry, Sept. 4, 2025.) The Court heard testimony from two witnesses: (1) Defendant Manolias, who was called by Defendants and the Secretary; and (2) Craig S. Hofmann, the former director of operations and human resources at Sarene, who was called by Defendants. (Bench Trial Tr. 5:7–10; 110:22–23, 112:8–10.) Although Defendants had identified three additional witnesses who would testify at the bench trial—Ira Podlofsky, Julie Annunziata, and Emina Poricanin—in the revised pre-trial order, Defendants did not call them to testify, even though none of these witnesses had testified at the jury trial. (Second Proposed Bench Tr. JPTO at 1–2.) Likewise, the Secretary identified Kristi Manolias, Tyler Stauber, and Nicole Stahl as additional bench trial witnesses, but did not call any of them to testify. (*Id.* at 2–3.)

Defendants sought to introduce proposed defense exhibit DX-LLLLLL, a redacted exemplar of the Job Description, into evidence during the bench trial over the Secretary's objection. (Bench Trial Tr. 15:11–25:12.) I permitted Defendants to publish DX-LLLLLL to Defendant Manolias during her testimony, but reserved decision on whether I would admit that exhibit as evidence and consider it along with Defendant Manolias' related testimony when making factual findings and legal conclusions on Defendants' good faith defense. (*Id.* 24:24–25:3.) I ordered Defendants to file a motion in limine seeking the admission of DX-LLLLLL into evidence within two weeks of the bench trial and required the Secretary to file a response one week thereafter. (*Id.* 130:18–23.)

Defendants filed their motion in limine seeking the admission of DX-LLLLLL into evidence on September 18, 2025. (MIL, ECF No. 316.) The Secretary responded on September 25, 2025. (MIL Opp'n, ECF No. 317.)

On September 30, 2025, the Secretary filed a post-bench trial brief. (Sec'y Br., ECF No. 319.) On October 3, 2025, Defendants filed their post-bench trial brief. (Defs.' Br., ECF No. 320.)

## THE PRELIMINARY EVIDENTIARY ISSUE

As a preliminary matter, I first determine whether to admit DX-LLLLLL into evidence.

### I. Discovery

Magistrate Judge Steven Tiscione marked the completion of discovery on December 4, 2023. (Min. Entry, Dec. 4, 2023.) On January 19, 2024, I granted the parties' joint proposal to engage in additional, limited discovery on the issue of retaliation to be completed by February 29, 2024. (Min. Entries, Jan. 12, 2024, Jan. 19, 2024.) The discovery period was extended from February 29, 2024 to May 3, 2024, due to the parties' numerous requests for additional time and various disputes.[2] All discovery was thereby concluded on May 3, 2024.

At no point during either the original discovery period or during the limited retaliation-focused discovery did Defendants produce any signed Job Descriptions or a blank, unsigned Job Description. Instead, Defendants first disclosed the Job Description on December 10, 2024, three days before the proposed joint pre-trial order was due, a *full year* after the close of the original discovery period, and *seven months* after the close of all discovery. (Feb. 7, 2025 Hr'g Tr. 126:16–21.)

[2] (*See* ECF Nos. 120, 123–24; Elec. Order, Feb. 13, 2024; Elec. Order, Mar. 13, 2024; Elec. Order, Apr. 8, 2024; Min. Entry, May 2, 2024; ECF No. 128.)

## II. Relevant Pre-Trial and Jury Trial Rulings Concerning Signed Job Descriptions

During the February 7, 2025 pre-trial conference, I granted the Secretary's motion in limine No. 7, which requested an order precluding Defendants from introducing into evidence at trial around 57,314 pages in proposed defense exhibits that Defendants had entirely failed to produce to the Secretary in discovery. (Feb. 7, 2025 Hr'g Tr. 136:20–23; ECF No. 184-1 at 25–31.) The precluded exhibits included proposed defense exhibit DX-LL, a 28,785-page exhibit which contained the signed Job Descriptions. (*Id.*) Defendants produced these documents to Plaintiffs in December 2023, just days prior to submission of the first proposed joint pre-trial order, even though Defendants had them in their possession and failed to disclose them during the more than three years of discovery in the case.

In reaching the decision to preclude Defendants from offering into evidence at trial documents they failed to produce during discovery, I evaluated the four factors set forth in *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100 (2d Cir. 2020), which courts in the Second Circuit consider when determining whether an exhibit should be precluded under Rule 37, Fed. R. Civ. P., due to a party's failure to disclose the information under Rule 26(a)(1)(A)(i), Fed. R. Civ. P. (Feb. 7, 2025 Hr'g Tr. 111:8–112:4; 135:7–137:20.) The four *Chamberlain* factors are:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Chamberlain*, 960 F.3d at 117; *Clones Investment, LLC v. People's Ins. Co. of China Prop. & Cas. Co. Ltd.*, 792 F. App'x 126, 128 (2d Cir. 2020) (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006)) (applying the same factors to determine whether documentary evidence shall be precluded under Rule 37 for failure to disclose under Rule 26(a)(1)(A)(ii)).

Applying the *Chamberlain* factors to proposed defense exhibit DX-LL, I found that even assuming that the second *Chamberlain* factor—the importance of the documents—weighed against precluding Defendants from introducing the documents at trial, the remaining factors weighed in favor of preclusion. (Feb. 7, 2025 Hr'g Tr. 136:24–137:2.)

Considering the first factor—the party's explanation for the failure to comply with the discovery order—Defendants' counsel claimed he did not know why these documents were not produced in discovery and that his client "does not have that information and prior counsel is not speaking to us." (*Id.* 118:11–19.) Due to Defendants' failure to articulate *any* explanation for the failure to produce *any* of the 28,785 pages of documents in DX-LL at any point, I found that "Defendants did not provide a satisfactory explanation for their failure to disclose these documents in the discovery process." (*Id.* 137:3–5.)

With respect to the third factor—the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony—I found that the prejudice suffered by the Secretary was "substantial" because Defendants sought to use at trial, but had failed to disclose during discovery "around 57,314 pages" of documents, including all 28,785 pages in DX-LL, "many of" which were "just one to two pages long, [] requiring the [] Secretary to comb through thousands, if not tens of thousands of documents." (*Id.* 137:5–11.)

Considering the fourth factor, the possibility of a continuance, I found that the April 1, 2025 trial date would "not be extended due to" the already "extensive delays" over the course of "this litigation, including [delays] due to [D]efendants' discovery conduct." (*Id.* 137:13–15.)

Taking these factors together, I concluded that proposed defense exhibit DX-LL and several other proposed defense exhibits were precluded based on a consideration of the *Chamberlain* factors. (*Id.* 137:19–20.) However, I reserved decision on whether Defendants

could use exhibit DX-LL and the other voluminous, untimely disclosed documents to impeach witnesses' testimony at trial if the document was signed by the specific witness whom Defendants sought to impeach. (*Id.* 134:13–135:5; *see also* Mar. 31, 2025 Hr'g Tr. 17:9–13.)

Ultimately, on March 31, 2025, after hearing additional argument from the parties, I permitted Defendants to use the signed Job Descriptions for impeachment purposes if they laid the proper foundation for use of the document as a prior inconsistent statement, in other words, a showing that a specific statement in the signed Job Description was inconsistent with a worker witness's trial testimony. (Mar. 31, 2025 Hr'g Tr. 17:9–13.)

The Secretary was provided the opportunity to raise any concerns about the authenticity of any of the signed Job Descriptions prior to their use at trial for impeachment purposes. Where there were no authenticity objections and where Defendants laid the proper foundation, I permitted Defendants to use the signed Job Descriptions to impeach a number of the Secretary's worker witnesses. (*See e.g.*, Jury Trial Tr. 108:5–113:10; 432:25–433:23; 652:3–653:2.)

## III. The Parties' Arguments Concerning DX-LLLLLL, the Unsigned Job Description

Defendants argue that I should admit proposed defense exhibit DX-LLLLLL, the unsigned Job Description, into evidence and consider it and the related testimony offered during the bench trial on the basis that the factors considered in my previous analysis of the signed Job Descriptions under *Chamberlain* have changed. (MIL at 2.) Defendants concede that the first *Chamberlain* factor—the importance of the documents—has not changed but assert that the other three factors now support admission. (*Id.*)

Defendants argue that the second *Chamberlain* factor—the importance of the exhibit—favors admission because DX-LLLLLL "reflect[s] the agreements between the Defendants and their employees to exclude sleep and meal periods from compensable time" and is

"[t]hus, . . . highly probative and undoubtedly important and relevant to Defendants' good faith defense." (*Id.*)

Defendants also argue the third factor—the prejudice suffered by the opposing party as a result of having to prepare to meet the new exhibit—favors admission for several reasons.

First, Defendants assert that the Secretary is not prejudiced because, unlike the situation prior to the April 2025 jury trial, the Secretary has had nine months to review the Job Description and only needed to review a one-page document, rather than tens of thousands of pages, to address it at the bench trial. (*Id.* at 2–3.)

Second, Defendants argue that the Secretary did not object to the admission of DX-LLLLLL prior to the bench trial. According to Defendants, the Secretary "met and conferred" with Defendants "on the redacted version of the document and prepared it jointly," and counsel for the Secretary stated during the bench trial that she "agreed to the admissibility of a redacted version." (*Id.* at 3.)

Third, Defendants argue that the Secretary's assertion of prejudice because she did not have the opportunity to depose Defendants with any signed Job Description is without merit because (1) the Secretary had the opportunity to cross-examine Defendants, as well as Kristi Manolias and Tyler Stauber, about the unsigned Job Description during the bench trial but declined to do so,[3] and (2) the Secretary did not object when Defendants first stated their intention to proffer DX-LLLLLL at the bench trial in the parties' July 21, 2025 joint letter,

[3] On this point, Defendants contend that the Secretary had named Stauber and Kristi Manolias as witnesses for the bench trial and could have questioned them about DX-LLLLLL, but ultimately declined to call them.

thereby preventing Defendants from taking any steps to mitigate prejudice to the Secretary. (MIL at 3–4.)

Finally, Defendants argue that the fourth *Chamberlain* factor—the likelihood of a continuance—weighs in favor of admission because the jury and bench trials in this case have been completed, the parties have "had the opportunity to examine witnesses as to the nature of" DX-LLLLLL, and "there is no reason to believe that this matter would be delayed as a result of the admission of . . . DX-LLLLLL." (*Id.* at 4.)

In opposition, the Secretary asserts that the *Chamberlain* factors still favor the exclusion of DX-LLLLLL from the bench trial record. (MIL Opp'n.) The Secretary argues that the first *Chamberlain* factor favors preclusion because Defendants still have provided no justification for their admitted failure to produce the Job Description—whether the unsigned version or the signed version—at any point during more than three years of discovery. (*Id.* at 2.)

The Secretary argues that the second *Chamberlain* factor favors preclusion as well because the question of whether Defendants had a reasonable agreement to deduct sleep and meal breaks from live-in aides' compensable time is irrelevant to Defendants' good faith defense under 29 U.S.C. § 260. (*Id.* at 2–4.) Specifically, the Secretary argues that the bench trial concerns whether Defendants can demonstrate that they made good faith efforts to comply with the FLSA—not whether there was any agreement between Defendants and their former live-in aides to deduct break time from workers' compensable time. (*Id.*)

The Secretary argues that the third *Chamberlain* factor favors preclusion because the Secretary was unable to depose defense witnesses about the Job Description given their extraordinarily belated production of the document more than eight months after the close of discovery and only days before the filing of the first proposed joint pre-trial order. (*Id.* at 4.) The

Secretary asserts that the prejudice is substantial given concerns about the Job Description's authenticity raised by certain witnesses who indicated that they did not sign the document when the Secretary or Defendants showed it to them. (*Id.*) She further argues that the time between the jury trial and the bench trial did "nothing to lessen the prejudice" because the unsigned Job Description was produced so long after the close of discovery that the Secretary "could not have conducted supplemental depositions about the Job Description before the" bench trial. (*Id.* at 4–5.) The Secretary asserts that the ability to question defense witnesses about the Job Description during the bench trial "without the opportunity to impeach with deposition testimony" was "no substitute for the ability to gather information during discovery." (*Id.* at 5.) The Secretary also "objects to Defendants' mischaracterization of the Secretary's position over the Job Description's use during the Sept. 4 Hearing." (*Id.*) According to the Secretary, Defendants did not identify *either* the signed or unsigned Job Description in their exhibit list in the First Proposed Bench Trial JPTO, and the Secretary objected to Defendants' intended use of signed Job Descriptions during the parties' conferences regarding the contents of the Second Proposed Bench Trial JPTO. (*Id.*)

Finally, the Secretary argues that the fourth *Chamberlain* factor favors preclusion of the unsigned Job Description into evidence because a continuance at this stage of the litigation, after both the jury and bench trials have concluded, is impossible. (*Id.*)

## IV. Analysis

Applying the *Chamberlain* factors, I conclude that DX-LLLLLL is admissible evidence and is admitted to the bench trial evidentiary record, notwithstanding Defendants' gross discovery misconduct in this case.

The first *Chamberlain* factor strongly favors preclusion due to Defendants' failure to provide any explanation whatsoever for their failure to produce the Job Description, whether in unsigned or signed form, *at any point* during *more than three years* of discovery in this action. The Job Description directly addresses issues central to the claims and defenses in this action and therefore should have been disclosed by Defendants under Rule 26(a), which requires that a party provide "a copy—or a description by category and location—of all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Moreover, even if Defendants had not discovered the signed and unsigned Job Description until well after discovery had commenced, Rule 26 expressly imposes a continuing obligation to "supplement or disclose" disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26.

To make matters worse for Defendants, the signed and unsigned Job Descriptions are *also* directly responsive to a number of the Secretary's discovery requests, yet were never produced. The Secretary's requests for production sought *all* documents provided to live-in aides regarding timekeeping, work hours, wages for time worked during a sleep or meal break, and Defendants' policies and practices pertaining to pay, among other things. (*See* ECF No. 244 at 1.) The Secretary's requests for production also specifically sought any documents that live-in aides were asked to sign, including any agreements between workers and Sarene referring to sleep time. (*Id.*) The Job Description falls squarely within each of these requests for production and therefore should have been timely produced. Moreover, the Secretary also explicitly questioned Defendants' 30(b)(6) witnesses about whether there was any written guidance provided to live-in aides about reporting interruptions to their meal and sleep breaks, and the

witnesses testified that no such written materials existed. (*Id*. at 2.) None of these witnesses disclosed the existence of signed or unsigned Job Descriptions.

As I noted during the jury trial, it is simply mind-boggling that Defendants failed to produce the signed and unsigned Job Descriptions at any point during more than three years of discovery given their highly probative value to the Secretary's overtime and recordkeeping claims and Defendants' defenses to those claims. (Jury Trial Tr. 7:13–14.) Defendants' appalling failure to disclose this document is underscored by their arguments at trial and in briefing on this motion in limine that the signed Job Descriptions constitute "agreements" between Sarene and the company's former live-in aide workers to deduct from their compensable time all meal and sleep periods—one of the central, if not *the* central issue on the merits of the Secretary's overtime and recordkeeping claims. Defendants fail to provide any satisfactory explanation for why they failed to produce a document that is so central to their defenses, and instead only blame Defendants' prior counsel. Defendants' conduct smacks of bad faith.

The second factor, the importance of the document, favors admitting the exemplar Job Description into evidence because it is probative of whether Defendants acted in good faith to comply with the FLSA's overtime and recordkeeping requirements relating to live-in aides. Defendants rely heavily on the unsigned Job Description for their defense that they sought to educate live-in aides about their "entitlement to sleep and meal breaks . . . ." (Defs.' Br. at 20–21.) According to Defendants, they used the Job Description to inform live-in aides that they are entitled to overtime pay if they miss their sleep or meal breaks and that, "if they provide care for their patients beyond 13 hours in a 24-hour period, they must immediately notify the Nursing Supervisor to receive approval for overtime pay . . . ." (Defs.' Br. at 4.) The exemplar Job Description and witness testimony about how and when Defendants used it is probative of

whether Defendants did in fact take steps to inform their former live-in aides about their entitlement to overtime compensation for work during sleep and meal periods and about how to report work interruptions during breaks to Defendants.

In contrast to the situation that confronted the Court in the weeks prior to the April 2025 jury trial, the third factor—the prejudice suffered by the opposing party as a result of having to prepare to meet the new exhibit—now favors admitting the exemplar Job Description into evidence. The signed and unsigned versions of the Job Description were disclosed to the Secretary in December 2024—more than nine months prior to the bench trial. Moreover, DX-LLLLLL (the unsigned Job Description) is a single page document, and the Secretary is familiar with its contents due to experience questioning a number of worker witnesses at trial about their signed copies of this document. Moreover, the Secretary did not move to reopen discovery before or after the jury trial for the limited purpose of deposing defense witnesses about the Job Description or move to request an order precluding Defendants from offering DX-LLLLLL into evidence at the bench trial.

The fourth *Chamberlain* factor, the possibility of a continuance, favors preclusion of DX-LLLLLL because both the jury trial and bench trial have concluded and discovery has long since closed.

Taken together the *Chamberlain* factors favor admission of DX-LLLLLL into evidence, especially in light of the limited prejudice to the Secretary at this stage of the action given the length of time that has passed since the document was first disclosed in December 2024 and the commencement of the bench trial in September 2025. Accordingly, I admit DX-LLLLLL into the evidentiary record on the bench trial and consider it and the related testimony of Defendant Manolias in evaluating Defendants' good faith defense.

## FACTUAL FINDINGS

The Court's findings of fact are set forth in this section and in the conclusions of law below.

### I. Sarene's Founding and Licensing

Sarene was founded by Defendant Manolias and Sal Gerbino in March 2006 and became a licensed home care services agency in July 2009. (Bench Trial Tr. 6:1–7; 8:22–9:11.) In order to become licensed, Defendants needed to secure approval from the New York State Department of Health ("NYSDOH"). (*Id*. 6:5–8:8.) In the application process, Defendant Manolias and Gerbino reviewed relevant state laws and the FLSA and provided the NYSDOH with policy documents for approval. (*Id.* 6:5–8:8.) Defendant Manolias consulted with Julie Annunziata, a consultant in the home care service industry and a former NYSDOH supervisor, on the creation of the policy documents and how to run a home care services agency. (*Id.* 9:13–10:14.) However, Annunziata was not an attorney or otherwise an expert in the FLSA. (*Id.* 89:11–16.) In 2006 and 2007, Defendant Manolias also consulted with the Small Business Development Center at Stony Brook University regarding how to set up Sarene's various departments, the development of Sarene's policy documents, and compliance with the FLSA. (*Id.* 10:15–11:10; 15:1–6.)

Sarene was originally licensed to provide nursing, therapy, and respiratory care services. (Bench Trial Tr. 11:11–19.) In 2013, Sarene requested that the NYSDOH add home health aide and social work services to Sarene's license. (*Id.* 11:23–12:5.) For those services to be added, Sarene was required to provide the NYSDOH additional policy documents related to home health aide and social work services. (*Id.* 12:6–14:11.) Defendant Manolias consulted with Annunziata, Gerbino, and the Small Business Development Center to create additional policy

documents. (*Id.* 14:13–25.) At some point, Annunziata assisted Defendant Manolias in creating the Job Description and the first version of the aide activity sheet ("Aide Activity Sheet #1),[4] although there is no evidence as to what advice Annunziata provided or the tasks she carried out in that process. (*Id.* 25:12–26:12, 37:15–38:14; *see also* DX-LLLLLL; PX-7A at 2.) The Job Description and Aide Activity Sheet #1 were submitted to NYSDOH. (Bench Trial Tr. 7:2–12; 10:1–4; 12:6 –14:11; 26:2–4; 109:10–16). Manolias did not identify any topics on which Annunziata offered advice other than the Job Description and Aide Activity Sheet #1 or whether she served as a consultant to Defendants at any other time after the submission of the application for an expanded license from NYSDOH. (Bench Trial Tr. 12:1–14:25.)

## II. Sarene's Policies and Practices

### A. The Job Description

Throughout the relevant period, Defendants provided the Job Description to newly hired live-in aides at the end of the orientation required before a live-in aide was assigned to a patient. (Bench Trial Tr. 25:4–29:10.) The full title of the Job Description is "Serene Home Nursing Agency Policy and Procedure Manual: HHA/PCA Live-In Aide Job Description-Agreement." (DX-LLLLLL.) The document provides that live-in aides "are responsible for providing personal care and assistance to the[ir] patient . . . as listed on the patient[']s plan of care during [their] 13 hours of work." (*Id.*)

---

[4] Various witnesses refer to the aide activity sheets by different names, including "timesheets," "timecards," "activity time sheets," and "aide activity reports."

A section of the document titled "Job Description Duties/Responsibilities" provides the following information about meal and sleep breaks, reporting overtime hours, and overtime compensation:

> As a Live-In Aide you are required to work 13 hours in a 24-hour period. If you provide care to your patient beyond 13 hours, you must immediately notify the Nursing Supervisor to receive approval for overtime pay. Overtime will be paid for time worked beyond 13 hours in a 24-hour period. As a live-in aide you are entitled to 8 hours of sleep in a 24-hour period. Five of those hours must be uninterrupted. If your patient requires care at night not allowing you to receive your sleep time break, you must call the agency immediately. As a live-in aide you are also entitled to uninterrupted break time for meals totaling 3 hours a shift. If you cannot receive your breaks for any reason you are required to call the agency immediately and report the interruption in the meal break to seek assistance in securing the break time. If it is not possible to schedule breaktime you will be approved for overtime pay.
>
> If you are not able to receive any required breaktimes, you must document this on your activity sheets or a separate sheet of paper detailing what you were doing, the time of occurrence, and why your breaktime was missed and if you contacted the nursing supervisor. Any work completed over 13 hours in a 24-hour period is considered overtime and will be compensated at the appropriate overtime rate.
>
> As a live-in aide you should report any overtime occurrence immediately to your nursing supervisor but no later than 48 hours after the occurrence.

(*Id.*) The bottom of the Job Description provides the recipient of the form a place to sign their name beneath the following pre-typed statement:

> I understand my job responsibilities as a live-in aide and the importance of reporting all changes in health status of my pat[i]ents immediately to the nursing supervisor. I also understand how to report any missed breaks, and overtime hours worked beyond 13 hours in a 24-hour period. I understand that I am not to provide any medical intervention to my patients and must call the nursing supervisor immediately upon any change in the health status of my patient.

(*Id.*) There is no specific location on the Job Description for the recipient of the form to provide the date on which the form is signed. (*Id.*)

**B. The Aide Activity Sheets**

During the relevant period, Sarene's live-in aides were required to fill out an aide activity sheet for each week that they provided live-in aide services to Sarene clients. (*See* Jury Trial Tr. 439:13–18; 608:17–19; 869:9–11; 906:19–21; 2199:17–19.)

Sarene used several different versions of the aide activity sheet during the relevant period, which are discussed in detail below:

- Aide Activity Sheet #1 (*see, e.g.*, PX-7A at 2 ("Aide Activity Sheet #1"));
- Aide Activity Sheet #2 (*see, e.g. id.* at 11 ("Aide Activity Sheet #2"));
- Aide Activity Sheet #3 (*see, e.g. id*. at 12 ("Aide Activity Sheet #3"));
- Aide Activity Sheet #4 (*see, e.g. id*. at 16 ("Aide Activity Sheet #4")); and
- Aide Activity Sheet #5 (*see, e.g. id*. at 18 ("Aide Activity Sheet #5").

(*See also* PX-7C (compiling different versions of completed aide activity sheets throughout the relevant period).)

The original document is referred to as "Aide Activity Sheet #1." (Aide Activity Sheet #1, PX-7A at 2.) Defendant Manolias developed Aide Activity Sheet #1 in consultation with Annunziata, although there is no evidence as to what advice Annunziata provided or what specific tasks, if any, she performed. (Bench Trial Tr. 38:1–11; Jury Trial Tr. 3027:17–20 (parties' stipulation).) Live-in aides primarily used Aide Activity Sheet #1 from March 2017 through around March 2019. (Jury Trial Tr. 3027:17–20; *id*. 922:17–923:2, 925:18–928:13 (K. Manolias testifying that the aide activity sheet was first amended around April 2019).) Aide Activity Sheet #1 instructed live-in aides to submit original, completed aide activity sheets on a weekly basis, by Sunday at noon. (*See, e.g.*, PX-7A at 2.)

[redacted]

EMPLOYEE NAME (PRINT) Aisha Carty
WEEK BEGINNING 01/1/17 (WEEK BEGINS ON Sundays at 12:01AM)
WEEK ENDING 01/7/17

UPDATED 09/28/16

| PERSONAL CARE | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| BATHE ☐BED ☐TUB ☐SHAMPOO | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐HAIRCARE ☐COMB/BRUSH | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ORAL/HYGIENE: ☐MOUTH CARE ☐DENTURE CARE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| SKIN CARE: ☐LOTION ☐SHAVE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐FOOT CARE ☐FILE FINGERNAILS | | | | | | | |
| DRESSING: ☐TOTAL ☐ASSIST | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MEALS: PREP & CLEAN ☐BRKFST ☐LUNCH ☐DINNER ☐SNACK | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ASSIST/FEED PT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| AMBULATION: ☐ASSIST ☐CANE ☐WALKER | | | | | | | |
| TRANSFER: ☐BED ☐CHAIR ☐WHEELCHAIR ☐HOYER | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐ROM ☐TURN Q2HRS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐OSTOMY CARE ☐CATHETER CARE | | | | | | | |
| ☐NON-STERILE DRESSING | | | | | | | |
| MEDICATIONS: ☐REMIND | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| RECORD: ☐INTAKE ☐OUTPUT | | | | | | | |
| RECORD: ☐TEMP ☐WEIGHT | | | | | | | |
| TOILETING: ☐TOILET ☐COMMODE ☐BEDPAN ☐URINAL | | | | | | | |
| INCONTINENCE MANAGEMENT ☐BLADDER ☐BOWEL | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| TRAINING: ☐BLADDER ☐BOWEL | | | | | | | |
| EXERCISE: (AS PER PHYSICAL THERAPIST PLAN) | | | | | | | |
| HOUSEHOLD (NOTICE INITIAL CODES) | PLEASE USE INITIAL CODES FOR HOUSEHOLD CHORES (NOT CHECK MARKS) | | | | | | |
| ☐DUST=D ☐VACUUM=V ☐BATHROOM=BR ☐PT AREA=PA | | | | | | | |
| ☐KITCHEN=K ☐STOVE=S ☐BED LINEN CHANGE=L ☐LAUNDER CLOTHES AND LINENS=C | | | A/L | | | | |
| ☐SHOPPING/ERRANDS ☐ESCORT TO: | | | | | | | |
| PHYSICAL STATUS AS REPORTED BY PATIENT: | REPORT ALL STATUS COMPLAINTS TO NURSING SUPERVISOR AS SOON AS REPORTED BY PATIENT | | | | | | |
| NO SIGNS/SYMPTOMS OF MEDICAL STATUS CHANGE | | | | | | | |
| IF YES, REPORTED TO AGENCY | | | | | | | |
| SAFETY & STANDARD PRECAUTIONS MAINTAINED | | | | | | | |
| DURING THIS WORK PERIOD THE PATIENT AND THE AIDE HAVE NOT SUSTAINED ANY INJURY (IF YES SEE BELOW) | Y N | Y N | Y N | Y N | Y N | Y N | Y N |
| INJURY REPORTED TO SUPERVISOR AND INCIDENT REPORT COMPLETED | | | | | | | |

CLIENTS PLEASE SIGN THIS PORTION ONLY AFTER IT IS COMPLETELY F [redacted]

| | DATE | TIME IN | TIME OUT | HOURS | EMPLOYEE SIGNATURE |
|---|---|---|---|---|---|
| SUN | 1/1/17 | 8 am | 8 am | live in | [signature] |
| MON | 1/2/17 | 8 am | 8 am | live in | [signature] |
| TUES | 1/3/17 | 8 am | 8 am | live in | [signature] |
| WED | 1/4/17 | 8 am | 8 am | live in | [signature] |
| THURS | 1/5/17 | 8 am | 8 am | live in | [signature] |
| FRI | 1/6/17 | 8 am | 8 am | live in | [signature] |
| SAT | 1/7/17 | 8 am | 8 am | live in | [signature] |
| [redacted] | | TOTAL HRS | 8 live in | | |

TIME SHEETS ARE DUE IN THE OFFICE ON SUNDAYS AT 12 NOON. YOU MAY FAX TO: 631-479-2770. BUT ALL ORIGINALS MUST BE SENT IN WEEKLY. 7 Days

87.50

2017-01-06 20:47 MCPL Centereach Fax 6315859393 >> 0 P 1/1

PX-7A, page 2 of 18

*Example of Aide Activity Sheet #1*

Aide Activity Sheet #1 offers no instructions on how live-in aides should report work interruptions to their meal or sleep breaks. (Jury Trial Tr. 552:21–553:7 (K. Manolias discussing PX-7A at 2).) Indeed, Kristi Manolias credibly testified that "[t]here's no instruction" on the aide activity sheet about recording break interruptions. (*Id.* 922:19–925:8.) She also confirmed her deposition testimony that she did not "believe there is anything written or signed" by live-in aides "with any reference to sleep and meal time interruptions" prior to April 2019. (*Id*. 932:5–935:18)

A table at the bottom of Aide Activity Sheet #1 asks live-in aides to write the "DATE," "TIME IN," "TIME OUT," and "HOURS," for each day of the week, and to sign next to that information. (*See, e.g.*, PX-7A at 2.) While this version of the form asks the live-in aide to record the number of hours they worked, it does not provide any instruction to include in that number the duration of any work interruptions to meal or sleep periods. (*See, e.g.*, PX-7A at 2–10; Jury Trial Tr. 724:15–726:10, 919:13–922:6 (K. Manolias testifying in reference to PX-7C at 2–6, 70–74, 82).)

The next version, "Aide Activity Sheet #2," was primarily used from around April 2019 through at least around October 2019. (Aide Activity Sheet #2, PX-7A at 11; Jury Trial Tr. 3027:17–20; *id*. 922:17–923:2; *id*. 2227:11–18 (referring to PX-7C at 599).) Aide Activity Sheet #2 instructs live-in aides to submit original, completed aide activity sheets on a weekly basis, by Tuesday at noon. (*See, e.g.*, PX-7A at 11.)

322

**SERENE HOME NURSING AGENCY AIDE ACTIVITY SHEET (Live-In)**

PATIENT NAME: [redacted]

EMPLOYEE NAME (PRINT): Salamatu Haruna

WEEK BEGINNING: 7/7/2019 (WEEK BEGINS ON Sundays at 12:01AM) WEEK ENDING: 7/13/2019

ORIGINAL TIME SHEETS ARE DUE IN THE OFFICE ON TUESDAYS BY 12:00 PM (NOON) **NO COPIES OR FAXES**

**Mark (√) When Task Is Completed During Every Shift**

| PERSONAL CARE | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| BATH/ASST/OBSERVE: ☐ BED BATH ☐ TUB ☒ SHOWER | ✓ | | ✓ | | ✓ | | ✓ |
| ☒ HAIRCARE ☒ COMB/BRUSH | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ORAL/HYGIENE: ☒ MOUTH CARE ☐ DENTURE CARE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| SKIN CARE: ☒ LOTION ☐ SHAVE (Electric Razor ONLY) | ✓ | | ✓ | | ✓ | | ✓ |
| FOOT CARE ☐ FILE FINGERNAILS | | | | | | | |
| DRESSING: ☐ TOTAL ☒ ASSIST | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MEALS, PREP & CLEAN UP: ☒ BKFST ☒ LUNCH ☒ DINNER ☒ SNACK | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ASSIST/FEED PT | | | | | | | |
| AMBULATION: ☐ ASSIST ☐ CANE ☐ WALKER | | | | | | | |
| TRANSFER: ☒ BED ☒ CHAIR ☐ WHEELCHAIR ☐ HOYER | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐ ROM ☐ TURN Q2HRS | | | | | | | |
| ☐ NON-STERILE DRESSING | | | | | | | |
| MEDICATIONS: ☒ REMIND | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| RECORD: ☐ INTAKE ☐ OUTPUT | | | | | | | |
| RECORD: ☐ TEMP ☐ WEIGHT | | | | | | | |
| TOILETING: ☒ TOILET ☐ COMMODE ☐ BEDPAN ☐ URINAL | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| INCONTINENCE MANAGEMENT ☒ BLADDER ☐ BOWEL ☐ OSTOMY CARE ☐ CATHETER CARE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| TRAINING: ☐ BLADDER ☐ BOWEL | | | | | | | |
| EXERCISE: (AS PER PHYSICAL THERAPIST PLAN) | | | | | | | |
| HOUSEHOLD (NOTICE INITIAL CODES) | PLEASE USE INITIAL CODES FOR HOUSEHOLD CHORES (NOT CHECK MARKS) | | | | | | |
| ☐ DUST = D ☐ VACUUM = V ☐ BATHROOM = BR ☐ PT AREA = PA | DVBRPA | DVBRPA | DVBRPA | DVBRPA | DVBRPA | DVBRPA | DVBRPA |
| ☐ KITCHEN = K ☐ STOVE = S ☐ BED LINEN CHANGE = L ☐ LAUNDER CLOTHES AND LINENS = C | KSLC | KSLC | KSLC | KSLC | KSLC | KSLC | KSLC |
| ☐ SHOPPING/ERRANDS ☐ ESCORT TO: | | | | | | | |
| PHYSICAL STATUS AS REPORTED BY PATIENT: Must Be Completed Daily | REPORT ALL STATUS CHANGES TO NURSING SUPERVISOR IMMEDIATELY | | | | | | |
| NO SIGNS/SYMPTOMS OF MEDICAL STATUS CHANGE | | | | | | | |
| IF YES, TIME REPORTED TO AGENCY | | | | | | | |
| SAFETY & STANDARD PRECAUTIONS MAINTAINED Must Be Completed Daily | | | | | | | |
| DURING THIS WORK PERIOD THE PATIENT OR HHA HAVE NOT SUSTAINED ANY INJURY. (IF YES SEE BELOW) CIRCLE Y OR N | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) |
| INJURY REPORTED TO SUPERVISOR AND INCIDENT REPORT COMPLETED | | | | | | | |

**HHA/PCA Personal Care and Sleep Allotment**

| | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| Did you Receive 8 hours of Sleep, 5 of which were uninterrupted: | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N |
| If No, Please detail what occurred and action taken: | | | | | | | |
| Did you have an hour for Breakfast: | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N |
| If No, Please detail what occurred and action taken: | | | | | | | |
| Did you have an hour for Lunch: | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N |
| If No, Please detail what occurred and action taken: | | | | | | | |
| Did you have an hour for Dinner: | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N | (Y) N |
| If No, Please detail what occurred and action taken: | | | | | | | |

**CLIENTS:** PLEASE SIGN THIS PORTION **ONLY AFTER** IT IS **COMPLETELY** FILLED OUT BY EMPLOYEES.

| Day | Date | Employee Signature | Client/Representative Signature |
|---|---|---|---|
| Sun | 7/7/19 | Salamatu | [redacted] |
| Mon | 7/8/19 | Salamatu | |
| Tues | 7/9/19 | Salamatu | |
| Wed | 7/10/19 | Salamatu | |
| Thurs | 7/11/19 | Salamatu | |
| Fri | 7/12/19 | Salamatu | |
| Sat | 7/13/19 | Salamatu | |

4/2019

DEF000155

**PX-7A, page 11 of 18**

*Example of Aide Activity Sheet #2*

Aide Activity Sheet #2 differs from Aide Activity Sheet #1 in that it does not contain fields for "TIME IN," "TIME OUT," and "HOURS" for each day of the week. (*Compare* PX-7A at 2 *with* PX-7A at 11.) Instead, it includes a bottom section titled "HHA/PCA Personal Care and Sleep Allotment," which asks live-in aides to circle "Y" or "N" in response to the following questions for each day of the week (Sunday through Saturday):

- "Did you Receive 8 hours of Sleep, 5 of which were uninterrupted?";
- "Did you have an hour for breakfast?";
- "Did you have an hour for lunch?"; and
- "Did you have an hour for dinner?"

(*See, e.g.*, PX-7A at 11.)

Under each of these questions, the form includes the direction: "If No, Please detail what occurred and action taken" and provides space for a written comment. (*Id.*) Hofmann assisted in revising Aide Activity Sheet #1 to include this "HHA/PCA Personal Care Sleep Allotment" section. (Bench Trial Tr. 42:24–43:12; 50:12–51:18; 118:6–121:5.)

Aide Activity Sheet #2 was the first aide activity sheet introduced by Sarene to include *any* language about sleep and mealtime interruptions. (Jury Trial Tr. 2182:20–24.) However, Aide Activity Sheet #2 still did not contain any instruction to live-in aides about where or how to record on the form the length of any meal or sleep break interruption. Instead, the form only asks live-in aides to "detail what occurred and action taken" if they did not receive "8 hours of sleep, 5 of which were uninterrupted" or "an hour" for breakfast, lunch or dinner. (*See, e.g.*, PX-7A at 11, 13, 15; *see also* Jury Trial Tr. 924:14–925:8.) The bottom of Aide Activity Sheet #2 includes a table requiring live-in aides to sign their name next to the date corresponding to each day of the week that they worked.

The third iteration, "Aide Activity Sheet #3," was used from around October 2019 through at least December 2020—the end of the relevant period. (Aide Activity Sheet #3, PX-7A at 12; Jury Trial Tr. 3027:17–20; *id*. 2227:19–2228:3 (referring to PX-7C at 996); *id*. 2466:13–24 (referring to PX-7C at 425).) Aide Activity Sheet #3 instructs live-in aides to submit original, completed aide activity sheets on a weekly basis, by Tuesday at noon. (*See, e.g.*, PX-7A at 12.) Aide Activity Sheet #3 features a different iteration of the "HHA/PCA Personal Care and Sleep Allotment" section than Aide Activity Sheet #2. (*Compare* PX-7A at 11 *with* PX-7A at 12.) Rather than featuring the five questions used in Aide Activity Sheet #2, Aide Activity Sheet #3 includes the following large block of text and a space for the live-in aide to sign their name underneath:

> By signing this timesheet below you are acknowledging that you received at least 5 hours of ***uninterrupted*** sleep and at least 1 ***uninterrupted*** hour each for Breakfast, Lunch and Dinner each day worked. ***Uninterrupted* time is defined as any time that was spent during designated sleep or meal times providing hands on care to the patient as per the Plan of Care**. This does not include time spent for bathroom visits or personal issues that you attend to unrelated to the patient's plan of care. If you did not receive *uninterrupted* time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep.

(PX-7A at 12 (emphasis added).)

**SERENE HOME NURSING AGENCY AIDE ACTIVITY SHEET (Live-In)**

PATIENT NAME: [redacted]
EMPLOYEE NAME (PRINT): Buhle Mhlongo
WEEK BEGINNING: 10/13/ (WEEK BEGINS ON Sundays at 12:01AM) WEEK ENDING: 10/19/19

**Mark (√) When Task Is Completed During Every Shift**

| PERSONAL CARE | SUN 10/13 | MON 10/14 | TUE 10/15 | WED 10/16 | THU 10/17 | FRI 10/18 | SAT 10/19 |
|---|---|---|---|---|---|---|---|
| BATH/ASST/OBSERVE: ☑ BED BATH ☐ TUB ☐ SHOWER | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☑ HAIRCARE ☐ COMB/BRUSH | | | | | | ✓ | |
| ORAL/HYGIENE: ☑ MOUTH CARE ☐ DENTURE CARE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| SKIN CARE: ☑ LOTION ☐ SHAVE (Electric Razor ONLY) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☑ FOOT CARE ☑ FILE FINGERNAILS | | | | | | ✓ | |
| DRESSING: ☑ TOTAL ☐ ASSIST | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MEALS, PREP & CLEAN UP: ☑ BKFST ☑ LUNCH ☐ DINNER ☐ SNACK | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ASSIST/FEED PT | | | | | | | |
| AMBULATION: ☐ ASSIST ☐ CANE ☐ WALKER | | | | | | | |
| TRANSFER: ☐ BED ☐ CHAIR ☐ WHEELCHAIR ☑ HOYER | ✓ | | | | | | ✓ |
| ☐ ROM ☑ TURN Q2HRS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ☐ NON-STERILE DRESSING | | | | | | | |
| MEDICATIONS: ☑ REMIND | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| RECORD: ☐ INTAKE ☐ OUTPUT | | | | | | | |
| RECORD: ☐ TEMP ☐ WEIGHT | | | | | | | |
| TOILETING: ☐ TOILET ☐ COMMODE ☐ BEDPAN ☐ URINAL | | | | | | | |
| INCONTINENCE MANAGEMENT: ☑ BLADDER ☑ BOWEL ☐ OSTOMY CARE ☐ CATHETER CARE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| TRAINING: ☐ BLADDER ☐ BOWEL | | | | | | | |
| EXERCISE: (AS PER PHYSICAL THERAPIST PLAN) | | | | | | | |
| HOUSEHOLD (NOTICE INITIAL CODES) | PLEASE USE INITIAL CODES FOR HOUSEHOLD CHORES (NOT CHECK MARKS) | | | | | | |
| ☐ DUST = D ☐ VACUUM = V ☐ BATHROOM = BR ☐ PT AREA = PA | V BR | BR | V BR | V BR | BR | BR | V BR |
| ☐ KITCHEN = K ☐ STOVE = S ☐ BED LINEN CHANGE = L ☐ LAUNDER CLOTHES AND LINENS = C | K S C | K S C | K S | K S | K S C | K S C | K S |
| ☐ SHOPPING/ERRANDS ☐ ESCORT TO: | | | | | | | |
| PHYSICAL STATUS AS REPORTED BY PATIENT: Must Be Completed Daily | REPORT ALL STATUS CHANGES TO NURSING SUPERVISOR IMMEDIATELY | | | | | | |
| NO SIGNS/SYMPTOMS OF MEDICAL STATUS CHANGE | Bu | Bu | N | N | N | N | N |
| IF YES, TIME REPORTED TO AGENCY | N | N | N | N | N | N | N |
| SAFETY & STANDARD PRECAUTIONS MAINTAINED Must Be Completed Daily | | | | | | | |
| DURING THIS WORK PERIOD THE PATIENT OR HHA HAVE NOT SUSTAINED ANY INJURY. (IF YES SEE BELOW) CIRCLE Y OR N | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) | Y (N) |
| INJURY REPORTED TO SUPERVISOR AND INCIDENT REPORT COMPLETED | N | N | N | N | N | N | N |

**HHA/PCA Personal Care and Sleep Allotment**

By signing this timesheet below you are acknowledging that you received at least 5 hours of uninterrupted sleep and at least 1 uninterrupted hour each for Breakfast, Lunch and Dinner each day worked. Uninterrupted time is defined as any time that was spent during designated sleep or meal times providing hands on care to the patient as per the Plan of Care. This does not include time spent for bathroom visits or personal issues that you attend to unrelated to the patient's plan of care. If you did not receive uninterrupted time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep, as well as describing the actual care performed in detail using the box below.

ORIGINAL TIME SHEETS ARE DUE IN THE OFFICE ON TUESDAYS BY 12:00 PM (NOON)

CLIENTS: PLEASE SIGN THIS PORTION ONLY AFTER IT IS COMPLETELY FILLED OUT BY EMPLOYEES.

| Day | Date | Employee Signature | Client/Representative Signature |
|---|---|---|---|
| Sun | 10/13/19 | | [redacted] |
| Mon | 10/14/19 | | |
| Tues | 10/15/19 | | |
| Wed | 10/16/19 | | |
| Thurs | 10/17/19 | | |
| Fri | 10/18/19 | | |
| Sat | 10/19/19 | | |

DEF000141

**PX-7A, page 12 of 18**

*Example of Aide Activity Sheet #3*

This block of text is confusing and uses the word "uninterrupted" in contradictory ways. In the first sentence, the word "uninterrupted" is used twice to refer to a period of time during which the live-in aide *did not work*. (*Id.*; *see also* Jury Trial Tr. 1070:10–1072:3 (K. Manolias testifying regarding PX-7C at 1022).) However, the second sentence defines "[u]ninterrupted time" as "any time that *was spent* during designated sleep or meal times *providing hands on care* to the patient as per the Plan of Care," and thus uses the word "uninterrupted" to refer to time that a live-in aide *did work*. (PX-7A at 12 (emphasis added).) As a result of the two contradictory uses of the word "uninterrupted," a live-in aide signing their name under this block of text may have sought to convey that they did in fact "provid[e] hands on care to the patient as per the Plan of Care" during "designated sleep or meal times." Accordingly, Kristi Manolias' testimony at trial that these two uses of the word "uninterrupted" in this block of text are *not* contradictory is simply not credible. (*See* Jury Trial Tr. 1072:4–1074:8.)

A fourth version, "Aide Activity Sheet #4," was used from around February 2020 until at least December 2020. (Aide Activity Sheet #4, PX-7A at 16 (containing a "02/05/2020" notation); Jury Trial Tr. 3027:17–20; *id.* 1352:1–1353:25 (referring to PX-7C at 466).) Aide Activity Sheet #4 instructs live-in aides to submit original, completed aide activity sheets on a weekly basis, by Tuesday at noon. (*See, e.g.*, PX-7A at 16.) Aide Activity Sheet #4 is nearly identical to Aide Activity Sheet #3, but replaces certain language underneath the "HHA/PCA Personal Care and Sleep Allotment" section with an instruction to call a supervisor as follows:

> If you did not receive uninterrupted time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep~~, as well as describing the actual care performed in detail using the box below.~~ and ***call your supervisor for further assistance.***

(PX-7A at 16 (emphasis added); *see also, e.g.*, PX-7C at 466; Jury Trial Tr. 1352:1–1353:15 (introducing Aide Activity Sheet #4).)

**SERENE HOME NURSING AGENCY AIDE ACTIVITY SHEET (Live-In)** 02/05/2020

PATIENT NAME: ____________________

EMPLOYEE NAME (PRINT): ____________________

WEEK BEGINNING: ___/___/___ (WEEK BEGINS ON Sundays at 12:01AM) WEEK ENDING: ___/___/___

**Mark (√) When Task Is Completed During Every Shift**

| PERSONAL CARE | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| BATH/ASST/OBSERVE: ☐ BED BATH ☐ TUB ☐ SHOWER | | | | | | | |
| ☐ HAIRCARE ☐ COMB/BRUSH | | | | | | | |
| ORAL/HYGIENE: ☐ MOUTH CARE ☐ DENTURE CARE | | | | | | | |
| SKIN CARE: ☐ LOTION ☐ SHAVE (Electric Razor ONLY) | | | | | | | |
| ☐ FOOT CARE ☐ FILE FINGERNAILS | | | | | | | |
| DRESSING: ☐ TOTAL ☐ ASSIST | | | | | | | |
| MEALS, PREP & CLEAN UP: ☐ BKFST ☐ LUNCH ☐ DINNER ☐ SNACK | | | | | | | |
| ASSIST/FEED PT | | | | | | | |
| AMBULATION: ☐ ASSIST ☐ CANE ☐ WALKER | | | | | | | |
| TRANSFER: ☐ BED ☐ CHAIR ☐ WHEELCHAIR ☐ HOYER | | | | | | | |
| ☐ ROM ☐ TURN Q2HRS | | | | | | | |
| ☐ NON-STERILE DRESSING | | | | | | | |
| MEDICATIONS: ☐ REMIND | | | | | | | |
| RECORD: ☐ INTAKE ☐ OUTPUT | | | | | | | |
| RECORD: ☐ TEMP ☐ WEIGHT | | | | | | | |
| TOILETING: ☐ TOILET ☐ COMMODE ☐ BEDPAN ☐ URINAL | | | | | | | |
| INCONTINENCE MANAGEMENT ☐ BLADDER ☐ BOWEL ☐ OSTOMY CARE ☐ CATHETER CARE | | | | | | | |
| TRAINING: ☐ BLADDER ☐ BOWEL | | | | | | | |
| EXERCISE: (AS PER PHYSICAL THERAPIST PLAN) | | | | | | | |
| HOUSEHOLD (NOTICE INITIAL CODES) | PLEASE USE INITIAL CODES FOR HOUSEHOLD CHORES (NOT CHECK MARKS) | | | | | | |
| ☐ DUST = D ☐ VACUUM = V ☐ BATHROOM = BR ☐ PT AREA = PA | | | | | | | |
| ☐ KITCHEN = K ☐ STOVE = S ☐ BED LINEN CHANGE = L ☐ LAUNDER CLOTHES AND LINENS = C | | | | | | | |
| ☐ SHOPPING/ERRANDS ☐ ESCORT TO: | | | | | | | |
| PHYSICAL STATUS AS REPORTED BY PATIENT: Must Be Completed Daily | REPORT ALL STATUS CHANGES TO NURSING SUPERVISOR IMMEDIATELY | | | | | | |
| NO SIGNS/SYMPTOMS OF MEDICAL STATUS CHANGE | | | | | | | |
| IF YES, TIME REPORTED TO AGENCY | | | | | | | |
| SAFETY & STANDARD PRECAUTIONS MAINTAINED Must Be Completed Daily | | | | | | | |
| DURING THIS WORK PERIOD THE PATIENT OR HHA HAVE NOT SUSTAINED ANY INJURY. (IF YES SEE BELOW) CIRCLE Y OR N | Y N | Y N | Y N | Y N | Y N | Y N | Y N |
| INJURY REPORTED TO SUPERVISOR AND INCIDENT REPORT COMPLETED | | | | | | | |

**HHA/PCA Personal Care and Sleep Allotment**

**By signing this timesheet below you are acknowledging that you received at least 5 hours of uninterrupted sleep and at least 1 uninterrupted hour each for Breakfast, Lunch and Dinner each day worked. Uninterrupted time is defined as any time that was spent during designated sleep or meal times providing hands on care to the patient as per the Plan of Care. This does not include time spent for bathroom visits or personal issues that you attend to unrelated to the patient's plan of care. If you did not receive uninterrupted time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep and call your supervisor for further assistance.**

X ____________________

**ORIGINAL TIME SHEETS ARE DUE IN THE OFFICE ON TUESDAYS BY 12:00 PM (NOON)**

CLIENTS: PLEASE SIGN THIS PORTION **ONLY AFTER** IT IS **COMPLETELY** FILLED OUT BY EMPLOYEES.

| Day | Date | Employee Signature | Client/Representative Signature |
|---|---|---|---|
| Sun | | | |
| Mon | | | |
| Tues | | | |
| Wed | | | |
| Thurs | | | |
| Fri | | | |
| Sat | | | |

DEF000180

PX-7A, page 16 of 18

*Example of Aide Activity Sheet #4*

Finally, at around the same time that Aide Activity Sheet #4 was introduced, "Aide Activity Sheet #5" was created. (Aide Activity Sheet #5, PX-7A at 18.) Aide Activity Sheet #5 was used from around February 2020 until at least December 2020. (*See, e.g.*, PX-7B at 2554; 2650–52; 2654–55; 2667–79; 2709; 2817–19; 2841 (containing completed aide activity sheets dated February through December 2020).) Aide Activity Sheet #5 is identical to Aide Activity Sheet #4 with the addition of the following bolded language to the first sentence of the "HHA/PCA Personal Care and Sleep Allotment" section:

> By signing this timesheet below you are acknowledging that you **completed the shift and task checked above. Also, that [you]** received at least 5 hours of uninterrupted sleep and at least 1 uninterrupted hour each for Breakfast, Lunch and Dinner each day worked.

(PX-7A at 18 (emphasis added).)

Completed versions of Aide Activity Sheet #5 are contained in Plaintiffs' compilation of completed forms for the relevant period. (*See* PX-7B; PX-7C.)

**SERENE HOME NURSING AGENCY AIDE ACTIVITY SHEET (Live-In)** 04/23/2020

PATIENT NAME:____________________________________

EMPLOYEE NAME (PRINT):______________________________

WEEK BEGINNING:____/___/____(WEEK BEGINS ON Sundays at 12:01AM) WEEK ENDING:____/___/____

**Mark (√) When Task Is Completed During Every Shift**

| PERSONAL CARE | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| BATH/ASST/OBSERVE: ☐ BED BATH ☐ TUB ☐ SHOWER | | | | | | | |
| ☐ HAIRCARE ☐ COMB/BRUSH | | | | | | | |
| ORAL/HYGIENE: ☐ MOUTH CARE ☐ DENTURE CARE | | | | | | | |
| SKIN CARE: ☐ LOTION ☐ SHAVE (Electric Razor ONLY) | | | | | | | |
| ☐ FOOT CARE ☐ FILE FINGERNAILS | | | | | | | |
| DRESSING: ☐ TOTAL ☐ ASSIST | | | | | | | |
| MEALS, PREP & CLEAN UP: ☐ BKFST ☐ LUNCH ☐ DINNER ☐ SNACK | | | | | | | |
| ASSIST/FEED PT | | | | | | | |
| AMBULATION: ☐ ASSIST ☐ CANE ☐ WALKER | | | | | | | |
| TRANSFER: ☐ BED ☐ CHAIR ☐ WHEELCHAIR ☐ HOYER | | | | | | | |
| ☐ ROM ☐ TURN Q2HRS | | | | | | | |
| ☐ NON-STERILE DRESSING | | | | | | | |
| MEDICATIONS: ☐ REMIND | | | | | | | |
| RECORD: ☐ INTAKE ☐ OUTPUT | | | | | | | |
| RECORD: ☐ TEMP ☐ WEIGHT | | | | | | | |
| TOILETING: ☐ TOILET ☐ COMMODE ☐ BEDPAN ☐ URINAL | | | | | | | |
| INCONTINENCE MANAGEMENT ☐ BLADDER ☐ BOWEL ☐ OSTOMY CARE ☐ CATHETER CARE | | | | | | | |
| TRAINING: ☐ BLADDER ☐ BOWEL | | | | | | | |
| EXERCISE: (AS PER PHYSICAL THERAPIST PLAN) | | | | | | | |
| **HOUSEHOLD (NOTICE INITIAL CODES)** | PLEASE USE INITIAL CODES FOR HOUSEHOLD CHORES (NOT CHECK MARKS) | | | | | | |
| ☐ DUST = D ☐ VACUUM =V ☐ BATHROOM =BR ☐ PT AREA =PA | | | | | | | |
| ☐ KITCHEN = K ☐ STOVE = S ☐ BED LINEN CHANGE = L ☐ LAUNDER CLOTHES AND LINENS =C | | | | | | | |
| ☐ SHOPPING/ERRANDS ☐ ESCORT TO: | | | | | | | |
| **PHYSICAL STATUS AS REPORTED BY PATIENT: Must Be Completed Daily** | REPORT ALL STATUS CHANGES TO NURSING SUPERVISOR IMMEDIATELY | | | | | | |
| SIGNS/SYMPTOMS OF MEDICAL STATUS CHANGE | | | | | | | |
| IF YES, TIME REPORTED TO AGENCY | | | | | | | |
| **SAFETY & STANDARD PRECAUTIONS MAINTAINED Must Be Completed Daily** | | | | | | | |
| DURING THIS WORK PERIOD THE PATIENT OR HHA HAVE SUSTAINED ANY INJURY. (IF YES SEE BELOW) CIRCLE Y OR N | Y N | Y N | Y N | Y N | Y N | Y N | Y N |
| INJURY REPORTED TO SUPERVISOR AND INCIDENT REPORT COMPLETED | | | | | | | |

**HHA/PCA Personal Care and Sleep Allotment**

**By signing this timesheet below you are acknowledging that you completed the shift and task checked above. Also, that received at least 5 hours of uninterrupted sleep and at least 1 uninterrupted hour each for Breakfast, Lunch and Dinner each day worked. Uninterrupted time is defined as any time that was spent during designated sleep or meal times providing hands on care to the patient as per the Plan of Care. This does not include time spent for bathroom visits or personal issues that you attend to unrelated to the patient's plan of care. If you did not receive uninterrupted time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep and call your supervisor for further assistance. X____________________________**

**ORIGINAL TIME SHEETS ARE DUE IN THE OFFICE ON TUESDAYS BY 12:00 PM (NOON)**

**CLIENTS:** PLEASE SIGN THIS PORTION **ONLY AFTER** IT IS **COMPLETELY** FILLED OUT BY EMPLOYEES.

| Day | Date | Employee Signature | Client/Representative Signature |
|---|---|---|---|
| Sun | | | |
| Mon | | | |
| Tues | | | |
| Wed | | | |
| Thurs | | | |
| Fri | | | |
| Sat | | | |

DEF000179

**PX-7A, page 18 of 18**

*Example of Aide Activity Sheet #5*

Even after new versions of the aide activity sheet were promulgated, however, Sarene did not ensure that all live-in aides replaced the old forms with the new forms. (Jury Trial Tr. 2226:19–25 (I. Manolias testifying that "sometimes [live-in aides] use the old forms when they should have used the new ones").) For example, Aide Activity Sheets #2 and #3 were in use at the same time. (*See, e.g.*, PX-7A at 12–15 (completed Aide Activity Sheets #2 dated October and November 2019; completed Aide Activity Sheets #3 also dated October and November 2019).) Similarly, Aide Activity Sheets #3, #4, and #5 were in use at the same time. (*See, e.g.*, PX 7C at 1203–1207, 1052–57 (completed Aide Activity Sheets #3, #4, and #5 dated April 2020). Nothing in the record shows that Sarene rejected any aide activity sheets when a live-in aide submitted an older version of the form.

Sarene used the aide activity sheets to track the number of days live-in aides worked for the company's clients in a given week. (Jury Trial Tr. 550:1–4.) Eugenia Doell, Sarene's head of payroll from February 2019 through after the end of the relevant period, testified that live-in aides submitted the aide activity sheets to Sarene for the payroll department's review. (*Id.* 2754:24–2755:4, 2756:10–17.)

All versions of the aide activity sheets prominently feature a large table identifying various patient care tasks and permitting the live-in aide to check off boxes indicating that they performed a specific task during one or more 24-hour shifts during the seven-day week (*e.g.*, "Sun," "Mon," "Tues," "Wed," "Thus," "Fri," "Sat,"). (Jury Trial Tr. 546:20–549:17; *see also* PX-7A at 2, 11, 12, 16, 18 (Aide Activity Sheets #1 through #5).) This table of patient care tasks takes up more than two-thirds of all versions of the form. (*See* PX-7A at 2, 11, 12, 16, 18 (Aide Activity Sheets #1 through #5).)

The bottom section of each aide activity sheet differs in certain respects as detailed above. However, no version of the form provides any means by which live-in aides could report the amount of time it took for them to complete each of the listed patient care tasks during each 24-hour shift. (Jury Trial Tr. 549:18–25; *see also* PX-7A at 2, 11, 12, 16 (Aide Activity Sheets #1 through #4).) Nor do any of the versions of the aide activity sheets elicit information about the exact hours live-in aides worked during any 24-hour shift during the covered week or the length of any interruption to a live-in aide's meal or sleep break or the precise time at which any interruptions took place. (Jury Trial Tr. 923:7–925:17; 1073:21–1077:2; 1354:1–1354:11; *see also* PX-7A at 2, 11, 12, 16 (Aide Activity Sheets #1 through #4).)

Aide Activity Sheets #3, #4, and #5 all ask live-in aides to confirm that they received uninterrupted meal and sleep breaks but do not provide live-in aides any method for tracking time they actually worked during each of their 24-hour shifts for the week at issue or for tracking whether any meal or sleep breaks were interrupted in any way, and if so, the duration of any such interruptions. (Jury Trial Tr. 1073:24–1077:2; 1354:1–1354:11 (K. Manolias referring to PX-7C at 1022 and 466, respectively).) None of these forms elicit such information with questions or instruct live-in aides to provide such information anywhere on the form.

## III. Orientation

### A. <u>The Timing and Length of Sarene's Live-in Aide Orientation</u>

Sarene required newly hired live-in aides to attend an orientation prior to being formally retained by the company. Valerie Sirio, Sarene's "HR supervisor" during the relevant period, testified that candidates for a live-in aide position were required to attend orientation before completing necessary hiring paperwork and before being assigned to Sarene clients. (Jury Trial Tr. 2787:4–18.)

Defendant Manolias and Sirio testified that the live-in aide orientation lasted "all day." (Jury Trial Tr. 2365:4–6 (I. Manolias testifying that when "people would apply for a position," Sarene "would set them up with an orientation," which was "all day long"); *id.* 2369:4–7 (I. Manolias clarifying that by "all day" she meant "maybe six to eight hours"); *id.* 2789:15–20 (Valerie Sirio testifying orientation was "[a]n all-day thing," and that they would "[s]ometimes . . . order[] lunch, so it was a full day.").)

By contrast, Defendants' former live-in aides credibly testified that the orientations that they actually attended varied in length, ranging from one hour to a full day.[5] At least nine worker witnesses credibly testified that the live-in aide orientation that they attended lasted anywhere from as little as around one hour to around half of a day:

- Defense witness Inez Deen credibly testified that she attended a live-in aide orientation at Sarene when she was hired which lasted "[o]ver an hour," and "a little more than 2 hours." (Jury Trial Tr. 2884:24–2885:5, 2895:23–2896:2.)
- Patrick Atta credibly testified that he attended an orientation after being hired, which was "three to five hours" long. (*Id.* 269:15–17.).
- Vida Osei credibly testified that she attended a live-in aide "orientation when [she] started working for Sarene" and that it lasted "like half of the day." (*Id.* 813:11–13; 825:13–17.)
- Alex Agyei credibly testified that he attended a live-in aide orientation for "multiple hours." (*Id.* 878:10–16.)

[5] Tysharra Wright credibly testified that she attended orientation when she "started at Sarene" but did not recall how long it lasted. (Jury Trial Tr. 1025:22–1026:1.)

- Delisha Sanders credibly testified that she attended a live-in aide orientation when she began at Sarene that lasted for "maybe two hours or maybe three." (*Id.* 1248:10–16.)
- Abigail Boakye Boateng credibly testified that she attended orientation when she started as a live-in aide at Sarene, and it lasted "almost an hour or an hour and a half." (*Id.* 1426:9–21.)
- Lucia Harvey credibly testified that she attended a live-in aide orientation when she started at Sarene that "last[ed] an hour." (Jury Trial Tr. 1521:4–11.)
- Krystal Marine credibly testified that that she attended a live-in aide orientation that lasted "probably, like a[n] hour." (*Id.* 1875:2–17.)
- Helen Eshun credibly testified that she attended an orientation that lasted "[c]lose to an hour." (*Id.* 2134:2–11.)

Twelve worker witnesses testified that the live-in aide orientation that they attended lasted around "one day," or somewhere between six and eight hours:

- Musana Donaldson credibly testified that orientation occurred the day after her hire. (*Id.* 94:17–21.)
- Alethea Powell credibly testified that she attended "a day" long orientation before her first assignment. (*Id.* 413:1–5.).
- Robert Daniels credibly testified that he attended an orientation that was "between six and eight hours" when he started working for Sarene. (*Id.* 462:16–17.)
- Taibat Kareem credibly testified that she attended Sarene's orientation, which was "[o]nly one day." (Jury Trial Tr. 592:6–7.)
- Carla Julius credibly testified that orientation lasted no more than one day. (*Id.* 694:20–695:1.)

- Nana Osei credibly testified that she attended an orientation that lasted "pretty much all day." (*Id.* 980:9–18.)
- Odura Doris Oguntunde credibly testified that she attended an orientation that lasted "6 hours." (*Id.* 1572:6–11.)
- Susan Wajtanowski credibly testified that she attended an orientation for "one day" but did not recall how many hours it lasted. (*Id.* 1699:4–14.)
- Judine Kerr Dubois credibly testified that she attended an orientation lasting "eight hours" when she started at Sarene. (*Id.* 1992:24–1993:13.)
- Robin Duff credibly testified that she attended a "one day" orientation when she started working for Sarene. (Jury Trial Tr. 2044:5–9.).
- Buhle Mhlongo credibly testified that she did not "remember exactly how long" her orientation with Sarene was, but that "it was one day." (*Id.* 2069:16–18.)
- Shantiqua Brown credibly testified that her live-in aide orientation was "[a]bout seven hours." (*Id.* 2735:7–21.)

Based on credible testimony in the record, Sarene's orientation for live-in aides ranged in duration from around one hour to a full day during the relevant period.

### B. <u>The Job Description and the Aide Activity Sheets During Orientation</u>

Jennifer Laper-Ifferte, who worked as a Sarene nursing supervisor for four months during the relevant period (from May 2017 through August 2017) and later worked as Sarene's director of nursing from February 2020 until December 2021, testified that she helped administer live-in aide orientation sessions from May 2017 through August 2017. (Jury Trial Tr. 3004:23–

3006:14.)[6] She also testified that "towards the end" of orientation, Sarene's nursing supervisors would "go over . . . the responsibilities [of live-in aides]" and instructions on how to fill out aide activity sheets, care for patients, and contact Sarene "if there's an issue with [their] patient." (*Id*. 3004:20–3005:19; 2993:22–2994:15.) According to Laper-Ifferte, "[p]robably about 30 minutes to 45 minutes" of the orientation were spent on "filling out the time sheets"—referring to the aide activity sheets. (*Id*. 2994:21–25.)

Laper-Ifferte further testified that live-in aides were instructed during the orientation "to call immediately and let [Sarene] know" if they did not get an uninterrupted sleep or meal break and that "they should also indicate it on their time sheet." (*Id.* 2995:10–25.) Laper-Ifferte further testified that Sarene staff reviewed the Job Description with live-in aides during orientation for "[p]robably another half hour to 45 minutes." (*Id*. 2995:2–2996:4.) According to Laper-Ifferte, live-in aides were informed that they were to work "[t]hirteen hours" and "were getting eight hours of sleep, five of which had to be uninterrupted, and then their meal breaks." (*Id*. 2995:10–17.) Valerie Sirio also testified that staff explained to live-in aides how to complete the aide activity sheets during orientation. (*Id*. 2790:16–2791:12.) According to Manolias and Sirio, live-in aides were required to sign the Job Description at the conclusion of their orientation before they could be assigned to a case. (Jury Trial Tr. 2369:8–2370:9; *id*. 2874:5-2875:2; Bench Trial Tr. 28:9–29:20.)

---

[6] Laper-Ifferte only testified about the content of live-in aide orientations during her tenure as a Sarene nursing supervisor for four months in 2017. She did not address the content of orientations from September 2017 through January 2020 when she did not work at the company or during her tenure as nursing director from February 2020 through December 2021, which includes the last eleven months of the relevant period.

Former live-in aides credibly testified that the focus of the orientation was how to provide patient care. For example, Patrick Atta credibly testified that "[t]he orientation was about how you take care of patients. Like, we watched videos and [that] tells you how, like, care has to be taken with the patient." (Jury Trial Tr. 209:19–23.) Alethea Powell credibly testified that Sarene discussed at orientation, "[t]he safety of the patient, "[t]he HIPPA information," "and that's basically it." (*Id*. 413:6–9.) Taibat Kareem credibly testified that orientation covered topics "[l]ike how to take care of the clients in their homes." (*Id*. 592:8–11.) Shantiqua Brown credibly testified that "the most important [topic covered at orientation] is . . . when you walk in the house, there's going to be a folder there that tells you everything that you are going to be doing for the patient . . . ." (*Id*. 2711:4–16.) Inez Deen credibly testified that orientation covered "how you have to take care of the client." (*Id*. 2885:10–12.)

Several worker witnesses credibly testified that Sarene staff addressed how to complete aide activity sheets during orientation. (*Id*. 132:13–16; 209:24–210:6; 607:17–20; 694:13–19.) However, several worker witnesses also credibly testified that their understanding following the orientation was that they should call their nursing supervisor about any work interruptions to their sleep or meal breaks.

- Musana Donaldson credibly testified that live-in aides were instructed to fill out the aide activity sheets "[e]xactly how it was filled out, if anything happens different, we will call the on-call nurse. We [weren't] told to put anything on the timesheet." (Jury Trial Tr. 137:13–15.)
- Robert Daniels credibly testified that he was told at orientation that he was "supposed to call the assistant" to report sleep and meal break interruptions. (*Id*. 521:3–5.)

- When asked whether she received any instruction about recording break times on the aide activity sheets, Shantiqua Brown credibly testified, "On the sheet, I don't – I don't remember on the sheet or not, but I know that I would always just call a nursing supervisor or the on call, someone in the office." (*Id*. 2726:15–20.)
- Judine Kerr Dubois credibly testified that at orientation, "They told us to call the number on the phone and report [break interruptions]." (*Id*. 1998:15–20.)

Former Sarene live-in aides credibly testified that they received the Job Description at the end of the live-in aide orientation, corroborating similar testimony by Laper-Ifferte, Sirio, and Manolias. However, these worker witnesses also credibly testified that during the orientation, Sarene staff did not explain the contents of the Job Description to them, that the Job Description was included among more than a dozen documents that staff hastily asked them to sign before leaving orientation, and that they felt rushed into signing those documents, including the Job Descriptions.

- Musana Donaldson credibly testified that she received the Job Description in an "envelope" with "20 to 30 papers" to sign at the orientation. (Jury Trial Tr. 138:22–139:14.)
- Patrick Atta credibly testified that he was told to sign a "big booklet" of documents before he left orientation, and that he "didn't get time to go through all" of it. (*Id.* 234:22–235:16.)
- Revonda Acka credibly testified that despite the text of the Job Description, she was not told that she would be paid overtime for interruptions to her sleep breaks. (*Id.* 433:11–434:24.)

- Taibat Kareem credibly testified that the Job Description was included in "a bunch of papers that [she] ha[d] to sign together." (*Id.* 609:1–7.)
- Vida Osei credibly testified that she received "a lot" of documents at orientation, "so [she didn't] have time to read." (*Id*. 813:14–18.)
- Alex Agyei credibly testified that "they give you a whole bunch of paper to sign" and that "you can't read everything . . . All you have to do is keep signing. You read the first page and then you sign it." (*Id*. 892:7–14.)
- Delisha Sanders credibly testified that she could not remember signing the Job Description at the live-in aide orientation "because there was a lot of paper." (*Id.* 1254:2–1255:16.)
- Abigail Boakye-Boateng credibly testified that that the Job Description was provided to her during "the latter part of the orientation," when she was "asked to sign stuff," and that she "didn't get much time to go through" the documents provided at the orientation. (*Id.* 1454:11–16.)
- Odura Doris Oguntunde credibly testified that she was provided with "a bunch of papers that [she] should sign" and was told to sign, but that she was not told "to read" the documents "or do anything like that." (*Id.* 1583:13–1584:2.)
- Krystal Marine credibly testified that she was "just briefly signing all the papers that [she] was getting" at orientation and that she "wasn't reading through them" because "[i]t was a lot of paperwork." (*Id.* 1888:21–1889:6.)
- Robin Duff credibly testified that she was given "a packet" of documents to sign at her orientation. (*Id.* 2057:8–15.)

- Helena Eshun credibly testified that she and other live-in aides "were not given the chance to go through the papers to read word-by-word" during her orientation. (*Id.* 2142:23–2143:18.)

I find that Sarene staff provided the Job Description to live-in aides near the end of the live-in aide orientation and that these workers were required to sign these documents in order to receive an assignment to work as a live-in aide. However, Sarene staff failed to explain the contents of the Job Description to them. Moreover, because the Job Description was hastily provided with more than a dozen other documents at or near the end of the orientation, live-in aides felt rushed into signing the Job Descriptions without understanding their contents or purpose.[7]

## IV. The Aide Activity Sheets and Other Recordkeeping Systems in Practice

### A. Defendants' Recordkeeping Systems & Purported Policy of Investigating Sleep or Meal Interruptions

The aide activity sheets were Defendants' primary method of keeping time and reporting hours worked by Sarene live-in aides during the relevant period. Defendants also used several other timekeeping and reporting procedures at various times throughout the relevant period, including: (1) primarily handwritten, but sometimes typed, logs of live-in aides' calls to Sarene supervisors outside of business hours (8 a.m. to 5 p.m.) on Monday through Friday, (2) an automated telephone clock in/clock out system called "IVR," and (3) a mobile application called

[7] On cross-examination, counsel for Defendants asked several worker witnesses to confirm the text set forth in the Job Descriptions. (*See, e.g.*, Jury Trial Tr. 239:5–12 (Patrick Atta); 2051:23–2052:6 (Robin Duff)). Evaluating each of these witnesses' testimony as a whole, based on their credibility and demeanor, these former live-in aides' confirmation of the text of the Job Descriptions that defense counsel read out loud to them or showed them does not establish that Sarene staff trained these individuals on the contents of the Job Description such that they understood what they were signing at the end of their live-in aide orientation sessions.

HHAeXchange, which also permitted live-in aides to submit information via an automated phone call. (Jury Trial Tr. 1349:3–1351:2; 1603:2–1604:9.) Sarene staff also used Skype to message each other internally regarding live-in aides' reports of interruptions to meal and sleep breaks. (*Id*. 1604:10–1605:17.) The IVR and HHAeXchange were used only for limited periods of time. (*Id*. 1733:4–9; 1075:7–1076:20).

Defendants' witnesses testified with varying degrees of credibility—and lack thereof—that Sarene had a policy to evaluate any reports by live-in aides of interruptions to their sleep or meal breaks and determine whether to provide them overtime compensation. Defendant Irene Manolias' testimony on this issue was entirely lacking in credibility based both on her intemperate demeanor and the content of her testimony in Court. Thus, the Court does not credit Manolias' self-serving testimony that she and Sarene maintained a policy by which, if a live-in aide reported an interruption on an aide activity sheet or by calling Sarene, a nursing supervisor would determine whether the live-in aide worked during a meal or sleep break and then the payroll department would pay the live-in aide for the interruption. (Jury Trial Tr. 2304:7–25, 2385:25–2386:24). Defendant Manolias also lacked credibility when testifying that Sarene had a policy of sending "respite aides" to care for patients who required more than 13 hours of care in a 24-hour period so that the live-in aides working with these patients could take their sleep breaks at night. (*Id*. 2364:10–18; 2406:1–8.)

Eugenia Doell, Sarene's head of payroll, testified vaguely that a staff member who reported to her would call any live-in aides who made a "note or indication" on an aide activity sheet and that a nursing supervisor would then follow-up to "look into the issue from a patient's standpoint." (Jury Trial Tr. 2759:16–2760:9.) Doell was not involved in determining whether a live-in aide worked through a meal or sleep break and did not speak directly to any live-in aides

about any such interruptions; rather "[i]t did go to nursing to understand exactly what was going on . . . ." (*Id*. 2761:5–10; *see also id*. 2763:20–2764:5 (Doell admitting that she "usually" "wasn't the one that had spoken directly to" any live-in aides about notations on aide activity sheets or calls relating to sleep or meal break interruptions).) Doell also testified vaguely that when a nursing supervisor authorized an additional overtime payment, Doell would review the payment in her role as head of payroll before it was disbursed. (*Id*. 2762:5–12.)

During her four months as a Sarene nursing supervisor in May 2017 through August 2017, Jennifer Laper-Ifferte reviewed aide activity sheets identified by the payroll department as indicating that a live-in aide worked more than 13 hours or experienced an interruption to a sleep or meal break. (*Id*. 3003:21–3004:8.) When Laper-Ifferte learned that an aide "had worked beyond their 13 hours," she would speak with them to understand "what was going on" and what was happening with the patient. (*Id*. 2992:18–2993:11.) She would "handle the clinical issue," determine "how long" the live-in aide was "performing these tasks," and then "[speak] with the payroll department to make sure that the employee got paid." (*Id*.) She did not document any of her conversations with live-in aides, payroll, or patients and their families about whether a live-in aide should be paid overtime for a sleep or meal break interruption. (*Id*. 3022:11–3023:12.) Laper-Ifferte did not testify that she conducted any such investigations of interruptions of live-in aides' sleep or meal breaks during her time as Sarene's director of nursing in 2020.

### B. <u>Sarene's Inadequate Recordkeeping and Investigation into Sleep and Meal Break Interruptions</u>

In stark contrast to what Laper-Ifferte and Doell described as Sarene's purported policy by which the nursing and payroll departments evaluated reports of interruptions to live-in aides' sleep and meal breaks to ensure overtime compensation, Sarene never made *a single* overtime payment to any of its more than 500 live-in aides for an interruption to a meal or sleep break

from March 19, 2017 through December 31, 2020. Moreover, Defendants maintained inadequate records of the actual hours worked by live-in aides and failed to investigate when live-in aides reported interruptions to their sleep and meal breaks.

*i.* ***Live-in Aides Reported Interruptions to Sleep and Meal Breaks, but were not Compensated***

Former Sarene live-in aides credibly testified that they reported to Sarene supervisors and management that they were experiencing interruptions to meal and sleep breaks through their aide activity sheets, the IVR and HHAeXchange systems, as well as phone calls to nursing supervisors or to the after-hours call line, but that Defendants ignored these reports.

For example, Robert Daniels credibly testified that he reported to Sarene that he did not receive his meal or sleep breaks, but that when he called the company, his coordinator was "not there" and he was never paid overtime for working through his breaks. (Jury Trial Tr. 520:12–527:16.)

Taibat Kareem credibly testified that she reported to Sarene that she was not receiving her sleep breaks. (*Id*. 600:9–11.) Sarene staff told her that "someone will reach out," but no one did despite the fact that Kareem left "messages." (*Id*. 600:18–20.) Sarene did not pay Kareem any overtime for work done during her sleep breaks. (*Id*. 600:21–23; 596:2–8 (Kareem testifying that she did not "ever get five hours of sleep without interruption" and that Sarene never paid her overtime for these interruptions).)

Abigail Boakye-Boateng credibly testified that a "majority" of the patients she served as a live-in aide required assistance that caused interruptions to her sleep breaks. (Jury Trial Tr. 1487:22–25.) However, "anytime that [she] call[ed]" Sarene, she could not reach anyone with whom to speak. (*Id*. 1487:22–1488:5.) Boayke-Boateng signed her aide activity sheets reporting no interruptions "because if you don't submit [them], you are not going to get paid." (*Id.*)

Musana Donaldson credibly testified that she would call Sarene "if something happened" that affected her sleep breaks, and that Sarene never paid her overtime for these interruptions. (*Id*. 137:19–25.)

Patrick Atta credibly testified that he would call Sarene when he was not receiving his breaks, but that "[t]hey didn't take no action." (*Id*. 182:5–12.)

Helena Eshun credibly testified that she was not paid overtime for the interruption to her sleep break stemming from a medical emergency experienced by the second client she served for Sarene. (Jury Trial Tr. 2122:22–2125:15.) Although her shift was scheduled to end at 9:00 p.m., her client was experiencing trouble breathing, prompting her to call 911 at around 11:30 p.m. (*Id*. 2123:3–11.) After calling 911, she called Sarene to let them know, but no one responded to her call. (*Id*. 2123:12–18.) She went with the client and the paramedics to the hospital to assist the patient, who was unable to answer certain questions from medical providers. (*Id*. 2123:25–2124:14.) She remained with the client in the hospital until 8:00 a.m. the next morning when she received a call from Sarene, explained to them what happened, and was instructed to leave the hospital. (*Id*. 2124:9–2125:7.) Although Sarene learned on that phone call that Eshun had spent her sleep break with the patient in the hospital, the company did not pay her any overtime for those hours. (*Id*. 2125:8–15.)

Squarely contradicting testimony by Irene Manolias, Doell, and Laper-Ifferte about a purported company policy for investigating live-in aides' reports of sleep and meal break interruptions, numerous workers credibly testified that when they reported consistent interruptions to their sleep breaks, Sarene failed to assign an aide who would provide patient care at night so that the live-in aide could sleep and at most provided only daytime assistance. For example, Delisha Sanders cared for "four to five" patients as a live-in aide for Sarene, including

four patients who were bedbound, and estimated that her sleep breaks were interrupted around "three times" in a given night. (Jury Trial Tr. 1239:19–1244:5.) Sanders reported to Sarene "a few times" that she was not receiving her sleeps breaks, and Sarene told her a "relief aide" would be sent. (*Id*. 1244:19–25.) However, no aide ever came to the patient's home to enable Sanders to take her sleep breaks. (*Id*. 1244:24–1245:1.) Sarene provided a "relief aide" to Lucia Harvey, but that aide only visited during the day and did not enable Harvey to take her eight-hour sleep break when her patient needed assistance at night. (*Id.* 1509:17–1511:7). Neither Sanders nor Harvey were paid for the interruptions to their sleep breaks. (*Id*. 1246:9–14 (Delisha Sanders); 1508:21–1509:1 (Lucia Harvey).) Carol Probst explained that she served as a Sarene "relief aide," but that in that role, she "never did overnights." (*Id.* 2881:16–2883:6.)[8]

*ii.* ***Sarene Maintained Systems that Failed to Record Hours Worked by Live-in Aides***

From March 19, 2017 through February 28, 2019, Sarene paid live-in aides for 12.5 hours of work per 24-hour shift. (Stipulation, ECF No. 262.) From March 1, 2019 through December 31, 2020, Sarene paid live-in aides for 13 hours of work for each 24-hour shift. (*Id.*) At some point, Defendants realized that they should have paid live-in aides for 13 hours per 24-hour shift during the March 19, 2017 through February 28, 2019 period. (Jury Trial Tr. 2177:5–18 (Stipulation).) After determining the amount of retroactive payments due to each employee,

[8] Defendant Manolias testified that "respite aide" is the term used to refer to a worker who provided patient care at night to permit a live-in aide to sleep, while "relief aide" refers to a worker who provided patient care during the day to provide some free time to the live-in aide. (Jury Trial Tr. 2406:1–25.) In the testimony cited above, Sanders and Harvey appear to have used the term "relief aide" to refer to an aide who would come to care for the patient at night so that they, the live-in aides, could sleep. Regardless of whether they used the proper terms, both witnesses credibly testified that when they reported to Sarene that the need to care for patients interrupted their sleep periods, Sarene did not send another aide to care for the patient at night so that Sanders and Harvey could sleep.

Serene sent retroactive payments of wages for an additional half hour per 24-hour shift to current and former live-in aides who had worked shifts between March 19, 2017 and February 28, 2019 and who had been paid only 12.5 hours per shift. (*Id.*; *see also id*. 1914:6–16 (K. Manolias testifying that there was a "clerical error" and that current and former live-in aides "entitled up to a half an hour of compensation" were "fully compensated").)

The record is replete with evidence showing that Sarene's recordkeeping systems did not adequately capture the hours worked by live-in aides. From March 19, 2017 through around March 2019—more than half of the relevant time period—the *only* time sheet used by Sarene to capture live-in aides' work time was Aide Activity Sheet #1. (*See* Jury Trial Tr. 2225:19–2227:16 (I. Manolias referring to PX-7C at 1, 70, 82).) Live-in aides often wrote "live-in" or the same time each day for the "TIME OUT" and "TIME OUT" periods when completing these forms, demonstrating that the forms were used to capture shifts rather than the specific amount of time each live-in aide worked each day. (*Id*. 913:24–922:6 (K. Manolias referring to PX-7C at 33, 41, 70, 71, 72, 82).) When a live-in aide used Aide Activity Sheet #1 to report working more than 13 hours per day, Sarene generally did not pay them overtime wages for any hours beyond 13 hours per day (91 hours per week). For example, an Aide Activity Sheet #1 dated the week beginning August 12, 2018 and ending August 18, 2018, shows that a live-in aide wrote "8:00 am" as the "TIME IN" and "11:00 pm" as the "TIME OUT" for each day of the week, which corresponds to 105 hours for the week. (PX-7C at 57.) However, there is a handwritten notation of "87.5" hours on the aide activity sheet. (*Id.*) As Kristi Manolias testified, 87.5 hours

corresponds to Sarene's initial practice (from March 19, 2017 through February 28, 2019) of paying live-in aides for 12.5 hours per 24-hour shift.[9]

Furthermore, Sarene sent mixed messages to live-in aides about whether to report meal and sleep break interruptions through the IVR and HHAeXchange systems. On the one hand, when Defendants adopted Aide Activity Sheet #3 in around October 2019 and Aide Activity Sheet #4 in around February 2020, they instructed live-in aides to report meal and sleep break interruptions through these systems. (*See* PX-7C at 12, 16.) This is because both of these aide activity sheets explicitly instruct live-in aides to report such interruptions by entering "444" for meal break interruptions or "555" for sleep break interruptions into the systems. (Jury Trial Tr. 1733:10–1736:4; 1741:7–25; *see, e.g.*, PX-7A at 12, 14, 16, 18.) Yet, Tyler Stauber confirmed that Sarene staff never went into the IVR and HHAeXchange systems to determine whether live-in aides were attempting to report sleep or meal break interruptions through those systems in light of the instructions to do so on Aide Activity Sheets #3 and #4. (*Id.* 1733:10–1734:22.)

#### *iii.* ***Defendants did not Once pay a Live-in Aide Overtime Compensation for an Interruption to a Sleep or Meal Break From March 2017 to December 2020***

When confronted with aide activity sheets, HHAeXchange entries, call logs, and Skype messages which showed that live-in aides reported interruptions to meal or sleep breaks and the corresponding payroll records for the relevant pay periods, Defendant Manolias and defense witnesses, Kristi Manolias and Tyler Stauber ("Stauber"), repeatedly admitted that, in fact, the live-in aides at issue were not paid for the reported interruptions to meal and sleep breaks.

---

[9] A live-in aide who works seven shifts per week at 12.5 hours per shift would be paid for 87.5 hours during the March 19, 2017 through February 28, 2019 period, before Sarene corrected a clerical error and made retroactive payments such that all live-in aides who worked during that period were paid for 13 hours per 24-hour shift. (Jury Trial Tr. 2177:5–18 (Stipulation).)

Defendant Manolias was asked to review an Aide Activity Sheet #3 in which the live-in aide wrote, "wake up at night sleeps day time," in the "HHA/PCA Personal Care and Sleep Allotment" section. (Jury Trial Tr. 2228:4–19 (referring to PX-7C at 605).) She admitted that the specific aide activity sheet directs the live-in aide to fill in the "HHA/PCA Personal Care and Sleep Allotment" section if they experienced an interruption to a sleep or meal break. (*Id*. 2229:10–21.) She also testified that Sarene did not consider the live-in aides' written notation, "wake up at night sleeps day time," to constitute a report of an interrupted sleep break because the live-in aide did not specify that they did not get a full eight hours of sleep, five of which were uninterrupted. (*Id*. 2234:4–2243:4.) When shown the payroll record documenting wages paid to that particular live-in aide for the week covered by that particular aide activity sheet, Defendant Manolias admitted that the payroll record showed that the live-in aide was not paid for working during any breaks. (*Id*. 2298:8–2300:15 (referring to PX-47).)

Defendant Manolias was shown a completed Aide Activity Sheet #2 on which the live-in aide circled "N" for each day of the week in response to the question "Did you receive 8 hours of [s]leep, 5 of which were uninterrupted?" and wrote "Patient kept hearing voices, walked around [*illegible*] I help her back to BR and stay on chair." (Jury Trial Tr. 2300:16–2301:24 (referring to PX-7C at 640).) Defendant Manolias acknowledged those notations on the form, but did not answer when directly asked whether the live-in aide was paid for any additional time during that pay period. (*Id*. 2302:3–2303:4.) Instead, she obfuscated and testified, without credibility, that the payroll department would have needed to investigate an aide activity sheet like this one to determine whether the live-in aide experienced interruptions to her sleep breaks. (*See id*.) Manolias also speculated that perhaps the live-in aide who completed this aide activity sheet had slept in the chair for the duration of her 8-hour sleep period. (*Id*. 2301:11–2303:4.) When shown

the payroll record documenting wages paid to that particular live-in aide for the week covered by that particular aide activity sheet, Defendant Manolias admitted that the payroll record showed that the live-in aide was not paid for working during any breaks. (*Id*. 2303:5–18 (referring to PX-45).)

Kristi Manolias also reviewed a completed Aide Activity Sheet #1 in which a live-in aide reported working 105 hours in a week. (Jury Trial Tr. 918:24–919:12.) Upon review of the corresponding payroll records, she admitted that the live-in aide was initially only paid for 87.5 hours a week.[10] (*Id*. 918:24–919:12.)

Kristi Manolias was questioned about a completed version of Aide Activity Sheet #2 in which the live-in aide circled "N" for each Monday through Saturday in response to the question, "Did you receive 8 hours of [s]leep, 5 of which were uninterrupted?" and wrote "she doesn't sleep in the night from 12 am." (Jury Trial Tr. 935:19–936:10 (referring to PX-7C at 603).) When shown the payroll record documenting wages paid to that particular live-in aide for the week covered by that particular aide activity sheet,[11] Kristi Manolias admitted the live-in aide was paid for only 13 hours per shift that week. (*Id*. 938:1–939:24 (referring to PX-30).)

Tyler Stauber was shown Skype messages sent between Sarene staff and logs documenting calls to Sarene, which include notes of reports by live-in aides suggesting that they experienced interruptions to a meal or sleep break. (Jury Trial Tr. 1606:22–1625:24 (discussing Skype Messages); 1631:17–1635:15 (discussing call logs).) One message from Sarene staff

---

[10] The live-in aide later received a retroactive payment in order to be compensated for 13 hours per 24-hour shift, pursuant to the administrative correction detailed above. *See* note 9 *supra*.

[11] The aide activity sheet at issue covered the week of October 6, 2019 to October 12, 2019. (PX-7C at 603.)

reported a call from a live-in aide "stating that the patient is not sleeping at night, patients been bother[ing] the aide every night, three times a night for . . . little stuff. Aide is not sleeping. Asked aide if she would like to get off. She said that isn't the issue." (*Id.* 1606:18–1610:6 (referring to PX 13 Excerpts at 9).) Another message reported a call from a live-in aide stating, "I was doing wellness calls and patient . . . is having issues sleeping, constipated. Dementia is getting worse . . . The family is asking for another HHA to work case in the night so live-in HHA can sleep." (*Id.* 1610:11–1611:24 (referring to PX 13 Excerpts at 2).) Another message reported that a live-in aide called "to inform client is awake all night and she do[es]n't have any rest." (*Id.* 1614:22–1615:1.) When shown corresponding payroll logs for both workers, Stauber admitted that the live-in aides were not paid any additional compensation for working during any part of any sleep or meal break during the time periods at issue. (*Id.* 1611:1–24; 1620:20–1621:20.)

Stauber was also questioned about the logs of calls from live-in aides who reported interruptions to sleep or meal breaks. One call from a live-in aide, made at 3:56 a.m., reported "we just got home at 3:43 by the ambulance," after the worker had accompanied the patient to the hospital. (PX-14 Excerpts at 17; *see* Jury Trial Tr. 1631:17–1632:8.) A similar call from another live-in aide, made at 5:31 a.m., reported that "we are at the hospital right now" after a patient fall. (PX-14 Excerpts at 18; *see* Jury Trial Tr. 1634:6–14.) When shown corresponding payroll logs for both live-in aides, Stauber admitted that they were not paid any additional compensation for working during any part of a sleep or meal break during the time periods at issue. (Jury Trial Tr. 1632:9–1633:11, 1634:15–1635:15.)

Stauber was also questioned about HHAeXchange notes entered by Sarene staff in connection with calls made by two live-in aides. (Jury Trial Tr. 1725:5–1732:15 (referring to PX-15 Excerpts and PX-38, PX-39, PX-41).) The first note indicates that "the patient keeps

asking to go to the bathroom to urinate during the night yet does not go to the bathroom this is causing the HHA not to sleep," and that this particular live-in aide "is not getting enough sleeping time due to the patient not sleeping during the night." (PX-15 Excerpts.) When presented with the payroll record corresponding to that live-in aide's work during the time period at issue and for the two subsequent weeks, Stauber admitted that the payroll record shows the live-in aide was paid only for 13 hours of work per 24-hour shift, without any additional payment for interrupted sleep time. (Jury Trial Tr. 1725:20–1729:1 (referring to PX-38 and PX-40).)

Stauber was also shown a second HHAeXchange note, which reads as follows:

> [Live-in aide] states that she was not able to stay on the case. **The patient does not sleep and is constantly calling the [live-in aide] during the night** and the patient does not assist in movements including sitting up. The patient is unstable on her feet and according to [live-in aide] a major fall precaution. The [live-in aide] had to hold patient walking and rock her side to side to move her feet. **[Live-in aide] never was able to sleep on case due to the patient not sleeping.** The daughter does not want the patient in the wheel chair. The patient wants to constantly be moved around[.][] [Live-in aide] asked to be taken off the case. **The patient will not let the [live-in aide] eat or sleep** or . . . she is constantly calling to be moved[.][] The [live-in aide] was up from 3AM on every time the [live-in aide] lies down the patient calls out. The patient keeps making the [live-in aide] pick her up[.][]

(PX-15 Excerpts.) After reviewing this second HHAeXchange note and the payroll records corresponding to that live-in aide's work during both the time period at issue and the following pay period, Stauber admitted that the live-in aide was only paid for 13 hours of work per shift, without any additional payment for interrupted sleep time. (Jury Trial Tr. 1729:2–1732:15 (referring to PX-39 and PX-41).)

### *iv. Defendants did not Maintain an Actual Policy of Investigating Reports by Live-in Aides of Interruptions to Sleep and Meal Breaks to Determine Whether Overtime Compensation Should be Paid*

Defendants failed to offer at trial *any* documentary evidence or witness testimony showing that Sarene's nursing or payroll departments investigated a single report by a live-in aide of an interruption to a sleep or meal break at any time during the relevant time period, much less that they investigated any of the specific incidents about which defense witnesses were questioned at trial as detailed above. Doell credibly testified that she was not involved in any direct calls with live-in aides or other inquiry to determine whether a live-in aide experienced a compensable interruption to a meal or sleep break, and only supervised the process of making a payment where extra overtime was authorized by the nursing department. (Jury Trial Tr. 2761:5–10; 2763:20–2764:5.) Laper-Ifferte testified that she recalled approving additional overtime pay for live-in aides from March 2017 to December 2020, but could not recall a single specific incident during that time frame, and the one incident she could recall took place in 2021—after the close of the relevant time period in December 2020. (*Id*. 2993:12–20; 3008:11–3009:13; 3023:25–3025:12.) Moreover, as noted, former Sarene live-in aides Daniels, Kareem, Boakye-Boateng, Donaldson, Atta, Eshun, Sanders and Harvey credibly testified that they reported interruptions to their sleep and/or meal breaks to Sarene management through various means, including calls to supervisors and the after-hours line, but that they were never once paid overtime compensation for working during those breaks. (*See* Factual Findings IV.B.i.)

Thus, evaluating all of the evidence in record, I find that, during the relevant period, Sarene did not have an actual practice of investigating live-in aides' reports of interruptions to their sleep and meal breaks and paying overtime compensation for those interruptions notwithstanding the testimony of Irene Manolias, Doell, and Laper-Ifferte. Irene Manolias'

testimony on this issue was entirely lacking in credibility, as described above. Doell testified only vaguely about such a policy and conceded that she was not involved other than to disburse overtime compensation when warranted—which the record reflects did not happen even a single time during the relevant period despite: (1) a workforce of more than 500 live-in aides, (2) credible testimony by Daniels, Kareem, Boakye-Boateng, Donaldson, Atta, Eshun, Sanders and Harvey that they reported work interruptions to meal and sleep breaks but were not paid overtime for such work, and (3) documentary evidence and witness testimony showing that not one of the live-in aides who reported work interruptions to sleep or meal breaks as documented in aide activity sheets, HHAeXchange entries, call logs, and Skype messages in the record were paid overtime for even one reported interruption. Finally, although Laper-Ifferte's testimony as to the existence of Sarene's purported policy was more specific than that of Doell, in the context of the record as a whole, it supports the finding that the principal focus of any inquiry into a live-in aide's markings on an aide activity sheet or call to management concerning a missed sleep or meal break was to determine whether the patient served by the worker was experiencing a clinical problem—not whether the live-in aide had performed work during the break that merited overtime compensation or to ensure that the live-in aide was paid.

## V. Defendants' Consultations with Outside Counsel and Industry Organizations

During the relevant period—March 19, 2017 through December 31, 2020—Sarene had no in-house counsel on staff. (Bench Trial Tr. 90:4–8; 99:6–100:10.) From March 19, 2017 through 2019, Defendants did not consult with *any* legal counsel regarding employee pay or labor requirements. (*Id.* 99:19–100:6.)

In November 2018, Defendants hired Ira Podlofsky. (Bench Trial Tr. 90:19–22.) Defendant Manolias was aware that Podlofsky was an attorney whose New York State bar

license had been suspended in October 2018. (*Id.* 90:19–25; 100:19–23.) Podlofsky had previously provided personal legal advice to Manolias. (*Id.* 91:7–9.) He did not work as a labor attorney prior to the suspension of his bar license, and Sarene did not consult him about any issues related to employee pay, timekeeping or recordkeeping requirements either during or prior to him joining Sarene's staff. (*Id.* 99:6–18; 101:10–16.)

Defendant Manolias testified that, at some point in 2019 or 2020, Defendants retained Emina Poricanin, who was general counsel for the New York State Association of Health Care Providers ("HCP"), for "advice on processes within [Sarene] to assure that [Defendants] were FLSA compliant and Department of Health complian[t] . . . ." (*Id.* 41:11–22; 89:23–90:15.) Defendants have provided no documentary evidence corroborating Manolias' testimony that Defendants retained Poricanin for any purpose, much less to provide legal counsel concerning Defendants' compliance with the FLSA, such as documents corroborating the existence of a contract or demonstrating that Defendants or any Sarene staff sought her legal advice or that Poricanin provided any legal advice. Nor did any witness testify about a single example in which Defendants or any Sarene staff member sought or obtained legal advice from Poricanin *on any matter*. As noted, Defendants identified Poricanin as a bench trial witness in the Second Proposed Bench Trial JPTO, but they ultimately chose not to call her to testify. Accordingly, I find that Defendant Manolias' testimony that Defendants retained Poricanin to provide legal advice to ascertain the FLSA's requirements to be entirely lacking in credibility based on the vagueness of her responses, her demeanor when testifying, and this lack of corroboration.

The HCP held webinars in which Poricanin presented on different policy changes including information about wage and hour law. (Bench Trial Tr. 38:17–39:22.) Defendant Manolias only attended a "couple" of these webinars. (*Id.* 38:23–25.) Rather, according to

Manolias, Doell of payroll and Tomoko Brown of Sarene's human resources department attended them. (*Id.* 39:23–40:1.) Manolias failed to testify credibly on this point, and Doell did not testify about attending any webinars or taking any measures to inform Sarene of the FLSA's requirements relating to live-in aides.[12]

In January 2018, Defendants hired Craig Hofmann to serve as Sarene's director of operations and human resources through December 2019. (Bench Trial Tr. 112:8–10; 113:5–8; ECF No. 299-1.) Hofmann had no prior experience in the home care industry or with FLSA requirements relating to home care workers. (Bench Trial Tr. 116:18–23.) Prior to joining Sarene, Hofmann worked in various human resources roles, first for Allstate Insurance and then for Stericycle Incorporated, a waste management company. (*Id.* 111:22-12:10.) At Sarene, Hofmann's responsibilities included "day-to-day operations," customer relations, and staff development. (*Id.* 113:18–24.) His responsibilities did not include payroll. (*See id.* 41:2–5; 117:2–8.) During the bench trial, he could not recall "having any direct conversations about" live-in aides' compensation with any other Sarene staff. (*Id.* 117:2–19.) Hofmann was not involved in the handling of payments to live-in aides, "did not see any of the time cards for aides," and was "not aware if anything was not being done correctly" with respect to their compensation. (*Id.* 116:24–117:8.) Hofmann reviewed and revised certain company policies

[12] During the jury trial, Defendants did not question Doell about what, if any, measures she took to inform Sarene of the FLSA's requirements relating to live-in aides, such as attendance at any trainings or webinars, likely because the question of Defendants' good faith was reserved for the bench trial. Defendants identified Doell as a witness in the First Proposed Bench Trial JPTO, but decided to remove her from the Second Proposed Bench Trial JPTO and chose not to call her to testify in support of their good faith defense. (*See* First Proposed Bench Tr. JPTO; Second Proposed Bench Tr. JPTO.) Thus, Defendants failed to elicit any testimony from Doell to corroborate Manolias' testimony that Doell and Brown attended HCP webinars on the FLSA's requirements whether at the jury trial or bench trial.

during his tenure at Sarene. (Bench Trial Tr. 113:25–115:18; 118:1–5.) In that process, he consulted the website of the Society of Human Resources Management ("SHRM") and participated in the SHRM online "chat room" to learn about "just about anything that pertains to HR." (*Id.* 115:6–18; 123:3–125:2.) However, Hofmann could not recall whether he ever consulted with anyone in the SHRM chat room concerning any issues relating to live-in aides, much less compensation, timekeeping, or recordkeeping relating to live-in aides. (*Id.* 125:6–126:1.)

Hofmann reviewed publicly available material on wage and hour laws on the websites of the federal and state departments of labor. (Bench Trial Tr. 115:6–9; 123:3–13; 124:1–9.) He could not specify any materials he consulted on those government websites and did not describe any particular issues he had researched concerning live-in aides. (*Id.* 123:7–10.)

## LEGAL STANDARDS

"Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (quoting 29 U.S.C. § 216(b) ("Any employer who violates [the overtime provisions of the FLSA] shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.")). Under 29 U.S.C. § 260 ("Section 260"), a district "court may, in its sound discretion," deny liquidated damages even though the employer failed to pay required wages required under the FLSA, if the employer shows two things: (1) that its "act or omission" leading to liability "was in good faith" and (2) that the employer "had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . ." In other words, the court has discretion to deny liquidated damages where, despite an employer's failure to pay

appropriate wages, the employer "acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield*, 537 F.3d at 150 (2d Cir. 2008) (quoting 29 U.S.C. § 260).

The Second Circuit "has characterized the employer's burden" under Section 260 "as 'a difficult one,' emphasizing that 'double damages [are] the norm and single damages the exception.'" *Id.*; *see also Reich v. S. New England Telecomms. Corp.* ("*SNET*"), 121 F.3d 58, 71 (2d Cir. 1997). The employer must "establish[], by plain and substantial evidence, subjective good faith and objective reasonableness." *SNET*, 121 F.3d at 71.

With respect to the first prong of this test, a showing of "good faith" requires an employer to demonstrate "that it took active steps to ascertain the dictates of the FLSA and then act to comply with them." *Barfield*, 537 F.3d at 150; *see also Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *SNET*, 121 F.3d at 71. The active steps the employer takes must be "with respect to the issue at hand." *Barfield*, 537 F.3d at 151. The fact that a defendant "did not purposefully violate the provisions of the FLSA is not sufficient to establish that it acted in good faith. Nor is good faith demonstrated by the absence of complaints on the part of employees, or simple conformity with industry-wide practice." *SNET*, 121 F.3d at 71 (quotation marks and citations omitted).

With respect to the second prong of the Section 260 test, an employer lacks objectively reasonable grounds for believing that it was in compliance with the FLSA when it "recklessly disregarded the possibility that [it] was violating the FLSA." *Herman*, 172 F.3d at 141–43.

**CONCLUSIONS OF LAW**

Defendants have failed to establish that they acted with the required subjective good faith or with objectively reasonable grounds for believing that their acts or omissions did not violate

the FLSA. Accordingly, this Court declines to reduce liquidated damages under 29 U.S.C. § 260 for the reasons explained below.

## I. Subjective Good Faith

Defendants assert that they "took numerous affirmative steps to ascertain their legal obligations under the FLSA" and acted to comply with those obligations. (Defs.' Br. at 13.) However, the record shows that Defendants failed to take sufficient steps to learn about the FLSA's requirements with respect to their live-in aide employees. Moreover, in part because they failed to take active steps to learn the FLSA's requirements relating to live-in aides, Defendants also failed to move to comply with those legal requirements. Accordingly, Defendants fail to demonstrate the subjective good faith required for a reduction of liquidated damages under Section 260.

### A. Defendants Failed to Take Active Steps to Ascertain the FLSA's Requirements Relating to Live-In Aide Employees

Defendants contend that they engaged in the affirmative steps to learn about their legal obligations under the FLSA with respect to live-in aides by: (1) gaining NYSDOH approval to become a licensed home care services agency; (2) consulting with attorneys prior to and during the relevant period, including Poricanin, (3) seeking the expertise of home care industry provider groups, human resources groups, ADP (a nationwide payroll company), NYSDOH, and former NYSDOH supervisor Annunziata concerning the FLSA's requirements, (4) finding and reviewing guidance and legal mandates from government agencies and following the New York Court of Appeals decision in *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152 (2019), (5) hiring Hofmann to serve as Sarene's director of human resources and operations, and (6) attending unnamed wage and hour webinars and events and reviewing unidentified legal updates related to the industry. (Defs.' Br. at 11–12.) Contrary to Defendants' broad and unsupported

description of these activities, the record reflects that Defendants failed to take active steps to actually learn about the FLSA's recordkeeping and overtime requirements concerning live-in employees.

*i.* ***Expanded NYSDOH License***

The steps taken by Defendants to apply for an expanded NYSDOH license covering home health aide services do not demonstrate any effort to learn about the company's FLSA obligations relating to live-in aides. Defendants generally argue that they were required to review the FLSA and "submit an application affirming their agreement to comply with the FLSA" in order to obtain the expanded license. (Defs.' Br. at 13.) However, the process for applying for this NYSDOH license focused on Defendants' compliance with New York state rules and statutes—not the FLSA. Defendant Manolias testified at length that when creating the policy documents required for NYSDOH review, she only consulted with Annunziata, a former NYSDOH supervisor, who was not an attorney—much less, a labor attorney—and had no expertise regarding the FLSA's requirements relating to recordkeeping and overtime compensation for live-in aides or steps to ensure compliance with those obligations. (Bench Trial Tr. 9:13–10:14; 89:11–16.) Defendant Manolias also testified that although she consulted with the Small Business Development Center regarding the license expansion application, that consultation did not address policies or procedures to ensure FLSA compliance. (*See id*. 14:13–15:6.) Equally significant, Defendant Manolias did not identify any information concerning FLSA requirements relating to live-in aides that she sought to obtain from either Annunziata or the Small Business Development Center through the process of putting together the license application. (*See id*.) Moreover, nothing in the record indicates that, as a result of the

consultation with either Annunziata or the Small Business Development Center, Defendants in fact ascertained what the FLSA required. (*Id.* 10:15–11:10; 14:13–15:6.)

*ii.* ***Sarene's Failure to Consult with In-House or Outside Counsel***

Defendants entirely failed to take active steps to learn about their FLSA obligations relating to live-in aides from any knowledgeable attorney. Defendants had no in-house counsel during the entire relevant time period. From March 19, 2017 through November 2018, Sarene did not have *any* attorneys on staff. (Bench Trial Tr. 90:16–25.) In November 2018, Defendants hired Ira Podlofsky, an attorney whom Defendant Manolias knew to have a suspended New York bar license at the time of hiring, but did not subsequently consult with him about *any* legal requirements or issues related to employee pay, timekeeping, or recordkeeping. (*Id.* 99:6–19, 100:19–23, 101:10–16.) From 2017 to 2019, Sarene had no legal counsel whom it consulted regarding employee pay or labor requirements in general, much less the requirements of the FLSA. (*Id.* 99:19–100:6.) Moreover, Defendant Manolias' testimony that Defendants retained Emina Poricanin sometime in 2019 or 2020 for "advice on processes within [Sarene] to assure that [Defendants] were FLSA compliant" was not credible based on the vagueness of her answers, her demeanor, and the lack of any corroborating evidence. (*Id.* 41:13–19.)

Even if Defendant Manolias' testimony as to the existence of a contract between Defendants and Poricanin for legal advice related to FLSA compliance was credible—and it was not—Manolias vaguely testified that Poricanin was retained at some point in *2019 or 2020*—either *two or three years* into the relevant period, which ended in December 2020—and that Poricanin was not retained as full-time staff or as Sarene's in-house counsel. (Bench Trial Tr. 41:11–22; 89:23–90:15.) Furthermore, Hofmann, Sarene's director of operations and human resources from January 2018 through December 2019, could not recall a single conversation he

had with Poricanin on any issue, much less the FLSA's requirements regarding recordkeeping and overtime compensation for live-in aides. (*Id.* 112:8–10; 113:5–8; 121:25–6.) Nor did Defendants provide any evidence corroborating Manolias' testimony that Defendants retained Poricanin for legal advice on FLSA compliance—such as documentation concerning the alleged contract for such services—or any specific examples where Defendants sought to learn about the FLSA's requirements from Poricanin or sought to comply with them by using Poricanin's input. Accordingly, the record squarely refutes Defendants' contention that they "consulted with several attorneys, including a well-known wage and hour attorney who specializes in advising employers in the home care industry" before and during the relevant period to learn about their FLSA obligations. (Defs.' Br. at 13.)

Additionally, Defendants' retention of Hofmann as Sarene's director of operations and human resources from January 2018 through December 2019, does not cure their failure to consult with any in-house or outside legal counsel to learn about the FLSA's requirements relating to live-in aides. Defendants purportedly hired Hofmann as "an individual with experience and knowledge in labor relations," "to ensure compliance with the FLSA and the NYLL." (Defs.' Br. at 13–14.) Contrary to that contention, however, Hofmann lacked the required experience and knowledge to provide legal advice to Defendants about, among other things, the FLSA's requirements regarding recordkeeping and overtime compensation for live-in aides.

Hofmann served as Sarene's director of operations and human resources for around two years of the relevant period. (Bench Trial Tr. 112:8–10; 113:5–8.) Prior to joining Sarene, he had no prior experience with "how the FLSA related to home care workers." (*Id.* 116:18–23.) He testified vaguely that he consulted government and SHRM websites and employed the "chat

room" function on the SHRM website to secure information about HR practices, but did not identify any materials that he consulted on those websites, what (if any) FLSA compliance issues he sought to learn about through consulting those websites, or what advice he solicited or received from any person with whom he spoke in the SHRM online "chat room." (*Id*. 115:6–18; 123:3–125:2.) Defendants did not take active steps to ascertain their FLSA obligations relating to their live-in aide employees by hiring Hofmann or through his activities from January 2018 through December 2019.

*iii.* ***Consultation of Other Authorities***

Nor did Defendants take active steps to learn about their FLSA responsibilities concerning live-in aides through consultation with HCP, SHRM, the Small Business Development Center, ADP, the NYSDOH, or Annunziata. (Defs.' Br. at 13.) Defendants fail to point to any evidence showing that any of these entities or Annunziata have knowledge or expertise in the FLSA's requirements or that Defendants learned anything about their FLSA obligations from any of these consultations. While Defendant Manolias credibly testified that Annunziata was a former NYDOH supervisor and served as a consultant to Sarene (Bench Trial Tr. 9:17–20), there is no evidence that she was familiar with FLSA's requirements or had expertise in advising home care organizations on how to devise and implement recordkeeping and payroll systems to ensure that live-in workers are paid for work interruptions to sleep and meal periods. Moreover, Defendant Manolias vaguely testified that Annunziata provided advice regarding the creation of the Job Description and Aide Activity Sheet #1, but failed to specify what substantive information or edits Annunziata provided. And there is no evidence in the record, such as testimony by Annunziata, emails, or draft documents showing that Annunziata leant any knowledge or expertise regarding the FLSA's requirements in that process.

Thus, Defendants' reliance on their engagement with these entities and Annunziata boils down to the position that Defendants' efforts to follow industry standards and state licensing requirements shows subjective good faith. (*See* Jury Trial Tr. 923:20; 924:1–2 (K. Manolias' testimony characterizing Sarene's practices as "industry standard").) However that is not the law. *See Elghourab v. Vista JFK, LLC*, 818 F. App'x 63, 67 (2d Cir. 2020) (summary order) (affirming district court's finding that defendant's reliance on "industry norm" was "insufficient" to meet the "heavy burden under [Section 260]" to secure reduction of liquidated damages); *SNET*, 121 F.3d at 71 ("Nor is good faith demonstrated by . . . simple conformity with industry-wide practice."); *Bowrin v. Cath. Guardian Soc.*, 417 F. Supp. 2d 449, 472–74 (S.D.N.Y. 2006) (finding insufficient defendant's claims that it "spoke with other professionals in the . . . industry about FLSA coverage" and "relied on national industry organizations" because "acting 'in accord with prevailing industry practice' is insufficient to establish a good faith defense to liquidated damages").

As discussed above, neither Defendants' consultation with Annunziata or others during the NYSDOH licensing process nor Defendant Manolias' limited consultation with the Small Business Development Center show that Defendants learned anything through these consultations about the FLSA's requirements concerning live-in aides or about how to create or implement policies and practices to maintain adequate records of hours worked and ensure that overtime was paid for work interruptions to meal or sleep periods. Defendant Manolias testified vaguely, without mentioning the FLSA, that Annunziata "helped us with the policies," "went over . . . what our response was if something happened to people in the home and then what we would do after hours and what the process was, which is also [a] DOH requirement, and . . . checked on-site, she came in and checked everything was in place before our last survey."

(Bench Trial Tr. 10:9–14.) She also testified vaguely and without credibility that an unnamed "certified business advisor" with the Small Business Development Center helped her "in creating and assuring my departments all correlated together, that communication was correct within the departments" and in going "through the processes, the policies, the procedures, including integrating the departments and also the rules of the FLSA and HR compliance, which was a large part of our policy and procedure book." (*Id*. 10:15–11:10; 14:13–15:6.) Manolias' testimony on these issues not only lacks credibility, but is vague and uncorroborated by any other evidence in the record. The record thus fails to support Defendants' contention that they "sought out the expertise of individuals and entities with specialized knowledge" in the FLSA in establishing policies and procedures related to live-in aides. (Def's Br. at 13.)

In the same vein, Defendants' contention that they attended wage and hour webinars and reviewed legal updates regarding FLSA compliance relating to live-in employees (*id*. at 14) is unsupported by the record. Both Defendant Manolias and Hofmann attended industry seminars and webinars and consulted industry organizations. (Bench Trial Tr. 39:1–8; 89:1–10; 115:8–14.) Yet, Defendant Manolias testified that she only attended "a couple" HCP webinars herself. (*Id.* 39:23–40:1.) She testified vaguely and without credibility that Doell and Brown attended HCP webinars on wage and hour issues, but that testimony is not corroborated by any other evidence in the record, not even Doell's testimony during the jury trial. (*Id.*; *see also* note 12 *supra*; Jury Trial Tr. 2754–74 (testimony of E. Doell).) Significantly, Defendants do not provide the name or date of a single "event" or "webinar"—whether hosted by HCP, SHRM, the Small Business Development Center, or any other entity—at which Defendants received "legal updates related to the industry" during the relevant period. (Defs.' Br. at 14.) Thus, the record does not show that Defendants or their staff attended any webinars or events at which they learned about

Defendants' FLSA obligations concerning live-in aides. Even if it did, however, Defendants' sparse participation in such unidentified wage-and-hour webinars and events fail to show that Defendants sought to ascertain the dictates of the FLSA as applied to live-in employees. *See Young v. Cooper Cameron Corp.*, No. 04-cv-5968, 2006 WL 1562377, at *9–10 (S.D.N.Y. June 6, 2006), *report and recommendation adopted,* 2007 WL 2809871 (S.D.N.Y. Sept. 26, 2007) (finding that "attending FLSA seminars presented by law firms, consulting 'various publications' such as legal articles and government web sites, and discussing job classifications with a human resources manager at a company whose workers perform similar job duties to the" defendant's employees is insufficient to show that defendant "undertook to apply the FLSA's requirements to the particular job at issue"). Moreover, Defendants also fail to show that they changed a single policy, document, or procedure as a result of learning *anything* about the FLSA's requirements relating to live-in aides by attending any webinar or event at any time during the relevant period.

Nor does Defendants' vague assertion that they "researched and reviewed relevant guidance and legal mandates from government agencies and legal authorities" and "closely monitor[ed] a live-in home care case" demonstrate active steps to ascertain the FLSA's requirements. (Defs.' Br. at 13.) Defendants do not describe their purported research efforts with any specificity or substantiate them with any supporting documentation. Moreover, Defendants' reliance on *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152 (N.Y. 2019), is unconvincing. *Andryeyeva* affirmed the New York State Department of Labor's ("NYSDOL") interpretation of its Miscellaneous Industries and Occupations Minimum Wage Order, which the NYSDOL found to require payment for at least 13 hours of a 24-hour shift by a live-in home care worker "if the employee is allowed a sleep break of at least 8 hours" and receives three one-hour meal breaks. 33 N.Y.3d at 164. Specifically, the NYSDOL permitted employers to exclude

"11 hours for sleep and meal breaks from compensable hours" for "employees assigned to 24-hour shifts" "when the employee *is able to take* the prescribed eight hours of sleep and three hours of meal breaks." *Id*. at 176, 182 (emphasis supplied).[13] Without addressing the FLSA, the *Andryeyeva* decision found the NYSDOL interpretation to be reasonable and in line with federal requirements. *See id*. at 180 ("It is neither unreasonable nor irrational for [NYSDOL] to interpret its Wage Order in a manner that reduces administrative burdens, such as dual-sovereign reporting and wage payment requirements, and also has the added benefit of avoiding intergovernmental conflict."). However, this decision does not specifically address the FLSA's overtime or recordkeeping requirements, such as employers' obligation under the FLSA to document all hours actually worked by employees who work 24-hour shifts. Thus, tracking this decision does not show that Defendants took sufficient steps to learn about the FLSA's recordkeeping and overtime compensation requirements related to live-in aides, such as how to identify an interruption to a meal or sleep break as a compensable interruption. Even if Defendants' mere tracking of developments in *Andryeyeva* were to constitute an "active step" to ascertain the requirements of the FLSA, *Barfield*, 537 F.3d at 151, it was wholly inadequate in consideration of the record as a whole.

[13] The NYSDOL's interpretation further provides: "If an aide does not receive five hours of uninterrupted sleep, the eight-hour sleep period exclusion is not applicable and the employee must be paid for all eight hours. Similarly, if the aide is not actually afforded three work-free hours for meals, the three-hour meal period exclusion is not applicable." *Andryeyeva*, 33 N.Y.3d at 166 (citing March 2010 NYSDOL opinion letter). In this litigation, Defendants took the position that if a live-in aide experienced an interruption to a sleep or meal break, they would only be compensated for the duration of the interruption itself—not the entire break time that was lost, which contradicts the *Andryeyeva* opinion. (Jury Trial Tr. 3058:4–3059:6.)

### B. <u>Defendants Failed to Move to Comply with the FLSA's Requirements Relating to Live-in Aide Employees</u>

Defendants point to their use of Job Description forms, timekeeping policies, and reporting procedures to show that after ascertaining the requirements of the FLSA, they took steps to comply with those requirements. (Defs.' Br. at 13.) They rely heavily on the text of the Job Description forms, which Defendants contend "mirrors the exact language of the FLSA." (*Id.*) However, the record fails to show that Defendants learned about the FLSA's requirements relating to live-in aides such that they then "move[d] to comply" with those obligations. *SNET,* 121 F.3d at 71. Moreover, their use of the Job Description forms demonstrates a lack of good faith.

#### *i. Job Description Forms and Instructions*

Defendants' use of the Job Description forms fails to show that they created and used that document in an effort to comply with their obligations under the FLSA's recordkeeping and overtime provisions. Defendants contend that they implemented "the [Job Descriptions], timekeeping policies, and reporting procedure[s] . . . to ensure that sleep and meal breaks could be excluded as non-compensable time." (Defs.' Br. at 14.) However, throughout the course of the jury trial, thirteen of Defendants' former live-in aides credibly testified about the orientation in which they were asked to sign the Job Descriptions. (*See* Factual Findings § III.B *supra*.) Their testimony shows that during the orientation, Sarene staff did not explain the contents of the Job Description, that the Job Description was included among more than a dozen other documents that staff hastily asked workers to sign just before leaving the orientation, and that workers felt rushed into signing the Job Description without understanding its contents or purpose. (*See id.*) At least ten worker witnesses credibly testified that Sarene staff provided the Job Descriptions with dozens of other documents to sign. (Jury Trial Tr. 138:22–139:14, 234:22–235:16, 609:1–7,

813:14–18, 892:7–14, 1254:2–1255:16, 1454:11–16, 1583:13–1584:2, 1888:21–1889:6, 2057:8–15.) Atta, Osei, Boakye-Boateng, and Eshun credibly testified that they were not given enough time to read the Job Description before they signed it. (*Id.* 234:22–235:16, 813:14–18, 892:7–14, 1454:11–16, 2142:23–2143:18.) Oguntunde credibly testified that she was told to sign a large number of papers, but that she was not told "to read" the documents "or do anything like that." (*Id.* 1583:13–1584:2.) Similarly, Marine credibly testified that she was not able to read all of the documents before signing them due to the sheer volume. (*Id.* 1888:21–1889:6.) Acka credibly testified that despite the text of the Job Description, she was not informed during orientation that she would be paid overtime for interruptions to her sleep breaks. (*Id.* 433:11–434:24.)

The evidence therefore shows that Sarene did not use the Job Descriptions in a good faith effort to train live-in aides about the meal and sleep breaks to which they were entitled during a 24-hour shift or how to report work interruptions to those breaks in order to receive compensation. Rather, Defendants used the Job Descriptions in a haphazard and hurried manner that left live-in aides confused and unaware of what they were signing during the rushed period at the end of orientation. Accordingly, Defendants' haphazard use of the Job Description underscores that they did not use the Job Description in a good faith effort to "act to comply with" their FLSA obligations. *Barfield*, 537 F.3d at 150.

*ii.* ***Timekeeping and Reporting Procedures***

Defendants fail to show that their timekeeping and reporting policies and procedures demonstrate an effort to comply with the FLSA's requirements. Defendants required live-in aides to complete weekly aide activity sheets to document the number of shifts worked per week. But their timekeeping and reporting procedures fail to demonstrate an effort to ensure that

Defendants were capturing work interruptions to live-in aides' sleep and meal breaks or that Defendants were properly compensating live-in aides for such work.

A review of all aide activity sheets in the record show that these documents were used to track the number of days live-in aides worked for the company's clients in a given week and certain patient care tasks—not to accurately capture hours worked or the duration of any work interruptions to sleep or meal breaks. No version of the form provides any means by which live-in aides could report the amount of time it took for them to complete each of the listed patient care tasks during each 24-hour shift. (*See* PX-7A at 2, 11, 12, 16, 18.) None of the versions of the aide activity sheets elicit any information about the exact number of hours live-in aides worked during their 24-hour shifts. (Jury Trial Tr. 549:18–25; *see also* PX-7A; PX-7C.) Nor do any versions of the aide activity sheets elicit information about the length of any work interruption to a meal or sleep break during any of the live-in aide's 24-hour shifts. (*See* PX-7A at 2, 11, 12, 16, 18.)

Moreover, Aide Activity Sheet #1—the version used for the first two years of the relevant period—contains *no instructions at all* on how to report work interruptions to meal or sleep breaks. (Jury Trial Tr. 552:21–553:7 (K. Manolias discussing PX-7A at 2).) The later iterations of the aide activity sheets that direct live-in aides to confirm that they received meal and sleep breaks still do not ask live-in aides to identify the duration of any reported interruptions. (Jury Trial Tr. 923:4–925:17; 1073:21–1077:2; 1354:1–1354:13; *see also* PX-7A at 11, 12, 16, 18.)

Aide Activity Sheet #2 asks live-in aides to answer "Yes" or "No" in response to questions about whether they received eight hours of sleep, five of which were uninterrupted and an hour for breakfast, lunch, and dinner for each 24-hour shift reported on the form. (*See* PX-7A

at 11.) However, if the answer is "No" to any of these questions, the form vaguely prompts the live-in aide to "detail what occurred and the action taken." (*Id.*) It does not ask the live-in aide to identify the amount of time spent working during that interruption or explain how to request overtime compensation.

Similarly, Aide Activity Sheets #3, #4, and #5 all include a large block of confusing text under the header "HHA/PCA Personal Care and Sleep Allotment," which provides *contradictory* instructions to live-in aides. It instructs live-in aides that "[u]ninterrupted time is defined as any time that *was spent* during designated sleep or meal times *providing hands on care* to the patient" and then also instructs them to sign the form to "acknowledge[e] that [they] received at least 5 hours of uninterrupted sleep and at least 1 uninterrupted hour each for Breakfast, Lunch and Dinner each day worked." (*See* PX-7A at 12 (emphasis added).) The contradictory use of the term "uninterrupted" obfuscates the meaning of the entire instruction. Moreover, the block text fails to direct live-in aides to report all work interruptions to meal or sleep breaks and to identify the length of any such interruptions. Accordingly, a live-in aide's signature below this block of text cannot reasonably be understood to convey that the person actually received all of their meal and sleep breaks for a given work week without interruption.

Defendants' other timekeeping and reporting procedures were either not used to report meal and sleep breaks or were consistently disregarded by Defendants. When live-in aides were briefly required to clock in and out by calling a phone number and, later by using the HHAeXchange app or phone number, the systems did not track the time live-in aides actually took to complete their tasks. (Jury Trial Tr. 1358:9–1361:6; 1733:2–1734:22.) Defendants' aide activity sheets require live-in aides to report break interruptions "in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep"

(PX-7A at 12, 16. 18) even though Defendants admittedly *disregarded* reports of break interruptions made through the mobile app or IVR. (Jury Trial Tr. 1733:10–1736:4; 1741:7–25.) Furthermore, when confronted with aide activity sheets, HHAeXchange entries, call logs, and Skype messages, which showed live-in aides reporting interruptions to their meal and sleep breaks and corresponding payroll records for the relevant pay periods, Defendant Manolias, Kristi Manolias, and Tyler Stauber repeatedly admitted that not one of the live-in aides at issue was paid for an interrupted break. (*See* Jury Trial Tr. 935:19–939:24; 1606:22–1625:24; 1631:17–1635:15; 1725:5–1729:1; 1729:2–1732:15; 2228:4–19; 2229:10–21; 2234:4–2243:4; 2298:8–2304:18.)

Moreover, as detailed above, during the relevant period, Sarene did not have an actual practice of investigating live-in aides' reports of interruptions to their sleep and meal breaks and paying overtime compensation for those interruptions. (*See* Factual Findings § IV.B.) Doell and Laper-Ifferte's testimony that Defendants had such a policy is flatly contradicted by: (1) credible testimony by Daniels, Kareem, Boakye-Boateng, Donaldson, Atta, Eshun, Sanders, and Harvey that they reported work interruptions to meal and sleep breaks but were not paid overtime for such work; and (2) documentary evidence and witness testimony showing that not one of the live-in aides who reported interruptions to sleep or meal breaks as documented on aide activity sheets, HHAeXchange entries, call logs, and Skype messages in the record during the relevant time period were paid overtime for even one reported interruption. (*Id.* § IV.B.i.) Rather, the principal focus of any inquiry by Defendants into a live-in aide's unusual markings on an aide activity sheet or call to management concerning a missed sleep or meal break was to determine whether the patient was experiencing a clinical problem—not whether the live-in aide had

performed work during the break that merited overtime compensation or to ensure that the live-in aide was paid.

#### *iii. **Defendants Failed to Take Specific Steps to Comply with the FLSA After Consulting with Various Persons and Entities***

Defendants failed to show that they took any steps to comply with their FLSA obligations relating to live-in aides after engaging in the various consultations through which they purportedly sought to ascertain the FLSA's requirements.

First, Defendants' consultation with Annunziata is insufficient for several reasons. While Defendant Manolias testified that she developed the Job Description and Aide Activity Sheet #1 in consultation with Annunziata, Manolias does not identify any advice given by Annunziata with respect to the creation or use of these documents, or how Sarene would train live-in aides on these documents. As established previously, Sarene staff did not explain the contents of the Job Description to live-in aides or give them adequate time to read the document before hastily asking them to sign the Job Description along with dozens of other onboarding documents at the end of the orientation. (Findings of Fact § III.B.) The other document that Annunziata helped develop—Aide Activity Sheet #1—is wholly deficient for the purposes of ensuring compliance with FLSA's recordkeeping or overtime requirements, for reasons already stated above. (*Id.* § IV; Conclusions of Law I.B.ii.) Finally, while Defendant Manolias testified vaguely that she consulted Annunziata to create "policies and procedures" in connection with the expanded NYSDOH license process, Defendants do not identify any specific policy or procedure developed—or even considered—as a result of Annunziata's guidance to ensure that Defendants kept records of live-in aides' hours worked or that live-in aides understood their rights to uninterrupted sleep and meal breaks under the FLSA and how to report interruptions so that they would be paid overtime wages. (*See* Bench Trial Tr. 9:24–10:14.) Similarly, nothing in the

record indicates that, as a result of the consultation with unnamed "certified business advisors" with the Small Business Development Center, Defendants in fact learned about their FLSA obligations and moved to comply with those requirements. (*See id.* 10:15–11:10; 14:13–15:6.)

Second, Manolias did not provide a single example of an instance in which she or *any* Sarene staff member sought, received, or used legal advice of any kind from Poricanin, much less legal advice relating to the FLSA's requirements concerning live-in aide employees. (*See id.* 39:10–41:22; 49:10–50:4; 89:23–90:15; 101:21–102:3.) Defendants also fail to show that they changed a single policy, document, or procedure as a result of learning *anything* about the FLSA's requirements relating to live-in aides by attending any webinar or event at any time during the relevant period.

Third, Defendants' retention of Hofmann as Sarene's director of operations and human resources from January 2018 through December 2019 did not advance any effort by Defendants to take steps to comply with the FLSA's recordkeeping and overtime requirements relating to live-in aides. Hofmann was not involved in Defendants' timekeeping, recordkeeping, and payroll practices at issue in this case. He could not recall "having any direct conversations about" compensation for a single live-in aide, "did not see any of the time cards for aides," was not involved in the handling of payments to live-in aides, and was "not aware if anything was not being done correctly" with respect to compensating them. (*Id.* 116:24–117:8.)

The only relevant actions that Hofmann took were to add the "HHA/PCA Personal Care and Sleep Allotment" section to Aide Activity Sheet #2 in around April 2019 and to Aide Activity Sheet #3 in around October 2019. (*Id.* 118:6–121:5.) However, as addressed at length, the "HHA/PCA Personal Care and Sleep Allotment" section of Aide Activity Sheets #2 and #3, the latter of which was retained in Aide Activity Sheets #4 and #5, plainly fail to elicit

information about when any work interruptions to sleep or meal breaks occurred and the length of such interruptions so as to ensure that Defendants recorded and compensated workers for this time.

Fourth, other than Hofmann's revision of the aide activity sheets starting in around April 2019, Defendants did not take any specific actions relating to recordkeeping or overtime compensation for live-in aides following the New York Court of Appeals decision in *Andryeyeva* on March 26, 2019. However, for the reasons already discussed, Hofmann's addition of an "HHA/PCA Personal Care and Sleep Allotment" section to Aide Activity Sheets #2, #3, #4, and #5 did not foster Defendants' compliance with their FLSA obligations to record live-in aides' actual hours worked or to pay overtime wages to these workers for work interruptions to meal and sleep breaks. Rather, his confusing and deficient changes to the forms further obfuscated for live-in aides how to report such interruptions to Sarene staff so that they could be paid. Thus, Defendants did not "move to comply" with their FLSA obligations relating to live-in aides through Hofmann's work to produce Aide Activity Sheets #2 and #3. *SNET*, 121 F.3d at 71.

* * *

For all of these reasons, Defendants have failed to show that they took active steps to ascertain the dictates of the FLSA with respect to recordkeeping and overtime compensation for live-in aides and moved to comply with such obligations. Accordingly, Defendants have failed to establish the subjective good faith required to reduce liquidated damages under Section 260. *Barfield*, 537 F.3d at 150 (quoting *Herman*, 172 F.3d at 142); *see also SNET*, 121 F.3d at 71.

## II. Defendants Failed to Act with Objective Reasonableness

In addition to demonstrating subjective good faith, an employer must also show that it acted with objective reasonableness in the conduct that led to its violation of the FLSA in order

to secure a reduction of liquidated damages under Section 260. *SNET*, 121 F.3d at 70–71; *see also Barfield*, 537 F.3d at 150 (requiring employer to show "reasonable grounds for believing that his act or omission was not a violation of the [FLSA]"). An employer fails to show objective reasonableness when it "recklessly disregarded the possibility that [it was] violating the FLSA." *Herman*, 172 F. 141–43.

Defendants' conduct was not objectively reasonable for three reasons. First, Defendants emphasized the importance that live-in aides meet patient needs at all times without using objectively reasonable systems for capturing the hours worked by these workers, including work interruptions to sleep and meal breaks. Second, Defendants' failure to implement any procedures for investigating reports by live-in aides of work performed during sleep and meal breaks to ensure live-in aides were compensated for such work during the relevant period was objectively unreasonable. Third, Defendants' failure to seek legal guidance to ensure that Sarene's practices were FLSA-compliant was objectively unreasonable. Finally, Defendants' arguments seeking to show that their conduct was objectively reasonable are unpersuasive as explained below.

### A. Defendants' Recordkeeping System Was Objectively Unreasonable

Defendants had no objectively reasonable basis to believe that the recordkeeping systems used during the relevant period—including aide activity sheets—captured live-in aides' hours worked, including the duration of work interruptions to meal and sleep breaks. Defendants' policies and training emphasized the importance of live-in aides' patient care responsibilities. For example, Sarene's worker witnesses credibly testified that patient care was the focus of orientation. (Findings of Fact § III.B.) Defendants' policies made live-in aides "responsible for the well-being of the patient at all hours." (Jury Trial Tr. 543:14–17 (quoting PX-10); 2213:13–16.) Defendants' policies emphasized that live-in aides could not leave a patient alone and

unattended under any circumstances and could even face termination if they left a patient unattended. (*Id*. 543:20–23; 545:16–20; 546:6–17.) Defendants even required some live-in aides to turn and position their patients every two hours. (*See id*. at 549:12–17 (reviewing PX-7C at 2).)

Despite placing these responsibilities on live-in aides, Defendants' aide activity sheets, supervision, and IVR and HHAeXchange systems were wholly inadequate to track the actual hours worked by live-in aides, a necessary prerequisite to ensuring that Sarene was compensating live-in aides for hours worked, including work performed during sleep and meal periods. This is established not just by the ample evidence about how these systems operated in practice, but also by the fact that Sarene never made a single payment of overtime wages to any of its more than 500 live-in aide employees for work done to meet patient needs during a meal or sleep break at any time from March 19, 2017 through December 31, 2020.

As addressed at length, during the first *two years* of the relevant period—more than half of the entire time at issue—the only timesheet used by Sarene to capture live-in aides' time was Aide Activity Sheet #1—a form that does not elicit any information from live-in aides about interruptions to a meal or sleep break. (*See* PX-7A at 2.) Defendants required live-in aides to use this form in which the "TIME IN" and "TIME OUT" fields were completed to say "LIVE-IN" or to provide a 24-hour time range (e.g., "9 a.m. to 9 a.m.") or otherwise did not identify the exact hours worked by the live-in aide during those 24-hour shifts. (Findings of Fact § II.B.) Accordingly, the only reasonable conclusion is that the purpose of these forms was to document the number of 24-hour shifts completed by the live-in aide in a given week—not to capture the number of hours worked during a 24-hour shift, much less any work interruptions to meal and sleep breaks that merited compensation with overtime pay. Use of this form was objectively

unreasonable, notwithstanding Defendants' contention that live-in aides received some instruction on the use of this form during their orientation.

During the remainder of the relevant period, from April 2019 through December 2020, Defendants used versions of the aide activity sheet that also fail to provide an objectively reasonable basis for Defendants to believe that they were capturing all interruptions to live-in aides' sleep and meal breaks. While Aide Activity Sheet #2 includes a section on "HHA/PCA Personal Care and Sleep Allotment," it still fails to provide *any instruction* about where or how to record on the form, or anywhere else, the length of time worked during a sleep or meal break or the number of such interruptions. Instead, the form only vaguely asks live-in aides to "detail what occurred and action taken" if they did not receive "8 hours of sleep, 5 of which were uninterrupted" or "an hour" for breakfast, lunch, or dinner. (*See* PX-7A at 11.)

Aide Activity Sheets #3, #4, and #5, all include an "HHA/PCA Personal Care and Sleep Allotment" section, but still fail to instruct live-in aides about where or how to record on the form or anywhere else the duration of any work interruption to a sleep or meal break. All of these forms use a confusing and contradictory definition of "uninterrupted" time—at one point using the term to refer to actual interruptions to a break and then using it to convey the exact opposite. (*See* PX-7A at 12, 16, 18.) Moreover, reliance on these forms to capture live-in aides' work time is objectively unreasonable because they instruct live-in aides that "[i]f you did not receive *uninterrupted* time as outlined above, you must record it in the mobile app or IVR system from the patient's home phone using the call-in code 444 for meals or 555 for sleep" (PX-7A at 12, 16, 18), despite the fact that Defendants never checked those systems to determine whether live-in aides reported a work interruption to a meal or sleep break. (Jury Trial Tr. 1733:10–1734:22.)

Accordingly, Defendants' reliance on Aide Activity Sheets #1 through #5 to conclude that live-in aides simply never experienced and never reported any work-related interruptions to their sleep and meal breaks during the relevant period was objectively unreasonable. Although Defendants assert that there is no requirement that timesheets capture the precise time when a sleep or meal break is interrupted (Defs.' Br. at 19), that argument is simply inapposite here where none of the aide activity sheets elicit or seek to capture the *duration* of any work interruptions to meal or sleep breaks experienced by live-in aides during the relevant period.

Defendants contend that because live-in aides work in private homes and interruptions to meal and/or sleep breaks are "neither expected nor scheduled," it was objectively reasonable for them to rely on workers to report all interruptions to those breaks in light of Defendants' recordkeeping "policies and procedures." (Defs.' Br. at 19–20.) This conclusion is belied by the factual record. The aide activity sheets that live-in aides were required to complete are deficient and confusing, failing to explain how to report work interruptions to sleep and meal periods and to elicit the duration of any interruptions for all of the reasons described at length. Moreover, any efforts by Defendants to train live-in aides on how to complete these forms is undermined by the face of the forms themselves, which did not elicit *any* information about interruptions to meal and sleep breaks (Aide Activity Sheet #1) and/or did not elicit information about the duration of any such interruptions (all aide activity sheets), used confusing and contradictory text in order to secure statements that workers experienced no interruptions to their breaks (Aide Activity Sheets #3, #4, #5), and falsely directed workers to report interruptions using electronic systems that

Defendants never consulted (Aide Activity Sheets #3, #4, #5; Trial Tr. at 1733:10–1734:2; 1736:5–1738:6, 1741:7-25).[14]

Defendants' contention that Aide Activity Sheets #2 through #5 brought greater "clarity" to the already clear instruction in Aide Activity Sheet #1, that live-in aides were to report all compensable time on these documents, including work interruptions to sleep and meal periods, is squarely contradicted by the face of the documents. (Defs.' Br. at 20.) Moreover, Defendants entirely miss the point by arguing that the majority of aide activity sheets and call logs do not show that live-in aides experienced interruptions to sleep and meal breaks during the relevant period. (*See* Defs.' Br. at 22.) The aide activity sheets simply did not and could not elicit such information because they sought to capture shifts rather than hours worked, used confusing and contradictory text, and instructed live-in aides to use electronic systems to report interruptions when Defendants never consulted such systems for that information. Furthermore, Defendants' former live-in aides credibly testified at trial that they were confused about Defendants' directives, particularly because when they reported interruptions to Sarene, they were neither paid for the time reported nor provided a respite aide so that they could take their sleep breaks. (Factual Findings IV.B.i.)

The FLSA requires Defendants to keep records of all hours worked by their live-in aides. 29 U.S.C. § 211(c). It was objectively unreasonable for Defendants to believe that their systems for recording the hours worked by live-in aides during the relevant time period complied with the FLSA. *See SNET*, 892 F. Supp. at 403-405 (finding employer's actions objectively unreasonable

[14] Accordingly, testimony by Laper-Ifferte and Sirio that the live-in aide orientation addressed how to complete aide activity sheets (Jury Tr. 2994:21–25 (Laper-Ifferte), 2790:16–2791:12 (Sirio)) is undermined by the face of the forms themselves.

where the employer failed to track workers' time but required work during unpaid lunch periods). Because Defendants' timekeeping policies did not allow for the complete and accurate recording of all time worked, Defendants' reliance on *DeSilva v. N. Shore-Long Island Jewish Health System*, 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) is inapposite.

### B. **<u>Defendants Failed to Investigate Live-In Aides' Reports of Work During Sleep and Meal Breaks</u>**

Defendants' failure to implement any procedures for investigating reports by live-in aides of work performed during sleep and meal breaks to ensure proper compensation for compensable work was objectively unreasonable. Defendants did not have an actual policy and practice of investigating live-in aides' reports of interruptions to meal and sleep breaks in order to pay them overtime for compensable interruptions. Rather, Defendants failed to investigate such reports, whether made on aide activity sheets, through calls to supervisors and the after-hours line, or elsewhere. *See* Factual Findings § IV.B. *supra*. Moreover, when they did investigate such reports, the principal focus was to determine whether the patient had a clinical issue—not to ensure that live-in aides were paid for work performed during meal or sleep breaks.

During the jury trial, Irene Manolias, Kristi Manolias, and Tyler Stauber were shown aide activity sheets, HHAeXchange, call logs, and Skype messages, which contained live-in aides' reports of interruptions to their meal and sleep time breaks, as well as the corresponding payroll records. *See id*. Each time they conceded that the payroll records show the live-in aide who reported the interruption was not paid any additional compensation for the interruption. *See id*. During the bench trial, Defendants failed to provide any evidence that Sarene's payroll or nursing departments actually investigated a single instance in which a live-in aide reported an interruption to a meal or sleep break during the nearly four-year-long relevant period (March 19,

2017 through December 31, 2020). (*See, e.g.*, Bench Trial Tr. 102:24–109:20 (I. Manolias testimony regarding payroll procedures); Factual Findings § IV.B *supra.*)

This failure is particularly striking in light of the credible testimony by former live-in aides Daniels, Kareem, Boakye-Boateng, Donaldson, Atta, Eshun, Sanders, and Harvey that they called Sarene care coordinators or the after hours call-in service to report work interruptions to meal and sleep breaks, but were not paid overtime for such work. (*See* Factual Findings IV.B.i.) Moreover, none of these workers testified that any Sarene staff person from the nursing, payroll, or staffing departments followed up with them to determine whether they should be compensated for the interruptions to their breaks. (*See* Jury Trial Tr. 520:12–527:16 (Robert Daniels credibly testifying that he reported meal and sleep interruptions to his Sarene coordinator, who was "not there," and was never paid overtime), 600:9–11 (Taibat Kareem credibly testifying that she reported sleep period interruptions to Sarene staff and was told that someone would follow up, which never happened despite the numerous messages she left), 1487:22–1488:5 (Abigail Boakye-Boateng credibly testifying that she could not reach anyone at Sarene when she called to report interruptions to sleep breaks), 2122:22–2125:15 (Helen Eshun credibly testifying that she called Sarene to report that she spent the night at the hospital during her patient's medical emergency and was instructed to leave the hospital, but never compensated).

Defendants contend that not all reported interruptions were compensable because a live-in aide could have taken their full meal or sleep break *at another time* during their 24-hour shift, and Defendants purportedly had policies and procedures which "allow[ed]" them "to determine if the report of an interruption was compensable." (Defs.' Br. at 23–24.) There is no dispute that an employers' investigation of individual reports of work interruptions to sleep and meal periods could be part of a reasonable procedure for vetting reported interruptions and ensuring that

workers receive compensation required under the FLSA. However, the record here shows that Defendants simply never engaged in any investigation of break interruptions for the purpose of determining overtime compensation for any live-in aides. Rather, the record shows that to the extent that this outreach actually occurred during the relevant time period, Defendants' nursing staff may have followed up with the live-in aide to determine whether an interruption to a sleep or meal period signaled a clinical issue with the patient, but the focus was determining patient needs—not compensating live-in aides for their overtime work. (Factual Findings § IV.B.iv.) As a practical matter, Sarene concluded that not a single live-in aide *ever* merited overtime pay for care provided to a patient during a sleep or meal period at any point during a nearly four-year period—not even Helen Eshun, who stayed with her patient overnight at the hospital in order to ensure that the patient received emergency care. (Jury Trial Tr. 2122:22–2125:15.) Eshun called Sarene to report that she did not get a sleep break, and then never received any follow-up about her experience or overtime pay for the hours she did not sleep. (*Id.*) Her experience is just one example of Defendants' failure to investigate.

Accordingly, Defendants maintained an objectively unreasonable practice of failing to investigate when live-in aides did report interruptions to meal and sleep breaks through a variety of mechanisms, including calls to Sarene staff and the after hours line and through aide activity sheets.

### C. <u>Failure to Seek Legal Guidance</u>

Defendants' failure to seek legal guidance to ascertain the law and take steps to ensure that Sarene's practices were FLSA-compliant was objectively unreasonable. At the bench trial, Defendants did not provide any evidence about measures implemented in response to *legal*

guidance about FLSA compliance. (*See* Bench Trial Tr. 39:10–41:22; 49:10–50:4; 89:23–90:15; 99:19–100:6; 101:21–102:3.)

Defendants failed to employ any legal counsel prior to 2019 or 2020, near the end of the relevant period, when Sarene hired Emina Poricanin as outside counsel. (Bench Trial Tr. 41:13–23.) Yet, Defendants fail to show that Poricanin provided any legal advice about labor issues, much less FLSA requirements relating to live-in aides or procedures to comply with those requirements. While Defendants hired Ira Podlofsky in 2018, Podlofsky did not specialize in labor issues; was not consulted about issues related to employee pay, timekeeping, or recordkeeping; and had his bar license suspended in October 2018, just before Sarene hired him. (*Id*. 90:19–22, 99:9–100:3.)

Moreover, Hofmann, who served as Sarene's director of operations and director of human resources from January 2018 through December 2019 (only two years of the relevant period) and helped revise the aide activity sheets, is not an attorney and had no experience in FLSA requirements for home care workers prior to starting at Sarene. (*Id*. 41:24–42:19; 112:23–113:8.) He did not consult with any lawyers at all, much less on FLSA compliance or any compensation, timekeeping, or recordkeeping issues relating to live-in aides, and testified only vaguely about consulting unidentified government websites to review publicly available materials relating to wage and hour laws. (*Id*. 115:6–9, 123:3–13, 124:1–9, 125:6–126:1.)

While Defendant Manolias testified about Annunziata's "expertise working with the Department of Health," Annunziata is not an attorney and it was objectively unreasonable for Sarene to believe that her advice could be substituted for that of an attorney in creating the Job Description, a document self-identified as an "agreement" between Sarene and each of its live-in aide employees, which Defendants required these workers to sign before assigning them to a

patient. (*Id*. 14:18–20.) Any guidance given by Annunziata to Defendant Manolias in development of the Job Description was not legal guidance on FLSA's requirements or how to implement procedures to comply with such requirements.

Defendants' failure to seek legal advice from an attorney with knowledge of the FLSA at any time during the entire relevant period was objectively unreasonable.

### D. Defendants' Remaining Arguments are Unavailing

Defendants make two additional arguments as to why their actions were objectively reasonable. Neither are persuasive.

First, Defendants argue that, because the majority of aide activity sheets completed by live-in aides and logs of calls from live-in aides to Sarene staff during the relevant period purportedly do not show interruptions to sleep and meal breaks, it was objectively reasonable for them to conclude that live-in aides were not experiencing interruptions to their breaks. (Defs.' Br. at 22.) However, because Defendants employed an objectively unreasonable system for recording live-in aides' time, including deficient and confusing forms, their reliance on the purported absence of reports of interruptions to sleep and meal breaks on aide activity sheets is unavailing.

Second, Defendants argue that the text of the FLSA and its implementing regulation, 29 C.F.R. § 785.22, "permits some interruption to sleep periods provided that the employee still receives no fewer than five hours of uninterrupted sleep and up to eight hours of sleep time." (*Id.* at 24.) Defendants argue that even if this interpretation of the FLSA is incorrect, it is objectively reasonable, and that courts in the Second Circuit do not construe 29 C.F.R. § 785.22 to require the sleeping period for a live-in employee to take place during the same eight recurring hours during each 24-hour shift. (*Id.* at 24–25.) However, this argument also fails in light of the

specific facts in the record before this Court. Defendants had no system in place to determine whether an interruption to a live-in aide's sleep break was covered by extra sleep time later during their 24-hour shift because no version of the aide activity sheets elicits such information or instructs live-in aides to provide such specificity in their reports and because no Sarene staff ever investigated a reported interruption and made such precise determinations. Again, no evidence in the record—whether credible witness testimony or documentary evidence—shows that Defendants ever investigated a single instance in which a live-in aide reported an interruption to a sleep or meal break during the relevant time period with the goal of determining whether the time was compensable. And no evidence in the record—whether credible witness testimony or documentary evidence—shows that Defendants ever provided a single instance of overtime compensation to a live-in aide for work performed during a meal or sleep break at any time during the relevant time period. Yet, ample evidence in the record shows that live-in aides attempted to report interruptions through calls to supervisors (*see, e.g.*, Jury Trial Tr. 520:12–527:16), on their aide activity sheets (*see, e.g.*, *id*. 2228:4–19), through after-hours calls to Sarene (*see, e.g.*, *id*. 1634:6–14), and through the HHAeXchange system (*see, e.g.*, *id*. 1725:5–1732:15).

Accordingly, the record fails to show that Defendants had any objectively reasonable grounds for believing that they were in compliance with the FLSA's overtime and recordkeeping requirements relating to their live-in aide employees at any time from March 19, 2017 through December 2020. Defendants' good faith defense against the imposition of liquidated damages under Section 260 thus fails for this separate and independent reason, even if the record were to show that Defendants demonstrated subjective good faith through any active steps to ascertain the FLSA's requirements and to comply with those obligations. 29 U.S.C. § 260.

## CONCLUSION

For the reasons set forth above in this Opinion & Order, Defendants do not merit a reduction in liquidated damages pursuant to 29 U.S.C. § 260. Accordingly, Defendants must pay an amount equal to the back wages of $5,293,437.55 in liquidated damages for a total of $10,586,875.10. The parties shall meet and confer and jointly propose by February 25, 2026, the terms of a judgment for entry by the Court.

Dated: Central Islip, New York
February 18, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge